IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

ALTAMAHA RIVERKEEPER and ONE
HUNDRED MILES

      Plaintiffs,

      v.

THE UNITED STATES ARMY CORPS OF
ENGINEERS, Lieutenant General TODD T.
SEMONITE, in his official capacity as
Commanding General of the U.S. Army Corps
of Engineers, Colonel DANIEL HIBNER in
his official capacity as District Commander of
the Savannah District, and TUNIS
McELWAIN, in his official capacity as Chief
of the Regulatory Branch of the U.S. Army
Corps of Engineers,

      Defendants.

Docket No. **C V 4 1 8 - 2 5 1**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    This is an action under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*, challenging the United States Army Corps of Engineers' (the Corps) issuance of Permit Number SAS-2015-00742 (the Permit) pursuant to Section 404 of the Clean Water Act and of the accompanying Environmental Assessment and Finding of No Significant Impact (EA/FONSI)[1] under the National Environmental Policy Act (NEPA).

2.    The Permit allows Sea Island Acquisition, LLC to construct a new T-head groin in front of Sea Island Acquisition's newest development, the Reserve at Sea Island; to dredge between 1,315,000 to 2,500,000 cubic yards of sand from an offshore source; and to renourish more than 17,000 linear feet of beach on Sea Island.

---

[1] The Corps refers to FONSIs as "Statements of Findings."

3.    This action seeks a declaration that the EA/FONSI and Permit are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A). This action also seeks an order vacating and enjoining reliance on the EA/FONSI and the Permit, enjoining construction of the groin pending this court's consideration of the legality of the environmental reviews challenged in this action, and requiring the removal of any portion of the groin built during this litigation and the restoration of any affected shoreline. A motion for a preliminary injunction has been filed contemporaneously with this Complaint.

## JURISDICTION AND VENUE

4.    This action arises under NEPA, 42 U.S.C. §§ 4321 *et seq.*, the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, and the APA, 5 U.S.C. §§ 701*et seq.*

5.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and may issue declaratory and other relief pursuant to 28 U.S.C. §§ 2201–02.

6.    One Hundred Miles (OHM) and Altamaha Riverkeeper (the Riverkeeper) (collectively, the Conservation Groups) are entitled to bring this action under the APA, 5 U.S.C. §§ 701–706.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events giving rise to the Conservation Groups' claims occurred in this district.

## PARTIES

8.    OHM is a not-for-profit organization headquartered in Brunswick, Georgia. OHM's mission is to protect, preserve, and enhance Georgia's 100-mile coast, including the portion of the Sea Island adversely affected by the issuance of the Permit.

2

9.      OHM also works to promote sustainable use of the coast for recreational, educational, scientific, aesthetic, and other uses by OHM's members and the public by advocating and communicating with citizens, business owners, community leaders, environmental scientists, and policy makers to improve policies and practices affecting Georgia's coast.

10.     OHM has members that use and enjoy the areas affected by the Permit. For example, OHM members who live on and visit St. Simon's Island and Sea Island regularly walk, bird-watch, paddle, and enjoy the natural setting on the Sea Island Spit.

11.     OHM and its members have participated and continue to participate in efforts to protect the Sea Island Spit and the wildlife that reside there, including federally protected species such as the Loggerhead Sea Turtle, the Piping Plover, and the Red Knot.

12.     OHM's members will continue to maintain an interest in these species and areas in the future.

13.     Additionally, OHM and its members and staff have an interest in ensuring that the Corps complies with all applicable laws, including the substantive, procedural, and informational provisions of NEPA, the Clean Water Act, and the Endangered Species Act.

14.     OHM's members are harmed by Defendants' actions, which will damage the Sea Island Spit, unreasonably interfere with access to and use of the public tidelands, and destroy habitat for federally listed sea turtles, piping plovers, and red knots.

15.     Altamaha Riverkeeper is a not-for-profit corporation with its principal place of business in Macon, Georgia, and a coastal office in Darien, Georgia.  The Riverkeeper is dedicated to the protection, defense, and restoration of the Altamaha River and its watershed.

3

The Riverkeeper furthers its mission through public education, advocacy, and, litigation. The Riverkeeper is frequently involved in the public comment process, including for the Permit at issue in this case.

16.     The Riverkeeper has approximately 500 members. Like OHM, the Riverkeeper has members that use and enjoy the areas affected by the Permit for recreation and business.

17.     The Riverkeeper and its members have participated and continue to participate in efforts to protect the Sea Island Spit and the wildlife that reside there, including federally protected species such as the Loggerhead Sea Turtle, the Piping Plover, and the Red Knot.

18.     The Riverkeeper and its members will continue to maintain an interest in these species and areas in the future.

19.     Like OHM, the Riverkeeper also has an interest in ensuring that the Corps complies with all applicable laws, including NEPA and the Clean Water Act.

20.     These harms would be redressed by an order from this Court setting aside the EA/FONSI and the Permit.

21.     Defendant U.S. Army Corps of Engineers is an agency within the United States Department of Defense charged with regulating construction in the waters of the United States. The Savannah District of the Corps is responsible for implementing Section 404 of the Clean Water Act in Georgia.

22.     Lieutenant General Todd Semonite is the current Commanding General of the U.S. Army Corps of Engineers. Lieutenant General Semonite is sued in his official capacity.

23.     Colonel Daniel Hibner is the current District Commander at the Savannah District

Office. The Savannah District Commander was responsible for signing the Record of Decision

and issuing the permit being challenged. Colonel Hibner is sued in his official capacity.

24.     Tunis McElwain is the Chief of the Regulatory Branch of the U.S. Army Corps of

Engineers. McElwain is sued in his official capacity.

## FACTUAL AND PROCEDURAL BACKGROUND

25.     Sea Island is a barrier island along the Georgia coast that is approximately four

and a half miles long.

26.     The southern portion of the island contains a fragile, undeveloped area called the

Spit that provides significant habitat for state and federally protected sea turtles, shorebirds, and

other species.

27.     The Spit, which is largely protected by a conservation easement, is also a popular

recreation area. Both residents and tourists frequently visit the public areas of the Spit below the

mean high water line to paddle, surf, bird-watch, and walk.

28.     Sea Island Acquisition, a private resort and real estate development company,

desires to build a new development called the Reserve on the north end of the Spit north of the

conservation easement boundary.

29.     On October 9, 2015, Sea Island Acquisition filed an application seeking

permission to construct a T-head groin immediately south of the proposed Reserve Development.

The application also sought authorization to construct dunes and renourish the 1,200 feet of

beach between an existing groin and the proposed groin.

30.     According to Sea Island, the purpose of the proposed T-head groin is "to stabilize

the eroding beach" in front of the proposed Reserve Development.

31.     Currently, however, there are no houses located in the proposed development, and no lots have been sold. In other words, no existing structures are threatened by the beach erosion the proposed project seeks to avoid. Instead, the intent of the project is to protect unbuilt real estate.

*Background on Groins*

32.     A groin is a hard structure, often constructed of rock or steel, that is built perpendicular to a beach. Its purpose, by definition, is to trap or block sand on the "updrift" side of the groin that would otherwise naturally move with the prevailing currents along the shoreline to the "downdrift" side of the groin. As this occurs, the beach downdrift of the groin retreats or erodes.

33.     In a very real sense, the groin starves the downdrift beach of sand by eliminating the updrift sand supply. This phenomenon is shown in the photograph below, which shows an existing groin on Sea Island. (The Reserve is located just south of the South Groin.)



6

34.     The negative impacts of groins are widely recognized.

35.     In addition to causing accelerated downdrift erosion, groins also have negative impacts to wildlife, especially federally threatened sea turtles.

36.     The T-head portion of a groin can inhibit nesting females from reaching the beach or act as a barrier to hatchlings as they attempt to migrate to the ocean.

37.     Hatchlings can also become physically trapped in the groin itself or be killed by predators that are more concentrated near the structure.

38.     In addition, because they cause accelerated erosion, groins can reduce important habitat for sea turtles, shorebirds, and other wildlife.

39.     Because of these negative effects, the Corps' own Coastal Engineering Manual recognizes that "[c]oastal zone management policy in many countries and the United States presently discourages the use of groins for shore protection." USACE Coastal Engineering Manual at V-3-61.

40.     Instead, over the past decade coastal engineers have shown a near universal preference for beach nourishment without a groin over similar projects with a groin or other stabilization structure.

41.     In the southeast United States, for example, there have been 139 beach nourishment projects over the past ten years. Of those 139 projects, *only five* have involved a groin.

*Public and Agency Opposition to the Groin*

42.     Because the proposed groin would harm the Spit, public opposition to the project has been overwhelming.

7

43.     During the initial public comment period, the Corps received comments from 197 separate individuals or organizations. Of those 197 commenters, 194 opposed the project.

44.     Of the nine commenters who live on Sea Island, seven opposed the project.

45.     In addition to the federal comments, nearly one hundred individuals and organizations, including federal and state agencies, submitted comments to the Georgia Department of Natural Resources Coastal Resources Division (CRD) opposing the project.

46.     For example, the Georgia Department of Natural Resources Wildlife Resources Division's Nongame Conservation Section (WRD) submitted written comments explaining that "[t]he construction of the T-head groin will result in the loss of sea turtle nesting habitat and will interfere with the conservation of sea turtle populations in Georgia."

47.     Similarly, the United States Fish and Wildlife Service (USFWS) submitted comments to the state opposing the construction of the groin, advising, "We recommend denial of the permit. Construction of another groin will have negative impacts to sea turtles and have possible adverse impacts to the Sea Island spit which is utilized habitat for federally listed shorebirds and sea turtles."

*Consultation with the National Marine Fisheries Service and the Fish and Wildlife Service*

48.     After the initial application, the U.S. Fish and Wildlife Service determined that at least eleven endangered or threatened species and two critical habitats could be impacted by the proposed project—the Leatherback Sea Turtle (endangered), the Loggerhead Sea Turtle (threatened), the North Atlantic Right Whale (endangered, critical habitat), the Piping Plover (endangered, critical habitat), the Atlantic Sturgeon (endangered), the Shortnose Sturgeon

8

(endangered), the Red Knot (threatened), the Wood Stork (threatened), the West Indian Manatee (endangered), the Eastern Indigo Snake (threatened), and the Gopher Tortoise (candidate).

49.     Sea Island Acquisition prepared a biological assessment to weigh the risks to these species.

50.     Sea Island Acquisition's biological assessment concluded that the proposed project "may affect, but [was] not likely to adversely affect" threatened and endangered species.

51.     In many cases, Sea Island Acquisition's determination was based in part on the fact that "no offshore borrow areas are proposed." *See* Biol. Assessment (Oct. 2015) at 23-24.

52.     In other cases, the determination was based on the fact that "[t]he project is of limited size—1,200 feet in length, a maximum of 120,000 yd$^3$ of sand…." *See* Biol. Assessment at 1.

53.     Ultimately, the US Fish and Wildlife Service and the National Marine Fisheries Service (NMFS) concurred with the applicant's initial effects determination on the 1,200 foot part of the project, despite acknowledging that the project would harm important habitat.

*Sea Island Acquisition's Revised Permit Application*

54.     Following the initial notice and comment period, two major hurricanes, Matthew and Irma, caused substantial damage to Sea Island.

55.     Among other things, the storms severely eroded the beach face and many of the frontal dunes on the Spit.

56.     The storms also damaged the main reach of the Sea Island beach, stripping much of the sand from between the existing groins.

9

57.    In light of these impacts, on March 6, 2018, Sea Island Acquisition submitted an addendum to its October 2015 permit application, seeking authorization (1) to construct the new T-head groin on the Spit; (2) to dredge between 1,315,000 to 2,500,000 cubic yards of sand from an offshore source; and (3) to renourish more than 17,000 feet of beach on Sea Island.

58.    The addendum proposed using a hydraulic cutterhead dredge to retrieve substantial amounts of sand from offshore—well over 100,000 dump trucks worth—since Sea Island Acquisition now needed too much sand to use an onshore source as previously proposed.

59.    The addendum also included a plan to perform periodic sand transfers within Sea Island via land-based equipment.

60.    Because the changes proposed in the March 2018 addendum were substantial, the Corps issued a new public notice, and the Conservation Groups again submitted comments opposing the proposed project.

61.    Among other things, the Conservation Groups noted that neither the October 2015 application nor the March 2018 addendum adequately considered the direct, indirect, or cumulative impacts of the proposed projects.

62.    In addition, neither the October 2015 application nor the March 2018 addendum adequately considered less environmentally damaging, practicable alternatives.

63.    For example, Sea Island Acquisition summarily dismissed nourishment without a groin as a practicable alternative, even though this option has been chosen by coastal engineers in over 96% of similar projects in the Southeast over the last decade.

10

*The Supplemental Biological Assessment*

64.     Because the March 2018 addendum increased the length of the project from 1,200 linear feet to approximately 17,000 linear feet (an over fourteen-fold increase), increased the maximum sand volume from 120,000 $yd^3$ to 2,500,000 $yd^3$ (an over twenty-fold increase), proposed retrieving sand from the ocean for the first time, and proposed the use of hydraulic cutterhead dredges, Sea Island Acquisition submitted a supplementary biological assessment.

65.     The applicant's supplementary biological assessment again concluded that the proposed project "may affect" but was "not likely to adversely affect" threatened and endangered species.

66.     The U.S. Fish and Wildlife Service ultimately concurred with this determination. However, the agency noted that "[t]he new groin is anticipated to result in decreased nesting and the loss of nests that do get laid within the project area for all subsequent nesting seasons following the completion of the proposed project." Letter from Fish and Wildlife Service to Col. Marvin Griffin (May 22, 2018) at 2. The agency also noted that "the sand project is anticipated to result in decreased nesting and loss of nests that do get laid within the project area for two subsequent nesting seasons following the completion of the proposed sand placement." Letter from Fish and Wildlife Service to Col. Marvin Griffin (May 22, 2018) at 2.

67.     Given that the supplemental application involved substantial offshore dredging and the use of a hydraulic cutterhead dredge, the U.S. Fish and Wildlife Service directed the Corps to "*please refer to [the National Marine Fisheries Service] for impacts in the water.*" Letter from Fish and Wildlife Service to Col. Marvin Griffin (May 22, 2018) at 2.

11

68.     However, rather than consult with the National Marine Fisheries Service about the supplemental application, the Corps instead concluded that no additional consultation was necessary for both the use of a cutterhead dredge and the placement of sand on the Sea Island beach.

*The Permit and NEPA Documents*

69.     On September 11, 2018, the Corps issued a permit authorizing Sea Island Acquisition to construct the new T-head groin on the Spit; to dredge between 1,315,000 to 2,500,000 cubic yards of sand from an offshore source; and to renourish more than 17,000 linear feet of beach on Sea Island.

70.     At the same time, the Corps issued an Environmental Assessment, finding that the authorized project would have no significant impact to the environment.

71.     Although concluding that there would be no significant impact, the Environmental Assessment repeatedly acknowledged that the existing groins caused accelerated erosion on the Spit and the proposed project would affect sea turtles and other endangered and threatened wildlife.

## LEGAL FRAMEWORK

### Clean Water Act

72.     In 1972, Congress passed the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

73.     To achieve this objective, Section 301 of the Clean Water Act prohibits "the discharge of any pollutant" into "the navigable waters of the United States" except in accordance with permits issued under the Clean Water Act. 33 U.S.C. § 1311(a).

12

74.     "Navigable waters" are defined as "the waters of the United States, including the territorial seas." *Id.* § 1362(7).

75.     "Pollutants" include dredged spoil, rock, dirt, and sand, among other materials. *Id.* § 1362(6).

76.     Section 404 of the Clean Water Act authorizes the Secretary of the Army to issue permits for the discharge of dredged or fill material into "the waters of the United States" when certain conditions are met.  33 U.S.C. § 1344.

77.     Unless exempted by Section 404(f)(1), which is not applicable here, all discharges of fill material into waters of the United States must be authorized under a Section 404 permit issued by the Corps.

78.     Issuance of all Section 404 permits is governed by the Section 404(b)(1) Guidelines found at 40 C.F.R. Part 230.

79.     The Section 404(b)(1) Guidelines provide that no discharge of fill material may be permitted if there is a less damaging "practicable alternative" available, or if the discharge will "cause or contribute to significant degradation" of waters of the United States.  40 C.F.R. § 230.10.

80.     In conducting this analysis, the Corps may rely on information submitted by the applicant but must independently verify such information. *Id.*; 40 C.F.R. § 1506.5(a).

81.     Corps regulations further require that "the Corps will, in all cases, exercise independent judgment in defining the purpose and need for the project from both the applicant's and the public's perspective." 33 C.F.R. § 325, App. B(9)(b)(4). This ensures that "an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make

13

what is practicable appear impracticable." *Sylvester v. U.S. Army Corps of Engineers*, 882 F.2d 407, 409 (9th Cir. 1989). Put differently, "the definition of a project purpose may not be used by the sponsor as a tool to artificially exclude what would otherwise be practicable alternatives to the project." *Florida Clean Water Network, Inc. v. Grosskruger*, 587 F. Supp. 2d 1236, 1244 (M.D. Fla. 2008) (quoting *Sylvester*, 882 F.2d at 409).

82.  The Section 404(b)(1) Guidelines require the Corps to deny a permit unless the applicant can show that there are no practicable alternatives with less adverse impact on the environment. 40 C.F.R. Part 230.

## National Environmental Policy Act

83.  Congress enacted NEPA to "promote efforts which will prevent or eliminate damages to the environment . . . ." 42 U.S.C. § 4321.

84.  To achieve this goal, NEPA requires federal agencies to fully consider and publicly disclose the environmental consequences of an agency action *before* proceeding with that action. *Id.* § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5.

85.  Agencies' evaluation of environmental consequences must be based on scientific information that is both "[a]ccurate" and of "high quality." 40 C.F.R. § 1500.1(b).

86.  Where an agency relies on the applicant to submit environmental information, the agency "shall independently evaluate the information submitted and shall be responsible for its accuracy. . . ." 40 C.F.R. § 1506.5(a).

87.  In addition, if there is "incomplete or unavailable information," the agency preparing the EIS "shall always make clear that such information is lacking." 40 C.F.R. § 1502.22.

14

88.     For major federal actions significantly affecting the quality of the human environment, NEPA requires that federal agencies prepare an Environmental Impact Statement (EIS). 42 U.S.C. § 4332(2)(C).

89.     Where it is not readily discernible whether the environmental effects of a proposed action will be significant, federal agencies may first prepare a less rigorous Environmental Assessment (EA) to establish the project's level of impact.  40 C.F.R. §§ 1501.4(b), 1508.9(a)(1); 33 C.F.R. §§ 230.10-.11. If impacts are likely to be significant, however, an EIS is then required.

90.     Agencies must consider a number of factors in determining whether impacts are likely to be significant, including the nature and extent of the impacts; the unique characteristics of the geographic area; the degree to which the impacts are highly controversial; the degree to which the possible effects are highly uncertain; the cumulatively significant nature of the impacts; and the degree to which the action may adversely affect endangered species and their habitat.  *See* 40 C.F.R. § 1508.27(b).

91.     Any "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

## STANDARD OF REVIEW

92.     Because NEPA does not contain an internal citizen suit provision, the APA governs the scope and standard of review of the Conservation Groups' NEPA claim against the Corps.

15

93.     The APA confers a right of judicial review on any person adversely affected by final agency action, and provides for a waiver of the federal government's sovereign immunity. 5 U.S.C. § 702.

94.     Although the Clean Water Act does contain a citizen suit provision, that provision does not govern suits brought to challenge a permitting decision made by the Corps in its capacity as a regulatory entity authorizing a discharge under Section 404. *See* 33 U.S.C. § 1365(a).

95.     Therefore, the APA also governs the scope and standard of review for the Conservation Groups' Clean Water Act claim against the Corps.

96.     Upon review of agency action under the APA, the court shall "hold unlawful and set aside actions . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

97.     An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. [A court] may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

16

## CLAIMS FOR RELIEF[2]

A.   **Claim One: The Corps violated the Clean Water Act and the APA by issuing the Permit when there is a less environmentally damaging practicable alternative to the project.**

98.   The Conservation Groups incorporate by reference the allegations contained in

the preceding paragraphs.

99.   Under 40 C.F.R. §§ 230.10(a) and 230.12(a)(3)(i), the Corps may not issue a

Section 404 permit if there is a less environmentally damaging practicable alternative to the

project.

100.   Practicable alternatives are those alternatives that are "available and capable of

being done after taking into consideration cost, existing technology, and logistics in light of

overall project purposes." *Id.* § 230.10(a)(2).

101.   Here, the Corps failed to adequately consider less environmentally damaging

practicable alternatives, including but not limited to nourishment of the beach without a groin,

and granted the Permit even though such alternatives existed.

---

[2] In addition to the claims identified in the Complaint, the Corps also violated the Endangered Species Act by failing to consult with the National Marine Fisheries Service following Sea Island Acquisition's submission of an amended application. After the initial concurrence letter, Sea Island Acquisition amended its application to seek renourishment of 17,000 linear feet—over fourteen times longer than the initial application that the National Marine Fisheries Service reviewed. *See* Environmental Assessment at 51. In addition to expanding the length of the project, the amended application proposed to pump up to 2.5 million $yd^3$—a over 20-fold increase from the initial application—from an offshore borrow site via a hydraulic cutterhead dredge. The Corps' failure to consult with the National Marine Fisheries Service following the submission of a substantially amended application is arbitrary and capricious and in violation of law and violates the Endangered Species Act and the Administrative Procedure Act.

102.    The Corps' inadequate evaluation of alternatives, and ultimate issuance of a

permit when there was a less environmentally damaging practicable alternative to the project, is

arbitrary and capricious in violation of the Clean Water Act and the APA.

**B.    Claim Two: The Corps violated the Clean Water Act and NEPA by failing to adequately evaluate the cumulative impacts of the authorized project.**

103.    The Conservation Groups incorporate by reference the allegations contained in

the preceding paragraphs.

104.    Under 40 C.F.R. §§ 230.11(g) (Clean Water Act) and 1508.7-.8 (NEPA), the

Corps is obligated to evaluate cumulative effects of the project before granting a Permit.

105.    Clean Water Act regulations define "cumulative impacts" as "the changes in an

aquatic ecosystem that are attributable to the collective effect of a number of individual

discharges of dredged or fill material. Although the impact of a particular discharge may

constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes

can result in a major impairment of the water resources and interfere with the productivity and

water quality of existing aquatic ecosystems." 40 C.F.R. § 230.11.

106.    NEPA regulations define "cumulative impact" as the "impact on the environment

which results from the incremental impact of the action when added to other past, present, and

reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or

person undertakes such other actions. Cumulative impacts can result from individually minor but

collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

107.    The Corps failed to adequately evaluate the cumulative effects of the proposed

project over the life of the project.

18

108.    Thus, the Corps' cumulative impacts review was arbitrary and capricious in violation of the Clean Water Act, NEPA, and the APA.

**C.    Claim Three: The Corps violated NEPA and the APA by failing to prepare an Environmental Impact Statement.**

109.    The Conservation Groups incorporate by reference the allegations contained in the preceding paragraphs.

110.    Under NEPA, the Corps must prepare or adopt an EIS before undertaking a major action that will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C).

111.    Based on the project's direct, indirect, and cumulative impacts to the sand-sharing system and to threatened and endangered species and the controversy and uncertainty surrounding the impacts of the Permit, the issuance of the Permit meets the regulatory definition of significance that calls for the preparation or adoption of an EIS.

112.    The Corps' FONSI and its decision to forgo preparing an EIS are arbitrary and capricious in violation of NEPA and the APA.

**D.    Claim Four: The Corps violated the Clean Water Act and the APA by issuing a permit for a structure that would create undue interference with access to and use of public tidelands.**

113.    The Conservation Groups incorporate by reference the allegations contained in the preceding paragraphs.

114.    Under 33 C.F.R. § 320.4, "in the case of proposals which create undue interference with access to, or use of, navigable waters," the permit should generally be denied. 33 C.F.R. § 320.4(g)(3).

115.   The proposed groin creates undue interference with access to at least 1,200 feet of public tidelands.

116.   The Corps did not consider this access issue.

117.   Thus, the Corps' issuance of the permit was arbitrary and capricious in violation of the Clean Water Act and the APA.

## PRAYER FOR RELIEF

The Conservation Groups respectfully request that this Court:

A.   Declare that the Corps' issuance of the Permit violates the Clean Water Act and its implementing regulations and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of the APA;

B.   Declare that the Corps' FONSI and its failure to prepare an EIS violate NEPA and its implementing regulations and are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of the APA;

C.   Vacate and enjoin reliance on the Permit;

D.   Enjoin construction of the groin pending this court's consideration of the legality of the environmental reviews challenged in this action;

E.   Require removal of any portion of the groin built during this litigation and restoration of any affected shoreline;

F.   Award the Conservation Groups the costs of this action, including their reasonable attorneys' fees; and

G.   Grant the Conservation Groups such additional relief as the Court deems just and proper.

20

Respectfully submitted this 31st day of October, 2018.

SOUTHERN ENVIRONMENTAL
LAW CENTER

/s/ *William W. Sapp*
William W. Sapp
Georgia Bar No. 626435
Megan Hinkle Huynh
Georgia Bar No. 877345
*Pro hac vice motion forthcoming*
Bob Sherrier
*Bar admission pending*
*Pro hac vice motion forthcoming*
Ten 10th Street NW, Suite 1050
Atlanta, Georgia 30309
Phone: (404) 521-9900
Fax: (404) 521-9909
bsapp@selcga.org
mhuynh@selcga.org
bsherrier@selcga.org

*Counsel for Plaintiffs*