IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

ALTAMAHA RIVERKEEPER and ONE
HUNDRED MILES

      Plaintiffs,

      v.

THE UNITED STATES ARMY CORPS OF
ENGINEERS et al.,

      Defendants.

Docket No. 4:18-cv-00251-RSB-JEG

## MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT

This case challenges a permit issued by the U.S. Army Corps of Engineers (the Corps) to Sea Island Acquisition LLC (d.b.a. Sea Island Company), allowing the company to construct a 350-foot long T-head groin[1] on the Sea Island Spit and to dredge and pump between 1,315,000 and 2,500,000 cubic yards of sand from an offshore source. *See generally* U.S. Army Corps of Eng'rs, Permit No. SAS-2015-00742 (Sept. 11, 2018) (attached as Ex. A). Opposition to the proposed project is overwhelming. Federal and state agencies, members of the public, and state legislators have spoken out against the proposed groin. Even the Corps' own guidance manual counsels that "[c]oastal zone management policy in many countries and the United States presently discourages the use of groins for shore protection." U.S. Army Corps of Eng'rs, Coastal Engineering Manual (USACE Manual) at V-3-61, *available at* https://www.publications. usace.army.mil/USACE-Publications/Engineer-Manuals/u43544q/636F617374616C20656

---

[1] See page 3 for groin definition.

E67696E656572696E67206D616E75616C/. For all of the reasons discussed below, allowing construction of the groin to move forward will irreparably harm the Sea Island Spit, the wildlife that lives there, and the people who use the area for recreation. The Court should grant a preliminary injunction to stop this imminent and irreparable injury.

## FACTUAL AND PROCEDURAL BACKGROUND

Sea Island is a barrier island along the Georgia coast that is approximately four-and-a-half miles long. The southern portion of the island is a fragile, undeveloped area called the Spit that provides significant habitat for state and federally protected sea turtles, shorebirds, and other species. The Spit, which is largely protected by a conservation easement, is also a popular recreation area. Both residents and tourists frequently visit the public tidelands on the Spit to paddle, surf, bird-watch, walk, and enjoy nature.

Sea Island Acquisition, a private resort and real estate development company, desires to build a new development called the Reserve on the north end of the Spit immediately north of the conservation easement boundary. On October 9, 2015, Sea Island Acquisition filed an application seeking permission to construct a T-head groin immediately south of the proposed Reserve Development. *See generally* Sea Island Acquisition, Application (Oct. 9, 2015). The application also sought authorization to construct dunes and renourish the beach between an existing groin and the proposed groin. *Id.* According to Sea Island, the purpose of the proposed groin is "to stabilize the eroding beach" in front of the Reserve development. *Id.* at 1. Currently, however, there are no homes located in the proposed development, and no lots have been sold. In other words, no existing structures are threatened by the beach erosion the proposed project seeks to avoid. Instead, the intent of the project is to protect unbuilt land. *See* Letter from S.

Envtl. Law Ctr. to Col. Marvin Griffin, U.S. Army Corps of Eng'rs (Jan. 15, 2016) (SELC 2016 Comments) at 3 (attached as Ex. B).

As testament to the fragility of the building lots, Hurricanes Irma and Matthew have eroded away nearly half of one of the lots, as well as the dunes in front of the lots. And Sea Island Acquisition applied for an emergency permit to protect the lots when Hurricane Florence was approaching.

*Background on Groins*

A groin is a hard structure, often constructed of rock, concrete, or steel, that is built perpendicular to a beach. Its purpose, by definition, is to trap or block sand on the "updrift" side of the groin that would otherwise naturally move with the prevailing currents along the shoreline to the "downdrift" side of the groin, as showing in the Google Earth image below.



*See* Dr. Bret Webb, Written Direct Testimony for OSAH Hearing (Webb WDT) ¶ 16 (attached as Ex. C); Dr. Robert Young, Written Direct Testimony for OSAH Hearing (Young WDT) ¶¶

31-32 (attached as Ex. D). As this occurs, the beach downdrift of the groin retreats. *Id.* In a very real sense, a groin starves the downdrift beach of sand by eliminating the updrift sand supply. *Id.*

The negative impacts of groins are widely recognized. In addition to causing accelerated downdrift erosion, groins also cause harm to wildlife, especially federally threatened sea turtles. *See* Letter from Jon Ambrose, Ga. Dep't of Nat. Res., Wildlife Res. Div., to Sheldon Leiker, Ga. Dep't of Nat. Res., Coastal Res. Div. (Nov. 24, 2015) (WRD Comments) at 4-6 (attached as Ex. E); Letter from Donald Imm, U.S. Fish and Wildlife Serv., to Sheldon Leiker, Ga. Dep't of Nat. Res., Coastal Res. Div. (Nov. 24, 2015) (USFWS Comments) at 1-2 (attached as Ex. F). The T-head portion of a groin can inhibit nesting females from reaching the beach or act as a barrier to hatchlings as they attempt to migrate from the beach to the ocean. *Id.* Hatchlings can also become physically trapped in the groin itself or be killed by predators that tend to congregate near the structure. *Id.* In addition, because they cause accelerated erosion, groins can reduce important habitat for sea turtles, shorebirds, and other wildlife downdrift of the groin and destroy valuable recreation areas for the public. *Id.*

Because of these negative effects, the Corps' own Coastal Engineering Manual recognizes that "[c]oastal zone management policy in many countries and the United States presently discourages the use of groins for shore protection." USACE Manual at V-3-61. Instead, as discussed below, over the past decade coastal engineers have shown a near universal preference for beach nourishment without a groin over similar projects with a groin or other stabilization structure. *See* Young WDT at ¶ 27. In the southeast United States, for example, over 96% of nourishment projects over the past ten years have been completed without a groin. *Id.*

*Public and Agency Opposition to the Groin*

Because the proposed groin would harm the Spit, public opposition to the project has been overwhelming. During the initial public comment period, the Corps received comments from 197 separate individuals or organizations. *See* U.S. Army Corps of Eng'rs, Decision Paper at 1 (Sept. 4, 2018); *see also* Letter from S. Envtl. Law Ctr. to U.S. Army Corps of Eng'rs (May 23, 2018) (SELC 2018 Comments) at 3 (attached as Ex. G). Of those 197 commenters, 194 (or over 98%) opposed the project. *Id.* Of the nine commenters who live on Sea Island, seven opposed the project. *Id.* In addition, nearly one hundred individuals and organizations, including federal and state agencies, submitted comments to the Georgia Department of Natural Resources opposing the project when Sea Island Acquisition applied for a state permit. *Id.* For example, the Georgia Department of Natural Resources Wildlife Resources Division submitted written comments to the state explaining that "[t]he construction of the T-head groin will result in the loss of sea turtle nesting habitat and will interfere with the conservation of sea turtle populations in Georgia." WRD Comments at 6. Similarly, the U.S. Fish and Wildlife Service submitted comments to the State opposing the construction of the groin, advising, "We recommend denial of the permit. Construction of another groin will have negative impacts to sea turtles and have possible adverse impacts to the Sea Island spit which is utilized habitat for federally listed shorebirds and sea turtles." USFWS Comments at 2. Others complained that the proposed project would further erode the Spit, as well as St. Simons Island's East Beach, and compromise their recreational use of those areas.

*Sea Island Acquisition's Revised Permit Application*

Following the initial notice and comment period, two major hurricanes, Matthew and Irma, caused substantial damage to Sea Island. Among other things, the storms severely eroded the beach face and many of the frontal dunes on the Spit. *See* Letter from S. Envtl. Law Ctr. to

U.S. Army Corps of Eng'rs (Feb. 28, 2017) (SELC 2017 Comments) at 21-22 (attached as Ex. H); Dr. Bret Webb, Supplemental Report Regarding the Practicability of Constructing a Successful Beach Nourishment Project on the Sea Island Spit (Webb Supplemental Report) at 9-10 (attached as Ex. I); SELC 2018 Comments at 4. The storms also damaged the main reach of the Sea Island beach in front of the developed area of the island, stripping much of the sand from the beach between the existing groins. SELC 2018 Comments at 4. In light of these impacts, on March 6, 2018, Sea Island Acquisition submitted an addendum to its 2015 permit application, seeking authorization (1) to construct the new T-head groin on the Spit; (2) to dredge between 1,315,000 to 2,500,000 cubic yards of sand from an offshore source; and (3) to renourish over 17,000 linear feet of beach on Sea Island. *See* Addendum to Application (Mar. 6. 2018).

Because the changes proposed in the March 2018 addendum were substantial, the Corps issued a new public notice, and One Hundred Miles and Altamaha Riverkeeper (collectively, the Conservation Groups) again submitted comments opposing the project. *See generally* SELC 2018 Comments. Among other things, the Conservation Groups noted that neither the October 2015 application nor the March 2018 addendum adequately considered the direct, indirect, or cumulative impacts of the proposed project. In addition, neither the October 2015 application nor the March 2018 addendum adequately considered less environmentally damaging practicable alternatives. For example, Sea Island Acquisition summarily dismissed nourishment without a groin as an alternative, even though this option has been chosen by coastal engineers in over 96% of similar projects in the Southeast over the last decade. *Id.*; *see also* Young WDT ¶ 27.

*The Permit, the Biological Assessment, and NEPA Documents*

Because the March 2018 addendum increased the length of the project from 1,200 linear feet to approximately 17,000 linear feet (a nearly fifteen-fold increase), increased the proposed

6

sand volume from 120,000 yd$^3$ to up to 2,500,000 yd$^3$ (an over twenty-fold increase), proposed retrieving sand from the ocean instead of an onshore source, and proposed the use of hydraulic cutterhead dredges, Sea Island Acquisition also submitted a supplementary biological assessment. *See generally* Supplementary Biological Assessment & Essential Fish Habitat Assessment (Supp. Biological Assessment) (March 2018) at 1. The company had previously submitted a biological assessment for the 1,200 foot project, but many of that assessment's determinations were based in part on the fact that "no offshore borrow areas are proposed" or on the fact that "the project is of limited size." *See* Biological Assessment of Threatened and Endangered Species, The Reserve at Sea Island Shoreline Protection Project (Oct. 2015) at 1, 23-24. Like the previous assessment, Sea Island Acquisition's supplementary biological assessment concluded that the proposed project "may affect" but was "not likely to adversely affect" threatened and endangered species. Supp. Biological Assessment at 85.

The U.S. Fish and Wildlife Service ultimately concurred with this determination. Letter from U.S. Fish and Wildlife Serv. to Col. Marvin Griffin, U.S. Army Corps of Eng'rs (May 22, 2018) at 2 (attached as Ex. J). However, the agency noted that "[t]he new groin is anticipated to result in decreased nesting and the loss of nests that do get laid within the project area for all subsequent nesting seasons following the completion of the proposed project." *Id.* The agency also noted that "the sand project is anticipated to result in decreased nesting and loss of nests that do get laid within the project area for two subsequent nesting seasons following the completion of the proposed sand placement." *Id*. Given that the supplemental application requested to remove up to 2,500,000 yd$^3$ of sand from the ocean floor with a hydraulic cutterhead dredge, the U.S. Fish and Wildlife Service also directed the Corps to "*refer to [the National Marine Fisheries Service] for impacts in the water*." *Id.* at 2.

However, rather than consult with the National Marine Fisheries Service about the supplemental application, the Corps instead concluded that further consultation was unnecessary. *See* Army Corps of Eng'rs, Memorandum for Record (Sept. 6, 2018) (Environmental Assessment) at 51 (attached as Ex. K) ("Since [the National Marine Fisheries Service's concurrence] the project was amended to include the renourishment of 17,000 LF of the Sea Island shoreline with the sand being pumped (via a hyrdraulic cutterhead dredge) from an offshore borrow site.").[2]

On September 11, 2018, the Corps issued a permit authorizing Sea Island Acquisition to (1) construct the new T-head groin on the Spit; (2) dredge between 1,315,000 to 2,500,000 cubic yards of sand from an offshore source; and (3) renourish more than 17,000 linear feet of beach on Sea Island. *See generally* Permit No. SAS-2015-00742. At the same time, the Corps issued an Environmental Assessment, finding that the authorized project would have no significant impact

---

[2] In addition to the shortcomings identified in this brief, the Corps also violated the Endangered Species Act by failing to consult with the National Marine Fisheries Service following the applicant's submission of an amended application. The Conservation Groups laid out these claims in a Notice Letter to the Army Corps of Engineers, a copy of which is attached as Exhibit S. Under § 7 of the Endangered Species Act, every federal agency must "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species [("listed species")] or result in the destruction or adverse modification of [critical] habitat of such species[.]" 16 U.S.C. § 1536(a)(2). For projects that may affect listed species, compliance with § 7 requires, at a minimum that the Fish and Wildlife Service or the National Marine Fisheries Service provide written concurrence to the action agency that the action will not adversely affect a threatened or endangered species or its critical habitat. The Fish and Wildlife Service and the National Marine Fisheries Service "are far more knowledgeable than other federal agencies about the precise conditions that pose a threat to listed species, and … are in the best position to make discretionary factual determinations about whether a proposed agency action will create a problem for a listed species and what measures might be appropriate to protect the species." *City of Tacoma, Washington v. F.E.R.C.*, 460 F.3d 53, 75 (D.C. Cir. 2006). Because the addendum to the application increased the proposed sand volume over twenty fold and proposed offshore dredging and pumping for the first time, the Corps' failure to consult with the National Marine Fisheries Service after Sea Island amended its application violates the Endangered Species Act.

on the environment. Environmental Assessment at 86. As discussed below, the Permit and the

Environmental Assessment violate the Clean Water Act, the National Environmental Policy Act,

and the Administrative Procedure Act. The Court should therefore grant a preliminary injunction

to prevent imminent and irreparable injuries to the Conservation Groups and their members from

Sea Island Acquisition's proposed project.

## STANDARD OF REVIEW

To succeed on a motion for preliminary injunction, a plaintiff must show that it is likely

to succeed on the merits, that it is likely to suffer irreparable injury absent preliminary relief, that

the balance of equities tips in its favor, and that an injunction is in the public interest. *U.S. v.*

*Jenkins*, 714 F. Supp. 2d 1213, 1220 (S.D. Ga. 2008).

## ARGUMENT AND CITATION OF AUTHORITIES

**I.      The Conservation Groups are likely to succeed on the merits.**

> **A.      The Corps violated the Clean Water Act by issuing the permit when there is**
> **a less environmentally damaging practicable alternative.**

Under 40 C.F.R. §§ 230.10(a) and 230.12(a)(3)(i), the Corps may not issue a Section 404

permit if there is a less environmentally damaging practicable alternative to the project. Here, the

Corps did not adequately consider less environmentally damaging practicable alternatives before

granting the permit. Take, for example, beach nourishment without a groin. The record shows

that two experts, Dr. Bret Webb and Dr. Robert Young, testified on multiple occasions that

beach nourishment *without* a groin is a practicable alternative to beach nourishment *with* a groin.

*See* Webb WDT at ¶ 95; Young WDT at ¶ 45. In his testimony, Dr. Webb explained that the

nourishment project proposed by Sea Island, with dunes, could be constructed as planned in the

1,200-foot project area and then extended south down the Spit without dunes (where dunes are not needed to protect any structures).[3]

According to Dr. Webb, extending beach nourishment down the Spit would require approximately 350,000 to 500,000 cubic yards of sand. Webb WDT ¶ 95. To calculate this number, Dr. Webb estimated the length of the shoreline from the existing south groin to Gould's Inlet and applied a beach fill density of 100 cubic yards per running foot, which accounts for the fact that the renourished shoreline could be tapered as it reached Gould's Inlet. Tr. of OSAH Hearing, *One Hundred Miles, et al. v. Shore Protection Committee*, OSAH-BNR-SP-1630908-60-Miller (May 9-12, 2016) (OSAH Tr.) at 115: 1-17 (excerpts attached as Ex. L). Dr. Webb explained that this number (100 cubic yards per running foot) is common in modern nourishment projects in the United States. *Id.* at 116:22-117:5.

The idea of beach nourishment without a groin is not novel by any stretch. For example, the Program for the Study of Developed Shorelines (PSDS), a joint research and policy center at Duke University and Western Carolina University, maintains a national database called the Beach Nourishment Database that catalogs every beach and dune construction project in the country. Young WDT ¶ 7. It is by far the most comprehensive catalog of beach and dune restoration projects available. *Id.* As part of this work, Dr. Young, the director of the PSDS, is funded by the United States Geological Survey to map, in detail, every beach nourishment project on the United States East Coast. *Id.* ¶ 8. Through Dr. Young's database, the PSDS has been tracking beach nourishment activities on Sea Island and across the country for more than

---

[3] Beach nourishment projects without groins or other stabilization devices typically last longer (or have a greater "half-life") if the projects cover a longer stretch of beach. For these reasons, Dr. Webb and Dr. Young recommended that the beach nourishment project be extended down the Spit, without dunes, to have a practicable half-life. The experts agree that a 1,200 foot nourishment project would not be practicable because it would have a relatively short half-life.

twenty years. *Id.* The beach nourishment projects mapped by Dr. Young have been implemented in areas with a wide variety of coastal features including barrier islands with longshore transport rates and inlet settings similar to those of Sea Island. *Id.* ¶ 22.

Based on his experience with the Beach Nourishment Database, Dr. Young concluded that beach nourishment without a groin is, *by far*, the most common configuration for beach nourishment projects in the United States. In the southeast, for example, there have been 139 beach nourishment projects in the past ten years, as of 2016. Young WDT ¶ 27. Of those 139 projects, only five involved a groin.[4] *Id.*; *see also* Webb WDT ¶ 95 (noting that almost every beach nourishment and/or renourishment project in Florida over the past twenty years has been done without a groin). Put differently, coastal engineers have found less damaging practicable alternatives that allowed them to nourish the beach without building a groin in *over 96 percent* of similar projects conducted in this region over the past ten years. Further from home, after Hurricane Sandy devastated the New Jersey coast, the Army Corps of Engineers implemented 22 beach nourishment projects, covering almost the full length of the state. Young WDT ¶ 26. According to Dr. Young, not one of them involved the construction of a groin or other artificial shoreline stabilization device.[5] *Id.* ¶ 26.

Unbelievably, the Corps summarily dismissed the nourishment-without-a-groin alternative *without any analysis* because it found the alternative was "outside the scope of the

---

[4] Of those five, three were built at the very end of the island—unlike Sea Island's proposed groin. Young WDT ¶ 27. The other two projects with groins were special circumstances not related to cost. Young WDT ¶ 27. There are no such special circumstances with respect to Sea Island's proposed project. Young WDT ¶ 27.

[5] Some portions of the New Jersey shore do have small, existing groins built many decades ago. Those groins are not even considered in the Corps' project design, and where possible, the Corps has been altering the groins to allow sand passage down the shore, effectively trying to rehabilitate the sand sharing system. Young WDT ¶ 26.

project and would not meet the overall project purpose." Environmental Assessment at 40. However, the law requires that an alternative chosen in over 96% of similar projects in the region and recommended under oath by two experts be given at least some meaningful discussion in an 86-page NEPA analysis. The regulations are clear: "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. 230.10(ii)(2). In the Environmental Assessment, the Corps did not dismiss this alternative as impractical or incapable of being done, nor did it indicate that nourishment without a groin would not work if the nourishment project was extended to the southern tip of the Spit. In addition, the Corps did not dismiss this alternative as too costly or impractical in terms of technology or logistics.[6] Put simply, the Corps violated its own regulations by failing to adequately consider a less environmentally damaging practicable alternative before issuing the permit.

**B.    The Corps violated NEPA by failing to prepare an Environmental Impact Statement.**

Under NEPA, "[i]f *any* 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared *before* agency action is taken." *Sierra*

---

[6] Although the Corps may attempt to point to other rationales in its response brief, the law is clear that the agency may not identify bases for rejecting alternatives in litigation after the fact. As one court put it, "Of great importance to a reviewing court is the distinction to be made between the environmental impact statement and the remainder of the administrative record.… Any substantial information pertinent to … the analysis of alternatives found in the administrative record, but not in the environmental impact statement, would render the impact statement inadequate under NEPA." *Nat'l Wildlife Fed'n v. Marsh*, 568 F. Supp. 985, 996-97 (D.D.C. 1983); *see also Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) ("We do not find adequate support for the [agency]'s decision in its argument that the 3,000 page administrative record contains supporting data. The EA contains virtually no references to any material in support of or in opposition to its conclusions. That is where the [agency]'s defense of its position must be found."); *League of Wilderness Defs. v. Forsgren*, 184 F. Supp. 2d 1058, 1069 (D. Or. 2002) (criticizing the agency for "again go[ing] outside of the EA to a [report] in the Administrative Record in attempting to assure the court that 'cumulative impacts' were considered").

*Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) (emphasis in original). Whether an

impact is "significant" depends on a number of factors including (1) whether the project has

"impacts that may be both beneficial and adverse;" (2) "[t]he degree to which the action may

adversely affect an endangered or threatened species;" (3) "[u]nique characteristics of the

geographic area such as proximity to … ecologically critical areas;" and (4) whether the project

"is related to other actions with individually insignificant but cumulatively significant impacts."

40 C.F.R. § 1508.27(b).[7] Any "one of these factors may be sufficient to require preparation of an

EIS in appropriate circumstances." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d

846, 865 (9th Cir. 2005); *see also Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 235 (D.D.C.

2003).

Based on these factors, other groin and beach nourishment permits in the Southeast have

triggered the need for an EIS; this one should too. *See, e.g.,* U.S. Army Corps of Eng'rs, Public

Notice re: Bald Head Island Groin (Aug. 1, 2014), *available at* https://www.saw.usace.army.mil/

Portals/59/docs/regulatory/publicnotices/2014/SAW-2012-00040-PN.pdf;[8] U.S. Army Corps of

Eng'rs, Public Notice re: Figure 8 Island Groin (June 29, 2016), *available at* http://saw-

reg.usace.army.mil/Proj/F8-TG/SAW-2006-41158-PN.pdf); U.S. Army Corps of Eng'rs, Draft

EIS re: Holden Beach Groin (Jan. 2015), *available at* http://www.saw.usace.army.mil/Portals/59/

docs/regulatory/regdocs/Projects/OIB/DEIS/2015-01-23_DEIS_Main_Body.pdf (permit

---

[7] To implement the requirements of NEPA, the federal Council on Environmental Quality (CEQ) has promulgated regulations applicable to all federal agencies. *See* 40 C.F.R. §§ 1500-1508. The Corps has promulgated its own set of NEPA guidelines and complies with the CEQ regulations except where those regulations are inconsistent with the statutory requirements of the Commission. 33 C.F.R. § 230.1.

[8] The Court may take judicial notice of information published on a federal agency's website. *Rahman v. Schriro*, 22 F. Supp. 3d 305, 311 (S.D.N.Y. 2014) (taking judicial notice of fact sheet published on EPA's website); *see also Stanifer v. Corin USA Ltd., Inc.*, No. 6:14-CV-1192-ORL, 2014 WL 5823319, at *3 (M.D. Fla. Nov. 10, 2014) (noting that courts regularly take judicial notice of public records available on federal agency's website).

application withdrawn on April 19, 2018); U.S. Army Corps of Eng'rs, Public Notice re: Ocean

Isle Groin (Mar. 7, 2017), *available at* http://saw-reg.usace.army.mil/Proj/OIB/SAW-2011-

01241-PN-ROD.pdf.

> i.      *The proposed project will have adverse impacts.*

First, the Corps should have prepared an EIS because the project will have significant

adverse impacts to the sand-sharing system,[9] surrounding beaches, and wildlife.

> a.      *The project will cause increased downdrift erosion.*

As discussed above, the record shows that groins cause accelerated erosion and serious

disruption of the sand-sharing system. In addition to expert testimony and the Corps' own

manual, the record shows that no fewer than twenty-two peer-review journal publications

describe, or at least reference, the negative impacts of improperly designed groins. SELC 2016

Comments at 6-7 (citing journal publications). And forty-three of the leading coastal scientists in

this country have signed on to a letter that agrees. *See* Rob Young, *et al.*, Coastal Scientist

Statement on Groin Impacts at 1 (attached as Ex. M). As the coastal scientists put it, "There is no

debate." *Id.; see also* Young WDT ¶ 35.

In addition to widespread scientific consensus on the adverse impacts of groins generally,

the documented impacts of Sea Island's existing groins show that the proposed project will cause

significant adverse impacts to the Spit. At the Office of State Administrative Hearings (OSAH)

hearing for the state permit, the Conservation Groups presented expert testimony by Dr. Chester

Jackson and Dr. Bret Webb regarding historical shoreline change on Sea Island before and after

the current groins were installed. *See* Webb WDT; OSAH Tr. at 834:6-935:17. That testimony

---

[9] The coastline continuously changes due to winds, currents, and wave action. The sand-sharing system is an interdependent sand and sediment system that includes sand dunes, beaches, and offshore bars and shoals. *See* O.C.G.A. § 12-5-232.

included an analysis of the existing south groin to determine what impact, if any, that groin has had on the Sea Island shoreline. *Id.* As recognized by the state administrative law judge, Dr. Jackson and Dr. Webb's testimony at the hearing convincingly demonstrated that the existing south groin on Sea Island has caused an increased rate of shoreline retreat downdrift of the groin since it was installed. *See* Final Decision, *One Hundred Miles, et al. v. Shore Protection Committee*, OSAH-BNR-SP-1630908-60-Miller, at 15, 18.

The Corps concluded the same in its Environmental Assessment. According to the Corps' analysis, "the construction of the existing groins," among other things, "ha[s] contributed to the Island's current sand deficit and shoreline erosion, including at the Spit." Environmental Assessment at 16. As the agency put it, "[T]he existing T-head groins are currently trapping some of the material (sand, silt, clay, etc.) that is naturally coming from the north, and moving south. The southern end of the spit is currently eroding and will continue to erode as long as the existing groin system remains in place." *Id.* at 70.

> b.   *The project could cause the Spit to break apart.*

The location of the proposed groin makes it particularly problematic. As Dr. Webb described in his written direct testimony, the erosion caused by the proposed groin would likely occur at a particularly vulnerable area of the Spit near an old borrow pit. *See* Webb WDT ¶¶ 70-80. That area has a narrow width and low volume density, and the walls of the borrow pit have already been breached by incoming waves on high tides. *Id.* The frontal dunes have eroded to the point where waves are overwashing sediment from the beach face into a low area behind the frontal dune system. *Id.* Thus, based on Dr. Webb's analysis, constructing a groin in the proposed location may cause the Spit to break apart, causing irreversible damage to the Spit and downdrift shorelines, including St. Simon's Island. *Id.*

c.      *The project will harm wildlife.*

The proposed project will also harm federally protected sea turtles and shorebirds, as discussed below in detail in Section I.B.ii. The National Marine Fisheries Service (NMFS), a division of the National Oceanic and Atmospheric Administration (NOAA), also expressed concern that the proposed project could harm essential fish habitat. In an April 2018 letter, the National Marine Fisheries Service advised the Corps that it had "multiple concerns with the proposed project, particularly with regard to impacts from the proposed shoreline armoring [the proposed groin]." Letter from Virginia M. Fay, Nat'l Marine Fisheries Serv., to Col. Marvin Griffin, U.S. Army Corps of Eng'rs (Apr. 20, 2018) (attached as Ex. N).

Among other things, the National Marine Fisheries Service expressed concerns that "the close spacing of the proposed groin with the existing groin may create a trap for pelagic eggs and larvae of managed species and their prey." *Id.* As a result, the agency recommended denial of Sea Island Acquisition's request to build a T-head groin. *Id.* Three months later, the Corps responded to the National Marine Fisheries Service's letter, but ignored the Service's concern that the proposed groin could trap "pelagic eggs and larvae of managed species and their prey." *See* Letter from Kimberly L. Garvey, U.S. Army Corps of Eng'rs, to Cynthia Cooksey, Nat'l Marine Fisheries Serv. (Jul 17, 2018) (attached as Ex. O); Letter from Virginia M. Fay, Nat'l Marine Fisheries Serv., to Col. Daniel Hibner, Army Corps of Eng'rs at 1 (July 27, 2018) (attached as Ex. P). As a result, as recently as July 2018, the National Marine Fisheries Service *again* recommended denial of Sea Island Acquisition's request to build a groin. Letter from Virginia M. Fay, Nat'l Marine Fisheries Serv., to Col. Daniel Hibner, Army Corps of Eng'rs at 1 (July 27, 2018). The Corps' failure to *even mention* this issue—raised by biologists at another

federal agency as a basis for partially denying the permit—shows that the Corps failed to take a hard look at the impacts of the proposed action as required by NEPA.

> ii.     *The proposed project will harm endangered and threatened species.*

Second, the Corps should have prepared an EIS because the proposed groin will harm endangered and threatened sea turtles and shorebirds. Under the Endangered Species Act, the Corps must consult with the National Marine Fisheries Service, the Fish & Wildlife Service, or both, to insure that the proposed project is "not likely to jeopardize the continued existence of any endangered species or threatened species" or destroy or adversely modify any critical habitat of those species. 16 U.S.C.A. § 1636 (a)(2). Importantly, a "no jeopardy" determination by the U.S. Fish and Wildlife Service or the National Marine Fisheries Service under the Endangered Species Act does not mean that there is no potential impact that triggers the need for an EIS under NEPA. *See Sierra Club v. Norton*, 207 F. Supp. 2d 1310, 1322 (S.D. Ala. 2002) ("An environmentally significant action need not involve a threat of extinction to a federally-protected species. Lesser impacts, including impacts on non-listed species, can constitute a significant effect."); *Makua v. Rumsfeld*, 163 F. Supp. 2d 1202, 1218 (D. Haw. 2001) ("Clearly, there can be a significant impact on a species even if its existence is not jeopardized.").

Here, the proposed project area includes nesting habitat used by three species of federally protected sea turtles: the Loggerhead Sea Turtle, the Green Sea Turtle, and the Leatherback Sea Turtle. According to the Georgia Department of Natural Resources and the U.S. Fish and Wildlife Service, the proposed groin would adversely impact sea turtles by (1) inhibiting nesting females from reaching the beach, (2) functioning as a barrier to hatchling migration to the ocean, (3) entrapping hatchlings within the structure, (4) concentrating predators in the vicinity of the

groin resulting in increased hatchling mortality; and (5) reducing downdrift nesting habitat. *See*

WRD Comments at 4-6; USFWS Comments at 1-2.

Although Sea Island Acquisition has repeatedly claimed the proposed groin would not

adversely impact sea turtles, its arguments are wholly unsupported and have been thoroughly

rejected by both state and federal agencies. For example, in its comments to the Georgia Coastal

Resources Division, the Georgia Department of Natural Resources Wildlife Resources Division

rejected Sea Island Acquisition's claim that the proposed groin would not result in accelerated

downdrift erosion and habitat loss, explaining that "[t]he analysis provided by [Sea Island

Acquisition] uses data from the early 1980's and does not use the best available technology and

analysis for assessing coastal erosion rates."  WRD Comments at 3. The U.S. Fish and Wildlife

Service was likewise unconvinced by Sea Island Acquisition's claim that the proposed groin

would not result in downdrift erosion and habitat loss, noting, "There is little data or analysis to

support this."  USFWS Comments at 2. More recently, U.S. Fish and Wildlife Service cautioned

that "[t]he new groin is anticipated to result in decreased nesting and the loss of nests that do get

laid within the project area for all subsequent nesting seasons following the completion of the

proposed project." Id. The Service also noted that "the sand project is anticipated to result in

decreased nesting and loss of nests that do get laid within the project area for two subsequent

nesting seasons following the completion of the proposed sand placement." Letter from U.S. Fish

and Wildlife Serv. to Col. Marvin Griffin, U.S. Army Corps of Eng'rs (May 22, 2018) at 2.

In addition to the Georgia Wildlife Resources Division and U.S. Fish and Wildlife

Service, two expert witnesses, Dr. Kirt Rusenko and Mark Dodd, offered testimony regarding the

impacts to sea turtles at the state administrative hearing. Mr. Dodd has been employed by the

Georgia Department of Natural Resources for over seventeen years as a Senior Wildlife

Biologist and the State of Georgia's Sea Turtle Program Coordinator. SELC 2017 Comments at 14. His duties include establishing protocols for sea turtle conservation in Georgia and reviewing and commenting on permit applications for projects that might impact sea turtles. See OSAH Tr. at 224:25-225:12; 226:3-12; 227: 20-24; 229:5-13. Mr. Dodd helped author the Recovery Plan for the Northwest Atlantic Population of the Loggerhead Sea Turtles in partnership with the National Marine Fisheries Service and the U.S. Fish and Wildlife Service. *Id*. at 232:2-11.

Dr. Rusenko has worked for 20 years as the Marine Conservationist for the City of Boca Raton, Florida's Gumbo Limbo Center where he manages the Boca Raton Sea Turtle Conservation and Research Program. Dr. Rusenko supervises nine sea turtle specialists and reviews and reports on all beachfront construction permits and monitors all beach renourishment projects for the city. Dr. Kirt Rusenko, Written Direct Testimony for OSAH Hearing (Rusenko WDT) ¶¶ 1, 5-7 (attached as Ex. Q). Both Mr. Dodd and Dr. Rusenko testified unequivocally that the proposed T-head groin would have unreasonable impacts on federally protected sea turtles. *See* OSAH Transcript at 256:21-257:5; Rusenko WDT at ¶ 36.

In addition to harming federally protected sea turtles, the record shows that a groin could harm shorebird habitat on the Spit. The Spit contains designated critical wintering habitat for the federally threatened Piping Plover and is heavily used by the federally protected Red Knot, as well as two state species of concern, the American Oystercatcher and Least Tern. According to the Georgia Department of Natural Resources, "[a]ll of these species require the natural sand-sharing system to build up appropriate nesting, roosting, and foraging habitat."  WRD Comments at 8. As the state agency has noted, "[s]horeline engineering projects (including groins), particularly near inlets are listed as one of the major threats to shorebird conservation in shorebird conservation plans . . . because they disrupt the natural sand sharing system." *Id*.

19

At the very minimum, this evidence indicates that the proposed project *might* negatively impact wildlife protected under both federal and state law, and that the Corps should have prepared an EIS to fully study these and other environmental impacts.

            iii.      *The geographic area is unique.*

Third, the Corps should have prepared an EIS because the geographic area is unique—as Sea Island Acquisition CEO Scott Steilen put it, "so unique" that it is unparalleled on the Georgia coast. OSAH Tr. 789:11, 17. According to the U.S. Fish and Wildlife Service, the project area provides habitat to over ten threated and endangered species. And as Sea Island Acquisition itself acknowledged, the Spit "is an excellent example of coastal barrier island habitat, with significant wildlife and plant habitat, including areas of high biological diversity and rare and threatened plants and wildlife." *See* Deed of Conservation Easement between St. Simon's Land Trust and Sea Island Acquisition, LLC at 2. The company also acknowledged that the Spit is "of great importance" to the public. *Id.*

            iv.      *The action is related to other actions with cumulatively significant impacts.*

Fourth, the Corps should have prepared an EIS because the project is related to other actions with cumulatively significant impacts. This factor is discussed in detail in Section I.C.

**C.    The Corps violated the Clean Water Act and NEPA by failing to adequately evaluate the cumulative impacts of the authorized project.**

Under the Clean Water Act and NEPA, the Corps is obligated to evaluate cumulative effects of the project before granting a Permit. This means that the Corps must consider the impacts of the authorized action "when added to other past, present, and reasonably foreseeable future actions." *See* 40 C.F.R. § 1508.7; *see also* 40 C.F.R. § 230.11(g) (Clean Water Act regulations); 40 C.F.R. § 1508.8 (NEPA regulations). The Corps' cumulative impacts analysis

here is defective for a number of reasons. Among other things, the Corps should have considered the impacts of other existing and reasonably anticipated shoreline stabilization or nourishment projects in the coastal region. The Corps' cumulative impacts analysis looks at the direct impact zone of the proposed project; however, "[w]hen analyzing the contribution of [the] proposed action to cumulative effects…the geographic boundaries of the analysis almost always should be expanded." Council on Envtl. Quality, Exec. Office of the President, Considering Cumulative Effects under the National Environmental Policy Act (Jan. 1997) at 12, *available at* https://ceq.doe.gov/docs/ceq-publications/ccenepa/sec2.pdf. So, for example, when conducting a cumulative effects analysis for coastal zone resources, the CEQ recommends analysis of the entire coastal region or watershed. *Id.* at 15. For resident wildlife resources, the CEQ recommends consideration of the entire species habitat or ecosystem. *Id.*

This concept is not far-fetched or novel. For example, in an EIS for the Bald Head Terminal Groin project, the Corps considered 141 miles of shoreline for its cumulative impacts analysis, including all beachfront and nearshore coastal areas of Onslow Bay and Long Bay. *See* Bald Head Island Final Environmental Impact Statement, Appendix W at 3, *available at* https://www.saw.usace.army.mil/Portals/59/docs/regulatory/regdocs/Projects/BHI/BHI_FEIS/Appendices/Appendices/AppendixW_VBHICEAJuly2014_072014.pdf. Likewise, in an EIS for the Figure 8 Island Groin Project, the Corps considered the entire coastline of North Carolina (approximately 301 miles), including all inlets. *See* Figure 8 Terminal Groin Final Environmental Impact Statement, Appendix F at 5, *available at* http://saw-reg.usace.army.mil/Proj/F8-TG/F8_FEIS_Appendice_C_through_I.pdf. And in an EIS for the Holden Beach groin project, the Corps considered cumulative effects "on a regional scale along the entire southern

NC coast between Cape Lookout and the NC/SC border." *See* Holden Isle Groin, § 5.1.2, *available at* http://saw-reg.usace.army.mil/PN2017/Holden_Beach_FEIS_Sections_1_7.pdf.

Here, the Corps is well aware of other existing and proposed renourishment projects in the Golden Isles region. For example, shortly before issuing the permit for the Sea Island project, the Corps issued a press release about a $13 million federally funded renourishment project on Tybee Island. *See* http://www.sas.usace.army.mil/Media/News-Releases/Article/1579700/ savannah-harbor-tybee-island-beach-others-to-receive-additional-funds/). And the State of Georgia designated another $10 million for beach nourishment projects on Georgia's coast in the amended fiscal year 2018 budget. *See* https://gov.georgia.gov/press-releases/2018-01-11/deal-budget-prioritizes-workforce-development-education-transportation. The Corps should have extended the geographic scope of its cumulative impacts analysis under the Clean Water Act and NEPA to include these and other regional projects.

> **D.    The Corps violated the Clean Water Act and the APA by issuing a permit without considering that it would exclude the public from public beach.**

The Corps failed to consider that the groin would effectively privatize the beach in front of the Reserve. The Corps must evaluate the impacts of a proposed project on public property and when the project would "create undue interference with access to, or use of, navigable waters," the Corps should in most cases deny the permit. 33 CFR § 320.4(g)(3); *see United States v. Harrell*, 926 F.2d 1036, 1041 (11th Cir. 1991) ("The navigable waters of the United States are public property."). Unlike the rest of Sea Island, the beach from the mean high water mark seaward is a "navigable water" and therefore open to the public. 33 C.F.R. §§ 329.12(a)(2), 328.4; Environmental Assessment at 22 ("Kayakers routinely paddle down Postell Creek or Black Bank River, land at the Spit, and walk along the Sea Island beach.").

Yet the proposed groin would exclude the public from 1,200 feet of their beach, much like the public has already been cut off from the several-mile-long beach that runs the length of the developed portion of Sea Island. For all but the most athletic individuals, it is nearly impossible to scale the existing groin's massive concrete blocks. The proposed groin would be six feet tall. Even if one could reach the top of either groin, they would be trespassing the moment they began their ascent because Sea Island Acquisition owns any portion of the groin that is above the mean high water mark. And since the groin will be 350 feet in length, it will be nearly impossible to swim around. *See* Reserve at Sea Island, Beach Renourishment & Groin Plan, Sheets 2-3 (Sept. 10, 2015) (incorporated into Permit at Condition 1(b)(9)n); *cf. U.S. v. St. Thomas Beach Resorts, Inc.*, 386 F. Supp. 769, 771-72 (D.V.I. 1974), *aff'd*, 529 F.2d 513 (3d Cir. 1975) (holding that a private fence extending into the water clearly interfered with a public right to use the shore).

Multiple commenters raised this issue prior to permitting. *E.g.* Comments of Monica Smith (excerpts attached as Ex. R) ("[I]t would be nice to have the USACE affirm that the beach is public and properly accessible to the public at all times."); Comments of Leslie Graitcer (excerpts attached as Ex. R) ("…the beach in front of these homes will not be open to use of any other Georgia residents."); Comments of Jane Johnson (excerpts attached as Ex. R) (questioning the right of the Corps "[t]o authorize construction of a private groin intended to create a private beach for a proposed development of eight (8) residences for high-wealth individuals…").

The Corps fails to acknowledge that the public has an interest that will be affected, *see* Environmental Assessment at 67, despite the common-sense fact that a groin is essentially a slippery rock wall that the public will be forced to scramble over to walk along the beach in front of the Reserve or further down the main Sea Island beach. The groin will have the functional

effect of privatizing an additional 1,200 linear feet of beach, unduly interfering with public access and use, and the Corps must consider the cumulative ramifications on the public interest before it issues a permit. 33 C.F.R. § 320.4(g)(3); *see Summersgill Dardar v. LaFourche Realty Co.,* No. CIV.A. 85-1015, 1986 WL 12201, at *2 (E.D. La. Oct. 29, 1986) (remanding permit to the Corps for failure to adequately consider impacts on navigable waters).

## II.     The Conservation Groups will suffer irreparable injury absent preliminary relief.

Altamaha Riverkeeper and One Hundred Miles will suffer an irreparable injury absent preliminary relief. The permit allows Sea Island Acquisition to begin construction of the T-head groin on November 1, 2018, following the conclusion of sea turtle nesting season.[10] The Conservation Groups understand that Sea Island Acquisition has already begun pre-construction activities, indicating its intent to build the T-head groin soon. In other words, the harm to the Sea Island Spit and the wildlife that live there is imminent and irreparable. As described above, the proposed project will harm the sand-sharing system, trigger accelerated erosion, and may cause the Spit to break apart—none of which could be compensated for with money damages. The proposed project is also likely to harm federally threatened and endangered wildlife, as well as essential fish habitat and other non-listed wildlife—again, none of which could be compensated for with money damages.

Case law supports the issuance of a preliminary injunction when these types of damages are at stake. As the Supreme Court has acknowledged, "[e]nvironmental injury, by its nature, can

---

[10] The Southern Environmental Law Center (SELC) submitted a Freedom of Information Act request on August 31, 2018, but was unable to receive a copy of the Permit until September 28, 2018. Other documents referenced throughout the Permit and repeatedly relied upon by the Corps in reaching its decision were not provided to SELC until October 30, 2018, despite repeated efforts to obtain the documents sooner. SELC filed this action and the accompanying preliminary injunction the following day.

seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987); *see also U.S.  v. Jenkins*, 714 F. Supp. 2d at 1221-22 (noting that "a court may more readily find that an environmental injury is 'irreparable'").

**III.     The balance of equities tips in favor of the Conservation Groups.**

The balance of equities tips in favor of a preliminary injunction. On one hand, the threats caused by the groin are substantial and irreparable. On the other hand, Scott Steilen, CEO of Sea Island Acquisition, testified under oath that the company does not need the project in order to sell the lots. OSAH Transcript, 811:12-10. And, as courts in this Circuit have noted, "[i]t would do the intervenors little good if they were allowed to continue construction on permits later found to be invalid."  *Sierra Club v. Norton*, 207 F. Supp. 2d 1310, 1341 (S.D. Ala. 2002).

**IV.     An injunction is in the public interest.**

As discussed above, public opposition to the proposed groin is overwhelming. During the federal public comment period, over 98% of public commenters opposed the project. Even state legislators have weighed in. Representative Alex Atwood asked the State Shore Protection Committee for a reconsideration hearing "after hearing the concerns of several constituents [he] represent[s]." Representative Steve Jones did the same.

This should come as no surprise. The proposed Reserve development is located on private property within a gated community. No existing homes or structures are currently threatened by beach erosion downdrift of the proposed groin. Instead, Sea Island Acquisition desires to construct the groin to protect just eight undeveloped lots—and very exclusive, private lots at that. On the other hand, the construction of the proposed groin would come at a steep price

to the public—jeopardizing the integrity of the Spit, harming federally protected wildlife, and

disrupting the public's right to use tidelands on the Spit for their recreation and enjoyment. Put

simply, building a groin that will substantially harm the public interest for the sake of eight

unbuilt lots is entirely contrary to the public interest.

## CONCLUSION

For all of the discussed above, the Court should grant a preliminary injunction to stop this

imminent and irreparable injury.

Respectfully submitted this 31st day of October, 2018.

> **SOUTHERN ENVIRONMENTAL**
> **LAW CENTER**
>
> /s/ *William W. Sapp*
> William W. Sapp
> Georgia Bar No.  626435
> Megan Hinkle Huynh
> Georgia Bar No. 877345
> *Pro hac vice motion forthcoming*
> Bob Sherrier
> *Bar admission pending*
> *Pro hac vice motion forthcoming*
> Ten 10th Street NW, Suite 1050
> Atlanta, Georgia 30309
> Phone: (404) 521-9900
> Fax: (404) 521-9909
> bsapp@selcga.org
> mhuynh@selcga.org
> bsherrier@selcga.org
>
> *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on October 31st, 2018, I electronically filed the foregoing *Motion for
Preliminary Injunction and Memorandum of Law in Support* with the Clerk of Court using the
CM/ECF system. I also served the foregoing motion by certified mail with the Complaint and
Summons pursuant to the procedure for serving federal agencies set forth in FRCP 4(i).

> /s/ *William W. Sapp*

26