**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | |
|---|---|
| ALTAMAHA RIVERKEEPER and ONE HUNDRED MILES,<br><br>    Plaintiffs,<br><br>v.<br><br>THE UNITED STATES ARMY CORPS OF ENGINEERS; Lieutenant General TODD T. SEMONITE, in his official capacity as Commanding General of the U.S. Army Corps of Engineers; Colonel DANIEL HIBNER in his official capacity as District Commander of the Savannah District; and TUNIS McELWAIN, in his official capacity as Chief of the Regulatory Branch of the U.S. Army Corps of Engineers,<br><br>    Defendants. | Civil Action No.<br>4:18-cv-00251-JRH-JEG |

**MOTION TO INTERVENE BY SEA ISLAND ACQUISITION, LLC
AND MEMORANDUM IN SUPPORT**

Pursuant to Rule 24 of the Federal Rules of Civil Procedure, Sea Island Acquisition, LLC ("Sea Island") hereby moves to intervene as a Defendant in this action. Sea Island moves to intervene as a matter of right under Rule 24(a) on the grounds that (1) Sea Island's Motion is timely; (2) Sea Island has a direct and substantial interest in the permit that is the subject of this action; (3) the disposition of this action could adversely affect that interest; and (4) the existing parties to this action cannot adequately represent Sea Island's interests. In the alternative, Sea Island moves to intervene under the less restrictive standard of Rule 24(b) on the grounds that the Motion is timely and that its defense and the main action involve common questions of law and

fact. Moreover, allowing intervention will promote the interests of judicial economy and fairness without causing prejudice or undue delay.

In this case, Plaintiffs Altamaha Riverkeeper and One Hundred Miles ("Plaintiffs") seek to invalidate Permit #SAS-2015-00742 ("Permit") issued by the U.S. Army Corps of Engineers ("Corps") on September 11, 2018, to Sea Island Acquisition, LLC ("Sea Island"). Pursuant to Rule 24 of the Federal Rules of Civil Procedure, Sea Island now moves to intervene in this matter in defense of its rights under that Permit. Unless allowed to intervene, Sea Island's substantial legal interests could be severely jeopardized. Plaintiffs have sought to preliminarily enjoin the permitted project before the case is heard on the merits. This request, if granted, would threaten Sea Island's ability to protect the entire developed Sea Island shoreline. Indeed, the consequences of even a temporary construction delay would be enormous. Because Sea Island has a legally-protected interest in the permit that is the subject of this case, and because its ability to protect that interest would be impeded or impaired by an adverse ruling by the Court, Sea Island respectfully requests that it be allowed to intervene in this matter to defend its interests.

## FACTUAL BACKGROUND

More than three years ago, Sea Island submitted permit applications with both the State of Georgia and the U.S. Army Corps of Engineers seeking authorization to take steps to protect its exceptionally valuable upland property known as The Reserve. As originally conceived, Sea Island's proposal sought simply to extend the existing beach nourishment project on Sea Island that had been in place since the early 1990s.

As at many other coastal areas, erosion has long been a source of concern at Sea Island. The developed oceanfront property on Sea Island north of The Reserve was protected decades ago, initially by rock revetments and sloping concrete seawalls installed in the late 1970s and

2

early 1980s. The revetments and seawalls halted further retreat of the shoreline, but much of Sea Island then had no high tide beach. In the late 1980s and early 1990s, Sea Island prepared and obtained permits from the state and the Corps to construct two groins, one on the north end of the island and the other about three miles south, and to nourish the beach with approximately 2.3 million cubic yards of sand between the two groins. This project was enormously successful in protecting the Sea Island developed shoreline, and there has been no further dredging or beach nourishment since the late 1990s.

However, The Reserve, which is located immediately south of the existing south groin, had no revetment, beach nourishment, or other protection, and erosion continued there unabated. In 2015, Sea Island sought to lengthen its successful shoreline protection project by an additional 1200 feet to the south (about 7-8%) in order to protect The Reserve. The Reserve is spectacular property, with views of the Atlantic Ocean to the east, Black Banks River and the marsh to the west, and Gould's Inlet to the south. This land is extraordinarily valuable; the upland property alone is estimated to be worth in excess of $30 million.

Unfortunately, The Reserve's extremely prized development is currently at serious ongoing risk from storm damage and continuing erosion. In just the few years that Sea Island has been pursuing the permitted project, the Island has been hit with two "hundred-year" storms—Hurricane Matthew in October 2016 and Hurricane Irma in September 2017. As a result, Sea Island needs not only to protect The Reserve but also to replenish the entire nourished beach that had functioned so well since the 1990s. The hurricanes have lowered the beach profile and damaged the rock revetments along the entire shore, leaving the mid-part of the Island without a dry sand beach. The result is a shoreline with significantly diminished storm protection, reduced recreational beach, and little to no sea turtle nesting habitat.

To rectify these problems, Sea Island revised the proposed project to include the addition of between 1,315,000 and 2,500,000 cubic yards of beach quality sand to the Sea Island beach from an offshore location. As amended, this project not only provides the critical protection needed to safeguard The Reserve, but also provides storm protection to roughly three miles of beachfront property along Sea Island. Unlike most other beach nourishment efforts, the entire project is financed privately, with no funding support from any local, state, or federal governmental agency.

The Corps issued the final required permit for the project on September 12, 2018. As authorized by the Permit, Sea Island began construction of the groin on November 1, 2018. Moreover, mobilization is underway for the dredging and beach nourishment portion of the project. The Permit authorizes construction activities only between November 1 and May 1, in order to avoid potential conflicts with sea turtle nesting season, and this multi-faceted project will require most of that construction window. Moreover, it is important to the project that the new groin be at least substantially complete prior to the placement of nourishment sand in that area of the beach. It is imperative that Sea Island complete the permitted project—both the groin construction and the broader nourishment project—before the May 1, 2019 cutoff date when sea turtle nesting season begins. Failure to do so would risk enormous, possibly catastrophic, losses at The Reserve and all along Sea Island's oceanfront.

Beyond allowing Sea Island to protect its property, the project as a whole provides undeniable and overwhelming benefits to the public. The infusion of over 1.3 million cubic yards of sand will significantly improve the beach along more than three miles of the Sea Island shoreline, resulting in greatly enhanced storm protection for upland properties on all of Sea Island, which includes both resort properties and hundreds of privately-owned homes. In

addition, the project will provide an improved dry sand beach for the enjoyment of guests, members, and property owners, as well as the creation of high-quality habitat for sea turtles, shorebirds, and other wildlife.

## **PROCEDURAL HISTORY**

Over the past three years, this project has been subject to extensive examination. It has now been reviewed and approved by multiple state and federal agencies, including the Georgia Shore Protection Committee, an Administrative Law Judge with the Georgia Office of State Administrative Hearings, the Superior Court of Fulton County, the National Marine Fisheries Service, the U.S. Fish & Wildlife Service, and the U.S. Army Corps of Engineers.

**A.    Original Project Purpose and Design**

In 2015, Sea Island submitted permit applications with Georgia's Shore Protection Committee ("Georgia SPC") as well as the U.S. Army Corps of Engineers to address the specific issue of ongoing beach erosion and shoreline retreat threatening The Reserve.

As described in the original permit applications, the proposed project would extend the very successful 1990 beach nourishment project by 1200 linear feet, or about 7-8%. This involves construction of a new, tapered groin south of and shorter than the existing south groin, and mechanically moving 120,000 cubic yards of sand from the area north of the existing south groin to create a dune system and renourished beach to the south. The area between the existing south groin and the new groin was to be filled with sand beyond the seaward toe of the groin so that sand would immediately begin bypassing the new groin and reaching the beach further to the south.

**B.    The Georgia Shore Protection Committee Approves Sea Island's Permit**

On December 11, 2015, the Georgia SPC granted Sea Island the requested permit. As issued, the permit contained 13 standard conditions and another 17 special conditions, many with

several subparts. These permit requirements were designed to minimize any potential adverse effects of the project. Among other things, the conditions addressed: (1) compliance with other federal, state, and local laws; (2) sampling and pre-approval of sand used; (3) submittal of beach profile surveys and engineering reports; and (4) post-construction surveys. The permit also precluded construction during the sea turtle nesting and hatching season. The permit further required that the groin be "adjustable and removable" and provided that Sea Island would have to adjust or remove the groin if it were found to be causing unreasonably adverse impacts.

**C.     Administrative Law Judge Denies Plaintiffs' Challenge to the Georgia SPC Permit**

Plaintiffs here, together with others, unsuccessfully challenged the permit issued by the Georgia SPC by filing a petition for hearing with the Georgia Office of State Administrative Hearings ("OSAH"). Among other things, Plaintiffs asserted that the Georgia SPC had not adequately considered alternatives to the project and argued that the project would have significant adverse environmental effects, particularly as to sea turtles and shorebirds. Plaintiffs also complained that the project would interfere with access to and recreational use of public lands. An Administrative Law Judge heard testimony regarding these claims from nearly 20 witnesses over the course of four days. The ALJ also conducted a site visit to view the proposed project first hand.

Following extensive argument from the parties and consideration of proposed findings of fact and conclusions of law, the ALJ issued an order on August 26, 2016, upholding issuance of the permit. In her 46-page order, the ALJ thoroughly considered—and rejected—many of the same claims that Plaintiffs make here. In particular, the ALJ found that the project had been designed to minimize adverse effects to the sand-sharing system, that any incidental effects to wildlife would not be unreasonable, and that the permit conditions would provide an additional

6

failsafe. OSAH Order at 43-45. The ALJ likewise rejected the contention that the project would interfere with the public's use and enjoyment of public lands. OSAH Order at 28. "Weighed against Sea Island's interest in protecting its valuable upland property, the modest adverse impacts of the permitted project are not unreasonable." The ALJ accordingly affirmed the permit. That decision was affirmed by the Superior Court of Fulton County. Plaintiffs at that point abandoned any further appeals.

The Georgia SPC permit—along with its special conditions and other requirements—remains in full force and effect, and significant portions of the record of the state litigation will be included in the Administrative Record in this case.

**D.    Approval of Sea Island's Permit Application by the Corps**

At around the same time, Sea Island was hit with two significant storm events, Hurricane Matthew (October 2016) and Hurricane Irma (September 2017). In the wake of those storms, the nourished beach that had functioned so well since the 1990s needed to be replenished in order to provide improved storm protection for all the developed property along the Sea Island beach. The hurricanes had lowered the beach profile and damaged the rock revetments, leaving the majority of the developed portion of the Island without a dry sand beach. The result was an extended shoreline with significantly diminished storm protection, reduced recreational beach, and substantially smaller sea turtle nesting habitat. These conditions compelled Sea Island to take action to correct this serious problem.

On March 6, 2018, Sea Island revised its permit application with the Corps, which had originally sought storm protection only for the limited area of The Reserve, in order to extend the beach nourishment aspect of the project along three miles of the Sea Island shoreline. As revised, this nourishment project adds between 1,315,000 and 2,500,000 cubic yards of sand to the Sea

Island beach from an offshore location, thereby improving the storm protection functions of the beach and dune system, increasing wildlife habitat (for sea turtles in particular), and enhancing recreational values inherent to a healthy beach system. Instead of shoring up only The Reserve, these improvements will extend for miles, from the existing north groin on Sea Island to a location 1200 feet south of the existing south groin.

The Corps received comments from the Plaintiffs and others on the permitted project. The administrative record to be compiled by the Corps documents careful review of the project by the Georgia Department of Natural Resources, the Georgia Environmental Protection Division, the U.S. Fish & Wildlife Service, the National Marine Fisheries Service, and others. Notably, the Corps received *no* comments—not from Plaintiffs here or from any other commenters—objecting to the beach nourishment aspect of the project, either to the dredging of sand from the off-shore borrow site or to the placement of sand to nourish the Sea Island beach. All commenters seemed to acknowledge not only the need for storm protection but also the added benefits to wildlife that will result from beach nourishment.

On June 29, 2018, Sea Island obtained the required permit from the Georgia SPC pertaining to the more extensive beach nourishment aspect of the project. That permit was not appealed and remains in full force and effect.

After extensive consideration of the proposed project, including comments received from Plaintiffs and others, the Corps set forth its findings regarding the permitted project in an 86-page decision document entitled Memorandum for Record, Department of the Army Environmental Assessment and Statement of Findings for the Above-Referenced Standard Individual Permit Application, dated September 6, 2018 ("MFR" or "Memorandum"). Of particular note, the Memorandum provides: "Based on the design of the project and proposed

special condition, the Corps has determined that the project would have a minimal individual and cumulative adverse impacts on the sand sharing system." MFR at 74. Indeed, the Corps solicited an independent review of the project from Mr. Kevin Conner, a coastal engineer in the Corps' Wilmington District. Mr. Conner found that "it is unlikely that the construction of a new shorter groin just south of the existing southern groin would interrupt sediment transport in any measurable way under the current system." MFR at 74. Moreover, addressing the beach nourishment aspect of the project, the Corps concluded that the introduction of over 1.3 million cubic yards of sand will "allow the beach between the groins to eventually reach an equilibrium state and thus allow some sand to bypass the groins and travel downdrift to the spit and potentially to St. Simon's Island, including East Beach." MFR at 74.

Based on its findings, the Corps on September 12, 2018, issued a permit for the revised project. The Corps permit includes seven general conditions as well as nine special conditions, many with multiple subparts. These conditions are designed to assure the groin and nourishment project does not cause adverse effects. Many of the conditions mirror requirements contained in the Georgia SPC permit. For example, the Corps permit requires that all work take place between November 1st and April 30th to avoid turtle nesting season. Corps Permit, Special Condition 1. In addition, the Corps permit includes conditions requiring monitoring of the project before, during, and after construction, for the next five years, and imposes extensive measures to ensure that the sand deposited on the beach is of sufficiently high quality. Corps Permit, Special Conditions 2-3 & 6-8. Further, as a fail-safe, Special Condition 8(e) of the Corps permit provides:

> Should the Corps determine that the groin is causing negative impacts to the sand-sharing system, the Permittee shall submit a corrective action plan (i.e. sand bypass, adjustment/removal of the new groin, etc.) to the Corps and GADNR for review and approval.

9

Corps Permit, Special Condition 8(e).

After waiting some seven weeks following issuance of the Permit by the Corps, Plaintiffs filed the present action.

## ARGUMENT

### A.  Sea Island Is Entitled to Intervene as of a Matter of Right Under Rule 24(a)

Sea Island is entitled to intervene as a matter of right pursuant to Rule 24(a)(2), which provides in relevant part as follows:

> On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a). The Eleventh Circuit has adopted a four-part test to assess a motion for intervention as of right. Under this test, a party may intervene as a matter of right when (1) the motion is timely; (2) the applicant claims an interest relating to the property or transaction that is the subject of the action; (3) the applicant is so situated that disposition of the action may as a practical matter impede or impair its ability to protect that interest; and (4) the applicant's interest is not adequately represented by existing parties. *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1249-50 (11th Cir. 2002); *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989). Once these prerequisites to intervention are established, the court has no discretion to deny the motion. *United States v. Georgia*, 19 F.3d 1388, 1393 (11th Cir. 1994). "Any doubt concerning the propriety of allowing intervention should be resolved in favor of the proposed intervenors because it allows the court to resolve all related disputes in a single action." *Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 216 (11th Cir. 1993).

### 1. The Motion to Intervene Is Timely

Sea Island's application to intervene is plainly timely. Plaintiffs filed their Complaint just over two weeks ago. No responsive pleadings to the Complaint are yet due and no dispositive motions have been filed. No hearing has been set on the Motion for Preliminary Injunction. The request to intervene is timely because no legally significant proceedings have taken place, and the Motion will not cause any undue delay in the process of the overall litigation. Simply stated, these proceedings are at the very earliest stages. There can be no doubt that the application is timely and that no party will be prejudiced. *See Chiles*, 865 F.2d at 1213 (finding that a motion to intervene was timely when filed seven months after the original complaint, three months after the government filed its motion to dismiss, and before any discovery had begun).

### 2. Sea Island Has a Legally Protected Interest in the Action

Sea Island has undeniable interests in the property and the permit that is the subject of this case. To satisfy the "interest" requirement of Rule 24(a)(2), an applicant must have a "direct, substantial, legally protectable interest in the proceeding." *Chiles*, 865 F.2d at 1213-14 (quoting *Athens Lumber Co. v. Fed. Election Comm'n,* 690 F.2d 1364, 1366 (11th Cir. 1982)). It is not necessary that the intervenor's interest "be of a legal nature identical to that of the claims asserted in the main action." *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d at 1251. The inquiry instead is a practical one, "focus[ing] on the particular facts and circumstances surrounding each application." *United States v. Perry County Bd. of Educ.,* 567 F.2d 277, 279 (5th Cir. 1978). In sum, "the 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Sierra Club v. Espy*, 18 F.3d 1202, 1207 (5th Cir. 1994).

Again, there can be no doubt that Sea Island has legally protected interests entitling it to intervention. The Permit being challenged here was issued by the Corps to Sea Island. Sea Island plainly has a direct, substantial, and legally-protected interest in the agency approval of its own activities. It is well-established that those who hold permits have a legally protected interest in the context of third-party challenges to the government's issuance of those permits. *See, e.g.*, *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 819 (9th Cir. 2001) (finding that "lawsuit would affect the use of real property owned by the intervenor by requiring the defendant to change the terms of permits it issues to the would-be intervenor, which permits regulate the use of that real property. These interests are squarely in the class of interests traditionally protected by law"); *Sierra Club v. U.S. EPA*, 995 F.2d 1478, 1482 (9th Cir. 1993) (owner of facility that received Clean Water Act permit had legally protected interest in litigation by third party that would invalidate permit), *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Service*, 630 F.3d 1173 (9th Cir. 2010); *Nat'l Parks Conservation Ass'n, Inc. v. U.S. Army Corps of Eng'rs*, 446 F. Supp. 2d 1322, 1327 n.1 (S.D. Fla. 2006) (noting that "owner of the land and holder of the permit at issue" had been allowed to intervene as of right in lawsuit by environmental groups against the Corps seeking to invalidate intervenor's permit). Because it is Sea Island's permit and its groin and beach nourishment project that it is at issue in this case, Sea Island has a strong interest in defending this challenge.

### 3.   This Action Threatens to Impair Sea Island's Legally Protectable Interests

There is no question that Sea Island's interests could be adversely affected by the relief requested by Plaintiffs, who specifically seek to "[v]acate and enjoin reliance on the Permit," "[e]njoin construction of the groin," and "[r]equire removal of any portion of the groin built during this litigation and restoration of any affected shoreline." EFC No. 1 at 20.

The express purpose of the intervention rule is to protect parties such as Sea Island, which have interests that are "of such a direct and immediate character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment." *United States v. AT&T*, 642 F.2d 1285, 1292 (D.C. Cir. 1980) (quoting *Smith v. Gale*, 144 U.S. 509, 518 (1892)). In determining whether an action threatens to impair a potential intervenor's interests, a reviewing court must look at the "'practical consequences' of denying intervention." *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 909 (D.C. Cir. 1977) (quoting *Nuesse v. Camp*, 385 F.2d 694, 702 (D.C. Cir. 1967)); *see also Chiles*, 865 F.2d at 1213 (applicant must show that the "disposition of the action, as a practical matter, may impede or impair [its] ability to protect that interest"). All that is required "is that the would-be intervener be practically disadvantaged by his exclusion from the proceedings." *Huff v. Commissioner of IRS*, 743 F.3d 790, 800 (11th Cir. 2014).

The potential adverse consequences of Plaintiffs' claims to Sea Island's interests are significant. As noted above, Plaintiffs seek to vacate the Corps Permit, enjoin construction of the groin, require removal of any portion of the groin that has been built, and to restore any altered shoreline. If successful, Plaintiffs' lawsuit would prevent or delay Sea Island from completing the permitted project, thereby creating substantial risk to Sea Island's property. Unless measures are taken to halt the ongoing erosion, the retreat of the shoreline into The Reserve is expected to continue. Indeed, conditions have grown much more dire in just the past few years as the Georgia coast has experienced two hurricanes and multiple northeast storms. The result is that The Reserve, which is valued in excess of $30 million, now faces the serious risk of catastrophic harm should another significant storm hit Sea Island before protective measures are put in place. Beyond The Reserve itself, the other three miles of Sea Island shoreline have likewise been

seriously compromised. Petitioners' challenge to the Corps Permit directly and significantly implicates Sea Island's interests. *See, e.g.*, *Espy*, 18 F.3d at 1207 (intervention appropriate where "it is obvious that the economic interests of the movants are at stake"); *Friends of Animals v. Kempthorne*, 452 F. Supp. 2d 64, 70 (D.D.C. 2006) ("costs, delays and uncertainties associated with the denial of intervention" were sufficient to establish that action threatened to impair applicant's interests).

The Tenth Circuit considered a highly analogous issue in *Natural Resources Defense Council. Inc. v. U.S. Nuclear Regulatory Commission*, 578 F.2d 1341 (10th Cir. 1978). In that case, the American Mining Congress ("AMC") and Kerr-McGee sought to intervene in an action instituted by the NRDC seeking declaratory and injunctive relief against the NRC and the New Mexico Environmental Improvement Agency prohibiting those agencies from issuing licenses for the operation of uranium mills in New Mexico without an environmental impact statement. In reversing the District Court's refusal to allow AMC and Kerr-McGee to intervene, the Tenth Circuit explained why they should be permitted to intervene as of right:

> [Kerr-McGee] operates a uranium mill in Grants, New Mexico, pursuant to an NMEIA license, which application for renewal is pending. A decision in favor of the plaintiffs, which is not unlikely, could have a profound effect upon Kerr-McGee. Hence, it does have an interest within the meaning of Rule 24(a)(2). . . . The interest asserted on behalf of Kerr-McGee and the American Mining Congress is one which is a genuine threat to Kerr-McGee and the members of the American Mining Congress to a substantial degree.

*Id.* at 1344. The same is true of Sea Island here.

### 4. No Party to This Action Can Adequately Protect Sea Island's Interests

The Corps and agency officials named as Defendants will not adequately represent Sea Island's interests. This final requirement is "satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as

14

minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972); *see also Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d at 1255-56; *Chiles*, 865 F.2d at 1214. This "minimal burden" is more than met here.

The government is in a fundamentally different position than Sea Island. The named defendants—a government agency and three government officials named in their official capacities—have no vested interest in the permitted project on Sea Island nor in whether or not measures to protect the Sea Island shoreline are promptly put into place. Their primary interest must be in defending their process of review and reasoning in deciding to issue the contested Permit. If Plaintiffs were to succeed in challenging or enjoining the Permit, the agency defendants would suffer no economic injury or harm to the agency's mission. Sea Island, on the other hand, has an interest in the Permit itself and is highly motivated to represent its own business and property interests. If the Plaintiffs were successful, Sea Island would be prevented from protecting its extremely valuable upland property, placing those assets at serious risk. Thus, the agency defendants and Sea Island have a completely different stake in the matter.

Under these circumstances, Sea Island's interests are not adequately represented by the agency. *See, e.g.*, *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d at 1259 ("[A] federal defendant with a primary interest in the management of a resource [lacks] interests identical to those of an entity with economic interests in the use of that resource."); *Fund for Animals, Inc. v. Norton*, 322 F.3d, 728, 736 (D.C. Cir. 2003) (intervenor's interests "plainly [were] not adequately represented by the federal defendants" even though both agreed that "the FWS's current rules and practices [were] lawful"); *see also Dimond v. Dist. of Columbia*, 792 F.2d 179, 192-93 (D.C. Cir. 1986) ("A government entity such as the District of Columbia is charged by law with representing the public interest of its citizens. State Farm, on the other hand, is seeking

15

to protect a more narrow and 'parochial' financial interest not shared by the citizens of the District of Columbia."); *Sierra Club v. Martin*, No. Civ. A 1:96-CV-926FMH, 1996 WL 452257, at *3 (N.D. Ga. June 17, 1996) (finding significant difference of interests between intervening Timber Contractors and U.S. Forest Service: "While the ultimate objective of the Timber Contractors is in synchrony with the ultimate objective of the Federal Defendants, the actual interests of the Timber Contractors and the Federal Defendants are not totally identical. The Timber Contractors' interests are in resuming operations on their timber contracts, and they have a stronger incentive to protect their economic interests than the Federal Defendants do."); *Costle*, 561 F.2d at 912-13 (rubber and chemical companies allowed to intervene in action against EPA where settlement agreement required EPA to establish regulations for various pollutants because applicant-intervenors' interests were "more narrow and focused than EPA's").

In sum, both the spirit and letter of Rule 24(a) are satisfied in this case. Sea Island has substantial interests in the challenged Permit, and its valuable property and interests may be significantly affected by the outcome of this case. Intervention of right has been established and should be allowed.

**B.     Alternatively, Sea Island May Intervene Permissively Pursuant to Rule 24(b)**

Alternatively, Sea Island requests that the Court grant it permissive intervention. Rule 24(b) provides that "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact."

There are two prerequisites for Rule 24(b)(2) intervention: "(1) the application to intervene [must be] timely; and (2) the intervenor's claim or defense and the main action [must] have a question of law or fact in common." *Purcell v. BankAtlantic Fin. Corp.*, 85 F.3d 1508, 1513 (11th Cir. 1996). Sea Island has met these requirements. First, as noted above, this Motion

is timely as the Complaint was just recently filed and no responsive pleadings have been filed or are presently due. Second, common questions of law and fact exist between Sea Island's defenses and the main action as both directly concern the Corps Permit authorizing the groin and beach nourishment project. As a result, if this Court does not permit Sea Island to intervene as a matter of right, permissive intervention is appropriate to allow Sea Island to protect its interests and present its defenses to Plaintiffs' claims.

## CONCLUSION

Sea Island meets all of the criteria for intervention. Accordingly, Sea Island respectfully requests that the Court grant its Motion to Intervene as a matter of right pursuant to Rule 24(a)(2), or, in the alternative, allow Sea Island to permissively intervene pursuant to Rule 24(b). Sea Island also asks that the Court order that (1) the Answer of Sea Island Acquisition, LLC (Attachment A); (2) Sea Island's Disclosure Statement Under S.D. Ga. LR 7.1.1 (Attachment B); (3) Sea Island's Notice of Alternative Dispute Resolution and Case Management Procedures Under S.D. Ga. LR 16.7 (Attachment C); and (4) Sea Island's Motion and Memorandum in Support Seeking a Due Date for Its Response to Plaintiffs' Motion for Preliminary Injunction (along with proposed order) (Attachment D), be deemed filed.

The United States has represented to undersigned counsel that it does not oppose Sea Island's Motion to Intervene. Counsel have not been able to reach agreement with Plaintiffs regarding the Motion to Intervene and the time for Sea Island to respond to the Motion for Preliminary Injunction. For this reason, Sea Island has attached a motion, referenced above as Attachment D, seeking a due date for its response to Plaintiffs' Motion for Preliminary Injunction.

A proposed Order granting the Motion to Intervene is attached for the Court's convenience.

Respectfully submitted, this 16th day of November, 2018.

| | |
|---|---|
| **HALL BOOTH SMITH, P.C.** | **KING & SPALDING LLP** |
| /s/ James B. Durham | PATRICIA T. BARMEYER |
| JAMES B. DURHAM |  Georgia Bar No. 038500 |
|  Georgia Bar No. 235526 | RANDY J. BUTTERFIELD |
| 3528 Darien Highway, Suite 300 |  Georgia Bar No. 100120 |
| Brunswick, Georgia 31525 | *(Pro Hac Vice application forthcoming)* |
| Phone: (912) 554-0093 | 1180 Peachtree Street |
| Fax:    (912) 554-1973 | Atlanta, Georgia 30309-3521 |
| Email: jdurham@hallboothsmith.com | Phone: (404) 572-4600 |
| | Fax:    (404) 572-5137 |
| | Email: pbarmeyer@kslaw.com |
| |             rbutterfield@kslaw.com |

*Attorneys for Sea Island Acquisition, LLC*

## **CERTIFICATE OF SERVICE**

      This is to certify that I have this day served a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter:

      DATED:  November 16, 2018.

<u>/s/ Patricia T. Barmeyer</u>
PATRICIA T. BARMEYER
  Ga. Bar No. 038500
KING & SPALDING LLP
