IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| ALTAMAHA RIVERKEEPER and ONE HUNDRED MILES<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES ARMY CORPS OF ENGINEERS et al.,<br><br>Defendants. | Docket No. 4:18-cv-00251-JRH-JEG |

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Given the ongoing and irreparable harm caused by the construction of the proposed project, Altamaha Riverkeeper and One Hundred Miles (the Conservation Groups) filed a Motion for Expedited Consideration on November 20, shortly before filing this brief. Because they seek expedited consideration, the Conservation Groups file this Reply one day after receiving Defendants' Response in Opposition to Plaintiffs' Motion. Accordingly, the Conservation Groups' Reply Brief does not address all legal issues in the Defendants' Response; however, certain points deserve mention.

**A. The Corps must independently analyze alternatives.**

In its Response Brief, the Corps points to Sea Island's analysis as to why the Conservation Groups' proposed alternatives would not work but does not identify anywhere in the record that it performed its own analysis (or even independently approved or verified Sea Island's analysis). *See* Defs. Br., ECF. No. 13, at 13. It should come as no surprise that *the applicant* thinks its proposed project is the best idea. But the law requires the *Corps* to make this determination, not the applicant. This makes sense—to hold otherwise would allow the Corps "to

abdicate its statutory duties by reflexively rubber stamping a statement prepared by others." *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974) ("The agency must independently perform its reviewing, analytical and judgmental functions and participate actively and significantly in the preparation and drafting process.").

The law on this point is clear: "The Corps has a duty to *independently evaluate* practicable alternatives to the proposed project . . . ." *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1263–67 (S.D. Fla. 2009) (emphasis added), *aff'd*, 362 F. App'x 100 (11th Cir. 2010). This is true under both Clean Water Act and NEPA regulations. *See id.* (discussing the Corps' duties to analyze practicable alternatives under Clean Water Act regulations); 40 C.F.R.. 1506.5(b) (discussing an agency's duties under NEPA regulations, and instructing that "the agency … shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment."). For example, under NEPA regulations, although an applicant may submit its own information about alternatives, "the district engineer should document *in the record* the Corps' *independent evaluation* of the information and *its accuracy*, as required by 40 C.F.R. 1506.5(a)." 33 C.F.R. § Pt. 325, App. B (emphasis added); *see also Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1165, 1187 (10th Cir. 2002) (holding that when a public commenter and an applicant disagree over the practicability of an alternative, the Corps may not rely upon the applicant's position without independently verifying its accuracy).

Tellingly, the Corps points to no statement *by the agency* on why other alternatives, like nourishment without a groin, would not work.[1] Nor does the Corps point to any place in the

[1] Although the Conservation Groups discuss this alternative in their Motion, it bears repeating: Coastal engineers have opted for nourishment *without* a groin in over 96% of similar projects conducted in the Southeast over the past ten years. Written Direct Testimony of Dr.

record where the agency independently evaluated or verified Sea Island's consideration of alternatives.[2] In fact, in the "Response to Comments" section of the Environmental Assessment (or MFR, as the Corps calls it), the Corps indicates that it "is satisfied with the applicant's response" on nearly every other issue. *See, e.g.*, Environmental Assessment (EA) (attached to Pls. Mot. as Ex. K) at 19, 20, 23, 24, 26, and 33. With respect to Sea Island's analysis of alternatives, however, the Corps did not say that it was "satisfied with the applicant's response," like it did on so many other of Sea Island's responses. Indeed, the Corps did not indicate that it accepted, incorporated, or even considered Sea Island's analysis in any way. Instead, the Environmental Assessment directs readers to Section 5 of the document, where the Corps explicitly incorporates one paragraph of Sea Island's alternatives analysis, but leaves out the bulk of the company's analysis—including parts that the Corps cites in its Response Brief. *Cf. Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (explaining the common-sense *expressio unius* canon which allows the inference that things in an associated group that are not mentioned "were excluded by deliberate choice").

---

Robert Young (attached to Pls. Mot. as Ex. D) at ¶ 27. Indeed, even the Corps' own guidance manual counsels that "[c]oastal zone management policy in many countries and the United States presently discourages the use of groins for shore protection." U.S. Army Corps of Eng'rs, Coastal Engineering Manual (USACE Manual) at V-3-61. In fact, even Dr. Basco, the coastal engineering expert proffered by Sea Island, conceded that nourishment without a groin would be "technically feasible." OSAH Tr. at 726:2–8; 15–23.

[2] For example, the Corps points to Sea Island's statement that Dr. Webb's report confirms that the half-life of a nourishment project from the existing south groin to the end of the spit would be only 1.25 years. *See* Defs. Br. at 11. Had the Corps independently verified this statement (or even performed a simple check of Sea Island's citations), it would have learned that this statement was taken out of context and omitted Dr. Webb's caveat that "adequate bypassing from the existing south groin would substantially increase the longevity of this fill material." And adequate bypass is a condition of the existing groin's permit, and Sea Island has repeatedly insisted that the south groin has adequate bypassing of sand.

The Corps' claim that it independently determined nourishment without a groin was not practicable because of the conservation easement is wrong. The Corps referenced the easement in passing to indicate that "currently there is no development nor potential for development in the upland property that is bounded by the existing conservation easement." EA at 40. The Corps did *not* say that the conservation easement was a basis for rejecting nourishment without a groin as an alternative, did *not* analyze the language of the conservation easement in any way, and did *not* attempt to determine whether the easement even applied.[3]

**B. The Corps should have prepared an Environmental Impact Statement.**

Rather than argue that no significance factors were present, the Corps spends several pages discussing how it "*considered* the factors Plaintiffs allege the agency did not consider." Def. Br. at 13 (emphasis added). That discussion is irrelevant: if the significance factors are present, an Environmental Impact Statement is required. *See Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005) (holding that any "one of these factors may

[3] Even if the Corps had properly relied on the conservation easement—which it did not—its analysis would be arbitrary and capricious. First, the conservation easement states that if an activity does not impair conservation values and the holder of the conservation easement approves, the activity may proceed. Under the terms of the easement, "Shoreline Engineering Activities" [including 'beach restoration or re-nourishment'] more than 160 feet south of the northern boundary are not specifically listed under the "Prohibited Uses" provision. Easement at p. 7, ¶ 8. Instead, these activities would fall under ¶ 8(k), which prohibits "any [other] unanticipated use or activity on or at the Property which would impair conservation values . . . ." Id. at p. 8, ¶ 8(k). That section, however, is modified as follows: "unless such use or activity is necessary for the protection of the Conservation Values that are the subject of this Easement, in which case such use or activity shall be subject to the approval of Grantee [St. Simons Land Trust], which approval shall not be unreasonably withheld." Id. at p. 8, ¶ 8(k). Under these limited circumstances, it is possible that the grantee would find that nourishment from the existing south groin to Gould's Inlet—for the limited purpose of avoiding the detrimental impacts of an updrift groin—would further the Conservation Values referenced in the easement and thus permit such nourishment. In any event, the record shows that the Spit could be nourished from the southern groin to its tip without affecting the portion of the beach protected by the conservation easement.

be sufficient to require preparation of an EIS in appropriate circumstances"); *see also Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 235 (D.D.C. 2003).

Moreover, the Corps has not made a "convincing case" for why there are no significant impacts, which the law requires it to do. *See Hill v. Boy*, 144 F.3d 1446, 1451 (11th Cir. 1998) (requiring agency to "make a convincing case in support of a finding of no significant impact"). Instead, the Corps points out that its issuance of the permit involved "a years-long process," "two public comment periods," and "preparation of an in-depth Environmental Assessment." Def. Br. at 2. But volume cannot make up for sufficiency. To the contrary, the length and complexity of the permitting process suggest the Corps should have prepared an Environmental Impact Statement, not the other way around. As one court put it, "To announce that these documents—despite their length and complexity—demonstrate an [Environmental Impact Statement] is unnecessary is rather like the mathematics teacher who, after filling three blackboards with equations, announces to the class, 'You see, it is obvious.'" *Sierra Club v. Marsh*, 769 F.2d 868, 874 (1st Cir. 1985) (Breyer, J.).

In any event, the Corps' so-called consideration of these issues was arbitrary and capricious at best. Take, for example, the project's impact on wildlife.[4] The Corps says it considered all "potential impacts to wildlife" and "reasonably concluded" that the project would

[4] Another example is the Corps' inadequate consideration of impacts to the sand-sharing system. Although they claim to have relied on an "independent review" by Kevin Conner in the Corps' Wilmington Office, it deserves mention that this "independent review" is a two-paragraph (less than one page) email. In the email, Mr. Conner acknowledges that "there is very limited data within the reports [reviewed by Mr. Conner] with no information included on sediment budget and limited reference to littoral transport along the island." *See* Email from Kevin Conner, U.S. Army Corps of Eng'rs, to Sarah Wise, U.S. Army Corps of Eng'rs (May 24, 2017). Mr. Conner also cautions that "[a] sediment budget of the island including inlets and corresponding ebb shoals to the north and south of Sea Island for both pre- and post-construction of the shoreline hardening and jetty system is needed to fully evaluate the impact of the 'as constructed' shoreline protection project." *Id.* This does not count as a "hard look" under NEPA.

not have harmful impacts. Defs. Br. at 13. What they don't say, however, is that the Georgia Department of Natural Resources, the U.S. Fish and Wildlife Service, the National Marine Fisheries Service, and an independent expert all concluded the opposite. *See* Letter from Jon Ambrose, Ga. Dep't of Nat. Res., Wildlife Res. Div., to Sheldon Leiker, Ga. Dep't of Nat. Res., Coastal Res. Div. (Nov. 24, 2015) at 4-6 (attached to Pls. Mot. as Ex. E) (explaining how construction of T-head groin would harm federally protected sea turtles and shorebirds); Letter from Donald Imm, U.S. Fish and Wildlife Serv., to Sheldon Leiker, Ga. Dep't of Nat. Res., Coastal Res. Div. (Nov. 24, 2015) at 1-2 (attached to Pls. Mot. as Ex. F) (recommending denial of state permit and explaining why construction of T-head groin would harm federally protected sea turtles and shorebirds); Letter from U.S. Fish and Wildlife Serv. to Col. Marvin Griffin, U.S. Army Corps of Eng'rs (May 22, 2018) at 2 (attached to Pls. Mot. as Ex. J) (acknowledging that proposed project may affect, but is not likely to adversely affect, endangered species, but explaining that T-head groin "is anticipated to result in decreased nesting and the loss of nests that do get laid within the project area for all subsequent nesting seasons following completion of the proposed project"); Letter from Virginia M. Fay, Nat'l Marine Fisheries Serv., to Col. Daniel Hibner, Army Corps of Eng'rs (July 27, 2018) at 1 (attached to Pls. Mot. as Ex. P) (recommending denial of the T-head groin portion of the permit because "[t]he Savannah District did not respond to" NMFS' concerns about pelagic eggs and larvae); Transcript of OSAH Hearing, *One Hundred Miles, et al. v. Shore Protection Committee*, OSAH-BNR-SP-1630908-60-Miller (May 9-12, 2016) at 256:21-257:5 (excerpts attached to Pls. Mot. as Ex. L) (Mark Dodd, Georgia Department of Natural Resources' Sea Turtle Coordinator, testifying that proposed project would unreasonably harm sea turtles); Written Direct Testimony of Dr. Kirt

Rusenko at ¶ 36 (attached to Pls. Mot. as Ex. Q) (independent expert testifying that the proposed project would unreasonably harm sea turtles).

In fact, the only party during this entire process to conclude that the project would not harm wildlife is Sea Island itself. Again, however, NEPA does not allow the Corps to "reflexively rubber stamp[]" the applicant's conclusion, especially when that conclusion is directly contradicted by the state and federal wildlife agencies tasked with protecting the species at issue. *See Sierra Club*, 502 F.2d at 59.

Finally, although the Corps now says it adequately considered the impacts of the proposed project on pelagic eggs and larvae in its July 17, 2018 letter, that National Marine Fisheries Service did not agree, complaining:

> The Savannah District did not respond to the concern that the close spacing of the proposed groin with the existing groin may create a trap for pelagic eggs and larvae of managed species and their prey, beyond noting the area of direct effects from groin construction is small and that ample habitat exists upstream and downstream from the project. The alterative analysis provided by the applicant also failed to provide an assessment of potential impacts to egg and larval transport. Given the lack of response to this issue, the NMFS continues to recommend that the permit not allow the T-head groin.

Letter from Virginia M. Fay, Nat'l Marine Fisheries Serv., to Col. Daniel Hibner, Army Corps of Eng'rs (July 27, 2018) at 1.

Put simply, the Corps did not adequately consider the significance factors, and even if they had, it is not enough to consider those factors in an Environmental Assessment—if they are present, the Corps *must* prepare an Environmental Impact Statement.[5] In analyzing the Corps'

[5] An Environmental Assessment, no matter how lengthy, cannot replace an Environmental Impact Statement. *See Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2011). An Environmental Impact Statement requires a more rigorous exploration of alternatives and a full analysis of appropriate mitigation measures, and requires that the agency obtain missing or incomplete

decision, it bears mention that "[a] determination that significant effects on the human environment will in fact occur is not essential. If substantial questions are raised about whether a project may have a significant effect upon the human environment, an EIS must be prepared." *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric*., 681 F.2d 1172, 1177–78 (9th Cir.1982) (citations omitted); *see also Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 2015) ("[I]f *any* significant environmental impacts *might* result from the proposed agency action, then the agency has to prepare an Environmental Impact Statement") (emphasis added). Surely those questions exist here, where, for example, every wildlife agency, both state and federal, determined that there would be harmful impacts to wildlife, and at least one federal agency said its recommendations were "ignored" and recommended denial of the T-head groin portion of the permit.

**C. The Corps' cumulative impacts analysis is deficient.**

The Corps does not dispute that the geographic scope of its cumulative impacts analysis is limited to the direct impact zone of the project. *See* Defs. Br. at 21. Instead, they say that the Corps shouldn't have to consider a larger geographic scope, citing no authority to support their argument and ignoring the government's own guidelines on cumulative impacts. As discussed in the Conservation Groups' Motion, "[w]hen analyzing the contribution of [the] proposed action to cumulative effects…the geographic boundaries of the analysis *almost always should be expanded* [past the immediate area of the proposed action]." Council on Envtl. Quality, Exec. Office of the President, *Considering Cumulative Effects under the National Environmental Policy Act* (Jan. 1997) at 12 (emphasis added), *available at* https://ceq.doe.gov/docs/ceq-publications/ccenepa/sec2.pdf. And although the Corps criticizes the Conservation Groups'

---

information so long as the costs of obtaining it are not exorbitant. *See* 40 C.F.R. §§ 1502.14(a); 1502.14(a); and 1502.22.

argument that the agency should have looked at the "coastal region," the Conservation Groups' position directly tracks the federal Council on Environmental Quality's (CEQ) recommendations, which say that when conducting a cumulative effects analysis for coastal zone resources, the agency should look at the entire "coastal region or watershed." *Id.* at 15. The Corps' failure to do so here does not satisy its obligations to assess the cumulative impacts of the project under NEPA or the Clean Water Act's 404(b)(1) guidelines.

**D. Plaintiffs will suffer irreparable harm absent a preliminary injunction.**

The Corps complains that Plaintiffs "provide no specificity as to the harms they will suffer," instead "speak[ing] only in general terms." Defs. Br. at 24-25. But the Conservation Groups specifically state that the proposed project will harm the sand-sharing system, trigger accelerated erosion, harm wildlife, and may cause the Spit to break apart—none of which could be adequately compensated with money damages. Apart from the other harms addressed in the Conservation Groups' Motion, surely written opinions from the U.S. Fish and Wildlife Service, the National Marine Fisheries Service, and the Georgia Department of Natural Resources confirming that the construction of the T-head groin will harm and *kill* wildlife, including endangered and threatened species, satisfy this standard. Indeed, it is hard to imagine a more irreparable harm. As discussed in the Conservation Groups' Motion, case law strongly supports the issuance of a preliminary injunction when these types of damages are at stake. *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable."); *U.S. v. Jenkins*, 714 F. Supp. 2d 1213, 1221-22 (S.D. Ga. 2008) (noting that "a court may more readily find that an environmental injury is 'irreparable'").

**E. Plaintiffs do not allege an Endangered Species Act claim at this time.**

The Corps also complains that the Conservation Groups "have not properly pled a violation of the Endangered Species Act…." Defs. Br. at 18. The Conservation Groups do not disagree. As discussed in Plaintiffs' Motion, the Conservation Groups sent a 60-day notice letter to the Corps outlining the Corps' Endangered Species Act violations (attached to Pls. Mot. as Ex. S), and will seek to amend the Complaint if necessary upon the expiration of the 60-day notice period. At this time, however, the Conservation Groups do not seek a preliminary injunction based on any Endangered Species Act claim. However, the Corps' failure to adequately consult with the National Marine Fisheries Service after the applicant increased the proposed sand volume over twenty fold and proposed offshore dredging and pumping for the first time is indicative of the Corps' lack of attention to its legal obligations throughout the permitting process.

**F. The groin prevents access to 1,200 feet of public tidelands.**

The Corps misunderstands the problem regarding accessibility, as it did in the Environmental Assessment. First, although the Corps argues that the groin would "not pose a serious barrier to access… from the water," it certainly poses a barrier to access by beachgoers and boaters who land on the Spit and walk on public tidelands, as shown in the below photograph of the existing groin.[6] Second, it was arbitrary for the Corps to rely on Sea Island's unsupported conclusion that there would be "no effort to interfere with" access now or in the future. The "effort" is the rock wall that plainly interferes with the *public*'*s* access to *public* tidelands. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

[6] The existing groin is approximately one hundred and fifty feet longer than the proposed groin, but the attached photograph shows how groins can create a barrier to access.

29, 43 (1983) (noting that an agency's conclusion is arbitrary and capricious when it "entirely fail[s] to consider an important aspect of the problem").



**Conclusion**

For all of the discussed above and in Plaintiffs' Motion, the Court should grant a preliminary injunction to stop this imminent and irreparable injury.

Respectfully submitted this 20th day of November.

**SOUTHERN ENVIRONMENTAL LAW CENTER**

/s/ *William W. Sapp*
William W. Sapp
Georgia Bar No. 626435
Megan Hinkle Huynh
Georgia Bar No. 877345
*Admitted pro hac vice*
Bob Sherrier
Georgia Bar No. 979890
*Pro hac vice motion forthcoming*
Ten 10th Street NW, Suite 1050
Atlanta, Georgia 30309
Phone: (404) 521-9900
bsapp@selcga.org
mhuynh@selcga.org
bsherrier@selcga.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on November 20th, 2018, I electronically filed the foregoing *Plaintiffs' Reply in Support of Motion for Preliminary Injunction* with the Clerk of Court using the CM/ECF system.

/s/ *William W. Sapp*