IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

ALTAMAHA RIVERKEEPER and ONE   *
HUNDRED MILES,   *
  *
     Plaintiffs,   *
  *
  *
        v.   *       CV 418-251
  *
THE UNITED STATES ARMY CORPS OF   *
ENGINEERS; Lieutenant General   *
TODD T. SEMONITE, in His   *
Official Capacity as Commanding   *
General of the U.S. Army Corps   *
of Engineers; Colonel DANIEL   *
HIBNER, in His Official   *
Capacity as District Commander   *
of the Savannah District; TUNIS   *
MCELWAIN, in His Official   *
Capacity as Chief of the   *
Regulatory Branch of the U.S.   *
Army Corps of Engineers,   *
  *
     Defendants.   *

**O R D E R**

Before the Court is Plaintiffs Altamaha Riverkeeper and One Hundred Miles' (collectively, "Plaintiffs") motion for a preliminary injunction. (Doc. 5.) In September of 2018, the Army Corps of Engineers ("Corps") issued a combined environmental assessment and finding of no significant impact (Doc. 5-11) and granted Sea Island Acquisition, LLC[1] a permit (Doc. 5-1). On

---

[1] On November 16, 2018, Sea Island Acquisition, LLC filed a motion to intervene as a defendant. (Doc. 12.) As of the date of this Order, that motion is still pending.

October 31, 2018, Plaintiffs concurrently filed a complaint for declaratory judgment (Doc. 1) and the current motion for a preliminary injunction (Doc. 5). On November 19, 2018, Defendants filed a response. (Doc. 13.) The following day, Plaintiffs filed a motion asking the Court to expedite consideration of its motion for preliminary injunction (Doc. 15) and a reply to Defendants' response (Doc. 17). On November 21, 2018, Sea Island Acquisition filed a motion for a hearing to explain the harm it would suffer if the injunction were granted. (Doc. 19.) On November 30, 2018, Plaintiffs filed an amended motion for a temporary restraining order or preliminary injunction (Doc. 21) that did not offer any new arguments but supplied the Court with an updated photograph of the ongoing construction. Finally, on December 3, 2018, Defendants filed a response in opposition to Plaintiffs' amended motion. (Doc. 22.)

As a preliminary matter, the Court **GRANTS** Plaintiffs' motion to expedite consideration (Doc. 15), **DENIES** Sea Island Acquisition's request for a hearing (Doc. 19), and **DENIES AS MOOT** Plaintiffs' amended motion (Doc. 21) because Plaintiffs ask for no new relief.[2] The Court now undertakes a decision on Plaintiffs' motion for a preliminary injunction (Doc. 5).

---

[2] Plaintiffs state, "Because the standards for preliminary relief in either form are the same, Plaintiffs incorporate all facts and arguments set forth in their original Motion for Preliminary Injunction." (Pls.' Am. Mot., Doc. 21, at 1.)

## I. FACTUAL AND PROCEDURAL BACKGROUND

Sea Island Acquisition, LLC ("Sea Island Acquisition"), a private resort and real estate development company, desires to build a new development (the "Development") on Sea Island. To "stabilize the eroding beach" in front of the Development, Sea Island Acquisition sought permission to construct a T-head groin[3] ("Proposed Groin") immediately south of the Development. (See Dec. 18, 2015 Public Notice, Doc. 13-3, at 1.) The Proposed Groin is south of two existing groins — one referred to as the "Southern Groin" and the other as the "Northern Groin" (collectively, "Existing Groins"). The application also sought authorization to construct dunes and renourish the beach between the Existing Groins and Proposed Groin.[4]

On December 18, 2015, the Corps published notice of the Project. (Id.) Following the initial notice and comment period, two major hurricanes, Matthew and Irma, caused substantial damage to Sea Island. The storms severely eroded the beach face and many of the frontal dunes on the Spit.[5] (Southern Environmental Law

---

[3] A groin is a hard structure, often constructed of rock, concrete, or steel, that is built perpendicular to a beach to trap or block sand from naturally flowing with the tides. (Dr. Webb Test., Doc. 5-3, at 4.) Because sand is trapped, the beach downdrift of a groin may retreat. (Id. at 4.)

[4] The proposed construction of the groin, renourishment of the beach, and activities in furtherance thereof are collectively referred to as the "Project."

[5] The Spit is located at the southern end of Sea Island and is largely protected by a conservation easement. (Resp. to Mot. for Prelim. Inj., Doc. 13, at 6 n.5.) Plaintiffs state it "provides significant habitat for state and federally protected sea turtles, shorebirds, and other species. . . . [It] is also a popular recreation area." (Mot. for Prelim. Inj., Doc. 5, at 2.)

Center ("SELC") May 23, 2018 Letter, Doc. 5-7, at 4; SELC Feb. 28, 2017 Letter, Doc. 5-8, at 21-22.) In light of these impacts, on March 6, 2018, Sea Island Acquisition submitted an addendum to its 2015 permit application seeking authorization to dredge between 1,315,000 and 2,500,000 cubic yards of sand from an offshore source and to renourish approximately 17,000 linear feet of beach on Sea Island. (See Mar. 20, 2018 Public Notice, Doc. 13-4, at 1-2, 16.) These changes increased the length of the Project from 1,200 linear feet to approximately 17,000 linear feet, increased the proposed sand volume from 120,000 cubic yards to up to 2,500,000 cubic yards, proposed retrieving sand from the ocean instead of an onshore source, and proposed the use of hydraulic cutterhead dredges. (Permit SAS-2015-00742, Doc. 5-1, at 1; compare Dec. 18, 2015 Public Notice, Doc. 13-3, at 1-2, with Mar. 20, 2018 Public Notice, at 1-2.) Because the proposed changes were substantial, the Corps issued a new public notice, and Sea Island Acquisition submitted a supplementary biological assessment. (Mar. 20, 2018 Public Notice.)

After reviewing the comments, the Corps, on September 12, 2018, issued a permit authorizing Sea Island Acquisition to (1) construct the Proposed Groin on the Spit, (2) dredge between 1,315,000 to 2,500,000 cubic yards of sand from an offshore source, and (3) renourish more than 17,000 linear feet of beach on Sea Island. (Permit SAS-2015-00742.) Concurrently, the Corps issued

an environmental assessment ("EA") with a finding of no significant impact ("FONSI").  (Memo. for Rec. ("MFR"),[6] Doc. 5-11.)

## II. STANDARD OF REVIEW

A district court has discretion over whether to grant or deny a preliminary injunction, but the discretion is not unbridled and must be exercised in light of the four prerequisites for granting the "extraordinary relief." <u>Canal Auth. of the State of Fla. v. Callaway</u>, 489 F.2d 567, 572 (5th Cir. 1974).  A district court may grant a preliminary injunction only when a movant shows the following four prerequisites:

> (1)  [I]t has a substantial likelihood of success on the merits;
> (2)  [T]he movant will suffer irreparable injury unless the injunction is issued;
> (3)  [T]he threatened injury to the movant outweighs the possible injury that the injunction may cause the opposing party;[7] and
> (4)  [I]f issued, the injunction would not disserve the public interest.

<u>CBS Broad., Inc. v. EchoStar Commc'ns Corp.</u>, 265 F.3d 1193, 1200 (11th Cir. 2001).  A preliminary injunction may not be granted "unless the movant clearly establishe[s] the 'burden of persuasion' as to each of the four prerequisites." <u>Siegel v. LePore</u>, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting <u>McDonald's Corp. v. Robertson</u>, 147 F.3d 1301, 1306 (11th Cir. 1998)).  Lastly, although preliminary injunctions may properly be granted in

---

[6] The MFR contains both the EA and FONSI.
[7] Prerequisite three is referred to as the "balance of the harms" analysis.

5

environmental litigation, they "have been issued not merely because some impact upon the environment has been alleged, but because the threatened harm has been properly shown to be irreparable. . . . Indeed, where no irreparable injury is alleged and proved, denial of a preliminary injunction is appropriate." Callaway, 489 F.2d at 574.

## III. DISCUSSION

The Court finds that Plaintiffs are not substantially likely to succeed on the merits, and Plaintiffs will not suffer irreparable injury during the pendency of the suit. Although the balance of the harms and public interest prerequisites may favor granting the injunction, Plaintiffs fail to show all four prerequisites. Thus, the Court denies Plaintiffs' motion for a preliminary injunction.

### A. Substantially Likely to Succeed on the Merits

Plaintiffs argue: (1) The Corps violated the Clean Water Act ("CWA") by issuing the permit when there is a less environmentally damaging practicable alternative; (2) the Corps violated the National Environmental Protection Act ("NEPA") by failing to prepare an environmental impact statement; (3) the Corps violated the CWA and NEPA by failing to adequately evaluate the cumulative impacts of the authorized project; and (4) the Corps violated the CWA and the Administrative Procedure Act ("APA") by issuing a

permit without considering that it would exclude the public from a public beach. To succeed on the merits, Plaintiffs have to show the Corps' decisions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Ga. River Network v. U.S. Army Corps of Eng'rs, No. 4:10-cv-267, 2012 WL 930325, at *12 (S.D. Ga. Mar. 19, 2012), aff'd, 517 F. App'x 699 (11th Cir. 2013). The arbitrary and capricious standard "requires substantial deference to the agency." Ga. River Network, 2012 WL 930325, at *12 ("The reviewing court may not substitute its judgment for that of the agency but must, instead, defer to the agency's technical expertise.") (quoting City of Oxford v. F.A.A., 428 F.3d 1346, 1352 (11th Cir. 2005)).

In determining whether an agency's actions are arbitrary or capricious, courts "ask whether the agency 'examined the relevant data and articulated a satisfactory explanation for its action.'" Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1288 (11th Cir. 2015) (quoting Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). Courts should uphold agency decisions of "less than ideal clarity if the agency's path may reasonably be discerned." Id. (quotation omitted). The court, however, "may not supply a reasoned basis for the agency's action that the agency itself has not given." Id. (quoting State Farm, 463 U.S. at 43).

## 1. Clean Water Act

Plaintiffs argue the Corps violated the CWA by not adequately considering less environmentally damaging practicable alternatives before granting the permit. Plaintiffs argue the Corps dismissed, "*without any analysis*," nourishment of the beach without a groin. (Mot. for Prelim. Inj., at 9–12 (emphasis in original).)

The CWA requires the Corps to consider whether "there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem."[8]   40 C.F.R. § 230.10(a). "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." Id. § 230.10(a)(2).

Although the Corps analyzed three alternatives that require beach nourishment without the Proposed Groin, Plaintiffs only focus on one — on-site alternative six: nourishment from the existing Southern Groin to the end of the Spit. (MFR, at 40.) The Corps found alternative six to be outside the scope of the Project, thus not practicable, because it would not meet the overall Project purpose. (Id.) The purpose of the Project is to

---

[8] NEPA also requires the Corps to consider alternatives. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1508.9(b). The NEPA alternatives analysis "will in most cases provide the information for the evaluation of alternatives under [the CWA's] Guidelines." 40 C.F.R. § 230.10(a)(4). However, only the alternatives analysis under the CWA requires the Corps to select the alternative that poses the least detrimental environmental impacts. Id. § 230.10(a).

"protect upland lots and development located along the shoreline of Sea Island from storm damage." (Id.) According to the Corps, there is no development upland along the shoreline covered by this alternative, nor could there be development because of the conservation easement. (Id.) This is supported by Dr. Basco, who stated, "There is a conservation easement that restricts any such development further south." (Dr. Basco Dep., Doc. 5-12, at 751:20-22.) Dr. Basco further stated, "except to strengthen some very low regions where there[ is] a potential for breaching, there would be no reason for strengthening the dune" further down the Spit. (Id. at 752:4-9.) Thus, any storm protection provided by this alternative would not serve to protect any "upland lots or development," making this alternative outside the overall Project purpose and, therefore, not practicable. (MFR, at 40.)

Additionally, the Corps found that the storm protection provided by this alternative would be temporary, only lasting for a few months. (Dr. Basco Dep., at 722:17-21 ("I only considered the concern of a beach nourishment project with no groin in which the beach nourishment project was only 1200 feet. And I immediately concluded that that was not economically feasible because it would not last more than a few months.").)

Plaintiffs also fault the Corps for failing to consider if beach nourishment would work if the nourishment project was extended to the southern tip of the Spit. (Mot. for Prelim. Inj.,

9

at 12.)  However, according to the MFR, the Supplemental Report of Dr. Webb acknowledged that even if the beach nourishment project were extended to almost a mile, the storm protection would still be temporary.  (MFR, at 28.)  Furthermore, the Corps stated that Dr. Kana opined that "a project with such a short half-life is clearly not a practicable alternative when considering that the proposal would be outside the scope of the overall project purpose."  (Id.)

Importantly, the Corps also analyzed on-site alternatives four and five, which both involved beach nourishment without adding the Proposed Groin.  On-site alternative four consisted of relocating the existing Southern Groin to the site of the Proposed Groin and renourishing the beach.  (Id. at 39.)  The Corps found this to be a practicable alternative, but not the least damaging practicable alternative, because by removing the Southern Groin "it is likely that it would result in the sand bypassing the southern end of Sea Island and potentially jetting the sand offshore and completely out of the sand[-]sharing system."  (Id. at 43.)  On-site alternative five consisted of removing the Southern Groin altogether and renourishing the beach.  (Id. at 39.)  The Corps found this not to be a practicable alternative because "without the [S]outhern [G]roin[,] any sand placed along the shoreline . . . would disseminate downdrift quickly" and result in only temporary storm protection.  (Id.)  Long term, the

result is "erosion of a portion of the existing storm protection" and "adverse effects to sea turtles through erosion of nesting habitat." (Id. at 40.)

Although beach nourishment without a groin may be "the most common configuration for beach nourishment projects in the United States" (Mot. for Prelim. Inj., at 11), the Corps had to analyze the Project in light of its purpose, intended long-term effects, and surroundings. The Court finds the Corps' alternatives analysis was neither arbitrary nor capricious.

### 2. National Environmental Policy Act

NEPA requires federal agencies to consider the environmental impact and potential alternatives for every proposed "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA does not set forth any substantive limits on an agency's decision-making authority, "[r]ather, it require[s] only that the agency take a 'hard look' at the environmental consequences before taking a major action." Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 97 (1983).

NEPA has "twin aims." Id. First, requiring an agency "to consider every significant aspect of the environmental impact of a proposed action." Id. (quotation omitted). Second, ensuring that an agency "will inform the public that it has indeed considered environmental concerns in its decisionmaking process."

11

Id. To achieve these aims, NEPA requires agencies to follow specific procedures. Sierra Club v. Van Antwerp, 526 F.3d 1353, 1360 (11th Cir. 2008).

The procedures require an agency to first determine whether the action is a "major action with a significant effect." Sierra Club v. U.S. Army Corps of Eng'rs, 295 F.3d 1209, 1214-15 (11th Cir. 2002) (citation and internal quotation marks omitted). To determine whether the effects are "significant," the agency must prepare an EA. 40 C.F.R. § 1501.4; Hill v. Boy, 144 F.3d 1446, 1450 (11th Cir. 1998). The EA must "include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).

Whether an impact is "significant" requires consideration of both "context," the affected region, interests, and locality; and "intensity," the "severity of impact." Id. § 1508.27. In analyzing a project's intensity, the agency should consider many factors, including: (1) Whether the project has "[i]mpacts that may be both beneficial and adverse"; (2) "The degree to which the action may adversely affect an endangered or threatened species"; (3) "Unique characteristics of the geographic area such as proximity to . . . ecologically critical areas"; and (4) Whether the project "is related to other actions with individually

insignificant but cumulatively significant impacts."[9]    Id. § 1508.27(b).

If the EA shows the effects are significant, the agency must prepare a more detailed statement of environmental consequences, known as an environmental impact statement ("EIS").  Id. § 1501.4. If the EA shows the effects are not significant, the agency must prepare a FONSI briefly presenting its reasons for finding no significant impact.  Id. §§ 1501.4(e), 1508.13.

Plaintiffs argue the Corps violated NEPA by failing to prepare an EIS.  (Mot. for Prelim. Inj., at 12.)  Plaintiffs have "the burden of showing by a preponderance of the evidence that [] [D]efendants failed to adhere to the requirements of NEPA."  Druid Hills Civic Ass'n v. Fed. Highway Admin., 772 F.2d 700, 709 n.9 (11th Cir. 1985).  The Court can only find the Corps violated NEPA if its decisions were arbitrary or capricious under the APA.  Black Warrior Riverkeeper, 781 F.3d at 1288 ("[W]e review an agency's [FONSI] and decision not to prepare an [EIS], pursuant to NEPA, under the same arbitrary-and-capricious standard."); see also Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs, 87 F.3d 1242, 1247-48 (11th Cir. 1996) (applied arbitrary and capricious standard to Corps' decision not to prepare an EIS).

---

[9] Although these are the factors listed by Plaintiffs, they are only four of ten factors and not the only factors the Corps considered.  40 C.F.R. § 1508.27(b).

The APA requires courts to give substantial deference to the Corps, "not only when reviewing decisions like what evidence to find credible and whether to issue a FONSI or EIS, but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue." Ga. River Network, 2012 WL 930325, at *11 (quoting Van Antwerp, 526 F.3d at 1361). As stated by the Eleventh Circuit, "Our task ultimately, then, is to 'ensure that the agency took a "hard look" at the environmental consequences of the proposed action.'" Black Warrior Riverkeeper, 781 F.3d at 1288 (quoting Sierra Club, 295 F.3d at 1216).

The Eleventh Circuit has enunciated four criteria to be considered in determining whether the Corps' decision not to prepare an EIS was arbitrary and capricious:

> (1) The Corps "must have accurately identified the relevant environmental concern";
> (2) The Corps must take a "'hard look' at the problem in preparing an EA";
> (3) If a FONSI is made, the Corps "must be able to make a convincing case for its finding"; and
> (4) If the Corps finds "an impact of true significance, preparation of an EIS can be avoided only if the [Corps] finds that changes or safeguards in the project sufficiently reduce the impact to a minimum."

Hill, 144 F.3d at 1450 (quotation omitted). When applying this test, "an agency must consider the direct, indirect, and cumulative impacts on the environment." Ga. River Network v. U.S. Army Corps of Eng'rs, 334 F. Supp. 2d 1329, 1335 (N.D. Ga. 2003).

Direct impacts "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). If the direct impacts are "significant," the permit may require the applicant to institute mitigation efforts to reduce the impacts to a minimum. If the mitigation requirements reduce the impacts to a minimum, no EIS is required. See 33 C.F.R. § 325.4; Ga River Network, 334 F. Supp. 2d at 1337 ("So long as significant measures are taken to mitigate the project's effects, they need not completely compensate for the adverse environmental effects.").

Applying Plaintiffs' chosen 40 C.F.R. § 1508.27(b) factors, Plaintiffs argue the proposed project is significant because (i) it will have adverse impacts, (ii) it will harm endangered and threatened species, (iii) the geographic area is unique, and (iv) it is related to other actions with cumulatively significant impacts.

### a. *Adverse Impacts*

Plaintiffs argue the project's adverse impacts are (1) increasing downdrift erosion and damage to the Spit and (2) harming wildlife. Applying the Eleventh Circuit's factors for determining whether an agency's decision not to prepare an EIS is arbitrary and capricious, the Corps accurately identified the relevant environmental concern, took a "hard look" at the problem in preparing the EA, and made a convincing case that adverse

15

impacts noted by Plaintiffs were not significant. Thus, the Corps'
decision was neither arbitrary nor capricious.

i. Increased Downdrift Erosion and Damage to the Spit

Plaintiffs accurately state it is undisputed that the
Existing Groins are trapping material (sand, silt, clay, etc.)
that is naturally coming from the north and moving south. (Mot.
for Prelim. Inj., at 14-15.) The Corps does not dispute this
fact.[10] The Corps, however, adopts Mr. Conner's expert opinion
that "regardless of whether the [] [P]roposed [G]roin is
constructed, the existing hard armoring . . . would continue to
contribute to the erosion of the [S]pit." (MFR, at 70.) Noting
that the Proposed Groin represents only an eight-percent increase,
Mr. Conner further stated, "[I]t is unlikely that the construction
of a new shorter groin just south of the existing [S]outhern
[G]roin would interrupt sediment transport in any measurable way
under the current system." (Id.) Furthermore, the groin's low
profile "would allow sand to pass over and around the structure,"
and the use of armor stone would allow sand to pass through. (Id.
at 73.) Lastly, the Corps found that the introduction of 1.3 to

---

[10] Mr. Kevin Conner, a coastal engineer in the Wilmington District, completed
an independent review of "reports document[ing] the history of shoreline change
on Sea Island and the potential for the project to result in erosion of downdrift
shorelines." (MFR, at 70.) Mr. Conner states that the Existing Groins "are
currently trapping some of the material . . . that is naturally coming from the
north[] and moving south. The southern end of the [S]pit is currently eroding
and would continue to erode as long as the existing groin system remains in
place." (Id.)

2.5 million cubic yards of sand from an offshore source is likely to "allow the beach between the groins to eventually reach an equilibrium state and thus allow some sand to bypass the groins and travel downdrift to the [S]pit." (Id. at 74.)

As a mitigation effort, the Corps stated that any draft permit issued for the Project must include requirements to monitor sand movement within the Southern Groin and Proposed Groin and downdrift of the groins. (Id. at 70-71; Permit SAS-2015-00742, at 6.) If the results of the monitoring indicate that the Proposed Groin is trapping sand, Sea Island Acquisition would be required to submit a corrective action plan. (Permit SAS-2015-00742, at 6.)

### ii. Harming Wildlife

Plaintiffs argue the Project will harm federally protected sea turtles and shorebirds,[11] essential fish habitats, and pelagic eggs and larvae of managed species and their prey. As required under the Magnuson-Stevens Act, the Corps concluded the Project would not result in significant impacts and obtained the National Marine Fisheries Service's ("NMFS") concurrence. (MFR, at 77-78.) On April 20, 2018, the NMFS provided the following conservation recommendations ("CR"): "(1) The T-head groin portion of the proposed action should not be permitted[;] and (2) To the extent practicable, work should be limited to seasonal periods of low

---

[11] The Court will address Plaintiffs' arguments regarding federally protected sea turtles and shorebirds in section III(A)(2)(b), infra.

biological activity." (NMFS Apr. 20th Letter, Doc. 5-14, at 2.)
On July 17, 2018, the Corps responded stating that it would not
follow CR 1 but would follow CR 2. (Corps July 17th Letter to
NMFS, Doc. 5-15, at 1-2.)

As required, the Corps justified the reasons for not following
CR 1. The Corps stated, first, the "footprint of the
project . . . represents a relatively small area of
habitat . . . that is utilized by the" wildlife at issue, and
"ample habitat is located both upstream and downstream of the
[P]roject site that these species could relocate to." (Corps July
17th Letter to NMFS, at 1.) Second, after reviewing reports on
the existing condition of the Sea Island shoreline, the small
proposed increase in the groin field is "not expected to more than
minimally exacerbate ongoing erosion of the [S]pit." (Id. at 1-
2.) In incorporating CR 2 as a special condition, the Corps
required all work to be completed between November 1st and April
30th, which is outside the sea turtle nesting season. (Id. at 2.)
Although not fully satisfied with the Corps July 17th Letter,[12] the

---

[12] Plaintiffs state the Corps "ignored [NMFS's] concern that the [P]roposed
[G]roin could trap 'pelagic eggs and larvae of managed species and their prey.'"
(Mot. for Prelim. Inj., at 16.) Although the NMFS found the Corps' response to
those concerns insufficient, the Corps still provided its reason for finding
the effects insignificant by stating the affected area is small and there is
ample habitat upstream and downstream from the project for the wildlife.
Ultimately, even with their disagreement, NMFS concluded the Corps complied
with the Magnuson-Stevens Act. (NMFS July 27th Letter, Doc. 5-16, at 2.) Thus,
it was neither arbitrary nor capricious for the Corps to find no significant
effects. See Ga. River Network, 334 F. Supp. 2d at 1337 ("Plaintiffs fail to
identify anything from the record showing the Corps ignored a relevant
environmental concern or made a plain error of judgment about the extent of the

NMFS stated it would "not further elevate" the Corps' decision and noted the Corps "has complied with . . . the Magnuson-Stevens Act and 50 CFR 600.920(k)(1)." (NMFS July 27th Letter, at 1-2.)

b. *Endangered and Threatened Species*

Plaintiffs allege "the Corps should have prepared an EIS because the [P]roposed [G]roin will harm endangered and threatened sea turtles and shorebirds."[13] (Mot. for Prelim. Inj., at 17.) In analyzing the impact to sea turtles, the Corps found that the available beach for turtle nesting has been eroding over time. (See Dr. Webb Test., at 31.) The Project, however, includes beach nourishment that will provide "additional dry sand beach for turtle nesting." (MFR, at 49.) The U.S. Fish and Wildlife Service ("FWS") concurred with the Corps' finding and only recommended sand compaction testing three years following the beach nourishment.[14] (FWS May 22, 2018 Letter, Doc. 5-10, at 1-3.)

Plaintiffs also note the risk that the Proposed Groin will trap turtle hatchlings as they swim past the groin. The Corps found this risk minimal because the Georgia Department of Natural Resources, Wildlife Resources Division's Sea Island Sea Turtle

---

direct impacts. As such, the Corps' decision that mitigation reduces all direct impacts to a level that is not significant is neither arbitrary nor capricious.").

[13] Plaintiffs do not challenge the Corps' findings regarding other endangered or threatened species, including the Atlantic Sturgeon, Shortnose Sturgeon, West Indian Manatee, and the North Atlantic Right Whale. Thus, the Court does not evaluate the Corps' findings as to those species.

[14] The Corps adopted this suggestion. The Permit requires Sea Island Acquisition to complete sand compaction surveys every February for five years and report annually to the Corps. (Permit SAS-2015-00742, at 3.)

Program requires relocating sea turtle nests in the area of the project to a dry sand beach. (MFR, at 49.) Thus, "most hatchlings would not be found in close proximity to the groin because their nests would be relocated away from the base of the groin." (Id.)

Regarding shorebirds, the Corps found the Project's impact would be minimal. Although erosion to the Spit does harm shorebirds by reducing their habitat, the Corps determined that the Project would not increase erosion of the Spit in a measurable amount. (Id. at 50.) Furthermore, the piping plover's critical habitat is located outside the Project site; thus, there will be no direct effect to its critical habitat. (Id.) Lastly, the Project may potentially expand the habitat for other shorebirds. (Id.)

The Corps took a "hard look" at the Project's impact on endangered and threatened species and found the impact not significant. The FWS agreed with the Corps' findings. Having made a convincing case for its findings, the Corps' decision was neither arbitrary nor capricious.

### c. Geographic Area is Unique

Plaintiffs argue the Corps should have prepared an EIS because the geographic area is unique. (Mot. for Prelim. Inj., at 20.) The area is unique because of its proximity to habitats for certain endangered or threatened species. However, that conclusion does not warrant finding for Plaintiffs. The uniqueness of an area is

only one of ten factors for an agency to consider, and NEPA only requires that "the adverse environmental effects of the proposed action are adequately identified and evaluated." N. Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1540 (11th Cir. 1990) (citation omitted). The Corps properly identified and evaluated the uniqueness of the geographic area by analyzing the potential impacts to wildlife and threatened and endangered species. Thus, the Corps' decision not to prepare an EIS was neither arbitrary nor capricious.

### d. *Cumulative Significance*

Plaintiffs argue the Corps should have prepared an EIS because the Project is related to other actions with cumulatively significant impacts. Mirroring Plaintiffs' format, the Court examines this factor in section III(A)(3), *infra*.

### 3. Cumulative Impacts

Plaintiffs argue the Corps violated the CWA and NEPA by failing to adequately evaluate the cumulative impacts of the authorized project. (Mot. for Prelim. Inj., at 20.) Specifically, Plaintiffs state, "the Corps should have considered the impacts of other existing and reasonably anticipated shoreline stabilization or nourishment projects in the coastal region," including an "analysis of the entire coastal region or watershed" and "the entire species habitat or ecosystem." (Id. at 21.) Plaintiffs claim the Corps was "well aware of other existing and proposed

renourishment projects" and should have extended the geographic scope of its analysis. (Id. at 22.)

Both the CWA and NEPA require a federal agency to analyze the cumulative impacts of a proposed project in conjunction with other actions. 40 C.F.R. § 230.11(g); Id. § 1508.27(b)(7); see City of Oxford, 428 F.3d at 1353. Cumulative impact is:

> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

The Corps considered the cumulative impacts of the Project, including assessment of the direct and indirect effects,[15] and concluded the Project could cause potential impacts to water quality, aquatic organisms and wildlife, and the sand-sharing system.

---

[15] In Plaintiffs' reply to Defendants' response, Plaintiffs stated "the Corps does not dispute that the geographic scope of its cumulative impacts analysis is limited to the direct impact zone of the project. Instead, they say that the Corps should [not] have to consider a larger geographic scope, citing no authority to support their argument and ignoring the government's own guidelines on cumulative impacts." (Reply in Supp. of Mot. for Prelim. Inj., Doc. 17, at 8.) However, Plaintiffs are mistaken. Defendants state, "[T]he Corps considered the cumulative impacts of the Project, including assessment of the direct and indirect effects." (Resp. to Mot. for Prelim. Inj., at 20.) Regarding the "larger geographic scope," the Corps detailed the geographic areas covered as those "that may be impacted with respect to water quality, aquatic organisms and wildlife, and the applicable sand-sharing system." (Id. at 21.) The Corps merely disputed the necessity of considering nourishment projects not within the same sand-sharing system. (Id.) At no point does the Corps state it limited its analysis to the "direct impact zone," or that it should not have to consider a larger geographic scope.

### a. *Water Quality*

The Corps found the Project's individual and cumulative impact on the water quality to be minimal. "The re-suspension of sediments during dredging at the offshore borrow site could result in minor, temporary adverse impacts to turbidity, total suspended solids[,] and dissolved oxygen in the water column." (MFR, at 72.) These impacts are not significant, however, because they would be "short-term and localized."[16] (Id.)

### b. *Aquatic Species and Wildlife*

The Corps found the Project's cumulative impact on aquatic species and wildlife not significant. (Id. at 73.) Cumulatively, "the project could exacerbate the ongoing erosion of the Spit and trap sand that would otherwise travel to downdrift shorelines," which would reduce habitat for aquatic wildlife. (Id. at 73.) However, the Corps found, after examining Mr. Conner's independent review, it "unlikely that the construction of a new shorter groin just south of the existing [S]outhern [G]roin would interrupt sediment transport in any measurable way under the current system." (Id.) Thus, the cumulative impact is minimal. Furthermore, to ensure the impact is minimal, the permit requires monitoring, and

---

[16] According to the MFR, "By letter dated June 8, 2018, the Georgia Department of Natural Resources, Environmental Protection Division issued the 401 Water Quality Certification for the project" because "the project would have a short-term minor effect on water quality and would not result in adverse cumulative effects to water quality." (MFR, at 72.) The Parties, however, have not provided a copy of the June 8th letter for the Court to verify.

if the Corps determines that "the groin is causing negative impacts to the sand-sharing system, [Sea Island Acquisition] shall submit a corrective action plan." (Permit SAS-2015-00742, at 6-7.)

c. *Sand-Sharing System*

Taking into account the Project's design and special conditions, the Corps "determined that the [P]roject would have minimal individual and cumulative adverse impacts on the sand[-]sharing system." (MFR, at 74.) The Proposed Groin could trap sand between the Southern Groin and Proposed Groin. (Id. at 69.) However, the low profile of the groin "would allow sand to pass over and around the structure," and the granite armor stone will allow "sand to pass through the structure." (Id. at 73.)

Furthermore, Mr. Conner's independent review examined the Project area from 1980 through 2023 and found that the Existing Groins:

> [A]re currently trapping some of the material that is naturally coming from the north and moving south. The southern end of the [S]pit is currently eroding and would continue to erode as long as the existing groin system remains in place. Therefore, regardless of whether the new [P]roposed [G]roin is constructed, the existing hard armoring . . . would continue to contribute to the erosion of the [S]pit. Furthermore, the area between the [S]outhern [G]roin and [P]roposed [] [G]roin represents only an [eight-]percent increase[] when compared to the area currently between the [N]orthern and [S]outhern [G]roins.

(Id. at 74.) As stated above, Mr. Conner concluded that the Proposed Groin is unlikely to interrupt sediment transfer in the

sand-sharing system "in any measurable way." (Id. at 73.) To ensure minimal interruption, Mr. Conner recommended that the construction of the Proposed Groin "be accompanied by the planned fill placement that is currently proposed as well as the inclusion of a monitoring plan." (Id.) Even though other experts may have reached different conclusions, when experts have conflicting views, "an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 378 (1989). In addition, the Corps found that the introduction of 1.3 to 2.5 million cubic yards of sand will likely allow the beach to "reach an equilibrium state" and allow sand to travel past the groin. (MFR, at 74.)

The Corps made a reasonable decision concerning cumulative impacts. A cumulative impacts analysis must include:

(1) [T]he area in which the effects of the proposed project will be felt;
(2) [T]he impacts that are expected in that area from the proposed project;
(3) [O]ther actions – past, present, and reasonably foreseeable proposed – that have had or are expected to have impacts in the same area;
(4) [T]he impacts or expected impacts from these actions; and
(5) [T]he overall impact that can be expected if the individual impacts are allowed to accumulate.

Ga. River Network, 334 F. Supp. 2d at 1341. The Corps complied with each factor. First, the scope of the Corps' cumulative impacts assessment was "the entire shoreline of Sea Island,

25

portions of Gould's Inlet and the Hampton River, and portions of the adjacent island of St. Simon's Island that may be affected by the proposed action, and the ocean waters and seafloor offshore of Sea Island that comprise the proposed borrow site." (MFR, at 71.) Second, as discussed above, the Corps analyzed the cumulative effects that are expected to water quality, aquatic organisms and wildlife, and the sand-sharing system. Third, the Corps' assessment included examining the past, present, and future changes to the area from 1980 through 2023. (Id.) Fourth, the Corps examined the impacts from past beach nourishment projects and the Existing Groins. Fifth, the Corps found that the "incremental contribution" from the Project "in relation to the overall impacts from past, present, and reasonably foreseeable future activities" is not significant. (Id. at 75.)

Because the Corps examined the cumulative impacts of the Project and satisfied the above five factors before concluding the cumulative impacts were not significant, the Corps' decision not to complete an EIS was neither arbitrary nor capricious.

### 4. Excluding the Public

Plaintiffs argue the Corps failed to consider that the Proposed Groin would reduce beach access in violation of 33 C.F.R. § 320.4(g)(3). Section 320.4(g)(3) states that projects should "generally be denied" if they create "undue interference with access to, or use of, navigable waters" for "riparian landowners."

26

Section 320.4(g)(3) focuses on the need for the agency to consider a riparian landowner's, not the general public's, ability to access the navigable waters. Even considering the public's ability to use the navigable waters, the Court finds the Corps' analysis was neither arbitrary nor capricious. The public is still able to access the waters by boat. Furthermore, the Corps noted that there is currently no public access to the beach on Sea Island by land, but an "unfettered right for any person to land a boat on the beach." (MFR, at 22.)

## B. Irreparable Injury During the Pendency of the Suit

Plaintiffs argue they will suffer irreparable injury absent preliminary relief. An irreparable injury is one that "cannot be undone through monetary remedies." United States v. Jenkins, 714 F. Supp. 2d 1213, 1221 (S.D. Ga. 2008) (quoting Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981)). Plaintiffs must show irreparable injury is likely, not just possible. See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) ("possibility" of harm standard "is too lenient"). Furthermore, the harm "must be likely to occur after the [Plaintiffs'] request for anFirr injunction and before resolution of the case on the merits." Jenkins, 714 F. Supp. 2d at 1221.

Plaintiffs do not explain what irreparable harm is likely to occur during the pendency of the suit. Plaintiffs only repeat the

general arguments that "the proposed project will harm the sand-sharing system, trigger accelerated erosion, [] may cause the Spit to break apart[,]" and "is also likely to harm federally threatened and endangered wildlife" — "none of which could be compensated for with money damages." (Mot. for Prelim. Inj., at 24.) Plaintiffs focus solely on the Proposed Groin without mentioning the beach nourishment project, which is intended to offset the harm to the sand-sharing system and to minimize the already-occurring erosion. Furthermore, the harm to the Spit does not warrant an injunction because Plaintiffs allege only that the Project "may" cause the Spit to break apart, not that such harm is likely during the pendency of this suit, as required.

Regarding aquatic species, the Corps found the harms would be minor and short-term, and Plaintiffs do not challenge the Corps' conclusion as to those findings. Lastly, construction on the Project is only allowed from November 1st to April 30th to avoid posing harm to some endangered and threatened species. Although the Court recognizes the importance of preventing environmental harm, Plaintiffs have failed to carry their burden of showing that irreparable harm is likely to occur during the pendency of this suit.[17]

---

[17] Although the remaining two prerequisites — balance of the harms and the public interest — may support granting the preliminary injunction, Plaintiffs must establish all four prerequisites for the Court to grant the injunction. Having already found Plaintiffs do not have a substantial likelihood of success on the merits nor will Plaintiffs suffer irreparable harm during the pendency of the

## IV. CONCLUSION

Having found Plaintiffs failed to show both a substantial likelihood of success on the merits and a likely risk of irreparable harm, the Court finds the preliminary injunction unjustified. Accordingly, the Court **DENIES** Plaintiffs' motion for a preliminary injunction. (Doc. 5.) As stated in the introduction, the Court **GRANTS** Plaintiffs' motion to expedite consideration of the motion (Doc. 15) and **DENIES AS MOOT** Plaintiffs' amended motion for a preliminary injunction (Doc. 21). Having denied the injunction on other grounds, the Court also finds Sea Island Acquisition's motion for a hearing as to its harm unnecessary; thus, the Court **DENIES** Sea Island Acquisition's motion. (Doc. 19.)

**ORDER ENTERED** at Augusta, Georgia, this 10th day of December, 2018.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

suit, the balance of the harms and public interest prerequisites are not determinative in this case.