IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| ALTAMAHA RIVERKEEPER, ONE HUNDRED MILES, and SURFRIDER FOUNDATION<br><br>  Plaintiffs,<br><br>  v.<br><br>THE UNITED STATES ARMY CORPS OF ENGINEERS et al.,<br><br>  Defendants,<br><br>and<br><br>SEA ISLAND ACQUISITION, LLC,<br><br>  Intervenor-Defendant. | Docket No. 4:18-cv-00251-JRH-JEG |

**SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

  1.  This is an action under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*, challenging the United States Army Corps of Engineers' (the Corps) issuance of Permit Number SAS-2015-00742, including all modifications (the Permit),[1] pursuant to Section 404 of the Clean Water Act and of the accompanying Environmental Assessment and Finding of No Significant Impact (EA/FONSI)[2] under the National Environmental Policy Act (NEPA).

  2.  The Permit allows Intervenor-Defendant Sea Island Acquisition, LLC to construct a new T-head groin in front of Sea Island Acquisition's newest development, the Reserve at Sea

---

[1] As used in this Second Amended Complaint, the term "Permit" refers to Permit Number SAS-2015-00742 and all modifications.

[2] The Corps refers to FONSIs as "Statements of Findings."

Island; to dredge between 1,315,000 to 2,500,000 cubic yards of sand from an offshore source; and to renourish more than 17,000 linear feet of beach on Sea Island.

3.     This action seeks a declaration that the EA/FONSI and Permit are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Clean Water Act, NEPA, the Endangered Species Act, and the APA, 5 U.S.C. § 706(2)(A). This action also seeks an order vacating and enjoining reliance on the EA/FONSI and the Permit and requiring the removal of the groin and the restoration of any affected shoreline.

4.     Plaintiffs filed a Complaint on October 31, 2018. On February 13, 2019, before the Government Defendants filed an answer, Plaintiffs filed an Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B).

5.     On July 5, 2019, the Corps modified the original permit. In light of the modification, Plaintiffs now file a Second Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(2).

## JURISDICTION AND VENUE

6.     This action arises under NEPA, 42 U.S.C. §§ 4321 *et seq.*, the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, the APA, 5 U.S.C. §§ 701 *et seq.*, and the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*

7.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and may issue declaratory and other relief pursuant to 28 U.S.C. §§ 2201–02.

8.     One Hundred Miles (OHM), Altamaha Riverkeeper (the Riverkeeper), and Surfrider Foundation (Surfrider) (the Conservation Groups) are entitled to bring this action under the APA, 5 U.S.C. §§ 701–706, and the Endangered Species Act, 16 U.S.C.  1540(g).

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events giving rise to the Conservation Groups' claims occurred in this district.

## PARTIES

10.     One Hundred Miles is a not-for-profit organization headquartered in Brunswick, Georgia.  OHM's mission is to protect, preserve, and enhance Georgia's 100-mile coast, including the portion of Sea Island adversely affected by the issuance of the Permit.

11.     OHM also works to promote sustainable use of the coast for recreational, educational, scientific, aesthetic, and other uses by OHM's members and the public by advocating and communicating with citizens, business owners, community leaders, environmental scientists, and policy makers to improve policies and practices affecting Georgia's coast.

12.     OHM has members that use and enjoy the areas affected by the Permit. For example, OHM members who live on and visit St. Simon's Island and Sea Island regularly walk, bird-watch, paddle, and enjoy the natural setting on the Sea Island Spit.

13.     OHM and its members have participated and continue to participate in efforts to protect the Sea Island Spit and the wildlife that reside there, including federally protected species such as the Loggerhead Sea Turtle, the Piping Plover, and the Red Knot. Among other things, OHM has submitted comments opposing the issuance of this Permit and challenged the Georgia Shore Protection Act permit for the T-head groin in state court.

14.     OHM's members will continue to maintain an interest in these species and areas in the future.

3

15.     Additionally, OHM and its members and staff have an interest in ensuring that the Corps complies with all applicable laws, including the substantive, procedural, and informational provisions of NEPA, the Clean Water Act, and the Endangered Species Act.

16.     OHM and its members are harmed by Defendants' actions, which will damage the Sea Island Spit, unreasonably interfere with access to and use of the public tidelands, and destroy habitat for federally listed species, including sea turtles and shorebirds.

17.     Altamaha Riverkeeper is a not-for-profit corporation with its principal place of business in Macon, Georgia, and a coastal office in Darien, Georgia.  The Riverkeeper is dedicated to the protection, defense, and restoration of the Altamaha River and its watershed. The Riverkeeper furthers its mission through public education, advocacy, and litigation. The Riverkeeper is frequently involved in the public comment process, including for the Permit at issue in this case.

18.     The Riverkeeper has approximately 500 members. Like OHM, the Riverkeeper has members that use and enjoy the areas affected by the Permit for recreation and business.

19.     The Riverkeeper and its members have participated and continue to participate in efforts to protect the Sea Island Spit and the federally protected wildlife that reside there, including by submitting comments opposing the issuance of this Permit and challenging the Georgia Shore Protection Act permit for the T-head groin in state court.

20.     The Riverkeeper and its members will continue to maintain an interest in these species and areas in the future.

21.     Like OHM, the Riverkeeper also has an interest in ensuring that the Corps complies with all applicable laws, including NEPA, the Clean Water Act, and the Endangered Species Act.

22.     The Riverkeeper and its members are harmed by Defendants' actions, which will damage the Sea Island Spit, unreasonably interfere with access to and use of the public tidelands, and destroy habitat for federally listed species, including sea turtles and shorebirds.

23.     Declarations showing the Riverkeeper's interest in this action are attached as Exhibits A and B to the First Amended Complaint.

24.     Surfrider Foundation is a national not-for-profit organization with its principal place of business in San Clemente, California.

25.     Founded in 1984, Surfrider has over 80 chapters and more than 38,000 members throughout the U.S. dedicated to Surfrider's mission to protect our ocean, waves, and beaches. Surfrider's Georgia Chapter currently has over 100 members in the state and over 1,000 supporters, including those who engage with the Chapter as followers on social media, attendees at its events, and recipients of the Chapter's emails.

26.     Some of these members and supporters use the Sea Island Spit and other places affected by the Permit for recreation.

27.     Surfrider and its supporters have participated in and continue to participate in efforts to protect the Sea Island Spit, including by submitting comments opposing the issuance of this Permit, challenging the Georgia Shore Protection Act permit in state court, and taking other actions to specifically protect the Sea Island Spit.

28.     Surfrider and its supporters will continue to maintain an interest in the Sea Island spit in the future, and its members and supporters will continue to use this area for recreation.

29.     Like the other conservation groups, Surfrider also has an interest in ensuring that the Corps complies with all applicable laws, including NEPA, the Clean Water Act, and the Endangered Species Act.

30.     Surfrider and its members are harmed by Defendants' actions, which will damage the Sea Island Spit, unreasonably interfere with access to and use of the public tidelands, and destroy habitat for federally listed species, including sea turtles and shorebirds.

31.     Declarations showing Surfrider's interest in this action are attached as Exhibits C and D to the First Amended Complaint.

32.     Because the Conservation Groups and their members have an interest in protecting the Spit and the wildlife that live there, and because the Conservation Groups have an interest in ensuring that the Corps complies with NEPA, the Clean Water Act, and the Endangered Species Act, they are harmed by the issuance of the Permit. These harms would be redressed by an order from this Court setting aside the EA/FONSI and the Permit.

33.     Defendant U.S. Army Corps of Engineers is an agency within the United States Department of Defense charged with regulating construction in the waters of the United States. The Savannah District of the Corps is responsible for implementing Section 404 of the Clean Water Act in Georgia.

34.     Defendant Lieutenant General Todd Semonite is the current Commanding General of the U.S. Army Corps of Engineers. Lieutenant General Semonite is sued in his official capacity.

6

35.     Defendant Colonel Daniel Hibner is the current District Commander at the Savannah District Office. The Savannah District Commander was responsible for signing the Record of Decision and issuing the Permit being challenged. Colonel Hibner is sued in his official capacity.

36.     Defendant Tunis McElwain is the Chief of the Regulatory Branch of the U.S. Army Corps of Engineers. Mr. McElwain is sued in his official capacity.

37.     Defendant-Intervenor Sea Island Acquisition, LLC is a private resort and real estate company that owns and operates Sea Island resorts.

## FACTUAL AND PROCEDURAL BACKGROUND

38.     Sea Island is a barrier island along the Georgia coast that is approximately four and a half miles long.

39.     The southern portion of the island contains a fragile, undeveloped area called the Spit that provides significant habitat for state and federally protected sea turtles, shorebirds, and other species.

40.     The Spit, which is largely protected by a conservation easement, is also a popular recreation area. Both residents and tourists frequently visit the public areas of the Spit below the mean high water line to paddle, surf, bird-watch, and walk.

41.     Sea Island Acquisition desires to build a new development called the Reserve on the north end of the Spit north of the conservation easement boundary.

42.     On October 9, 2015, Sea Island Acquisition filed an application seeking permission to construct a T-head groin immediately south of the proposed Reserve development. The application also sought authorization to construct dunes and renourish the 1,200 feet of beach between an existing groin and the proposed groin.

7

43.     According to Sea Island, the purpose of the proposed T-head groin is "to stabilize the eroding beach" in front of the proposed Reserve development.

44.     Currently, however, there are no houses located in the proposed development, and no lots have been sold.

45.     In other words, no existing structures are threatened by the beach erosion the proposed project seeks to avoid. Instead, the intent of the project is to protect unbuilt real estate.

*Background on Groins*

46.     A groin is a hard structure, often constructed of rock or steel, that is built perpendicular to a beach. Its purpose, by definition, is to trap or block sand on the "updrift" side of the groin that would otherwise naturally move with the prevailing currents along the shoreline to the "downdrift" side of the groin.  As this occurs, the beach downdrift of the groin retreats or erodes.

47.     In a very real sense, the groin starves the downdrift beach of sand by eliminating the updrift sand supply. This phenomenon is shown in the photograph below, which shows an existing groin on Sea Island (the South Groin). (The Reserve is located just south of the South Groin.)

8



48.     The negative impacts of groins are widely recognized.

49.     In addition to causing accelerated downdrift erosion, groins also have negative

impacts to wildlife, especially federally threatened sea turtles.

50.     The T-head portion of a groin can inhibit nesting females from reaching the beach

or act as a barrier to hatchlings as they attempt to migrate to the ocean.

51.     Hatchlings can also become physically trapped in the groin itself or be killed by

predators that are more concentrated near the structure.

52.     In addition, because they cause accelerated erosion, groins can reduce important

habitat for sea turtles, shorebirds, and other wildlife.

53.     Because of these negative effects, the Corps' own Coastal Engineering Manual

recognizes that "[c]oastal zone management policy in many countries and the United States

presently discourages the use of groins for shore protection."  USACE Coastal Engineering

Manual at V-3-61.

54.     Instead, over the past decade coastal engineers have shown a near universal preference for beach nourishment without a groin over similar projects with a groin or other stabilization structure.

55.     In the southeast United States, for example, there have been 139 beach nourishment projects over the past ten years. Of those 139 projects, *only five* have involved a groin.

<em>Public and Agency Opposition to the Groin</em>

56.     Because the proposed groin would harm the Spit, public opposition to the project has been overwhelming.

57.     During the initial public comment period, the Corps received comments from 197 separate individuals or organizations. Of those 197 commenters, 194 opposed the project.

58.     Of the nine commenters who live on Sea Island, seven opposed the project.

59.     In addition to the federal comments, nearly one hundred individuals and organizations, including federal and state agencies, submitted comments to the Georgia Department of Natural Resources Coastal Resources Division (CRD) opposing the project.

60.     For example, the Georgia Department of Natural Resources Wildlife Resources Division's Nongame Conservation Section (WRD) submitted written comments explaining that "[t]he construction of the T-head groin will result in the loss of sea turtle nesting habitat and will interfere with the conservation of sea turtle populations in Georgia."

61.     Similarly, the United States Fish and Wildlife Service (USFWS) submitted comments to the state opposing the construction of the groin, advising, "We recommend denial of the permit. Construction of another groin will have negative impacts to sea turtles and have

10

possible adverse impacts to the Sea Island spit which is utilized habitat for federally listed shorebirds and sea turtles."

*Consultation with the National Marine Fisheries Service and the Fish and Wildlife Service*

62.     After the initial application, the U.S. Fish and Wildlife Service determined that at least eleven endangered or threatened species and two critical habitats could be impacted by the proposed project—the Leatherback Sea Turtle (endangered), the Loggerhead Sea Turtle (threatened), the North Atlantic Right Whale (endangered, critical habitat), the Piping Plover (endangered, critical habitat), the Atlantic Sturgeon (endangered), the Shortnose Sturgeon (endangered), the Red Knot (threatened), the Wood Stork (threatened), the West Indian Manatee (endangered), the Eastern Indigo Snake (threatened), and the Gopher Tortoise (candidate).

63.     Sea Island Acquisition prepared a biological assessment to weigh the risks to these species.

64.     Sea Island Acquisition's biological assessment concluded that the proposed project "may affect, but [was] not likely to adversely affect" threatened and endangered species.

65.     In many cases, Sea Island Acquisition's determination was based in part on the fact that "no offshore borrow areas are proposed." *See* Biol. Assessment (Oct. 2015) at 23–24.

66.     In other cases, the determination was based on the fact that "[t]he project is of limited size—1,200 feet in length, a maximum of 120,000 yd$^3$ of sand…." *See* Biol. Assessment at 1.

67.     Ultimately, the U.S. Fish and Wildlife Service and the National Marine Fisheries Service (NMFS) concurred with the applicant's initial effects determination on the 1,200 foot part of the project, despite acknowledging that the project would harm important habitat.

11

*Sea Island Acquisition's Revised Permit Application*

68.     Following the initial notice and comment period, two major hurricanes, Matthew and Irma, caused substantial damage to Sea Island.

69.     Among other things, the storms severely eroded the beach face and many of the frontal dunes on the Spit.

70.     The storms also damaged the main reach of the Sea Island beach, stripping much of the sand from between the existing South and North Groins.

71.     In light of these impacts, on March 6, 2018, Sea Island Acquisition submitted an addendum to its October 2015 permit application, seeking authorization (1) to construct the new T-head groin on the Spit; (2) to dredge between 1,315,000 to 2,500,000 cubic yards of sand from an offshore source; and (3) to renourish more than 17,000 feet of beach on Sea Island.

72.     The addendum proposed using a hydraulic cutterhead dredge to retrieve substantial amounts of sand from offshore—well over 100,000 dump trucks worth—since Sea Island Acquisition now needed too much sand to use an onshore source as previously proposed.

73.     The addendum also included a plan to perform periodic sand transfers within Sea Island via land-based equipment.

74.     Because the changes proposed in the March 2018 addendum were substantial, the Corps issued a new public notice, and the Conservation Groups again submitted comments opposing the proposed project.

75.     Among other things, the Conservation Groups noted that neither the October 2015 application nor the March 2018 addendum adequately considered the direct, indirect, or cumulative impacts of the proposed projects.

76.     In addition, neither the October 2015 application nor the March 2018 addendum adequately considered less environmentally damaging, practicable alternatives.

77.     For example, Sea Island Acquisition summarily dismissed nourishment without a groin as a practicable alternative to building a groin, even though this option has been chosen by coastal engineers in over 96% of similar projects in the Southeast over the last decade.

*The Supplemental Biological Assessment*

78.     Because the March 2018 addendum increased the length of the project from 1,200 linear feet to approximately 17,000 linear feet (an over fourteen-fold increase), increased the maximum sand volume from 120,000 yd$^3$ to 2,500,000 yd$^3$ (an over twenty-fold increase), proposed retrieving sand from the ocean for the first time, and proposed the use of hydraulic cutterhead dredges, Sea Island Acquisition submitted a supplementary biological assessment.

79.     The applicant's supplementary biological assessment again concluded that the proposed project "may affect" but was "not likely to adversely affect" threatened and endangered species.

80.     The U.S. Fish and Wildlife Service ultimately concurred with this determination. However, the agency noted that "[t]he new groin is anticipated to result in decreased nesting and the loss of nests that do get laid within the project area for all subsequent nesting seasons following the completion of the proposed project." Letter from USFWS to Col. Marvin Griffin (May 22, 2018) at 2. The agency also noted that "the sand project is anticipated to result in decreased nesting and loss of nests that do get laid within the project area for two subsequent nesting seasons following the completion of the proposed sand placement." *Id.*

13

81.     Given that the supplemental application involved substantial offshore dredging and the use of a hydraulic cutterhead dredge, the U.S. Fish and Wildlife Service directed the Corps to "*please refer to [the National Marine Fisheries Service] for impacts in the water.*" *Id.*

82.     However, rather than consult with the National Marine Fisheries Service about the supplemental application, the Corps instead concluded that no additional consultation was necessary for both the use of a cutterhead dredge and the placement of sand on the Sea Island beach.

*The Original Permit and NEPA Documents*

83.     On September 11, 2018, the Corps issued a permit authorizing Sea Island Acquisition to construct the new T-head groin on the Spit; to dredge between 1,315,000 to 2,500,000 cubic yards of sand from an offshore source; and to renourish more than 17,000 linear feet of beach on Sea Island.

84.     At the same time, the Corps issued an Environmental Assessment, finding that the authorized project would have no significant impact to the environment.

85.     Although concluding that there would be no significant impact, the Environmental Assessment repeatedly acknowledged that the existing groins caused accelerated erosion on the Spit and the proposed project would affect sea turtles and other endangered and threatened wildlife.

*Project Construction and the Modified Permit*

86.     Sea Island Acquisition began constructing the groin and renourishment project in November 2018.

14

87.     During and after construction, Sea Island Acquisition violated the original permit in several ways, including building a roughly 480-foot groin instead of the permitted 350-foot groin (exceeding the permitted length by nearly 40%), moving offshore sand onto upland areas, constructing the access ramp in the wrong location, dredging too deeply and outside of the authorized locations, and excavating sand from unauthorized locations, to name a few.

88.     Sea Island Acquisition did not seek permit modifications from the Army Corps of Engineers or the Georgia Department of Natural Resources before deviating from its state and federal permits.

89.     Instead, on May 24, 2019, Sea Island Acquisition requested a permit modification from the Corps to "authorize the project as it [had] been constructed to date." A copy of the Request for Permit Modification is attached to this Second Amended Complaint as Exhibit A.

90.     Upon review of the permit modification request, the Corps acknowledged that Sea Island Acquisition (SIA) had violated its original permit in several respects. A copy of the Memorandum for Record is attached to this Second Amended Complaint as Exhibit B.

91.     In the Memorandum for Record, the Corps found:

a.     "The permit does not authorize the placement of the offshore sand into these upland areas… Therefore, the Corps has determined that SIA is non-compliant with the permit." Memorandum for Record at 2.

b.     "The permit only authorized the use of Reach A as a borrow site for sand recycling activities…. Therefore, the Corps has determined that SIA is non-compliant with the permit." *Id.* at 4.

c. "In addition to the above alleged non-compliance, the Corps has determined that the access ramp has also not been constructed according to the authorized drawings." *Id.* at 6.

d. "The post dredge survey of the offshore borrow area indicated that the Permittee exceed the authorized cut depths in certain areas." *Id.*

92.     Despite acknowledging these permit violations, the Corps determined that modifying the Permit, rather than enforcing its original terms, was "in the public interest" and "in compliance" with Clean Water Act regulations.

93.     On July 5, the Corps modified the Permit to authorize the project as constructed. A copy of the permit modification is attached to this Second Amended Complaint as Exhibit C.

94.     On July 11, 2019, the Government Defendants filed a copy of the permit modification in this case. Dkt. 54.

## LEGAL FRAMEWORK

### Clean Water Act

95.     In 1972, Congress passed the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

96.     To achieve this objective, Section 301 of the Clean Water Act prohibits "the discharge of any pollutant" into "the navigable waters of the United States" except in accordance with permits issued under the Clean Water Act.  *Id.* § 1311(a).

97.     "Navigable waters" are defined as "the waters of the United States, including the territorial seas." *Id.* § 1362(7).

98.     "Pollutants" include dredged spoil, rock, dirt, and sand, among other materials. *Id.* § 1362(6).

99.     Section 404 of the Clean Water Act authorizes the Secretary of the Army to issue permits for the discharge of dredged or fill material into "the waters of the United States" when certain conditions are met. *Id.* § 1344.

100.     Unless exempted by Section 404(f)(1), which is not applicable here, all discharges of dredged or fill material into waters of the United States must be authorized under a Section 404 permit issued by the Corps.

101.     Issuance of all Section 404 permits is governed by the Section 404(b)(1) Guidelines found at 40 C.F.R. Part 230.

102.     The Section 404(b)(1) Guidelines provide that no discharge of dredged or fill material may be permitted if there is a less damaging "practicable alternative" available, or if the discharge will "cause or contribute to significant degradation" of waters of the United States.  40 C.F.R. § 230.10.

103.     In conducting this analysis, the Corps may rely on information submitted by the applicant but must independently verify such information. *Id.*; 40 C.F.R. § 1506.5(a).

104.     Corps regulations further require that "the Corps will, in all cases, exercise independent judgment in defining the purpose and need for the project from both the applicant's and the public's perspective." 33 C.F.R. § 325, App. B(9)(b)(4). This ensures that "an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable." *Sylvester v. U.S. Army Corps of Engineers*, 882 F.2d 407, 409 (9th Cir. 1989). Put differently, "the definition of a project purpose may not be used by the sponsor as a tool to artificially exclude what would otherwise be practicable alternatives to

the project." *Florida Clean Water Network, Inc. v. Grosskruger*, 587 F. Supp. 2d 1236, 1244 (M.D. Fla. 2008) (quoting *Sylvester*, 882 F.2d at 409).

105.    The Section 404(b)(1) Guidelines require the Corps to deny a permit unless the applicant can show that there are no practicable alternatives with less adverse impact on the environment. 40 C.F.R. Part 230.

## National Environmental Policy Act

106.    Congress enacted NEPA to "promote efforts which will prevent or eliminate damages to the environment…." 42 U.S.C. § 4321.

107.    To achieve this goal, NEPA requires federal agencies to fully consider and publicly disclose the environmental consequences of an agency action *before* proceeding with that action. *Id*. § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5.

108.    Agencies' evaluation of environmental consequences must be based on scientific information that is both "[a]ccurate" and of "high quality." 40 C.F.R. § 1500.1(b).

109.    Where an agency relies on the applicant to submit environmental information, the agency "shall independently evaluate the information submitted and shall be responsible for its accuracy…." 40 C.F.R. § 1506.5(a).

110.    In addition, if there is "incomplete or unavailable information," the agency preparing the Environmental Impact Statement (EIS) "shall always make clear that such information is lacking." 40 C.F.R. § 1502.22.

111.    For major federal actions significantly affecting the quality of the human environment, NEPA requires that federal agencies prepare an EIS. 42 U.S.C. § 4332(2)(C).

112.    Where it is not readily discernible whether the environmental effects of a proposed action will be significant, federal agencies may first prepare a less rigorous Environmental Assessment to establish the project's level of impact.  40 C.F.R. §§ 1501.4(b), 1508.9(a)(1); 33 C.F.R. §§ 230.10–.11. If impacts are likely to be significant, however, an EIS is then required.

113.    Agencies must consider a number of factors in determining whether impacts are likely to be significant, including the nature and extent of the impacts; the unique characteristics of the geographic area; the degree to which the impacts are highly controversial; the degree to which the possible effects are highly uncertain; the cumulatively significant nature of the impacts; and the degree to which the action may adversely affect endangered species and their habitat.  *See* 40 C.F.R. § 1508.27(b).

114.    Any "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

## Endangered Species Act

115.    Congress enacted the Endangered Species Act "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be preserved …." 16 U.S.C. § 1531(b).

116.    Under section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), the Corps, in consultation with the U.S. Fish and Wildlife Service and/or the National Marine Fisheries Service, "shall insure that any action authorized, funded, or carried out by [the agency]

is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat…."

117.    In satisfying Section 7(a)(2), the Corps is required to "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

118.    Consultations with the USFWS and/or NMFS are required when a proposed action "may affect" a listed species.

## STANDARD OF REVIEW

119.    Because NEPA does not contain an internal citizen suit provision, the APA governs the scope and standard of review of the Conservation Groups' NEPA claim against the Corps.

120.    The APA confers a right of judicial review on any person adversely affected by final agency action, and provides for a waiver of the federal government's sovereign immunity. 5 U.S.C. § 702.

121.    Although the Clean Water Act does contain a citizen suit provision, that provision does not govern suits brought to challenge a permitting decision made by the Corps in its capacity as a regulatory entity authorizing a discharge under Section 404. *See* 33 U.S.C. § 1365(a).

122.    Therefore, the APA also governs the scope and standard of review for the Conservation Groups' Clean Water Act claim against the Corps.

123.    Upon review of agency action under the APA, the court shall "hold unlawful and set aside actions . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

20

124.     An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. [A court] may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

125.     The Endangered Species Act, 16 U.S.C. § 1540(g), allows "any person" to bring a lawsuit to enjoin a government agency that has not complied with the Endangered Species Act.

## CLAIMS FOR RELIEF

**A.    Claim One: The Corps violated the Clean Water Act and the APA by issuing the Permit when there is a less environmentally damaging practicable alternative to the project and by improperly limiting the "purpose and need" of the project.**

126.     The Conservation Groups incorporate by reference the allegations contained in the preceding paragraphs.

127.     Under 40 C.F.R. §§ 230.10(a) and 230.12(a)(3)(i), the Corps may not issue a Section 404 permit if there is a less environmentally damaging practicable alternative to the project.

128.     Practicable alternatives are those alternatives that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2).

129.    Here, the Corps failed to adequately consider less environmentally damaging practicable alternatives, including but not limited to nourishment of the beach without a groin, and granted the Permit even though such alternatives existed.

130.    The Corps also improperly narrowed the purpose of the project and thus failed to adequately examine all practicable alternatives, including but not limited to looking for other sites in the area to develop as alternatives to the Reserve location.

131.    The Corps' inadequate evaluation of alternatives, and ultimate issuance of a permit when there was a less environmentally damaging practicable alternative to the project, is arbitrary and capricious in violation of the Clean Water Act and the APA.

**B.    Claim Two: The Corps violated the Clean Water Act and NEPA by failing to adequately evaluate the cumulative impacts of the authorized project.**

132.    The Conservation Groups incorporate by reference the allegations contained in the preceding paragraphs.

133.    Under 40 C.F.R. §§ 230.11(g) (Clean Water Act) and 1508.7–8 (NEPA), the Corps is obligated to evaluate cumulative effects of the project before granting a permit.

134.    Clean Water Act regulations define "cumulative impacts" as "the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material. Although the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems." 40 C.F.R. § 230.11.

135.    NEPA regulations define "cumulative impact" as the "impact on the environment which results from the incremental impact of the action when added to other past, present, and

22

reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

136.    The Corps failed to adequately evaluate the cumulative effects of the proposed project over the life of the project.

137.    Thus, the Corps' cumulative impacts review was arbitrary and capricious in violation of the Clean Water Act, NEPA, and the APA.

**C.    Claim Three: The Corps violated NEPA and the APA by failing to take a "hard look" at the environmental consequences of the proposed action and by failing to prepare an Environmental Impact Statement.**

138.    The Conservation Groups incorporate by reference the allegations contained in the preceding paragraphs.

139.    Under NEPA, the Corps must take a "hard look" at the environmental consequences of an action before issuing a Clean Water Act permit. In so doing, the Corps must use "high quality" information, including "accurate scientific analysis." 40 C.F.R. § 1500.1(b).

140.    The Corps failed to take a hard look at the environmental consequences of the proposed action.

141.    For example, the Corps did not adequately consider the impacts to piping plovers, summarily dismissing potential impacts to the federally listed species because "the listed critical habitat is located outside the project site. Therefore there would be no direct effect to critical habitat." EA at 50.

142.    According to the textual unit description published in the Federal Register, however, critical habitat for the piping plover "extends north of Gould's inlet (Sea Island) 2.5 km

(1.54 mi) starting *just south of the groin* and extends south of Gould's Inlet (St. Simons Island) 1.6 km (1,0 mi)." 66 Fed. Reg. at 36,099 (emphasis added).

143.     The Corps' failure to adequately consider impacts to this species is arbitrary and capricious and in violation of law and violates NEPA, the Endangered Species Act, the Clean Water Act, and the APA.

144.     The Corps' failure to prepare an Environmental Impact Statement also violates NEPA. Under NEPA, the Corps must prepare or adopt an EIS before undertaking a major action that will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C).

145.     Based on the project's direct, indirect, and cumulative impacts to the sand-sharing system and to threatened and endangered species and their habitat as well as the controversy and uncertainty surrounding the impacts of the Permit, the issuance of the Permit meets the regulatory definition of significance that calls for the preparation or adoption of an EIS.

146.     The Corps' FONSI and its decision to forgo preparing an EIS are arbitrary and capricious in violation of NEPA and the APA.

**D.     Claim Four: The Corps violated the Clean Water Act and the APA by issuing a permit for a structure that would create undue interference with access to and use of public tidelands.**

147.     The Conservation Groups incorporate by reference the allegations contained in the preceding paragraphs.

148.     Under Corps regulations, "in the case of proposals which create undue interference with access to, or use of, navigable waters," the permit should generally be denied. 33 C.F.R. § 320.4(g)(3).

149.    The proposed groin creates undue interference with access to at least 1,200 feet of public tidelands.

150.    The Corps did not consider this access issue.

151.    Thus, the Corps' issuance of the permit was arbitrary and capricious in violation of the Clean Water Act and the APA.

**E.    Claim Five: The Corps violated the Endangered Species Act and the Administrative Procedure Act by failing to adequately consult with NMFS and USFWS regarding the project.**

152.    The Conservation Groups incorporate by reference the allegations contained in the preceding paragraphs.

153.    Sea Island Acquisition provided a biological assessment with their initial application documenting that eleven threatened or endangered species reside or nest in the project area, and that the Piping Plover and North Atlantic right whale have critical habitat either within or adjacent to the project area.

154.    Based on Sea Island Acquisition's initial biological assessment, the Corps determined that the authorized activities "may affect," but were unlikely to adversely affect, listed species.

155.    By letter dated May 10, 2017, the Corps sent the applicant's biological assessment to NMFS and requested concurrence with the agency's effects determination.

156.    By letter dated October 10, 2017, NMFS concurred, noting that the effects of the 1,200 foot-long project were sufficiently small to be "discountable" or "insignificant."

157.    After NMFS's concurrence, Sea Island Acquisition amended its application to seek renourishment of 17,000 linear feet—over fourteen times longer than the initial application that NMFS reviewed.

158.    In addition to expanding the length of the project, the amended application proposed to pump up to 2,500,000 yd$^3$—an over 20-fold increase from the initial application—from an offshore borrow site via a hydraulic cutterhead dredge. By contrast, the initial applicant proposed moving 120,000 yd$^3$ of sand from an onshore location via truck.

159.    Because NMFS had summarily examined the effects of a hydraulic cutterhead dredge on the sea turtles in an aquatic environment over two decades earlier, the Corps concluded that no additional consultation was needed despite increasing the size of the project by a multiple of fourteen, changing the project location, and adding an aquatic component.

160.    Pursuant to 16 U.S.C. § 1540(g)(2), the Conservation Groups provided written notice of the violation to Defendants on October 31, 2018. A copy of the written notice is attached to the Conservation Groups' Motion for Preliminary Injunction as Exhibit S, ECF No. 5-19.

161.    Neither the Corps nor NMFS has taken action to bring the Corps into compliance with the Endangered Species Act since receiving the letter.

162.    The Corps' failure to consult with NMFS following the submission of a substantially amended application is arbitrary and capricious and in violation of law and violates the Endangered Species Act, the Clean Water Act, and the APA.

26

**F.      Claim Six: The Corps violated NEPA, the Clean Water Act, and the APA by failing to take adequate steps to minimize or mitigate the adverse impacts of the project.**

163.    The Conservation Groups incorporate by reference the allegations contained in the preceding paragraphs.

164.    NEPA regulations require an analysis of measures to mitigate the impacts of proposed actions.  *See* 40 C.F.R. §§ 1502.14(f), 1502.16(h).

165.    Clean Water Act regulations, 40 C.F.R. § 230.10(d), similarly require the Corps to take "appropriate and practicable steps which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."

166.    The Corps failed to take adequate steps to minimize or mitigate the adverse impacts of the project. For example, the Permit requires no mitigation measures for piping plover critical habitat, despite the inclusion of such measures in prior permits.

167.    The Corps' failure to adequately consider mitigation measures is arbitrary and capricious in violation of NEPA and the APA.

**G.      Claim Seven: The Corps violated NEPA, the Clean Water Act, and the APA by issuing the permit modification.**

168.    The Conservation Groups incorporate by reference the allegations contained in the preceding paragraphs.

169.    In addition to the violations described in Claims One through Six above, in issuing the modification, the Corps failed to adequately notify the public and to consider or explain the impacts of the modification as required by the Clean Water Act, NEPA, and the Administrative Procedure Act.

170.    The Corps' decision to modify the Permit in response to Sea Island Acquisition's knowing violations, without any notice to the public, is unreasonable, arbitrary, capricious, and not in accordance with law.

## **PRAYER FOR RELIEF**

The Conservation Groups respectfully request that this Court:

A.    Declare that the Corps' issuance of the Permit, including modifications, violates the Clean Water Act and its implementing regulations and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of the APA;

B.    Declare that the Corps' FONSI and its failure to prepare an EIS violate NEPA and its implementing regulations and are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of the APA;

C.    Declare that the Corps' issuance of the Permit violates the Endangered Species Act and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

D.    Vacate and enjoin reliance on the Permit;

E.    Require removal of any portion of the groin built during this litigation and restoration of any affected shoreline;

F.    Award the Conservation Groups the costs of this action, including their reasonable attorneys' fees; and

G.    Grant the Conservation Groups such additional relief as the Court deems just and proper.

Respectfully submitted this 13th day of September, 2019.

**SOUTHERN ENVIRONMENTAL
LAW CENTER**

/s/ *Megan Hinkle Huynh*

William W. Sapp
Georgia Bar No.  626435
Megan Hinkle Huynh
Georgia Bar No. 877345
*Admitted pro hac vice*
Ten 10th Street NW, Suite 1050
Atlanta, Georgia 30309
Phone: (404) 521-9900
Fax: (404) 521-9909
bsapp@selcga.org
mhuynh@selcga.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on September 13, 2019, I electronically filed the foregoing *Second Amended Complaint for Declaratory and Injunctive Relief* with the Clerk of Court using the CM/ECF system.

/s/ *Megan Hinkle Huynh*