# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | | |
|---|---|---|
| ALTAMAHA RIVERKEEPER, ONE HUNDRED MILES, SURFRIDER FOUNDATION, and CENTER FOR A SUSTAINABLE COAST, INC. | * * * * | |
| Plaintiff, | * * | CIVIL ACTION FILE NO. 4:18-cv-00251- JRH -JEG |
| v. | * * | _____ |
| THE UNITED STATES ARMY CORPS OF ENGINEERS, et al., | * * * | |
| Defendants, | * * | |
| And | * * | |
| SEA ISLAND ACQUISITION, LLC., | * * | |
| Intervenor-Defendant. | * | |

---

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

**COMES NOW,** Plaintiff Center for a Sustainable Coast, Inc. (the "Center" or "CSC")

and pursuant to Fed. R. Civ. P. 15(a) and 16(b), hereby files its First Amended Complaint as

follows:

### INTRODUCTION

1.

This action challenges the U.S. Army Corps of Engineers' (the "Corps[1]'") issuance of a

Clean Water Act Section 404 permit to Sea Island Acquisition, LLC ("SIA" or "Sea Island

---

[1] Unless otherwise noted, the term "Corps," will refer collectively to all of the originally named
defendants (the Corps and officers of the Corps sued in their official capacities).

Acquisition") and the accompanying Environmental Assessment and Finding of No Significant Impact ("EA/FONSI") under the National Environmental Policy Act ("NEPA"), as well as, the subsequent after-the-fact modification of the permit by the Corps.

2.

On September 12, 2018, the Corps issued Permit Number SAS-2015-00742 (the "Permit") enabling Sea Island Acquisition to significantly alter the beach, dunes and sand sharing system on Sea Island, including in the vicinity of the Spit, a sensitive, pristine, fragile, and undeveloped piece of land at the southern end of Sea Island, to protect eight undeveloped and vacant lots Sea Island Acquisition seeks to develop as part of a proposed development known as the Reserve at Sea Island. The Permit authorized Defendant-Intervenor Sea Island Acquisition to construct a new T-head groin in front the Reserve at Sea Island; to dredge between 1,315,000 to 2,5000,000 cubic yards of sand from an offshore location; and to renourish more than 17,000 linear feet of beach on Sea Island. Notably, under the Permit, the majority of and a disproportionate amount of the sand is to be used on only 1,200 linear feet of beach on the Spit to build up the area in front of the Reserve at Sea Island. The Permit was issued pursuant to and conditioned on compliance with certain project specifications and plan.

3.

Work performed under the Permit by Sea Island Acquisition between November 2018 and April 30, 2019 was done in blatant violation of the terms and conditions of the Permit, constituting a substantial deviation from the project plans and significantly altering the scope, extent and impact of the project. By way of example, Sea Island Acquisition violated the terms and conditions of the Permit by, among other things, (i) using dredged sand from an offshore borrow site to create and fill upland private property on the Reserve at Sea Island; (ii) taking

sand from the public beach area, which sand is held in public trust, to create and fill upland private property on the Reserve at Sea Island; (iii) failing to properly fill the newly established groin cell in front of the Reserve at Sea Island; (iv) lengthening the new groin; (v) exceeding the dredging depth of the permitted offshore borrow site; (vi) dredging and utilization of a new offshore borrow site; and (vii) altering public access from the new groin to the Spit, in such a manner to restrict the same.   On or around April 24, 2019, the Center, by and through its counsel, notified the Corps and Sea Island Acquisition, via a sixty-day notice of intent to sue letter ("Notice Letter") pursuant to Section 505 of the Clean Water Act, 33 U.S.C. § 1365, of its intent to sue for violations of the Permit and the Clean Water Act associated with the work performed unless the violations were remedied within sixty days.  Neither the Corps nor Sea Island Acquisition responded to the Center's Notice Letter.   Instead of remedying the violations, Sea Island Acquisition requested a permit modification from the Corps to authorize the violations.  Instead of enforcing the terms and conditions of the Permit and requiring Sea Island to remedying the violations, the Corps, on or around July 5, 2019, granted an after-the-fact modification of the Permit to Sea Island Acquisition, in essence authorizing the violations.  The Corps failed to provide any public notice and opportunity for public comment on the permit modification.

4.

The Corps' actions violate the substantive and procedural provisions of the Clean Water Act, 33 U.S.C. §1344, ("CWA") and the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), and are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of the Administrative Procedures Act ("APA"), 5 U.S.C. §§553, 706(2)(A).

5.

Plaintiff Center for a Sustainable Coast asks the Court to (1) declare that the Corps violated its statutory duties under the CWA and NEPA in issuing the Permit, as well as, the after-the-fact permit modification; (2) issue an injunction requiring the Corps to vacate or rescind the Permit, including the after-the-fact permit modification; (3) enjoin any further construction of the groin as well as any further dredging and beach nourishment activities under the Permit, including as modified; (4) require removal of any portion of the groin built during this litigation and restoration of any affected beach and shoreline; (5) award to Plaintiff its costs and expenses, including reasonable attorneys' fees and expenses of litigation.

## JURISDICTION AND VENUE

6.

This action arises under the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.,* the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.,* and the implementing regulations of these acts.

7.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and may issue declaratory and further relief pursuant to 28 U.S.C. §§ 2201 and 2202.

8.

Plaintiff Center for a Sustainable Coast, Inc. is authorized to bring this action under the APA, 5 U.S.C. §§ 701-706.

9.

Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to this claim occurred in this District, including Defendant's grant of the Permit.

**PARTIES**

10.

Defendant United States Army Corps of Engineers is the federal agency charged with administering permits under Clean Water Act § 404 for the discharge of dredged or fill material into waters of the United States. The Corps is headquartered in Washington, D.C., and has a District Office in Savannah, Georgia, where a significant portion of the actions and/or omissions alleged in this Complaint occurred.

11.

Defendant Lieutenant General Todd Semonite, who is being sued in his official capacity, is the current Commanding General of the U.S. Army Corps of Engineers. He is charged with the supervision and management of all Corps decisions and actions, including the evaluation of Corps decisions and actions under NEPA and Section 404 of the CWA, which are the subject of this lawsuit.

12.

Defendant Colonel Daniel Hibner, who is being sued in his official capacity, is the District Commander in charge of the U.S. Army Corps of Engineers in Savannah, Georgia. The Savannah District is responsible for the review, assessment, consideration and issuance of the permit being challenged. Colonel Hibner was responsible for signing the permit being challenged.

13.

Defendant Tunis McElwain, who is being sued in his official capacity, is the chief of the Regulatory Branch of the U.S. Army Corps of Engineers. The Regulatory Branch of the U.S. Army Corps of Engineers administers and enforces Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act of 1899. McElwain was responsible for the issuance and signing of the Environmental Assessment (EA) and Finding of No Significant Impact (FONSI), or Statement of Findings as now referred to by the Corps, for the permit being challenged.

14.

Plaintiff Center for a Sustainable Coast, Inc. (CSC or the Center), who brings this action on behalf of itself and its members, is a not-for-profit organization incorporated in Georgia. The Center's principal place of business is in Glynn County, Georgia. The Center's mission is to support conservation and sustainable use of Georgia's coastal resource – natural, historic, and economic – including the coastal resources of Sea Island adversely affected by the issuance of the Permit. The Center is a local leader and advocate on issues related to the adverse impacts associated with the use of groins and sand renourishment practices.

15.

The Center's members use, recreate, work, reside near, as well as derive aesthetic enjoyment from, the waters, adjacent habitat and aquatic life and wildlife along Georgia's coast including on Sea Island, the Sea Island Spit, the adjacent Gould's Inlet, and the adjacent St. Simons Island and other areas adversely affected by the issuance of the Permit, and subsequent after-the-fact permit modification. The Center and its members enjoy the natural serenity of the Spit.

16.

The Center and its members believe the public deserves the best possible protection of Georgia's environmental interests and quality of life, while enjoying responsible use of this region's diverse natural resources. The Center and its members work to advance the Center's mission so that the interest of existing and future generations of Georgians are adequately protected in decisions that affect them, such as the permitting decision at issue here.

17.

As part of its core mission, the Center and its members monitor state, federal and local permitting actions pertaining to the issuance of permits and/or authorizations for construction or other work affecting Georgia's coastal resources, including the Sea Island Spit, the adjacent Gould's Inlet, and the adjacent St. Simons Island and other areas adversely affected by the issuance of the Permit and subsequent after-the-fact permit modification.

18.

The Center and its members have an interest in ensuring that the U.S. Army Corps of Engineers carries out and complies with all applicable laws and regulations in performing its duties, including as it relates to the issuance of the challenged permit.

19.

The Center and its members have participated extensively and continue to participate in efforts to protect the coastal resources along Sea Island and St. Simon's Island, including the sensitive Sea Island Spit and other areas affected by the issuance of the Permit and subsequent after-the-fact permit modification, as well as to protect the wildlife that resides and depends upon these areas, for existing and future generations.

20.

The Center and its members are adversely affected and injured by Defendants' actions and/or omissions resulting in the issuance of the Permit and subsequent after-the-fact permit modification, which will damage the sensitive, pristine, and fragile Spit and nearby areas of Gould's Inlet and St. Simon's Island as well as the wildlife species that reside and depend upon these areas. The Center and its members have suffered injury and will suffer injury to their well-being, aesthetic, recreational, environmental, real property, and/or economic interests as a result of Defendants' issuance of the Permit and subsequent after-the-fact permit modification. The Center and its members observe and experience the adverse impacts of groin development and alteration of the beach, dune and sand sharing system along the coast, shore erosion and accretion, destruction of sensitive ecosystems, alteration of wildlife habitat, including habitat of federally protected species such as the Loggerhead Sea Turtle, the Red Knot and the Piping Plover, as well as the unreasonable interference with the use and enjoyment of public beach and tidelands. The Center and its members are adversely impacted and injured by the Corps' failure to adequately consider, assess and evaluate the impacts associated with the project, including as modified.

21.

Implementation of the work authorized by the Permit, particularly in light of Defendants' failures to comply with the applicable statutes and regulations, has caused and will cause the Center and its members to suffer imminent, irrefutable harm and/or injury. Likewise, Defendants' actions and/or omissions have deprived the Center and its members of certain information and procedural rights pertaining to the review and issuance of the Permit and the subsequent after-the-fact permit modification, including the failure to provide notice and

opportunity to comment prior to the issuance of the after-the-fact permit modification; the failure to hold public hearings, whereby affording the public a meaningful opportunity to engage in public comment on the proposed project; and the failure to properly assess and consider the impacts of the work authorized by the Permit and the subsequent after-the-fact permit modification. Specifically, Defendants' FONSI decision and subsequent failure to order an Environmental Impact Statement (EIS), which resulted in issuance of the Permit and subsequent after-the-fact permit modification, has caused and will cause the Center and its members imminent, irrefutable harm and/or injury.

## STATUTORY AND REGULATORY BACKGROUND

### *The Clean Water Act*

### 22.

Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251, *et seq.* To accomplish this goal, Section 301 of the Clean Water Act prohibits the discharge of any pollutant, including dredged spoil or other fill material, into navigable waters unless authorized by and in accordance with a permit issued under the Clean Water Act. *Id.* § 1342(a).

### 23.

"Pollutants" include dredged spoil, rock, and sand, among other materials. Clean Water Act § 502(6), 33 U.S. §1362(6). "Navigable waters" are defined as "the waters of the United States, including the territorial seas." *Id.* §1362(7).

24.

One type of permit authorized under the Clean Water Act is a Section 404 permit. *Id.* §
1344. Section 404 of the Clean Water Act authorizes the Secretary of the Army, via the Corps,
to issue permits, under certain circumstances, after notice and opportunity for public hearing,
"for the discharge of dredged or fill material into the navigable waters at specified disposal
sites." *Id.* § 1344(a). The Secretary of the Army acts through the Chief of Engineers of the U.S.
Army Corps of Engineers. *Id.* § 1344(d); 33 C.F.R. § 323.6(a).

25.

Unless exempted by Section 404(f)(1), which is not applicable here, all discharges of fill
material into waters of the United States must be authorized by a Section 404 Permit issued by
the Corps.

26.

In addition to obtaining a Section 404 permit to discharge dredge and fill material,
Section 401 of the Clean Water Act, 33 U.S.C. § 1341, requires that applicants for permits to
discharge pollutants into waters of the United States obtain a certification from the State in
which the proposed discharge would originate that the discharge will not violate specified water
quality standards. The Georgia Department of Natural Resources, Environmental Protection
Division ("EPD") is the authorized agency that issues 401 water quality certifications for the
State of Georgia.

27.

There are two sets of implementing regulations that govern the 404 permit program under
33 C.F.R. §320.4(b)(4) – one that was promulgated by the Corps itself, 33 C.F.R. Parts 320-330,
commonly referred to as the "public interest" factors, and one that was promulgated by the

Environmental Protection Agency ("EPA"), commonly called the "404(b)(1) Guidelines."  *See*

40 C.F.R. § 230.1 *et seq.*  Under the Corps' regulations, an applicant for a 404 permit must

include in the permit application all activities which it plans to undertake which are "reasonably

related" to the project, along with a complete description of such activities "sufficient for public

notice."  33 C.F.R. §325.1(d)(2).  When the Corps has received a complete application, it must

issue a public notice soliciting comments from interested persons as to the advisability of

granting the permit.  33 U.S.C. § 1344(a); 33 C.F.R. §§325.2(a)(2), 325.3.

28.

The Corps' rules provide that "[a] public hearing will be held in connection with the

consideration of a [404 permit] whenever a public hearing is needed for making a decision on"

the permit application.  33 C.F.R. §327.4(a).  Requests for a public hearing "shall be granted,

unless the district determines that the issues raised are insubstantial or there is otherwise no valid

interest to be served by a hearing," 33 C.F.R. §327.4(b), but "[i]n case of doubt, a *public hearing*

*shall be held.*"  33 C.F.R. §327.4(c) (emphasis added).

29.

The Corps is equally obliged to provide public notice, comment and a hearing, whenever

a modification to a permit is requested.  33 C.F.R. §325.6(d).

30.

With regard to the Corps' substantive review, the Corps adopted regulations, known as

the "public interest" factors to implement its permitting authority.  33 C.F.R. § 320.  "Evaluation

of the probable impact which the proposed activity may have on the public interest requires a

careful weighing of all those factors which become relevant in each particular case.  The benefits

which reasonably may be expected to accrue from the proposal must be balanced against its

reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process." *Id.* § 320.4(a)(1).

31.

The Corps must consider a broad range of potential relevant impacts as part of its public interest review, including "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership, and, in general, the needs and welfare of the people." *Id.*

32.

The EPA's "404(b)(1) Guidelines" for the issuance of dredge and fill permits are also binding on the Corps. 40 C.F.R. Part 230, 33 C.F.R. § 320.4(b)(4). The 404(b)(1) Guidelines apply to all Section 404 permits and the Corps must follow these guidelines in deciding whether to issue a Section 404 permit. *See* 33 U.S.C. § 1344(b); 40 C.F.R. §230.2. The Corps is prohibited from issuing a Section 404 permit unless there is "sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with [the] Guidelines." 40 C.F.R. § 230.12(a)(3)(iv).

33.

A permit must be denied if it is contrary to the public interest or does not comport with the 404(b)(1) Guidelines. 33 C.F.R. §§ 320.4(a)(1), 323.6(a); 40 C.F.R. §§ 230.10, 23.12.

34.

The 404(b)(1) Guidelines prohibit the issuance of a Section 404 permit under certain conditions relevant to this lawsuit: First, "[f]undamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probably impacts of other activities affecting the ecosystem of concern." 40 C.F.R. §230.1(c) and (d).

35.

Second, the 404(b)(1) Guidelines prohibit the issuance of a Section 404 permit if the discharge will "cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). "Significant degradation" includes, but is not limited to, "significantly adverse effects" on "fish, shellfish, wildlife, and special aquatic ecosystems," 40 C.F.R. § 230.10(c)(1), the last of which includes wetlands. 40 C.F.R. Subpart E, § 230.41. "Significant degradation" also includes "significantly adverse effects … on life stages of aquatic life and other wildlife dependent on aquatic ecosystems," as well as on "aquatic ecosystem diversity, productivity, and stability." 40 C.F.R. § 231.10(c)(2), (3). Other factors that must be considered in determining whether a project will result in "significant degradation" of waters of the United States include, but are not limited to: (1) alterations of salinity gradients, 40 C.R.R. §230.25; (2) impacts to threatened and endangered species, 40 C.F.R. § 230.30; and (3) impacts to recreational and commercial fisheries, 40 C.F.R. § 230.51.

36.

The EPA's guidelines also strictly prohibit the Corps from issuing any permit "if there is a practicable alternative that would have less adverse impact on the aquatic ecosystem. 40

C.F.R. § 230.10(a). The Corps guidelines further provide that "practicable alternatives" include "not discharging into waters of the U.S. or discharging into an alternative aquatic site with potentially less damaging consequences." 40 C.F.R. § 230.5(c). Practicable alternatives are presumed to be available unless "clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3).

37.

The Corps must document its findings of compliance or noncompliance with these restrictions. 40 C.F.R. § 230.10(a)(2). In conducting its assessment, the Corps may rely on information submitted by the applicant in conducting its analysis, but it must independently verify such information. Nevertheless, Section 404(b)(1) Guidelines require the Corps to deny a permit unless the applicant can show that there are no practicable alternatives with less adverse impact on the environment. 40 C.F.R. § 230.

38.

The burden of proof to demonstrate compliance with the 404(b)(1) Guidelines rests with the applicant. 40 C.F.R. § 230.1(c). The Corps must deny a permit where the proposed discharge fails to comply with the Guidelines or where there is insufficient information to determine compliance. 40 C.F.R. §§230.10, 230.12(a)(3)(iv).

*National Environmental Policy Act*

39.

Congress enacted NEPA to "promote efforts which will prevent or eliminate damages to the environment …" 42 U.S.C. § 4321. To achieve this goal, NEPA requires federal agencies to fully consider and disclose the environmental consequences of an agency action before proceeding with that action. *Id.* at § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5. NEPA is designed to "insure that environmental information is available to public officials and citizens

before decisions are made and actions are taken," and to "help public officials make decisions that are based on understanding of environmental consequences…" *Id.* at 1500.1(b)-(c).

40.

Agencies' evaluation of environmental consequences must be based on scientific information that is both "[a]ccurate" and of "high quality." 40 C.F.R. § 1500.1(b).  In addition, federal agencies must notify the public of proposed projects and allow the public the opportunity to comment on the environmental impacts of their actions.  *Id.* at 1506.6.

41.

NEPA requires all federal agencies to prepare an Environmental Impact Statement (EIS) for major federal actions significantly affecting the quality of the human environment.  42 U.S.C. § 4332(2)(C).

42.

Where it is not readily discernible how significant the environmental effects of a proposed action will be, federal agencies may prepare an Environmental Assessment ("EA"), a less onerous assessment, to establish the project's level of impact.  40 C.F.R. §§ 1501.4(b), 1508.9(a)(1); 33 U.S.C. §§ 230.10 - 230.11.   An EA "should include a brief discussion of the need for the proposed action, or appropriate alternatives if there are unresolved conflicts concerning alternative uses of available resources, of the environmental impacts of the proposed action and alternatives and a list of the agencies, interested groups and the public consulted."  33 C.F.R. §230.10.

43.

If after taking a hard look at the environmental impacts in its EA, the agency properly concludes that the action will not have a significant effect on the human environment, it may

issue a Finding of No Significant Impact ("FONSI"), and is not required to prepare an EIS. 40 C.F.R. § 1501.4(c). The FONSI should contain a brief explanation of the "reasons why an action …. will not have a significant effect on the human environment." 40 C.F.R. §1508.13 and 33 C.F.R. 230.11.

44.

In determining whether the environmental effects of a project are likely to be significant, agencies must consider a number of factors, including the nature and extent of the impacts; the degree to which the proposed action affects public health or safety; the unique characteristics of the geographic area; the degree to which the impacts are likely to be highly controversial; the degree to which the possible effects are highly uncertain or involve unique or unknown risks; the cumulative impacts; the degree to which the action may adversely affect endangered species and their habitat; and whether the action threatens a violation of state, federal or local law or requirements imposed for the protection of the environment. *Id.* at 1508.27(b). Any "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances" *Ocean Advocates v. U.S. Army Corps of Eng'rs,* 402 F.3d 846, 865 (9th Cir. 2005).

45.

An EIS serves three primary functions. First, it ensures that an agency will take a hard look at the direct, indirect, and cumulative environmental impacts of a proposed action. Second, it guarantees that the agency will consider a range of reasonable alternatives to accomplish the underlying goals of the proposed action – including options that may have fewer adverse impacts on the environment – before deciding whether to undertake the project as originally proposed. Finally, the EIS also provides detailed information about the proposed action, its impacts, and

reasonable alternatives to the public and other agencies, so that they may be informed participants in the decision-making process.

46.

To implement the requirements of NEPA, the Council on Environmental Quality promulgated regulations applicable to all federal agencies. *See* 40 C.F.R. §§ 1500-1508.

47.

NEPA requires that an EIS contain a statement of purpose and need for the proposed action which "shall briefly specify the underlying purpose and need for which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. §1502.13.

48.

NEPA requires an agency to include in an EIS a "detailed statement" on "alternatives to the proposed action." 42 U.S.C. §4332(2)(C)(iii). In this statement, the agency must rigorously explore and objectively evaluate all reasonable alternatives that could achieve the underlying project purpose. 40 C.F.R. §1502.14(a). This alternatives analysis is "the heart of the environmental impact statement," and should "present the environmental impacts of the proposal and the alternative in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decision maker and the public." 40 C.F.R. §1502.14.

49.

Agencies must "[d]evote substantial treatment to each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits." 40 C.F.R. § 1502.14(b). Only those alternatives that are deemed to be unreasonable can be eliminated from the study. 40 C.F.R. § 1502.14(a).

50.

NEPA further requires that every EIS be prepared with objective good faith and fully and fairly discuss, among other things, the adverse environmental effects of the proposed action and the alternatives to the proposed action which may avoid or minimize these adverse effects. 42 U.S.C. § 4332(2)(C), (E).

51.

Permitting agencies have an obligation under NEPA to independently evaluate and verify factual information supplied by the project applicant. *See* 40 C.F.R. § 1506.5 (where an agency relies on the applicant to submit environmental information, the agency "shall independently evaluate the information submitted and shall be responsible for its accuracy…."). In addition, if there is "incomplete or unavailable information," the agency "shall always make clear that such information is lacking." 40 C.F.R. §1502.22.

52.

Among other considerations, NEPA requires consideration of the direct environmental impacts of the proposed action, the indirect effects of the proposed action, and the cumulative impacts of the proposed action. *Id.* §§1502.16(a)-(h); 40 C.F.R. § 1508.7.

53.

NEPA defines "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. §1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* "Cumulative actions are actions "which when viewed with other proposed actions have

cumulatively significant impacts and should therefore be discussed in the same impact statement." *Id. § 1508.25(a)(2).* "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. § 1508.27(b)(7). "Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." *Id.*

54.

NEPA defines "indirect effects" as effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Further, indirect effects may include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Id.*

55.

Section 7 of the Endangered Species Act (ESA) requires all federal agencies to ensure that any action authorized, funded or carried out by the agency is not likely to jeopardize the continued existence of any endangered or threatened species, or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2).

**THE ADMINISTRATIVE PROCEDURES ACT**

56.

The Center's CWA and NEPA claims are subject to judicial review under the APA, which confers a right of judicial review on any person adversely affected by final agency action, and provides for a waiver of the federal government's sovereign immunity. 5. U.S.C. § 702.

57.

Section 10 of the APA establishes that, as a general rule, "agency action, findings, and conclusions" shall be set aside when they are "found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

58.

An action is arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. '[The court] may not supply a reasoned basis for the agency's action that the agency itself as not given.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

## FACTUAL BACKGROUND AND ALLEGATIONS

### *Sea Island and the Spit*

59.

One of a series of barrier islands off the coast of Georgia, Sea Island is approximately four and a half miles long and a half-mile wide at its widest point. Sea Island is separated from Little St. Simon's Island to the north by the Hampton River and from St. Simon's Island to the west and south by Village Creek, the Black Banks River and Gould's Inlet.

60.

The Spit is a pristine, undeveloped, and ecologically fragile area at the very southern end of Sea Island, between the Black Banks River and the Atlantic Ocean, which provides important

habitat for protected sea turtles, shorebirds, and other species, as well as an important recreational area for local residents and tourists alike.

61.

The Spit also provides an invaluable protective barrier for St. Simons Island from storm surge, flooding, and erosion and is vitally important to the sand sharing system that nourishes the beaches and shoreline of St. Simons, including the East Beach area.

***Sea Island Acquisition and The Reserve at Sea Island Development***

62.

SIA is a private resort and real estate development company, that seeks to build eight multi-million dollar homes on vacant land at the north end of the Spit, just north of the conservation easement boundary, as part of a new development called the Reserve at Sea Island. Significantly for purposes of the permitting evaluation and decision, no lots have been sold, and no homes have been built at the Reserve at Sea Island. Therefore, there are no homes or other structure that require storm protection, the purpose of the project as stated by SIA and determined by the Corps. Instead, the true intent of the project authorized by the Permit is to protect undeveloped property SIA considers "very, very valuable" and its interest in developing that property for profit.

63.

The inappropriateness of development on the Spit is highlighted by the United States Department of the Interior's designation of the Spit as ineligible for federally-backed flood insurance and federal disaster assistance by FEMA under the Coastal Barrier Resources Act, 6 U.S.C. § 3501 *et seq.*

***Current Groins on Sea Island are Causing Erosion of the Spit and the Proposed Groin Will Exacerbate Conditions and Adversely Impact East Beach on St. Simons Island***

64.

Sea Island currently has two groins that were built in the early 1990s. One groin is located at the northern end of the island, and the other one is located further south at the northern edge of the Spit. The current groins have caused a loss of at least 250 feet in the beach width and at least 2,000 feet in the length of the Spit at the southern end near Gould's Inlet.

65.

The shoreline losses south of the existing groins are not surprising. Groins halt the natural process of the sand-sharing system. The purpose of a groin is to contain sand on the updrift side of the groin. Thus, the groin acts to starve the downdrift beach of sand by eliminating the updrift supply. Because a groin deprives downdrift areas of sand, the construction of one groin typically leads to the construction of another.

66.

The negative impacts of groins are well documented and widely recognized. In fact, the Corps specifically acknowledges the destructive effects of groins, describing them as "probably the most misused and improperly designed of all coastal structures… Over the course of some time interval, accretion causes a positive increase in beach width updrift of the groin. Conservation of sand mass therefore produces erosion and decrease in beach width on the downdrift side of the groin." *See* Army Corps of Engineers Coastal Engineering Manual at Part V, Chapter C, p. V-3-59 (2002).

67.

The Corps' opinion is shared by forty-three of the country's leading geologist, who, in a joint statement, stated: "[t]he negative impact of groins and jetties on downdrift shorelines is

well understood.  When they work as intended, sand moving along the beach in the so called downdrift direction is trapped on the updrift side, causing a sand deficit and increasing erosion rates on the downdrift side.  This well-documented and unquestioned impact is widely cited in the engineering and geologic literature." *See* Coastal Scientist Statement on Groin Impacts, p. 2. Those scientist further noted: "[t]he localized and temporary updrift benefits afforded by groins and jetties rarely, if ever, justify the downdrift damage cause by increased erosion." *Id.*

68.

The negative effects of the groins on Sea Island are already known and well-documented both in personal observations and photographic evidence.

69.

The uses of groins, including on Sea Island, results in the proverbial, kick the can down the road solution.  The proposed groin on the Spit on Sea Island will be built 1,360 feet closer to St. Simon than the current groin.  It is expected to cause erosion and sand depletion at East Beach on St. Simons Island.

70.

In addition to starving downdrift beaches of sand and causing accelerated downdrift erosion, the proposed groin will have negative impacts on wildlife, especially federally protected sea turtles.  The U.S. Fish and Wildlife Service (USFWS) found that "[c]onstruction of another groin will have negative impacts to sea turtle and have possible adverse impacts to the Sea Island spit which is utilized habitat for federally listed shorebirds and turtles." *See* USFWS November 24, 2015 Comments at p. 2.

*Administrative History*

71.

On or around October 9, 2015, SIA submitted an application seeking permission to construct a T-head groin immediately south of the proposed Reserve at Sea Island development, as well as authorization to construct dunes and build a beach along 1,200 linear feet between an existing groin and the proposed groin. Pursuant to the application, the proposed groin would be located approximately 1,200 feet south of an existing groin and would be approximately 350 feet in crest length with a "T" head section, parallel to the shoreline, of 120 feet in crest length. The application further provided that the proposed dune construction and beach development project would involve the removal and placement of approximately 120,000 cubic yards of sand from the northern side of the existing groin to the project area.

72.

In its application, SIA stated the purpose of the project is "to stabilize the eroding beach south of the existing groin (in front of the Reserve at Sea Island development) and to provide storm protection to the adjacent upland."

73.

The Corps issued a public notice of the permit application on or around December 18, 2015.

74.

On or around January 15, 2016, the Center submitted comments opposing SIA's permit application (GreenLaw 2016 Comments) along with documentation supporting its opposition. In its comments, the Center explained that the proposed project would cause significant erosion along the Sea Island Spit south of the proposed groin and would adversely impact habitat for a

number federally protected species, as well as cause erosion and other adverse impacts to East Beach on St. Simons Island.

75.

In response to the application and public notice, the Corps received comments from 197 separate individuals or organizations.   Of those 197 commenters, 194 opposed the project.   In addition to the federal comments, nearly one hundred individuals and organizations, including federal and state agencies, submitted comments to the state agency – the Georgia Department of Natural Resources Coastal Resource Division (CRD) opposing the project.

76.

By way of example, the Georgia Department of Natural Resources Wildlife Resources Division (WRD) submitted written comments explaining that groins interfere with the conservation of federally and state protected sea turtle and specifically stating that "[t]he construction of the T-head groin will result in the loss of sea turtle nesting habitat and will interfere with the conservation of sea turtle populations in Georgia."

77.

Similarly, the USFWS submitted comments specifically recommending denial of the permit because of the adverse and negative impacts the groin will have on sea turtles and their habitat.

78.

On or around March 6, 2018, SIA submitted an amended application.  The amended application included the construction of the T-head groin in front of the Reserve at Sea Island, but not the proposed excavation and discharge of sand.  Instead, the revised project includes dredging vastly larger volumes of sand from an offshore location, and placement along a greater

area of the Sea Island coast.  Specifically, the amended application seeks authorization (1) to construct the new T-head groin on the Spit; (2) to dredge between 1,315,000 to 2,500,000 cubic yards of sand from an offshore location; and (3) to renourish more than 17,000 feet of beach on Sea Island.

79.

The Applicant's stated purpose of the project and need is "to restore the Sea Island (GA) beach to provide storm protection for adjacent uplands, restore wildlife habitat, restore recreational functions, and to provide a reservoir for sand recycling to address existing erosion patterns."  *See* March 6, 2018 Addendum.  The Applicant further stated, "[t]he basic project purpose is to provide storm protection for developed shoreline through beach nourishment techniques."  *Id.*

80.

Because the changes proposed in the March 2018 addendum (amended application) were substantial, the Corps issued a new public notice.  On or around March 20, 2018, the Corps published notice of the vastly expanded project and Revised Application.

81.

Again, the Corps received overwhelming opposition to the application and proposed project.

82.

On or around May 23, 2018, the Center submitted comments opposing SIA's permit revised application (SELC 2018 Comments) along with documentation supporting its opposition. In its comments, the Center explained that the proposed project would cause significant erosion along the Sea Island Spit south of the proposed groin and would adversely impact habitat for a

number federally protected species, as well as cause erosion and other adverse impacts to East Beach on St. Simons Island.

83.

Among other things, the Center noted that neither the October 2015 application nor the March 2018 revised application by SIA adequately considered the direct, indirect, or cumulative impacts of the proposed project.  In addition, neither the October 2015 application nor the March 2018 revised application by SIA adequately considered less environmentally damaging, practicable alternatives.

84.

On or around September 11, 2018, the Corps issued a permit authorizing Sea Island Acquisition to construct the new T-head groin on the Spit; to dredge between 1,315,000 to 2,500,000 cubic yards of sand from an offshore source; and to renourish more than 17,000 linear feet of beach on Sea Island. The Permit authorizes SIA to place a disproportionate amount of sand on the Spit, along 1,200 linear feet of the more 17,000 linear feet identified in the project, in which half, if not more, of all the sand, is proposed to be placed.

85.

On or around this same time, the Corps issued its combined Environmental Assessment, 404(B)(1) Guidelines Evaluation, Public Interest Review, and Statement of Findings for the subject application, rendering a finding that the authorized project would have no significant impact to the environment.

86.

In this decision document, the Corps specifically found the basic purpose of the project to be storm protection. "The Corps has determined that the overall project purpose is to protect upland lots and development located along the shoreline of Sea Island from storm damage."

87.

The purpose of the project as defined by the Applicant and determined by the Corps do not support the issuance of the Permit and the work authorized pursuant to the Permit, nor does it support the subsequent after-the-fact permit modification.

88.

In its decision document, the Corps also specifically found the project not to be water dependent.

89.

In its decision document, the Corps found that the authorized project would have no significant impact to the environment. Despite such, the decision document is replete with acknowledgements that the existing groins have caused accelerate erosion on the Spit and the proposed project will likely exacerbate conditions downdrift and will adversely affect sea turtles and other endangered and threatened wildlife.

90.

The Corps' decision to grant the Permit is arbitrary, capricious, an abuse of discretion and otherwise contrary to law.

*Permit Violations and Issuance of After-the-Fact Permit Modification*

91.

Despite the pending challenge to the Corps' issuance of the Permit, Sea Island Acquisition chose to proceed with construction of the project.

92.

Such work was commenced and carried out by Sea Island Acquisition in blatant disregard for and in violation of the terms and conditions of the Permit.

93.

By way of example, Sea Island Acquisition violated the terms and conditions of the Permit by, among other things, (i) using dredged sand from an offshore borrow site to create and fill upland private property on the Reserve at Sea Island; (ii) taking sand from the public beach area, which sand is held in public trust, to create and fill upland private property on the Reserve at Sea Island; (iii) failing to properly fill the newly established groin cell in front of the Reserve at Sea Island; (iv) lengthening the new groin; (v) exceeding the dredging depth of the permitted offshore borrow site; (vi) dredging and utilization of a new offshore borrow site; and (vii) altering public access from the new groin to the Spit, in such a manner to restrict the same.

94.

On April 24, 2019, the Center, in accordance with the citizen suit provisions of the Clean Water Act, 33 U.S.C. § 1365, sent Defendant-Intervenor Sea Island Acquisition a sixty-day notice of intent to sue letter ("Notice Letter") for its blatant disregard for and violation of the terms and conditions of the Permit.   In accordance with the citizen suit provisions of the Clean Water Act, a copy of the Notice Letter was also provided to the Corps.  Neither Sea Island Acquisition nor the Corps responded to the Center's Notice Letter.

95.

Instead, Sea Island Acquisition requested an after-the-fact modification of its permit to allow its substantial deviation from and violations of the terms and conditions of the original Permit.

96.

On or around July 5, 2019, the Corps' granted an after-the-fact modification of the Permit pursuant to Sea Island Acquisitions' request, thereby authorizing the majority of the violations while noting certain violations were outside the authority of the Corps.

97.

As issued, the after-the-fact modification of the Permit, constitutes a major modification of the Permit.

98.

The Corps failed to provide any public notice and opportunity for public comment on the after-the-fact modification of the Permit.

99.

In fact, Sea Island and the Corps intentionally withheld from the Center and the other Plaintiffs to this action, as well as the broader public, the request for the after-the-fact permit modification and initial issuance of the same.

100.

The after-the-fact modification of the Permit was also issued without first securing necessary and required local and state authorizations.

## CLAIMS FOR RELIEF

## COUNT I:

## VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT
## AND IMPLEMENTING REGULATIONS
### *Failure to Adequately Evaluate and Analyze Environmental Impacts and Prepare an EIS and Failure to Provide Public Notice and Opportunity to Comment*

101.

Plaintiff incorporates the allegations asserted in paragraphs 1 through 100 as if stated fully herein.

102.

Plaintiff avers that the Corps' Finding of No Significant Impact and failure to require an Environmental Impact Statement violates the NEPA, including but not limited to, 42 U.S.C. § 4332, the APA, and/or the CWA.

103.

NEPA requires the Corps to prepare an EIS whenever it engages in a major Federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C).

104.

Implementing regulations require agencies to determine whether to prepare an EIS for such actions based on the analysis set forth in an EA. 40 C.F.R. § 1501.4(c).

105.

The Corps' NEPA regulations require the Corps to issue a FONSI for any project for which an EIS is not prepared. 33 C.F.R. § 230.11. In the FONSI, the Corps must present reasons why an action will not have a significant effect on the human environment. *Id.*

106.

As acknowledged by the Corp's own findings in its decision document, the environmental effects of the project are likely to be significant considering the project's direct, indirect and cumulative impacts to the sand-sharing system, the adverse impacts to threatened and endangered species and their habitat, the controversial nature of the project as evidence by the overwhelming objection to the project and the highly controversial nature of the impacts. In addition, there is evidence that the project may violate State and local laws governing work on the sand-sharing system.

107.

The issuance of the Permit, and the subsequent after-the-fact modification of the Permit, under Clean Water Act § 404 to SIA is a major federal action that significantly affects the quality of the human environment, and thus Defendants were required under NEPA and implementing regulations, and the Corps regulations to prepare an EIS before the Permit was issued. 42 U.S.C. § 4332(2)(C); 40 C.R.R. §§ 1501.4(c); 33 C.F.R. §§ 230.10 and 230.11.

108.

The FONSI issued for the SIA project does not provide a rational basis for the Corps' decision not to prepare an EIS. Accordingly, Defendants grant of the Permit, and subsequent after-the-fact modification of the Permit, absent presentation of an EIS violates NEPA, 42 U.S.C. § 4321 *et seq.,* and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

109.

NEPA requires agencies to prepare a supplemental analysis when (1) there are substantial changes in the proposed action relevant to the environmental concerns; or (2) there are

significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.  40 C.F.R. § 1502.9(c)(1).

110.

In this instance, Sea Island Acquisition's violations of the Permit substantially altered the project and required supplemental analysis.  Likewise, Sea Island Acquisition's request of an after-the-fact permit modification triggered the requirement for supplemental analysis.

111.

The Corps' failure to prepare a supplemental analysis to evaluate the substantial changes to the project prior to issuance of the after-the-fact modification of the Permit violates NEPA and its implementing regulations.

112.

The Corps violated NEPA and its implementing regulations, abused its discretion, and acted arbitrarily and capriciously in violation of the APA by failing to prepare a NEPA document that adequately addresses the serious environmental issues raised by the Corps' decision to issue the Permit and the subsequent after-the-fact modification of the Permit by not:

(a) Conducting any meaningful analysis of the substantial adverse impacts that will result from the project, including arising from Sea Island Acquisition's violations of the Permit and the after-the-fact modification of the Permit;

(b)  Disclosing critical environmental information to the public before its decisions were made, particularly before issuing the after-the-fact modification of the Permit;

(c) Taking the necessary "hard look" at the serious direct, indirect, and cumulative environmental impacts of the activity, including before issuing the after-the fact modification of the Permit.

33

113.

The Corps also violated NEPA and its implementing regulations, abused its discretion, and acted arbitrarily and capriciously in violation of the APA by failing to provide public notice and the opportunity for public comment prior to its issuance of the after-the-fact modification of the Permit.

114.

These violations of NEPA and the APA by the Corps threaten the Center and its members with irreparable injury for which they have no adequate remedy at law.

## COUNT II.

### VIOLATIONS OF THE CWA AND IMPLEMENTING REGULATIONS
*Failure to Obtain Required 401 Certification; Violation of 404(b)(1) Guidelines (Least Damaging Practicable Alternative, Minimization of Potential Adverse Impacts, Failure to Adequately Evaluate and Analyze Environmental Impacts); Violation of Public Interest Review Requirements; Failure to Provide Public Notice and Opportunity to Comment*

115.

Plaintiff incorporates by reference paragraphs 1-100 as if fully stated herein.

116.

Under the Clean Water Act, no permit may be issued by the Corp under Section 404 without the State certifying compliance with state water quality standards and related coastal management certifications under Section 401 of the Clean Water Act. 33 U.S.C. §1341.

117.

Sea Island Acquisition was required to obtain a revised or amended 401 Certification as well as certain state and local authority prior to obtaining any after-the-fact modification of the Permit. The Corps' issuance of the after-the-fact modification of the Permit without an amended 401 Certification violates the Clean Water Act and its implementing regulations. Likewise, the

Corps' issuance of the after-the-fact modification of the Permit without modifications to state permitting and local authorization requirements violates the Clean Water Act and its implementing regulations and renders the decision arbitrary, capricious, an abuse of discretion and otherwise contrary to law.

118.

The Clean Water Act requires the Corps to grant or deny permits for the discharge of fill material in accordance with criteria set forth in the Corps' own guidelines. *See* 33 U.S.C. § 1344(b) and 40 C.F.R. § 230.1 *et seq.*

119.

An applicant for a Section 404 permit must show that its project complies with Section 404 Guidelines. The 404(b)(1) Guidelines provide that "dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." 40 C.F.R. § 2301.1(c). In evaluating adverse impacts, the Corps must consider both the short and long term consequences of discharges on the physical, chemical and biological components of the aquatic environment. 40 C.F.R. § 230.11.

120.

The Corps may approve a project only if: (a) it is the least damaging practicable alternative; (b) it would not violate the Endangered Species Act; (c) its discharges would not cause or contribute to significant degradation of the waters of the United States; and (d) its potential impacts to aquatic ecosystems are minimized to the extent practicable.

121.

As set forth above, the Corps failed to take a "hard look" at the environmental concerns raised by the Permit, and subsequent after-the-fact permit modification. It failed to analyze adequately both the specific environmental impacts that would be allowed if the permit were granted and the cumulative environmental impacts of the project.

122.

The Corps failed to analyze and consider practicable alternatives that achieve the purpose of the project, including as modified, while causing significantly fewer adverse environmental effects. With respect to the least damaging practicable alternative requirement, the Guidelines provide that "[a]n alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. 40 C.F.R. § 230.10(a)(2). The Corps improperly determined that the work, as requested by SIA in its application, was the least environmentally damaging practicable alternative that would achieve the purposes for which the work is being performed. The Corps failed to adequately consider less environmentally damaging practicable alternatives, including but not limited to no action; beach nourishment without a groin; and beach nourishment coupled with removal of the existing south and/or north groin, particularly in the context of the purpose for the project. Accordingly, Plaintiff avers that the Corps violated the CWA and the APA by issuing the Permit when there is a less environmentally damaging practicable alternative. 40 C.F.R. §§ 230.10(a) and 230.12(a)(3)(i).

123.

The Corps failed to adequately analyze endangered and threatened species issues. SIA has an obligation to show that the proposed project will not violate the Endangered Species Act.

As set forth above, there is ample evidence which demonstrates that the proposed project will jeopardize existence of several threatened and endangered species under the ESA, including the Loggerhead Sea Turtle, the Piping Plover, and the Red Knot. There is also ample evidence that the proposed project will result in the destruction or adverse modification of critical habitat.

124.

The Corps failed to adequately analyze minimization of adverse impacts from the proposed project, including as modified. The Corps did not establish that the significant effects of the permitted activities would be reduced to a minimum by mitigation measures. To the contrary, the Corps determined that no mitigation measures would be required. The Corps' reference to future monitoring of the project fails to adequately evaluate and consider minimization of adverse impacts from the proposed project, particularly in light of the purpose of the project.

125.

Plaintiff also avers that the Corps violated the CWA and NEPA by failing to adequately evaluate the cumulative impacts of the authorized project, including as modified. Pursuant to 40. C.F.R. §§ 230.11(g) (CWA) and 1508.7-1508.8 (NEPA), the Corps is required to evaluate cumulative effects of the project before granting a permit. The CWA regulations define "cumulative impacts" as "the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges or dredge or fill material. Although the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems." 40 C.F.R. § 230.11. NEPA regulations define "cumulative impacts" as the "impact on the environment

which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. The Corps' failed to adequately evaluate the cumulative effects of the proposed project over the life of the project.

126.

Because the Corps failed to comply with these requirements and guidelines, the Corps' grant of the Permit, and subsequent after-the-fact modification of the Permit, violates the Clean Water Act, 33 U.S.C. § 1344 and the Corps' guidelines for implementing the CWA, 40 C.F.R. § 230.1 *et. seq.,* and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law in violation of the APA, 5 U.S.C. § 706(2)(A).

127.

The Corps also violated the Clean Water Act and its implementing regulations, abused its discretion, and acted arbitrarily and capriciously in violation of the APA by failing to provide public notice and the opportunity for public comment and a hearing prior to its issuance of the after-the-fact modification of the Permit. *See* 33 U.S.C. §1344(a); 33 C.F.R. §§ 325.2, 325.3, 327.4 and 325.6.

128.

In addition, the Corps violated the Clean Water Act and its implementing regulations, abused its discretion, and acted arbitrarily and capriciously in violation of the APA by issuing the Permit, and subsequent after-the-fact modification of the Permit without having undertaken an adequate and objective "public interest review." *See* 33 C.F.R. §320.

129.

Furthermore, to the extent the Permit, or after-the-fact modification of the Permit, authorizes the use of dredged sand from the public beach and/or public tidelands, which is held in public trust, for the purpose of creating or filling upland private property, the Permit, and after-the-fact modification of the Permit, exceed the authority of the Corps' jurisdiction and are invalid.

130.

These violations of the CWA and the APA by the Corps threaten the Center and its members with irreparable injury for which they have no adequate remedy at law.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

(a) Take jurisdiction of this case;

(b) Order, adjudge, and decree that this is a proper case for a declaratory judgment and that there is a bonafide controversy among the parties as to their legal rights, duties, status and proper course of action;

(c) Issue process to each Defendant as provided by law and the rules of this Court and require each Defendant to respond or answer this Complaint within the time permitted by law;

(d) Enter judgment declaring that the Corps' issuance of the Permit, and subsequent after-the-fact modification of the Permit, violates the Clean Water Act and its implementing regulations and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of the APA and/or *ultra vires*;

(e) Enter judgment declaring that the Corps' FONSI and its subsequent failure to require and prepare an EIS violate NEPA and its implementing regulations and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law in violation of the APA;

(f) Vacate and enjoin reliance on the Permit, and subsequent after-the-fact modification of the Permit;

(g) Enjoin any further construction of the groin as well as any further dredging and beach nourishment activities under the Permit, and subsequent after-the-fact modification of the Permit;

(h) Require removal of any portion of the groin built during this litigation and restoration of any affected beach and shoreline;

(i) Award the Center its reasonable attorney's fees and costs of litigation;

(j) Award the Center such other relief as justice may require and that this Court may deem appropriate.

Respectfully submitted this 13th day of September 2019.

/s/ Kasey Sturm_____
Kimberly [Kasey] A. Sturm
Georgia Bar No. 690615

Weissman PC
One Alliance Center, 4th Floor
3500 Lenox Road
Atlanta, Georgia 30326
Office:  404.926.4600
Direct: 404.926.4630
kaseys@weissman.law
*Attorney for Plaintiff Center for a Sustainable Coast*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of September, 2019, I electronically filed the

foregoing *Amended Complaint for Declaratory and Injunctive Relief* with the Clerk of Court

using the CM/ECF system.

/s/ Kasey Sturm_____

Kimberly [Kasey] A. Sturm
Georgia Bar No. 690615

Weissman PC
One Alliance Center, 4th Floor
3500 Lenox Road
Atlanta, Georgia 30326
Office: 404.926.4600
Direct: 404.926.4630
kaseys@weissman.law
***Attorney for Plaintiff Center for a Sustainable Coast***