IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| ALTAMAHA RIVERKEEPER, ONE HUNDRED MILES, and SURFRIDER FOUNDATION, | |
| Plaintiffs, | |
| v. | Docket No. 4:18-cv-00251-JRH-CLR |
| THE UNITED STATES ARMY CORPS OF ENGINEERS et al., | |
| Defendants. | |

## MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT

This case challenges a permit issued by the U.S. Army Corps of Engineers (the Corps) to Sea Island Acquisition LLC (d.b.a. Sea Island Company), allowing the company to construct a T-head groin on the Sea Island Spit and to dredge and pump sand from an offshore source. For the reasons below, the Court should grant summary judgment in favor of the Conservation Groups, vacate the permit, and require removal of any portion of the groin built during this litigation as well as mitigation of any impacts caused by the construction of the project.

## FACTUAL AND PROCEDURAL BACKGROUND

Sea Island is a barrier island along the Georgia coast that is approximately four-and-a-half miles long. The southern portion of the island is a fragile, undeveloped area called the Spit. The Spit, which is largely protected by a conservation easement, provides important habitat for threatened and endangered sea turtles and shorebirds. AR002159; AR002168–69. It is also a popular recreation area. Both residents and tourists frequently visit the public tidelands to surf, paddle, or walk along the beach.

1

Sea Island Acquisition, a private resort and real estate development company, plans to build a new development called the Reserve on the north end of the Spit immediately north of the conservation easement boundary. In October 2015, Sea Island filed an application seeking permission to construct a T-head groin immediately south of the proposed Reserve development. AR003480. The application also sought authorization to construct dunes and renourish the beach between an existing groin and the proposed groin. AR003482.

*Background on Groins*

A groin is a hard structure, often constructed of rock, concrete, or steel, that is built perpendicular to a beach. *See* Written Direct Testimony of Dr. Bret Webb (Webb WDT), AR003998–90. Its purpose, by definition, is to trap or block sand on the "updrift" side of the groin that would otherwise naturally move with the prevailing currents along the shoreline to the "downdrift" side of the groin, as shown in the Google Earth image below. *Id.*



As this occurs the beach downdrift of the groin retreats. *Id.* A groin starves the downdrift beach of sand by eliminating the updrift sand supply — in essence, robbing Peter to pay Paul. *Id.*

The negative impacts of groins are widely recognized. *See* Dr. Rob Young, *et al.*, Coastal Scientist Statement on Groin Impacts, AR003977–79 (letter from 43 of the nation's leading coastal scientists describing the detrimental impacts of groins on downdrift shorelines). In

addition to causing accelerated downdrift erosion, groins also harm wildlife, especially sea turtles. *See* Letter from J. Ambrose, Ga. Dep't of Nat. Res., Wildlife Res. Div., to S. Leiker, Ga. Dep't of Nat. Res., Coastal Res. Div. (Nov. 24, 2015) (WRD Comments), AR002162–66 ("[T]he construction of the T-head groin will result in the loss of sea turtle nesting habitat and will interfere with the conservation of sea turtle populations in Georgia."); Letter from D. Imm, U.S. Fish and Wildlife Serv., to S. Leiker, Ga. Dep't of Nat. Res., Coastal Res. Div. (Nov. 24, 2015) (USFWS 2015 Comments), AR002168–69 ("We recommend denial of the permit. Construction of another groin will have negative impacts to sea turtles and have possible adverse impacts to the Sea Island spit which is utilized habitat for federally listed shorebirds and sea turtles.").

For example, the T-head portion of a groin can prevent nesting females from reaching the beach or block hatchlings from migrating from the beach to the ocean. *Id.* Hatchlings can also become trapped in the groin itself or be killed by predators that tend to congregate near the structure. *Id.* In addition, because they cause accelerated erosion, groins can destroy important habitat for sea turtles, shorebirds, and other wildlife downdrift of the groin and harm valued recreation areas for the public. *Id.*

Because of these negative effects, the Corps' own Coastal Engineering Manual recognizes that "[c]oastal zone management policy in many countries and the United States presently discourages the use of groins for shore protection."  *See* Letter from S. Envtl. Law Ctr. to U.S. Army Corps of Eng'rs (Feb. 28, 2017) (SELC 2017 Comments), AR003685 (quoting Coastal Engineering Manual at V-3-61[1]). Instead, as discussed below, over the past decade engineers have shown a near universal preference for beach nourishment *without* a groin over similar projects with a groin. *See* Written Direct Testimony of Dr. Robert Young (Young WDT),

---

[1] Available at https://www.publications.usace.army.mil/LinkClick.aspx?fileticket= ueOFzCUhCck%3d&tabid=16439&portalid=76&mid=43544.

AR003988. In the southeast United States, for example, over 96% of nourishment projects over the past ten years have been completed without a groin. *Id.*

*Sea Island Acquisition's Revised Permit Application*

Following the initial notice and comment period, two major hurricanes, Matthew and Irma, caused substantial damage to Sea Island. Among other things, the storms severely eroded the beach and many of the dunes on the Spit. *See* SELC 2017 Comments, AR003703–04; Dr. Bret Webb, Supplemental Report (2017), AR004100–01; Letter from S. Envtl. Law Ctr. to U.S. Army Corps of Eng'rs (May 23, 2018) (SELC 2018 Comments), AR001182. The storms also damaged the beach in front of the developed area of the island. *Id.*

In response to the storms, Sea Island submitted an addendum to its 2015 permit application, this time seeking authorization (1) to construct the new T-head groin on the Spit (as previously requested); (2) to dredge between 1,315,000 to 2,500,000 cubic yards of sand from an offshore source; and (3) to renourish over 17,000 linear feet of beach on Sea Island. AR001699. As part of its supplemental application, Sea Island also submitted a supplementary biological assessment. AR001730. The company had previously submitted a biological assessment for the 1,200-foot project, but many of that assessment's determinations were based in part on the fact that "no offshore borrow areas are proposed" or on the fact that "the project is of limited size"— which were no longer the case. AR003543; AR003565–66. Like the previous assessment, Sea Island's supplementary biological assessment concluded that the proposed project "may affect" but was "not likely to adversely affect" threatened and endangered species. AR003566.

The U.S. Fish and Wildlife Service ultimately concurred with this determination. AR001211–12. However, in its concurrence letter, the agency cautioned that "[t]he new groin is anticipated to result in decreased nesting and the loss of nests that do get laid within the project

area for all subsequent nesting seasons following the completion of the proposed project."
AR001212. The agency also explained that renourishment would have similar effects for two
nesting seasons. *Id*. Given that the supplemental application requested to remove up to 2,500,000
yd³ of sand from offshore with a hydraulic cutterhead dredge, the U.S. Fish and Wildlife Service
also directed the Corps to "refer to [the National Marine Fisheries Service (NMFS)] for impacts
in the water." *Id*. However, rather than consult with NMFS about the supplemental application,
the Corps apparently concluded that further consultation was unnecessary. *See* Army Corps of
Eng'rs, Memorandum for Record (Sept. 6, 2018) (MFR), AR000269.

*The Permit and NEPA Documents*

On September 11, 2018, the Corps issued a permit authorizing Sea Island to (1) construct
the new T-head groin on the Spit; (2) dredge between 1,315,000 to 2,500,000 cubic yards of sand
from an offshore source; and (3) renourish more than 17,000 linear feet of beach on Sea Island.
AR000049. At the same time, the Corps issued an Environmental Assessment, claiming that the
authorized project would have no significant impact on the environment. AR000304.

*Sea Island Acquisition's Permit Violations and the After-the-Fact Permit Modification*

After the permit was issued, the Conservation Groups filed this lawsuit. During the
course of the litigation, Sea Island began constructing the project. During and after construction,
the company violated multiple terms of its permit. As described in Section E below, the company
built a larger groin than authorized, built a larger dune than authorized, and dredged in
unauthorized locations and depths. AR005055; AR004639–47.

After conservation groups raised concerns, Sea Island asked the Corps to modify the
permit to "authorize the project as it has been constructed to date." AR005055. In response, the
Corps' found that Sea Island had violated the terms of its permit, but nevertheless rubberstamped
the modification request. AR004639–47

As discussed below, the Permit, the Environmental Assessment, and the Permit Modification violate the Clean Water Act, the National Environmental Policy Act (NEPA), the Endangered Species Act, and the Administrative Procedure Act (APA). The Court should grant summary judgment in favor of the Conservation Groups.[2]

## STANDARD OF REVIEW

Challenges to agency actions under the APA are typically adjudicated on cross-motions for summary judgment. However, in APA cases, the typical summary judgment standards set forth in Rule 56 do not apply. *See Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014), *aff'd sub nom, Fulbright v. Murphy*, 650 F. App'x 3 (D.C. Cir. 2016). Instead, when a party moves for summary judgment in an APA case, the Court turns directly to the question of whether the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(a). An agency action is arbitrary and capricious if the agency

---

[2] The Conservation Groups moved for a preliminary injunction in October 2018. The Court denied the preliminary injunction, finding that the Conservation Groups had not established a substantial likelihood of success on the merits or shown a likelihood of irreparable injury. Since that time, the Conservation Groups filed an amended complaint adding two claims: an Endangered Species Act claim and a claim based on the Corps' unlawful modification of the permit. In addition, the Corps filed the complete administrative record. Based in part on these developments, the Conservation Groups raise new arguments or claims that have not been considered by the Court:

(1) The Corps misidentified critical habitat for piping plover and based its Finding of No Significant Impact on inaccurate information in violation of NEPA. *See* pp. 8–10.

(2) Mr. Conner's review was based on incomplete information and did not satisfy the Corps' obligations to take a hard look under NEPA. For example, the Corps provided the Conservation Groups' 23-page comment letter to Mr. Conner, but omitted nearly 400 pages of attachments, including thorough analysis and testimony by three different experts. *See* pp. 11–13.

(3) The Corps failed to consult with NMFS regarding the amended project application as required by the Endangered Species Act. *See* pp. 17–20.

(4) The Corps violated the Clean Water Act by sanctioning Sea Island's permit violations. *See* pp. 20–24.

The Conservation Groups also raise arguments set forth in their preliminary injunction motion in greater detail, with the benefit of a full record – including the Corps' failure to adequately evaluate alternatives, the Corps' failure to evaluate impacts raised by marine biologists at NMFS, and the Corps' failure to consider cumulative impacts and access issues.

"relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT AND CITATION OF AUTHORITIES

**A.     The Conservation Groups have standing.**

The Conservation Groups have standing to bring this action, in support of which they attached organizational and individual member declarations to their amended complaint. *See* Dkt. 41-1; 41-2; 41-3; 41-4. As shown in those declarations, the Conservation Groups have members who have suffered or imminently will suffer injuries to their recreational and aesthetic interests that are fairly traceable to the outcome of this litigation and that are likely to be redressed by a favorable decision from this Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

**B.     The Corps violated NEPA by failing to take a hard look at the impacts of the project and by failing to prepare an Environmental Impact Statement.**

The National Environmental Policy Act (NEPA) obligates the Corps and other federal agencies to "take a hard and honest look at the environmental consequences of their decisions" before issuing a permit for a proposed project. *Am. Rivers v. Fed. Energy Regulatory Comm'n*, 895 F.3d 32, 49 (D.C. Cir. 2018). To satisfy its obligations under NEPA, the Corps may first prepare an "Environmental Assessment" to determine whether a proposed project will have any significant environmental impacts. 40 C.F.R. §§ 1501.4; 1508.9(a). If the Assessment shows the proposed project will not have *any* significant environmental impacts, the Corps may issue a "Finding of No Significant Impact," or FONSI. *Id*. §§ 1508.9; 1508.13. But if the Assessment

shows that "*any* significant environmental impacts *might* result" from the issuance of a permit, the Corps must prepare an "Environmental Impact Statement," or EIS, to fully evaluate the potential environmental impacts. *Sierra Club v. Peterson,* 717 F.2d 1409, 1415 (D.C. Cir. 1983) (first emphasis in original); 42 U.S.C. § 4332(2)(C).

The Eleventh Circuit, following the D.C. Circuit, looks at four factors to determine whether an agency's Environmental Assessment and FONSI are arbitrary and capricious: did the agency "(1) identify accurately the relevant environmental concerns, (2) take a hard look at the problem in preparing its Environmental Assessment, (3) make a convincing case for any finding of no significant impact, and (4) show why, if there is an impact of true significance, there are sufficient changes or safeguards in the project to reduce the impact to a minimum, which would obviate the need for an Environmental Impact Statement entirely." *Am. Rivers v. Fed. Energy Regulatory Comm'n*, 895 F.3d 32, 49 (D.C. Cir. 2018); *see also Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998). Under this test, an agency's Environmental Assessment "will pass muster only if it undertook a 'well-considered' and 'fully informed' analysis of the relevant issues and opposing viewpoints." *Am. Rivers*, 895 F.3d at 49. The Corps' analysis here was neither.

i.    **The Corps did not take a hard look at the fundamental problems of the proposed project.**

The Corps did not identify all of the relevant environmental concerns or take a "hard look" at the ones they did identify. Below are three examples of the Corps' sloppy and incomplete analysis, any one of which amounts to a NEPA violation on its own.

First, the Corps wrongly assumed that the project area did not include piping plover critical habitat[3] and therefore concluded, without any analysis, that "there would be no direct

---

[3] As defined by the Endangered Species Act, critical habitat is a designated area that contains features essential to the conservation of a protected species and that may require special management

effect to critical habitat." MFR, AR000268. However, the textual description published in the Federal Register says that critical habitat for piping plovers "start[s] just[4] south of the [previously constructed] groin . . . ." 66 Fed. Reg. at 36,099 (emphasis added).[5] As the map below shows, the project location is located within the area described in the Federal Register:



Permit Application, AR003502 (red text and arrow added). Indeed, in 2015 comments to the Georgia Department of Natural Resources, the U.S. Fish and Wildlife Service confirmed that "*[t]he construction area* and the Sea Island Spit are designated piping plover critical habitat by the Service." USFWS 2015 Comments, AR002168 (emphasis added).

Second, the Corps largely ignored concerns raised by scientists at the National Marine Fisheries Service (NMFS) about the groin. In an April 2018 letter, NMFS told the Corps that its biologists had "multiple concerns with the proposed project, particularly with regard to impacts

and protection. 16 U.S.C. § 1532(5). Critical habitat can also include areas not currently occupied by the species if they are essential to its recovery. *Id.*

[4] According to Merriam-Webster online diction, in this context, "just" means "immediately [or] directly" (for example "just west of here"). *See* https://www.merriam-webster.com/dictionary/just.

[5] "These textual unit descriptions are the definitive source for determining the critical habitat boundaries … General location maps [like the one relied on by the Corps in this case]… are provided for general guidance purposes only, and not as a definitive source for determining critical habitat boundaries." 66 Fed. Reg. at 36,086.

from the proposed [groin]." AR004103. Among other things, NMFS biologists worried that "the close spacing of the [new] groin with [a previously constructed] groin may create a trap for pelagic eggs and larvae of managed species and their prey." *Id.* As a result, NMFS recommended that the Corps deny Sea Island's request to build a T-head groin. *Id.*

Three months later, the Corps responded to NMFS's letter, AR000926–28, but, according to NMFS, largely ignored their concern. NMFS then sent a second letter to the Corps:

> The Savannah District *did not respond* to the concern that the close spacing of the proposed groin with the existing groin may create a trap for pelagic eggs and larvae of managed species and their prey, beyond noting the area of direct effects from groin construction is small and that ample habitat exists upstream and downstream from the project. The alterative [*sic*] analysis provided by the applicant also failed to provide an assessment of potential impacts to egg and larval transport. *Given the lack of response to this issue, the NMFS continues to recommend that the permit not allow the T-head groin.*

AR000837–38 (emphasis added). The Corps did not respond to this second letter at all, and did not offer any additional analysis in the Environmental Assessment. *See* AR000272.

The Court previously considered this argument and found the Corps complied with the Magnuson-Stevens Act. Dkt. 23 at 18–19. The Conservation Groups do not allege that the Corps violated the Magnuson-Stevens Act. NEPA serves a different purpose and provides a different standard, and the Corps must comply with both laws. As discussed above, under NEPA, if *any* significant impact *might* result, the Corps must prepare an EIS. To avoid preparing an EIS, the Corps must make a *convincing case* that no significant impact *might* result. Here, after hearing the Corps' reasoning, the marine biologists at NMFS *still* said that the Corps' response was insufficient and continued to recommend denial of the project. It is unclear how the Corps can make a convincing case that there is no chance a significant impact might occur when marine biologists at an expert agency say the opposite, and the Corps offers no reasoning or evidence to rebut their conclusion.

Third, the Corps did not take a "hard look" at whether the project could cause accelerated downdrift erosion. The Corps has repeatedly claimed that it "relied on the expertise of a Corps coastal engineer, Mr. Kevin Conner, who completed an independent review." Dkt. 13 at 7. Indeed, the Environmental Assessment cites Mr. Conner's review at least six times. *See* MFR, AR000235, AR000237, AR000243–44, AR000288, and AR000291–92. In its Order denying the Conservation Groups' Motion for a Preliminary Injunction, the Court found that the Corps was entitled to rely on "reasonable opinions of its own qualified experts." Dkt. 23 at 25.

Yet a full review of the record filed after the preliminary injunction stage shows that this "independent review" was a two-paragraph email based on incomplete information. *See* Email from K. Conner, U.S. Army Corps of Eng'rs, to S. Wise, U.S. Army Corps of Eng'rs (May 24, 2017), AR001970. Although Mr. Conner says he "[doesn't] think construction of the new proposed groin would increase erosion downstream," he acknowledged that "there is very limited data within the reports [he reviewed] with no information included on sediment budget and limited reference to littoral transport along the island." *Id.* He also complains that "it is not clear the data [in Sea Island's application] has been processed consistently" and notes that more information "is needed to fully evaluate the impact of the 'as constructed' shoreline protection project." *Id.*

The Conservation Groups and others submitted hundreds of pages of expert analysis showing that the proposed groin would cause significant downdrift erosion—but the record shows the Corps never provided most of this analysis to Mr. Conner. AR0001967 (identifying five documents provided to Mr. Conner). For example, the Corps provided the Conservation Groups' 23-page comment letter, but omitted nearly 400 pages of attachments, including thorough analysis and testimony by three different experts. *See* AR001967; AR002372–94.

Again, courts have instructed that an agency's Environmental Assessment and FONSI "will pass muster *only* if it undertook a 'well-considered' and 'fully informed' analysis of the relevant issues and opposing viewpoints." *Am. Rivers*, 895 F.3d at 49 (emphasis added). The Corps' Assessment does not. It does not reveal that the project will be built on critical habitat, it dismisses contrary analysis of consulting federal agencies, and it discounts hundreds of pages of expert testimony and scientific analysis with a two-paragraph agency review.

### ii.     The Corps failed to demonstrate that an EIS was not required for the project under federal law.

The Corps did not make a "convincing case" that no significant environment impacts might result from the proposed project. Under NEPA regulations, to evaluate whether a potential impact is "significant," the Corps should analyze the context in which the proposed action would take place and the intensity of its impact. 40 C.F.R. § 1508.27. "Intensity" concerns "the severity of impact." 40 C.F.R. § 1508.27(b). NEPA regulations prescribe several factors that can make a proposed project significant from an intensity standpoint, including (1) whether the project will have environmental impacts; (2) whether the effects of the proposed project are controversial; (3) whether the effects of the proposed project are uncertain or involve unique or unknown risks; (4) whether the action is related to other actions with cumulatively significant impacts; (5) whether the geographic area is unique; (6) whether the action may adversely affect endangered or threatened species or their critical habitat. *Id.* Any "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 235 (D.D.C. 2003). Every one of these factors trips the EIS requirement here.

Regarding the first three factors, the Conservation Groups' experts provided convincing and conclusive analysis that demonstrated the proposed project would significantly accelerate

downdrift erosion on the Spit. Three experts, Dr. Webb, Dr. Young, and Dr. Jackson, testified in the state court case and prepared extensive reports for the Corps. The record also includes citations to twenty-two peer-reviewed journal publications that document the negative impacts of improperly designed groins and a letter signed by forty-three of the nation's leading coastal scientists explaining that groins cause accelerated downdrift erosion. *See* AR001043–62 (Webb 2018 Supplemental Report); AR002171–82 (Webb 2016 Report); AR002059–66 (Jackson Report); AR003873–3975 (Jackson Testimony); AR003981–93 (Young WDT); AR003995–4036 (Webb WDT); AR004092–4101 (Webb 2017 Report); AR002146–47 (citations to peer-reviewed journals); AR003977 (Coastal Scientist Statement). With the weight of all this scholarly and practical research on their shoulders, all the Corps did in response was produce Mr. Conner's two-paragraph email. At the absolute minimum, the Conservation Groups' mountain of research on this point creates sufficient uncertainty and controversy to trigger an EIS.

Regarding the uniqueness factor, there is no dispute that the geographic area is unique. Among other things, according to the U.S. Fish and Wildlife Service, the project area provides habitat to over ten threatened and endangered species. In addition, the proposed project may have cumulative adverse impacts, as discussed in Section F below.

Regarding the final factor, there is no real dispute that the proposed groin may harm federally protected wildlife – even if that harm does not trigger a "jeopardy" determination by the expert agencies. *See Sierra Club v. Norton*, 207 F. Supp. 2d 1310, 1322 (S.D. Ala. 2002) ("An environmentally significant action need not involve a threat of extinction to a federally protected species. Lesser impacts, including impacts on non-listed species, can constitute a significant effect."); *Makua v. Rumsfeld*, 163 F. Supp. 2d 1202, 1218 (D. Haw. 2001) ("Clearly, there can be a significant impact on a species even if its existence is not jeopardized.").

As discussed above, the Georgia Department of Natural Resources, the U.S. Fish and Wildlife Service, and an independent expert all concluded that the project would harm federally protected species. *See* WRD Comments, AR002162–64; USFWS 2015 Comments, AR002168–69; USFWS May 22, 2018 Letter, AR001211–12 (acknowledging that proposed project may affect, but is not likely to adversely affect, protected species, but explaining that the groin "is anticipated to result in decreased nesting and the loss of nests that do get laid within the project area for all subsequent nesting seasons following completion of the proposed project"); Transcript of OSAH Hearing, *One Hundred Miles, et al. v. Shore Protection Committee*, OSAH-BNR-SP-1630908-60-Miller (May 9–12, 2016), AR003707–3835 (Mark Dodd, Georgia Department of Natural Resources' Sea Turtle Coordinator, testifying that proposed project would unreasonably harm sea turtles); Written Direct Testimony of Dr. Kirt Rusenko, AR004038–65. In fact, the only party during this entire process to conclude that the project would not harm federally protected wildlife is Sea Island. NEPA, however, does not allow the Corps to "reflexively rubber stamp" the applicant's conclusion, especially when that conclusion is directly contradicted by the state and federal wildlife agencies tasked with protecting the species at issue. *See Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974).

**C.      The Corps violated the Clean Water Act by issuing the permit when there is a less environmentally damaging practicable alternative.**

Under Clean Water Act regulations, the Corps may not grant a Section 404 permit if there is a practicable alternative that would have less environmental impact. 40 C.F.R. § 230.10(a). An alternative is practicable if "it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purpose." *Id.* Importantly, "[t]he burden of proof to demonstrate compliance with [this requirement] rests with the applicant; *where insufficient information is provided to determine compliance, the Guidelines*

14

*require that no permit be issued.*" U.S. Envtl. Prot. Agency, Memorandum: Appropriate Level of Analysis Required for Evaluating Compliance with CWA Section 404(b)(1) Guidelines Alternatives Requirements (emphasis added).[6]

Here, the Corps did not adequately consider less environmentally damaging practicable alternatives before granting the permit. For example, the record shows that two experts, Dr. Webb and Dr. Young, testified that beach nourishment *without* a groin is a practicable alternative to beach nourishment *with* a groin. *See, e.g.,* Webb WDT, AR004032–33; Young WDT, AR003993; Webb 2017 Report, AR004092–101. Although the Court previously found that this proposed alternative would not meet the overall project purpose, the record shows that it does. *See* AR004100. As the Court noted, the overall project purpose is "protect upland lots and development located along the shoreline of Sea Island from storm damage." MFR, AR000232; *see also* Dkt. 23 at 9. Under the proposed alternative, the dunes and beach nourishment in front of the Reserve could have been constructed just as Sea Island proposed, thereby accomplishing the overall project purpose in exactly the same manner. AR004032–33. Because beach nourishment projects without groins or other stabilization devices typically last longer (or have a greater "half-life") if the projects cover a longer stretch of beach, Dr. Webb also recommended that the nourishment project be extended down the Spit. AR009095.  In other words, the purpose of the extension would be to support the nourishment in front of the Reserve (and thereby support the overall project purpose), not to protect upland areas on the Spit.

As the Corps well knows, the idea of beach nourishment without a groin is not novel by any stretch. The Program for the Study of Developed Shorelines (PSDS), a joint research and policy center at Duke University and Western Carolina University, maintains a Beach

---

[6] Available at https://www.epa.gov/cwa-404/memorandum-appropriate-level-analysis-required-evaluating-compliance-cwa-section-404b1.

Nourishment Database that catalogs every beach and dune construction project in the country. AR003983. It is by far the most comprehensive catalog of beach and dune restoration projects available. *Id*. As part of this work, Dr. Young, the director of the PSDS, is funded by the United States Geological Survey to map, in detail, every beach nourishment project on the United States East Coast. *Id*. Through Dr. Young's database, the PSDS has been tracking beach nourishment activities on Sea Island and across the country for more than twenty years. *Id*.

Based on his experience with the Beach Nourishment Database, Dr. Young concluded that beach nourishment without a groin is, *by far*, the most common configuration for beach nourishment projects in the United States. In the southeast, for example, there have been 139 beach nourishment projects in the past ten years (as of 2016, when Dr. Young testified). Young WDT, AR003988. Of those 139 projects, *only five* involved a groin.[7] *Id*. Put differently, coastal engineers have found less damaging practicable alternatives that allowed them to nourish the beach without building a groin in *over 96 percent* of similar projects conducted in this region over the past ten years.

Still, the Corps summarily dismissed this alternative *without any analysis* because it found the alternative was "outside the scope of the project and would not meet the overall project purpose." MFR, AR000258. But, again, two experts disagreed and explained how it would meet the project purpose (and how it has in over 96% of similar projects). At the very minimum, the Clean Water Act requires the Corps to truly consider this alternative and explain its basis for dismissing it before issuing a permit. 40 C.F.R. § 230.10(a).  By failing to do so, the Corps violated its own regulations.

---

[7] Of those five, three were built at the very end of the island—unlike Sea Island's proposed groin. Young WDT, AR003988. The other two projects with groins were special circumstances not related to cost. *Id*. There are no such special circumstances with respect to Sea Island's proposed project. *Id*.

**D.      The Corps violated the Endangered Species Act by failing to consult NMFS.**

The Corps violated the Endangered Species Act by failing to consult NMFS after Sea Island substantially expanded the scope of the project. Sea Island proposed dredging the ocean floor for up to 2,500,000 cubic yards of sand (enough to fill over 200,000 dump trucks) to renourish over two additional miles of beach, concluding that the project may affect threatened and endangered marine species. The Corps, without the required written concurrence of marine biologists at NMFS, unilaterally determined that the expanded project posed no problem.

The Endangered Species Act (ESA) represents "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). At the very "heart of the ESA is section 7(a)(2), 16 U.S.C. § 1536(a)(2)." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011). For projects that may affect endangered or threatened (i.e. listed) species, Section 7 of the ESA requires consultation with expert agencies who "are far more knowledgeable than other federal agencies about the precise conditions that pose a threat to listed species, and … are in the best position to make discretionary factual determinations about whether a proposed agency action will create a problem for a listed species and what measures might be appropriate to protect the species." *City of Tacoma, Washington v. F.E.R.C.*, 460 F.3d 53, 75 (D.C. Cir. 2006).

The procedural requirements of Section 7 consultation require the Corps to send the expert agency, NMFS, an analysis of potential effects to listed species, e.g. a biological assessment, and for NMFS to respond in writing as to whether it concurs with the conclusions. 50 C.F.R. §§ 402.12(j)–(k) and 402.13(c). Neither step occurred here. *See* AR001310. Accordingly, the issuance of Sea Island's permit violated Section 7 of the ESA.

The Corps did not follow the proper procedure.[8] As recognized by the Court, in 2018 Sea Island amended its proposed project and "[b]ecause the proposed changes were substantial, … submitted a supplementary biological assessment." Dkt. 23 at 4. The Corps then decided that the proposed dredging and renourishment "may affect, but is not likely to adversely affect" listed species or habitat. AR001219–22. Rather than seek the written concurrence of NMFS, as required by ESA regulations, 50 C.F.R. §§ 402.13(c) and 402.14(b)(1), the Corps ended the consultation process claiming that the "work qualifie[d] for SARBO/SARBA." AR001219; *see* AR000269–70 (referring to two sets of documents, SARBO/SARBA, upon which the Corps bases its position). As explained below, SARBO does not apply and SARBA cannot constitute the written concurrence of NMFS because NMFS did not write it.

SARBO (South Atlantic Regional Biological Opinion) refers to a series of Biological Opinions written by NMFS in the 1990s with respect to federally-operated dredging projects. Biological Opinions constitute the opinion of the expert agency as to the risks a project may pose to listed species or critical habitat. 50 C.F.R. § 402.02. They are the end result of formal consultation—required when a proposed agency action may affect and is likely to adversely affect listed species. *Id.* § 402.14(a). Biological Opinions are action-specific and look at the effect of a specific action on all relevant protected species and habitat. They must include a "detailed discussion of the effects of the action." *Id.* § 402.14(h). Similarly, a Regional Biological Opinion, such as SARBO, addresses an action or series of actions in which "(1) specific species affected by the action can be identified; (2) specific actions affecting these species can be described; (3) the effects of the action on the species can be determined during

---

[8] For the original proposal in 2015, the Corps did follow the proper consultation procedures, resulting in the written concurrence of both expert agencies, FWS and NMFS. AR000269.

consultation; and (4) the consultation fulfills an agency's obligation under section 7(a)(2)." ESA Section 7 Consultation Handbook at 5-2; *see id.* at 5-5.[9]

On the other hand, and here, "If a proposed work activity in a permit application does not fall under the scope of the [Regional Biological Opinion], then the Corps must conduct the consultation process on an individual basis with the [expert agencies]." *See Pac. Coast Shellfish Growers Ass'n v. United States Army Corps of Engineers*, No. C16-193RAJ, 2016 WL 3000259, at *2 (W.D. Wash. May 25, 2016); *accord Native Ecosystems Council v. Krueger*, 63 F. Supp. 3d 1246, 1253 (D. Mont. 2014), *aff'd sub nom. Native Ecosystems Council v. Marten*, 883 F.3d 783 (9th Cir. 2018). "Sufficient description of the proposed action should be included [in the Biological Opinion] so that the subsequent analysis of effects and the scope of the opinion are clear." ESA Section 7 Consultation Handbook at 4-26.

Sea Island's dredging and nourishment project does not fall under the scope of SARBO which "addresses the use of hopper dredges in [navigation] channels and borrow areas … includ[ing borrow] areas off of Dade County Florida and Myrtle Beach South Carolina." AR000383. NMFS' analysis was limited to "federal project boundaries," AR001221, or the Corps' own dredging to maintain navigation in river channels and for Congressionally-mandated beach nourishment. AR000323–36. The borrow area dredged by Sea Island is not within these bounds and not dredged by the Corps. AR000072.

Even if the Corps could rely on SARBO for non-federal dredging, it cannot rely on SARBO alone. The latest SARBO dates back to September 25, 1997, or nearly fifteen years before NMFS listed the Atlantic sturgeon as an endangered species. AR000379; 77 Fed. Reg. 5913 (Feb. 6, 2012). Sea Island's Supplemental Biological Assessment noted that sturgeon may be present in the project area and may be affected by the project. AR004428–31 and AR004459;

---

[9] Available at https://www.fws.gov/endangered/esa-library/index.html#consultations.

*compare* AR002218 (Sea Island's January 2017 Revised Biological Assessment noted that sturgeon have been killed by cutterhead dredging). Similarly, NMFS revised the critical habitat for the North Atlantic right whale in 2016 to include the marine waters of Georgia and Sea Island's borrow site. AR000270; 81 Fed. Reg. 4838. Therefore, SARBO clearly cannot provide the written concurrence for all listed species that may be affected—which explains the existence of SARBA, the other document relied upon by the Corps.

SARBA (South Atlantic Regional Biological Assessment) is an assessment, written by the Corps and the Bureau of Ocean Energy Management—not NMFS—that has not been finalized or received the concurrence of NMFS. AR000397. SARBA is a request for an update to SARBO. AR000406–10.[10] That is, the Corps cannot rely on SARBA as the written concurrence of the expert agency under the ESA. *See* AR000270; 50 C.F.R. § 402.14(m).[11]

The Corps' new policy regarding the applicability of SARBO/SARBA violates the Endangered Species Act. *See* AR001219–22 (referring to forthcoming guidance on a new approach to SARBO/A). SARBO does not apply to Sea Island's project and SARBA was not written by NMFS. But even if the Corps could rely on SARBO/SARBA, the Corps never received the written concurrence of the expert agency that this project qualified.

**E.      The Corps violated the Clean Water Act and the APA by sanctioning Sea Island's permit violations.**

During the course of this litigation, Sea Island violated multiple terms of its Section 404 permit. Sea Island (1) built the groin 40% longer than authorized, (2) built the dune larger than

---

[10] SARBA, in addition to addressing changes to listed species and critical habitat, requests that CWA § 404 permits like that issued to Sea Island be covered. AR000420. If the Corps and NMFS intended SARBO to cover private dredging projects, it would have said so in SARBO.

[11] Moreover, SARBA states that the Corps will send NMFS project-specific information about individual borrow area dredging projects. AR000455. The Corps failed to provide such information to NMFS here and has offered no explanation for why it failed to comply with its own representations to NMFS. *See Native Ecosystems Council*, 63 F. Supp. 3d at 1254.

authorized, (3) renourished the beach with sand from an unauthorized area, and (4) dredged in unauthorized locations and depths. Only after outside observers noticed something was amiss did Sea Island ask the Corps to modify the permit, to "authorize the project as it has been constructed to date." AR005055 (May 24, 2019). The Corps' found Sea Island had not adhered to the terms of its permit. AR004639–47. Nevertheless, the Corps rubberstamped the modification request saying it was "in the public interest." *Id.* The Corps' permit modification violated its own consultation procedures and used arbitrary reasoning.

First, Corps regulations prohibit modification of permit terms without consulting resource agencies like NMFS if the modification would result in greater impacts and the resource agency expressed a significant interest before the Corps issued the original permit. 33 C.F.R. § 325.7(b). The Corps violated this requirement by modifying the permit to increase the size and configuration of the groin as well as the scope of the offshore dredging.

NMFS clearly expressed significant interest in the project before the Corps issued the original permit. In fact, NMFS advised the Corps not to permit construction of the groin. AR004103. The Corps did permit a 350-foot groin. Sea Island then constructed a 480-foot groin. AR005106. Sea Island also constructed the access ramp in a different configuration than permitted. AR004644; AR004637. These are greater impacts than permitted and the Corps should have consulted the expert agency.

Further, as explained in Section D above, the Corps failed to consult NMFS about the offshore dredging before it issued the original permit. In its permit modification request, Sea Island alerted the Corps that dredging occurred outside the "locations and depths" that the Corps had approved. AR005060. Again without consulting NMFS, the Corps modified the permit to

sanction both violations. *See* AR004638. And the Corps' rationale for the modification ignored that dredging occurred outside the permit area. *See* AR004644.

Second, the Corps' modification of Sea Island's permit relied on a flawed analysis. The Corps "may determine that the public interest requires a modification of the terms or conditions of the permit." 33 C.F.R. § 325.7(b); *see id.* § 320.4 (public interest review). "Among the factors to be considered are the extent of the permittee's compliance with the terms and conditions of the permit; whether or not circumstances relating to the authorized activity have changed since the permit was issued or extended, and the continuing adequacy of or need for the permit conditions; [and] any significant objections to the authorized activity which were not earlier considered[.]" 33 C.F.R. § 325.7(a).

The Corps failed to consider that many of the issues that arose during construction were previously raised by commenters and took pains to minimize the scope of review. After Hurricanes Matthew and Irma, outside experts alerted the Corps and Sea Island that due to significant dune and beach erosion in front of the Reserve, "the proposed project needs to be redesigned and reevaluated." AR001892–93. While Sea Island amended its proposal to dredge sand for placement along the length of the island, it failed to account for the changed conditions in front of the Reserve. The Corps permitted the project anyway and included plans in the permit that pre-dated the storms as though nothing had changed. AR000007 (Special Condition (9)(n)); AR000028. When Sea Island built larger dunes, filled in eroded upland lots with sand, and extended the length of the groin, because "hurricanes had eroded the escarpment," AR005059, the Corps accepted the excuse that any such material placed above the 2014 high water mark was "outside of the Corps' jurisdiction and does not require Corps' authorization." AR004640.

22

The Regulatory Guidance Letter the Corps relied upon does not take so firm a stance on jurisdiction. It says that "all approved geographic jurisdictional determinations completed and/or verified by the Corps must be in writing and will remain valid for a period of five years, *unless new information warrants revision of the determination before the expiration date*[.]" RGL 05-02(1)(a).[12] The Corps nowhere addresses the second half of this guidance.[13]

Pretending Corps authorization is unnecessary for parts of a project that extend beyond geographic limits also contradicts Corps regulations regarding the scope of review. Under NEPA, the Corps must determine the impact that a proposed project would have on waters as well as on "those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review." 33 C.F.R. 325 App. B § 7(b)(1). And under historic preservation review, the permit area includes "uplands directly affected as a result of authorizing the work." 33 C.F.R. § Pt. 325, App. C. § (g). Because the upland lot repair as well as the dune and groin construction are directly related to, and would not have occurred without, the Corps' authorization of this project for storm protection and beach renourishment, the Corps should have considered these permit violations.

Moreover, the day before issuing the original permit, the Corps permitted the placement of sand bags almost entirely above the 2014 jurisdictional line, which bags were to be "buried under dunes to be created as a part of the Reserve beach renourishment project." AR000098–100; *compare id.* with AR004751–53 and AR004691. There was no consideration then that the

---

[12] Available at https://www.usace.army.mil/missions/civil-works/regulatory-program-and-permits/guidance-letters/.

[13] Rather, the Corps hedges, stating the unauthorized use of dredged material above the 2014 line "more than likely would have been verified under Nationwide Permit (NWP) 45." AR004641. Yet, NWP 45 "does not authorize beach restoration or nourishment." 2017 Decision Document, Nationwide Permit 45 at 1, available at https://www.usace.army.mil/Missions/Civil-Works/Regulatory-Program-and-Permits/Nationwide-Permits/2017_NWP_FinalDD/. The Corps also seemingly fails to consider that an application for this NWP should be submitted "within 12 months of the date of the damage." *Id.*

bags were outside the Corps' jurisdiction and the Corps has offered no reasoned explanation for its change of position.

**F.     The Corps violated the Clean Water Act and NEPA by failing to adequately evaluate the cumulative impacts of the authorized project.**

Under the Clean Water Act and NEPA, the Corps is obligated to evaluate the cumulative effects of a project before granting a permit. This means that the Corps must consider the impacts of the authorized action "when added to other past, present, and reasonably foreseeable future actions." *See* 40 C.F.R. § 1508.7; *see also* 40 C.F.R. § 230.11(g) (Clean Water Act regulations); 40 C.F.R. § 1508.8 (NEPA regulations). The Corps' cumulative impacts analysis here is defective for a number of reasons. Among other things, the Corps should have considered the impacts of other existing and reasonably anticipated shoreline stabilization or nourishment projects in the coastal region. As explained by the White House Council on Environmental Quality (CEQ), "[w]hen analyzing the contribution of [the] proposed action to cumulative effects … the geographic boundaries of the analysis almost always should be expanded." CEQ, Considering Cumulative Effects under the National Environmental Policy Act (Jan. 1997) at 12.[14] So, for example, when conducting a cumulative effects analysis for coastal zone resources, CEQ recommends analysis of the entire coastal region or watershed. *Id.* at 15. For wildlife resources, CEQ recommends consideration of the entire species habitat or ecosystem. *Id.* Thus, the Corps should have extended the geographic scope of its cumulative impacts analysis under the Clean Water Act and NEPA to include other regional impacts.

**G.     The Corps violated the Clean Water Act and the APA by failing to adequately consider access issues.**

The Corps failed to consider the groin's interference with access by foot to the beach in front of the Reserve. The proposed 350-foot rock groin (and constructed 480-foot groin) acts as a

---

[14] Available at https://ceq.doe.gov/docs/ceq-publications/ccenepa/sec2.pdf.

barrier for beachwalkers approaching from the south who cannot cross the high tide line without trespassing. The Corps' regulations require consideration of access issues:

> Authorization of work or structures by [the Corps] does not convey a property right, nor authorize any injury to property or invasion of other rights. …A riparian landowner's general right of access to navigable waters of the United States is subject to the similar rights of access held by nearby riparian landowners and to the general public's right of navigation on the water surface. In the case of proposals which create undue interference with access to, or use of, navigable waters, the authorization will generally be denied.

33 U.S.C. § 320.4(g). While it is true that one of the focuses of 320.4(g)(3) is riparian access, that subsection also applies to access to all navigable waters, including the shore.[15]

In its Brief in Opposition to Plaintiff's Motion for Preliminary Injunction, the Corps did not deny that access by foot to the beach between the groins would be impeded. Dkt. 13 at 22–23. Moreover, the Conservation Groups disagree that the Corps' cursory consideration of boat access suffices. To use a riparian example, if a riparian owner built a dock in the river parallel to the riverbank that spanned the entire length of a neighbor's waterfront property, the Corps could not simply say that the dock-builder did not interfere with the neighbor's unfettered right to use a zipline to access the river over the dock. Yet that is essentially what has occurred here.

Sea Island and the Corps acknowledge that "Kayakers routinely paddle down Postell Creek or Black Bank River, land at the Spit, and walk along the Sea Island beach." AR000240. Yet these kayakers are not paddling from the Creek or the River around the southern tip of the Spit and then across wave action three quarters of a mile up the Atlantic coast of Sea Island to land in front of the Reserve. *See* p. 9 (map depicting the Spit and Gould's Inlet—the mouth of the Creek). They land near the tip of the Spit and walk north until they are turned around by the South Groin. *See* Dkt. 41-3 at ¶ 17; Dkt. 41-4 at ¶¶ 6–7. Or rather, until they are turned away by

---

[15] The Corps defines "navigable waters" as extending "to the line on the shore reached by the plane of the mean (average) high water." 33 C.F.R. §§ 329.12(a)(2) and 328.4.

the new T-head groin. The Corps failed to consider this aspect of the groin's effects in violation of its own regulations. Accordingly, we ask this Court to order appropriate relief such as the construction of a pathway and posting of signs stating the public may walk around the new groin.

## CONCLUSION

For all of the reasons discussed above, the Court should grant summary judgment in favor of the Conservation Groups.

Respectfully submitted this 28th day of February, 2020.

**SOUTHERN ENVIRONMENTAL LAW CENTER**

/s/ *Megan Hinkle Huynh*
William W. Sapp
Georgia Bar No. 626435
Megan Hinkle Huynh
Georgia Bar No. 877345
Ten 10th Street NW, Suite 1050
Atlanta, Georgia 30309
Phone: (404) 521-9900
bsapp@selcga.org
mhuynh@selcga.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on February 28, 2020, I electronically filed the foregoing *Motion for Summary Judgment and Memorandum of Law in Support* with the Clerk of Court using the CM/ECF system.

/s/ *Megan Hinkle Huynh*

26