CESAS-RD-C                                                                April 16, 2020

MEMORANDUM FOR RECORD

SUBJECT:  Request for a Permit Modification to the Sea Island Reserve Project, SAS-2015-00742

1.  I refer to a Department of the Army permit SAS-2015-00742, with an effective date of September 11, 2018, authorizing impacts to tidally influenced waters (i.e. the Atlantic Ocean) to construct and maintain a new T-head groin south of the existing southern groin and place sand along approximately 17,000 linear feet (LF) of beach located between an existing north groin, and the new T-head groin.  Specifically, the permit authorized the use of a hydraulic cutter-head dredge to remove and pump between 1,315,000 to 2,500,000 cubic yards (CY) of sand from the offshore source, to various locations along the beach. Temporary sand-training dikes would be constructed on the beach, and used to contain the discharge of sand and water, parallel to the shore. Once it is dewatered, bulldozers and other equipment would be used to move the sand up and down the beach, to shape the beach to the design template. Following completion of beach renourishment, sand fencing and/or native vegetation would be installed in strategic locations in the dunes in accordance with a Georgia Department of Natural Resources (DNR)-approved vegetation plan.

The project consists of the following four reaches: Reach 1extends 1,200' south of the southern groin (i.e. to the new groin); Reach A extends 4,000 LF north of the southern groin to approximately East 9th Street; Reach B extends 9,000 LF from East 9th Street to East 34th Street; and Reach C extends 3,500 LF from East 34th Street to the northern groin.  Subsequent sand recycling activities would be accomplished with excavators, dump trucks, and other heavy equipment.  Recycling activities would occur during/for the following times/reasons:  (1)  up to once per year outside of turtle nesting season to maintain the project; (2)  at any time to correct unusual erosion rates or to correct damage caused by discrete events, upon notice to the Corps, Georgia Department of Natural Resource, Coastal Resources Division (Georgia CRD); and (3) in the event of an approaching storm to shape dunes to raise low lying areas for upland protection, upon notice to the Corps and Georgia CRD. Material for recycling activities would be obtained from any location above mean lower low water from Reach A or Reach C.  This permit is scheduled to expire September 5, 2023.  The enclosed permit with drawings provide project specific information concerning this permit.

2.  On April 24, 2019, the Center for a Sustainable Coast (a plaintiff in the present litigation) issued a Notice of Intent to Sue (NOI) Sea Island Acquisitions (SIA), alleging multiple violations of the Clean Water Act (CWA) while performing the work under the current permit.  Specifically, the NOI alleged that SIA has: (1) dredged sand from the offshore source and placed a portion of that sand outside of the permitted project area; (2) excavated sand from Reach A and placed it within the new groin cell to "create uplands and fill waters outside the permitted area and (3): failed to comply with the 404 permit by not properly filling the new groin cell as authorized in the approved project drawings.

3.  In response to the NOI, the Corps determined that SIA (the permittee) was not compliant with the terms and conditions of the permit.  However, the deviations from the permit were considered minor and therefore, the permit was modified to reflect the as built conditions.  In addition, some of the deviations occurred outside of Corps' jurisdiction and therefore were not included in the modified permit.  For further detail, refer to the enclosed Memorandum for Record documenting the Corp's decision to modify the permit.

4.  On March 4, 2020, the Georgia Department of Natural Resources, Coastal Resources Division (Georgia CRD), executed a Consent Order with SIA which required the removal of the tie-back portion of the groin and the access road.  On March 26, 2020, Georgia CRD issued Letter of Acknowledgement (LOA) that authorized the permittee to reconstruct the access road.  On April 7, 2020 SIA submitted an updated drawing to Georgia CRD and asked for an amended LOA to reflect the modification of the drawing referenced in the March 26, 2020 LOA as well as the need for an additional dune.  By email dated April 8, 2020, Georgia CRD stated it had no objection to the plan as presented.

5.  As authorized by Georgia CRD, the access road would be constructed within the same footprint as what is authorized in the Corps' permit modification.  However, the width of the road has been reduced from 15' to 11'.  As a result, the permittee has requested a modification to the Corps permit to reflect the change in the width of the road.  Based on the March 11, 2015 delineation, a small portion of the road would be located within the Corps' jurisdiction.

6.  Regarding potential impacts to threatened and endangered species, the Corps has determined that the proposed modification would not change the effects determinations made as a part of the original permit evaluation.

   a.  On May 10, 2017, the Corps determined that the project as proposed at that time (which consisted of the construction of the groin, dune field in front of the Reserve and the access road), would have an adverse effect on the following species under the purview of the National Marine Fisheries Service-Protected Resources Division (NMFS-PRD):  Green sea turtle (*Chelonia mydas*), Hawksbill sea turtle, (*Eretmochelys imbricata*), Leatherback sea turtle (*Dermochelys coriacea*), Loggerhead sea turtle (*Caretta caretta*), and Kemp's Ridley sea turtle (*Lepidochelys kempii*).

b.  On October 19, 2017, the NMFS-PRD determined that the above structures/work may affect, but were not likely to adversely affect the above sea turtles stating, "Because all potential project effects to listed species were found to be discountable, insignificant, or beneficial, we conclude that the proposed action is not likely to adversely affect listed species under NMFS's purview. This concludes your consultation responsibilities under the ESA for species and proposed critical habitat under NMFS's purview."

    c.  On March 20, 2018, the Corps determined that project may affect but is not likely to adversely affect the following species under the purview of the U.S. Fish and Wildlife (USFWS):  Green sea turtle (*Chelonia mydas*), Hawksbill sea turtle, (*Eretmochelys imbricata*), Leatherback sea turtle (*Dermochelys coriacea*), Loggerhead sea turtle (*Caretta caretta*), Kemp's Ridley sea turtle (*Lepidochelys kempit*); Piping Plover (*Charadrius melodus*), Red knot (*Calidris canutus rufa*), and the West Indian Manatee (*Trichechus manatus*). On May 22, 2018, the USFWS concurred with the above effects determinations.

    d.  The Corps has determined that the proposed modification is a minor modification and does not rise to the level of reinitiating Section 7 consultation with either agency.  Specifically, the road would be constructed utilizing the same materials as proposed (and authorized) in the original application and construction would occur outside of sea turtle nesting season.  In addition, the proposed modification would reduce the width of the road from 15' to 11'.  The modification would be conditioned with the same special conditions designed to minimize effects to the above species (see enclosed permit and subsequent modification).  Therefore, the Corps has determined that the original project has not been modified in a manner that would cause an effect to a listed species or critical habitat in a manner (or to an extant) not previously considered.  In addition, no new species have been listed or critical habitat designated since the original project consultation. Based on the above, the Corps has determined that the proposed modification constitutes a minor modification that does not rise to the level of reinitiating Section 7 consultation with the USFWS.  For the same reasons, the Corps has determined that the proposed modification does not rise to the level of reinitiating Section 7 consultation with NMFS.

7.  Regarding potential impacts to Essential Fish Habitat (EFH), as stated above, a small portion of the road would be located within Corps' jurisdiction.  However, the access road was previously evaluated and consulted on under the Magnusson Stevens Act during the original permit evaluation.  In addition, the width of the road has been reduced and would not result in additional adverse effects to EFH.  Therefore, per 50 CFR 600.920, the Corps has determined that re-initiation of consultation under the Magnuson Stevens Act is not required.

8.  In regard to Section 106 of the National Historic Preservation Act (NHPA), the proposed modification does not change the Corps' original determination of no adverse effect to historic properties.  Therefore, the existing consultation is still valid and reinitiation of consultation is not required.

9.  Given the above evaluations, the Corps has determined that the proposed modification does not result in greater impacts nor change the determinations made in the Public Interest Review, 404(b)(1) analysis, National Environmental Policy Act (NEPA) analysis or cumulative impacts assessment performed during the evaluation of the original permit. Therefore, the Corps has determined that the proposed modifications are in the public interest, in compliance with the 404(b)(1) guidelines, NEPA and other applicable Corps regulations, and would not have a significant effect on the human environment.

10.  Based on the above information, the Corps is granting the permit modification.  All General and Special Conditions issued with the 2018 permit will continue to be effective with the above referenced modification.


Sarah E. Wise
Team Lead, Coastal Branch



CESAS-OP-RB                                                    June 28, 2019

MEMORANDUM FOR RECORD

SUBJECT:  Request for a Permit Modification to the Sea Island Reserve Project, SAS-2015-00742

1.  I refer to a Department of the Army permit SAS-2015-00742, with an effective date of September 11, 2018, authorizing impacts to tidally influenced waters (i.e. the Atlantic Ocean) to construct and maintain a new T-head groin south of the existing southern groin and place sand along approximately 17,000 linear feet (LF) of beach located between an existing north groin, and the new T-head groin.  Specifically, the permit authorized the use of a hydraulic cutter-head dredge to remove and pump between 1,315,000 to 2,500,000 cubic yards (CY) of sand from the offshore source, to various locations along the beach. Temporary sand-training dikes would be constructed on the beach, and used to contain the discharge of sand and water, parallel to the shore. Once it is dewatered, bulldozers and other equipment would be used to move the sand up and down the beach, to shape the beach to the design template. Following completion of beach renourishment, sand fencing and/or native vegetation would be installed in strategic locations in the dunes in accordance with a Georgia Department of Natural Resources (DNR)-approved vegetation plan.

The project consists of the following four reaches: Reach 1extends 1,200' south of the southern groin (i.e. to the new groin); Reach A extends 4,000 LF north of the southern groin to approximately East 9th Street; Reach B extends 9,000 LF from East 9th Street to East 34th Street; and Reach C extends 3,500 LF from East 34th Street to the northern groin.  Subsequent sand recycling activities would be accomplished with excavators, dump trucks, and other heavy equipment.  Recycling activities would occur during/for the following times/reasons:  (1)  up to once per year outside of turtle nesting season to maintain the project; (2)  at any time to correct unusual erosion rates or to correct damage caused by discrete events, upon notice to the Corps, Georgia Department of Natural Resource, Coastal Resources Division (Georgia CRD); and (3) in the event of an approaching storm to shape dunes to raise low lying areas for upland protection, upon notice to the Corps and Georgia CRD. Material for recycling activities would be obtained from any location above mean lower low water from Reach A or Reach C.  This permit is scheduled to expire September 5, 2023.  The enclosed permit with drawings provide project specific information concerning this permit.

2.  On April 24, 2019, the Center for a Sustainable Coast (a plaintiff in the present litigation) issued a Notice of Intent to Sue (NOI) Sea Island Acquisitions (SIA), alleging multiple violations of the Clean Water Act (CWA) while performing the work under the current permit.  Specifically, the NOI alleges that SIA has: (1) dredged sand from the offshore source and placed a portion of that sand outside of the permitted project area; (2) excavated sand from Reach A and placed it within the new groin cell to "create uplands and fill waters outside the permitted area and (3): failed to comply with the 404 permit by not properly filling the new groin cell as authorized in the approved project drawings.

3.  Regarding the placement of the offshore sand outside of the permitted project footprint, the plaintiff alleges areas landward of the permitted project area are being illegally filled with the dredged sand.  The NOI states,

> "Sea Island is not only trying to reestablish the beach areas and protective dunes in accordance with the 401 Certification and the 404 Permit, but is also trying to reestablish private property by reclaiming jurisdictional lands in violation of the Clean Water Act and the Georgia Shoreline Protection Act."

By letter dated May 24, 2019, SIA provided a response to the above accusations, stating:

> "The approved groin permit drawings are based upon the limits of jurisdiction approved under SAS-2013-00690, issued May 29, 2014, and valid until May 29, 2019, and extended thereafter with the Permit in accordance with Regulatory Guidance Letter 05-02(3)(g).  Since the initial Georgia DNR approval for the Reserve (SPC Permit #438), two hurricanes had eroded the escarpment line landward."

Corps Evaluation:  The Corps is satisfied with the SIA's response.  Essentially, the limits of the Corps' jurisdiction were verified on May 29, 2014, and the authorization of the permit was based on that delineated boundary.  Therefore, any sand/material placed landward (i.e. above that line) or work/construction that occurred landward of the 2014 line, is outside of the Corps' jurisdiction and does not require Corps' authorization.  This includes the placement of sand for the repair of upland lots damaged by recent storm events, construction of portions of the dune and the groin tie back section.

However, currently, the permit does not authorize the placement of the offshore sand into these upland areas.  As stipulated by the permit, all offshore sand was to be placed below the May 2014 jurisdiction line and within the approved design template.  Therefore, the Corps has determined that SIA is non-compliant with the permit.

According to SIA,

> "The dredged material required extensive mechanical management after discharge from the dredge pipe into the Reserve. Temporary berms and retention ponds were constructed in the upper areas of the beach to dewater the material. Sediments that were finer than anticipated created difficulty in retaining the material in the dry beach and dune feature template. The higher than normal quantities of material that washed out to the low-tide terrace were subsequently recovered mechanically and placed back at the high tide and dune locations during construction. Nourishment material was placed at the existing escarpment and subsequently built seaward. In addition, as stated above, a portion of the material utilized at the Reserve was obtained from the Reach A borrow area. Finally, the area behind the constructed dunes was in part constructed of beach quality sand from an upland source. The still-valid Corps jurisdiction line is seaward of most of the constructed dune portion of the project. Areas behind the new dune are clearly outside Corps jurisdiction.
>
> The characteristics of the dredged material (much like the existing Sea Island beach but more fine than at most beach nourishment projects) affected the ability to construct the dune to the exact specifications of the Permit designed. The dune feature is slightly lower and slightly wider than the approved design template. Although the existing project deviates slightly from the approved design template, as shown on the attached survey documenting current conditions, the project meets the overall project purpose to provide storm protection, wildlife habitat, and recreational value."

In order to resolve this, SIA has requested a permit modification to authorize the current configuration of the dune at the Reserve as shown on the drawings entitled "Proposed Groin & Dune Plan, Sea Island Cloister Reserve, Beach Renourishment & Groin", dated September 10, 2015, as well as the use of the offshore sand in the upland area landward of the May 2014 jurisdiction line.

Corps Evaluation: The Corps is satisfied with the applicant's response. As stated above, the material placed above the May 2014 jurisdiction line is not within the Corps' jurisdiction. However, should the offshore material been placed within the Corps' jurisdiction, the work/fill more than likely would have been verified under Nationwide Permit (NWP) 45 (Repair of Uplands Damaged by Discrete Events). Specifically, NWP 45 authorizes discharges of dredged or fill material, including dredging or excavation, into all waters of the United States for activities associated with the restoration of upland areas damaged by storms, floods, or other discrete events. The restoration of the damaged areas, including any bank stabilization, must not exceed the contours, or ordinary high water mark, that existed before the damage occurred.

Regarding potential impacts to threatened and endangered species associated with the above use of the offshore borrow material, the Corps has determined that the activity did not change the Corps' effects determinations made during the evaluation of the application for any threatened and endangered species nor listed critical habitat. (Refer to section 6.4.1 of the DA Environmental Assessment and Statement of Findings).

4. The Plaintiff also alleges that based upon photographic evidence, SIA has excavated sand from Reach A and placed it within the new groin cell to "create uplands and fill waters outside the permitted area." Essentially, the Plaintiff is arguing that SIA has removed sand from Reach A and used it to build upland lots as well as fill the new groin cell.

Regarding the use of sand from Reach A, SIA states:

> "Project construction in the area of the Reserve, between the south groin and the new groin, was commenced using dredged material from the off-shore borrow area. That material was supplemented by the mechanical movement of sand from the Reach A borrow area. Use in the Reserve of material from both off-shore and the Reach A borrow area was contemplated in the permit application, and Sea Island construes the Permit as authorizing such use."

Corps Evaluation: As stated above, the placement of sand/material and work performed above the May 2014 delineated boundary is outside of the Corps' jurisdiction and therefore does not require DA authorization. However, currently, the permit only authorizes the use of Reach A as a borrow site for sand recycling activities. Although the application "contemplated" the use of the material from Reach A to construct portions of the project, it is not authorized in the DA permit. Therefore, the Corps has determined that SIA is non-compliant with the permit. In order to resolve this permit non-compliance, SIA has requested a permit modification to allow for sand to be excavated from Reach A and used for the construction of the project.

Regarding potential impacts to threatened and endangered species associated with the excavation of sand from Reach A, the Corps has determined that the unauthorized activity had no effect on sea turtles, the shortnose and Atlantic sturgeon or the North Atlantic Right Whale. In addition, the unauthorized activity did not change the Corps' effects determinations made during the evaluation of the application for the Piping plover, Red knot and West Indian manatee (Refer to section 6.4.1 of the DA Environmental Assessment and Statement of Findings).

Specifically, regarding potential impacts to sea turtles, the sand from Reach A was previously determined to meet the applicable guidelines for placement of the material onto the beach. In addition, the work occurred outside of sea turtle nesting season. Given the above, the Corps has determined that the unauthorized work had no effect on sea turtles.

Regarding potential impacts to the shortnose sturgeon, Atlantic sturgeon and North Atlantic right whale, the sand from Reach A was removed via an excavator at low tide, placed into a dump truck and then hauled to the new groin cell. Reach A is located directly adjacent to the existing southern groin within the intertidal zone. Given the location of Reach A as well as the depth of the water at this location, it is not anticipated that the shortnose sturgeon, Atlantic sturgeon or North Atlantic right whale would be located in this area. Therefore, given the above, the Corps has determined that the unauthorized work had no effect on the shortnose sturgeon, Atlantic sturgeon or North Atlantic right whale.

Regarding potential impacts to Essential Fish Habitat, the Corps has determined that the unauthorized work would not change the effects determination made during the evaluation of the application (refer to section 10.2.3 of the DA Environmental Assessment and Statement of Findings).

5. The Plaintiff also alleges that SIA has failed to comply with the 404 permit by not properly filling the new groin cell as authorized in the approved project drawings. Specifically, the NOI states,

> "Sea Island's construction of the new groin was justified by the beach renourishment that was to occur in the New Groin Cell. Accordingly, the 404 Permit and the 401 Certification require the New Groin Cell to be filled to capacity. The purpose of filling the New Groin Cell to capacity is to allow sand to bypass the new groin and create a neutral impact on the sand sharing system and the downdrift areas from the new groin (i.e., the spit on Sea Island and East Beach on Saint Simons Island). Sea Island's failure to properly fill the New Groin Cell violates Sections 301(a), 401, and 404 of the Clean Water Act because Sea Island has failed to comply with the 404 Permit and the 401 Certification. 33 U.S.C. § 1344(p). This deficit in the New Groin Cell causes sand to be trapped by the new groin and prevents sand sharing to the downdrift areas from the new groin; thereby causing additional erosion and degradation of beaches and waters of the United States."

Corps Evaluation: On May 24, 2019, SIA provided an interim status report that included the survey entitled, "Beach Monitoring Pre and Post Construction For: Sea Island South Groin and Beach Renourishment," dated May 22, 2019. Based on this survey, the new groin cell has been "filled" as approved. In addition, the special conditions of the DA permit require that SIA perform beach profile surveys of this area at the following times: (a) pre-construction; (b) post-construction; (c) 6 months, 1 year, 2 years, 3 years, 4 years, and 5 years after the post-construction survey; and (d) more frequently after storm events, if warranted. Therefore, this area will be continually monitored to ensure that the new groin is not trapping sand. The permit is also conditioned the "Should the Corps determine that the groin is causing negative impacts to the sand-sharing system, the Permittee shall submit a corrective action plan (i.e. sand bypass, adjustment/removal of the new groin, etc.) to the Corps and GADNR for review and approval."

6.  In addition to the above alleged non-compliance, the Corps' has determined that the access ramp has also not been constructed according to the authorized drawings.  As a result, SIA has requested a permit modification to allow for the access ramp to remain in its current location as well as approval of the actual depths to which the offshore borrow area was dredged.  The Corps has determined that the deviation from the approved drawings is minor and that it did not change any of the effect determinations made during the evaluation of the application.

7.  In addition, the post dredge survey of the offshore borrow site indicated that the Permittee exceeded the authorized cut depths in certain areas. Specifically, SIA exceeded the authorized cut depths in two locations, B-North and B-West.  According to the interim status report provided by SIA,

> "Excavations in B-West deviated from the design cut depth over ~18% (16.5 acres) of that section of the borrow area (or ~6.5% of the total borrow area). Most of the deviation occurred over the crest of the central ridge within 600' of B-Main where an 8' cut was specified.  B-West was the last area utilized during the project."

The report also identified that B-North deviated from the design cut depth over ~5% (1.3 acres).

Corps Evaluation:  Although SIA dredged to a deeper depth than authorized, SIA utilized the same type of dredge equipment and process that was previously evaluated in the Corps EA (i.e. hydraulic cutterhead dredge and pumping the material onto the beach) and abided by the same construction windows as stipulated in the special conditions.  In addition, post sand placement surveying indicates that all the material placed along the beach (including the material taken from the deeper depths) met all applicable beach quality standards.  Therefore, the Corps has determined that the deviation from the approved cut depths is minor and did not change any of the effect determinations and evaluations made in the Corps EA.

8.  SIA is also requesting modification of the permit regarding the tilling requirements and the use of Reach C to complete the project.

Regarding the revision to the tilling requirements, Special Condition (1)(b) of the Permit requires that the permittee cross-till the project from the high tide wave rush to the seaward toe of the constructed dune feature, including the dune feature, should compaction testing reveal that readings are greater than 500 CPU for the specified depths and stations. The Permittee states,

> "based upon site inspections and coordination with Georgia DNR Senior Wildlife Biologist Mark Dodd, it has been determined that tilling of the berm portion of the constructed beach should not be required. The dune feature has been tested for compaction and tilled per Mr. Dodd's instruction.  However, as stated by Mr. Dodd (email dated March 1, 2019)(Enclosed), the Sea Island beach differs from

other nourished beaches in Georgia in that the subject beach slope rises to a low berm (approximately 7' NAVD 88) and then transitions to the dune feature. Other nourished beaches in Georgia typically slope to a larger/wider terrace at approximately 8' to 9' NAVD88, above the high tide wave rush.

Given the profile of the Sea Island beach, Mr. Dodd expects that the project beach will perform more like a natural coastal Georgia beach with sea turtles nesting primarily on the dune, and therefore tilling of the lower elevation and narrower Sea Island berm is not required, as sea turtles would be unlikely to attempt nesting on the berm. Required monitoring of the nourished beach will be conducted as stipulated in the Permit, and future necessity to cross-till the entire area between the high-tide wave rush and the dune feature will be subject to inspection and coordination with Georgia DNR and USFWS on a seasonal basis."

Therefore, SIA requests modification of the Special Condition (1)(b) Permit to read as follows:

"Following construction, the Permittee shall test the dune feature for compaction prior to the planting of vegetation or sand fence construction. If compaction readings are greater than 500 CPU at any of the test depths (6 inches, 12 inches, 18 inches) for two consecutive stations, the dune feature will be tilled. Alternatively, the permittee may till the dune feature without compaction testing."

Regarding the use of Reach C, SIA is requesting to modify the permit to allow for sand to be excavated from Reach C to complete the project (i.e. not just for sand recycling events as stipulated in the permit).

"The Reach C Borrow Area includes the low tide terrace connecting the beach on Sea Island to Hupp's Bar, which is located approximately 1,200 feet south of the existing north groin. The proposed revised Reach C Hupp's Bar borrow area is approximately 1,700' long by 750' wide located between stations 240+00 and 260+00, as shown on the attached drawing titled Proposed Reach C Recycling Area, dated February 28, 2019. In order to continue nourishment activities after the end of sea turtle nesting season (November 1, 2019) and support DNR's request, SIA is requesting modification of the Permit to authorize mechanical dredging of beach-quality material from the revised Reach C Hupp's Bar borrow area, and to authorize use of that material for beach nourishment construction, as well as for recycling. The material will be placed within the beach nourishment template set forth in the Permit.

Use of the modified borrow area for construction material will not cause any adverse effects to threatened and endangered species; this area has already been approved by the Corps as a location for excavating material for recycling, after full consultation with the resource agencies. The material will be placed on the beach in locations authorized by the Permit. Moreover, dredging of sand from

the low-tide terrace connecting Hupp's Bar to the beach has been specifically requested by Georgia DNR for the benefit it will provide to nesting shorebirds. By letter of February 8, 2019, Mr. Jason Lee, Program Manager with the Georgia Department of Natural Resources, Wildlife Conservation Section of the Wildlife Resources Division (GADNR/WRD), recommended beach management options that would benefit the significant shorebird nesting habitat found on Hupp's Bar (referred to in the letter as Pelican Spit) (Enclosed).  This offshore bar has migrated toward the Sea Island beach and at low tide the beach terrace provides pedestrian access to the bar that serves as valuable shorebird nesting habitat. This low tide terrace affords access to Hupp's Bar by predators such as raccoons, and pedestrian access by humans and pets that can disturb nesting birds and destroy active nests. Excavating beach quality sediments from the low-tide terrace would provide protection to the nesting site from land-based predators.

Testing of the sediments has been completed to ensure that the material meets applicable guidelines. The results of the testing are included in the Geotechnical Engineering Investigation report prepared by Terracon Consultants, Inc. dated March 17, 2019. (Enclosed).   The material will be excavated at low tide, trucked to the placement areas and shaped to the original permitted design, with final shaping, compaction testing, tilling, and planting per existing Permit conditions. Excavation depths will be mandated by the presence of suitable material determined by the geotechnical investigations. If unsuitable material is encountered, it will remain in the low tide terrace or be disposed of outside the project area".

Based on the above, the Corps has determined that the proposed modifications would not change the effects determinations made during the evaluation of the application (Refer to section 6.4.1 of the DA Environmental Assessment and Statement of Findings). By email dated June 20, 2019, the Corps coordinated the above modification request with the USFWS.  By email dated June 21, 2019, the USFWS stated they had no objection to the proposed modifications.

9.  In regards to Section 106 of the National Historic Preservation Act (NHPA), both the ATF modification as well as the proposed modifications do not change the Corps' original determination of no adverse effect to historic properties.  Therefore, the existing consultation is still valid and reinitiation of consultation is not required.

10.  Based on the information provided by SIA, the Corps has determined that the proposed modifications do not change the determinations made in the Public Interest Review, 404(b)(1) analysis or cumulative impacts assessment performed during the evaluation of the original permit. Therefore, the Corps has determined that the proposed modifications are in the public interest, in compliance with the 404(b)(1) guidelines and would not have a significant effect on the human environment.

11. Based on the above information the Corps is granting the permit modifications. All General and Special Conditions issued with the 2018 permit will continue to be effective with the above referenced modifications.

WISE.SARAH.ELIZABETH.1281640590
Digitally signed by WISE.SARAH.ELIZABETH.1281640590
Date: 2019.06.28 12:24:38 -04'00'

Sarah E. Wise
Team Lead, Coastal Section

RUTLIN.WILLIAM.M.1390465064
Digitally signed by RUTLIN.WILLIAM.M.1390465064
Date: 2019.07.05 15:29:02 -04'00'