———————————————————————

ALTAMAHA RIVERKEEPER and )
ONE HUNDRED MILES )
)
)
Plaintiffs, )
)
) Case No. 4:18-cv-00251-JRH-CLR
)
UNITED STATES ARMY CORPS OF )
ENGINEERS, et al., )
)
Defendants. )
———————————————————————)

## FEDERAL DEFENDANTS' STATEMENT OF UNDISPUTED FACTS, CONCLUSIONS OF LAW, AND RESPONSES TO PLAINTIFFS' STATEMENTS

Pursuant to Rule 56.1 of the Local Rules of the U.S. District Court for the Southern District of Georgia, Federal Defendants submit this statement of material facts as to which there is no genuine dispute, conclusions of law in support of their motion for summary judgment, and responses to Plaintiffs' statement of facts.

**I.     Federal Defendants' Statement of Undisputed Facts and Conclusions of Law:**

As an initial matter, we note that Plaintiffs have brought this case under the Administrative Procedure Act.  *See* Altamaha Riverkeeper, One Hundred Miles, and Surfrider Foundation's 2nd Am. Compl. ¶ 1; Center for a Sustainable Coast Am. Compl. ¶ 4.  Under the APA, judicial review generally occurs on the agency's administrative record.  *See* 5 U.S.C. § 706 ("the court shall review the whole record or those parts of it cited by a party").

*Statement of Facts:*

1.     On October 15, 2015, Sea Island Acquisition, LLC ("SIA") submitted a Clean Water Act Section 404 permit application for the construction of a T-head groin near the

southern end of the barrier island and the creation of a sand dune ridge and a 150 foot wide beach through the excavation of sand near the Project site ("Project"). Administrative Record ("AR")[1] 3479-682. On December 18, 2015, the Corps issued a Joint Public Notice ("JPN") for the proposed project. *Id.* 3438-69.

2. The Project site is located within the surf zone of the Atlantic Ocean, along the Sea Island shoreline. *Id.* 220. Sea Island is an approximately five-mile long barrier island located along the Georgia coast, separated from Little St. Simons Island to the north by the Hampton River, and from St. Simons Island to the west and south by Village Creek, the Black Banks River, and Gould's Inlet. *Id.*

3. On March 6, 2018, SIA amended the application by proposing to construct the T-head groin located near the southern end of the barrier island and to construct beach nourishment activities along the 17,000 linear feet of shoreline from the existing northern groin to the proposed T-head groin. *Id.* 1699-1889, 233. In the amended application, SIA sought to hydraulically dredge 1,315,000 to 2,500,000 cubic yards (cy) of sand from an offshore borrow area and place the sand on the Sea Island shoreline. *Id.* 1700. On March 20, 2018, the Corps issued an addendum to the JPN and solicited comments on the amended application. *Id.* 1619-98.

4. Following the receipt of public comments during the two public comments processes, the Corps prepared a Memorandum for Record documenting the Corps' Environmental Assessment and Statement of Findings for the permit application ("MFR"). *Id.* 219-307.

---

[1] Federal Defendants have filed an administrative record for the U.S. Army Corps of Engineers ("Corps") in the challenged permit decision. *See* ECF Nos. 46, 48, 67. Citations to the Corps' record are marked herein as Administrative Record ("AR") along with the Bates-stamped page number. For ease of reference, the leading zeroes of the Bates-stamped page number have been omitted.

5.      The Corps determined that "the basic project purpose is storm protection and the overall project purpose is to protect upland lots and development located along the shoreline of Sea Island from storm damage." *Id.* 252.

6.      In its MFR, the Corps engaged in a thorough review of the proposed Project, including the analysis of two "no action" alternatives (installing a bulkhead in the upland or doing nothing) and six on-site alternatives to the Project:  SIA's preferred alternative, construction of a T-head groin and beach nourishment (*id.* 255-58); a nearshore berm (*id.* 256); rock revetments and sea walls without nourishment (*id.* 257); relocation of the existing southern groin and beach nourishment between the northern groin and the new groin (*id.*); removal of the southern groin and nourishment of the beach from the northern groin to the end of the Spit (*id.* 257-58);[2] and beach nourishment from the existing southern groin to the end of the Spit (*id.* 258).

7.      The Corps found some of the alternatives to not be practicable because those alternatives would not meet the overall project purpose of providing storm protection, and ultimately determined that the least environmentally damaging practicable alternative to be the first on-site alternative, SIA's preferred alternative.  *Id.* 258-62.

8.      Following the analysis of alternatives, the Corps considered potential impacts stemming from the proposed Project, including potential impacts to the sand sharing system, wildlife, and endangered and threatened species.  *Id.* 291-92, 266-73.

9.      Due to concerns regarding the sand sharing system raised in multiple public comments, the Corps consulted a Corps coastal engineer, Mr. Kevin Conner, who completed an independent review.  *Id.* 234-35.

10.     Based on Mr. Conner's evaluation, the Corps concluded that regardless of the construction of a new groin, the existing hard armoring on the shoreline would continue to contribute to erosion and that the construction of a new shorter groin toward the southern end of

---

[2] The area Plaintiffs and some commenters refer to as "the Spit" is located at the southern end of Sea Island, and is largely protected by a conservation easement.

the barrier island would not interrupt sediment transport in any measurable way. *Id.* 235, 292. Due to the importation of sand from an off-site borrow site, the Corps found that the additional sand would allow the beach between the existing groins to reach an equilibrium state and allow the sand to bypass the existing groins and travel south in the downdrift. *Id.*

11.     With respect to the Corps' evaluation of impacts to wildlife, endangered and threatened species, historic properties, coastal zone management, and water quality, the Corps consulted with the appropriate resource agencies. *Id.* 294-96.

12.     On May 10, 2017, the Corps forwarded to the National Marine Fisheries Service, Protected Resources Division ("NMFS PRD") a copy of SIA's Biological Assessment for the initial application and the Corps' determination that the project is likely to adversely affect female loggerhead turtles and may affect but is not likely to adversely affect loggerhead sea turtle hatchlings, leatherback sea turtle hatchlings, green sea turtle hatchlings, nesting female leatherback sea turtles, and nesting green sea turtles. *Id.* 1904-66. By letter dated October 19, 2017, NMFS PRD advised the Corps of its finding that the project is not likely to adversely affect listed species under NMFS's purview. *Id.* 1896-1901.

13.     After SIA submitted its revised application to include the beach nourishment element using sand dredged from an offshore borrow area, the Corps contacted NMFS PRD by email on May 1, 2018 to inquire about expedited consultation. *Id.* 1310. In response, NMFS PRD instructed the Corps not to submit the revised application for consultation without first coordinating with the Corps' South Atlantic Division ("SAD") to determine whether the project would be authorized under the South Atlantic Regional Biological Opinion ("SARBO"). *Id.* Upon the recommendation of NMFS PRD, the Corps coordinated with SAD and SAD determined the project qualified under the SARBO/SARBA. *Id.* 1219-1223, 1310.

14.     The SARBO is a programmatic Endangered Species Act Section 7 consultation with NMFS regarding the impacts of dredging material placement on endangered and threatened species within the NMFS purview in the South Atlantic (from the North Carolina/Virginia border to Key West, Florida, and the U.S. Caribbean). The SARBO has been through three iterations

beginning in 1991 (*id.* 308-22), then 1995 (*id.* 323-78) and 1997 (*id.* 379-96). The SARBO was

supplemented by a South Atlantic Regional Biological Assessment ("SARBA") in 2017 while

the Corps and NMFS negotiated a new SARBO (*id.* 397-521). The history of the NMFS-Corps

SARBO consultations is described in Section 1 of the SARBA. *Id.* 406-12.

15.     The Corps requested reinitiation of ESA consultation with NFMS on the 1997

SARBO by letter dated April 30, 2007. *See* AR 508. In its response letter dated October 25,

2007, NMFS advised that "the COE is not required to suspend dredging or relocation trawling

operations pending conclusion of the reinitiated consultation, so long as the continuation of

operations (by all districts) would not violate section 7(a)(2) or 7(d) of the ESA." By letter dated

March 21, 2014, NMFS further recommended that the Corps should prepare its own

determination pursuant to ESA Section 7(a)(2)/7(d). *See* AR 509. Consistent with NMFS'

recommendation, on April 21, 2014, the Corps completed its determination pursuant to ESA

Section 7(a)(2)/7(d). *Id.* 511. The Corps concluded that "USACE has not and will not make any

irreversible or irretrievable commitment of resources that would foreclose the formulation or

implementation of any reasonable and prudent alternatives necessary to avoid jeopardizing the

continued existence of the Atlantic sturgeon." *Id.* 516. Therefore, pending completion of the

reinitiated consultation, pursuant to ESA Section 7(d), 16 U.S.C. § 1536(d), the Corps

determined that it could proceed with its ongoing permitting activities, as described in the

SARBA. *See id.*

16.     On March 27, 2020, NMFS issued the 2020 South Atlantic Regional Biological

Opinion for Dredging and Material Placement Activities in the Southeast United States ("2020

SARBO"), *available at*

https://www.fisheries.noaa.gov/content/endangered-species-act-section-7-biological-opinions-

southeast (last visited Apr. 17, 2020). The 2020 SARBO provides ESA coverage for dredging

and material placement activities under Corps jurisdiction, including sand placement for beach

renourishment, as anticipated in the SARBA, AR 449. *See* 2020 SARBO at 16.

17.     On March 20, 2018, the Corps forwarded to the United States Fish and Wildlife Service ("USFWS") a copy of SIA's revised Biological Assessment and the Corps' determination that the project may affect but is not likely to adversely affect the various species of sea turtles, the birds, or the West Indian Manatee in and around the project area.[3] *Id.* 1441-42. By letter dated May 22, 2018, USFWS concurred with the Corps' determination. *Id.* 1211-14.

18.     On June 12, 2018, the Corps forwarded to the Georgia State Historic Preservation Officer ("GASHPO") a copy of SIA's Phase I archeological survey of the project area and the Corps' determination that no historic properties would be affected by the project. *Id.* 1117-18. By letter dated July 6, 2018, GASHPO concurred with the Corps' determination. *Id.* 1038.

19.     In response to the JPN for SIA's initial permit application, the Georgia Department of Natural Resources, Coastal Resources Division ("DNR CRD") provided its certification that the project was consistent with the Georgia Coastal Management Program ("GCMP") by letter dated March 25, 2017. *Id.* 2467. After SIA revised its application to include the beach nourishment and offshore dredging component, DNR CRD again provided its certification that the project is consistent with the GCMP by letter dated July 13, 2018. *Id.* 1014-37.

20.     By letter dated May 23, 2017, the Georgia Department of Natural Resources, Environmental Protection Division ("DNR EPD") issued its Clean Water Act Section 401 water quality certification for the project. *Id.* 1902-03. After SIA revised its application to include the beach nourishment and offshore dredging component, DNR EPD again provided its water quality certification by letter dated June 8, 2018. *Id.* 1162-63.

21.     In response to the JPN for SIA's initial permit application, the National Marine Fisheries Service, Habitat Conservation Division ("NMFS HCD") provided its comments and recommendations regarding the project's impacts to Essential Fish Habitat ("EFH") by letter dated April 20, 2018. *Id.* 4102-04. The NMFS HCD recommended that the T-head groin

---

[3] The initial SIA permit application was not coordinated with USFWS because SIA revised its permit application and biological assessment before USFWS coordination was performed on the initial application.

portion of the project not be permitted due to impacts to habitat and that work should be limited to seasonal periods of low biological activity. *Id.* 4103. By letter dated July 17, 2018, the Corps responded to NMFS HCD's comments and recommendations. *Id.* 926-28. The Corps advised NMFS HCD that the groin project's footprint impacts only a small area of the habitat and that there is ample habitat upstream and downstream for species relocation and also described the sand sharing system and the beach nourishment aspect of the project. *Id.* 926-27. The Corps also advised how it would satisfy NMFS HCD's recommendation regarding limiting work to periods of low biological activity. *Id.* 927. Finally, the Corps advised NMFS HCD that the Corps intended to issue the permit within ten (10) days of the date of the letter. *Id.* By letter dated July 27, 2018, NMFS HCD advised the Corps that while the Corps will not fully implement the NMFS HCD recommendations, it will not further elevate the decision. *Id.* 837-38. Further, NMFS HCD noted that the Corps has complied with its obligations under the Magnuson-Stevens Act. *Id.*

22. After consideration of impacts to wildlife, endangered and threatened species, historic properties, coastal zone management, and water quality, the Corps evaluated cumulative impacts and mitigation. *Id.* 287-93. The Corps determined that a special condition, a sand movement monitoring plan, should be in place to detect and compensate for any potential cumulative impacts to resources. *Id.* 292. The monitoring plan includes extensive surveying of the shoreline both pre and post-construction. Should the surveying conclude that the new groin is trapping sand, SIA will be required to submit a corrective action plan. *Id.* 293, 298-303.

23. After a lengthy review and analysis, as well as the consideration of many public comments throughout both public comment periods, the Corps concluded that the Project would have no significant impact on the quality of the human environment, that the Project complied with Section 404(b)(1) guidelines, and the Project was not contrary to the public interest. *Id.* 304. On September 11, 2018, the Corps authorized construction of the T-head groin and beach nourishment Project. *Id.* 1-44.

24.     On April 24, 2019, the plaintiff Center for a Sustainable Coast ("CSC") issued a Notice of Intent ("NOI") to sue SIA, alleging multiple violations of the Clean Water Act while constructing the project. *Id.* 5174-92.  CSC alleged that SIA dredged sand from an offshore source and placed a portion of that sand outside of the permitted project area, excavated sand from a portion of the shoreline known as Reach A and placed it within the new groin cell to create uplands and fill waters outside the permitted area, and failed to comply with the permit by not filling the new groin cell as authorized in the approved project drawings. *Id.* 4640.

25.     By letter dated May 24, 2019, SIA's environmental consultant responded to the allegations raised in CSC's NOI and requested a modification to the permit to address several aspects of the construction of the project, including sources of sand for placement on the project, the required amount of material to be placed, post-construction tilling requirements, tie-in of the new groin and constructed dunes to the existing escarpment, configuration of the access ramp from the new groin to the south end of the island, and depth of dredging completed at the offshore borrow site. *Id.* 5055-146.

26.     The Corps considered the allegations raised in the CSC NOI and SIA's responses thereto in evaluating SIA's modification request. *Id.* 4639-47.

27.     The Corps determined that offshore sand was indeed placed outside of the permitted project area but that the area where the sand was placed was outside of the Corps' jurisdiction. *Id.* 4640.  However, the use of the offshore sand for placement in the non-jurisdictional areas was not authorized under the permit. *Id.*  SIA requested a modification to authorize the use of the offshore sand in the upland areas.  The Corps determined that SIA ultimately requests to place dredged sand outside Corps jurisdiction and that such use of the offshore sand in the upland areas likely would have been authorized under a Corps Nationwide Permit ("NWP") 45 for repair of uplands damaged by storm events. *Id.* 4641.

28.     Regarding the CSC NOI allegation that SIA used sand from Reach A to create uplands and fill waters, SIA responded that the Reach A sand was used to supplement the offshore borrow sand in the area between the south groin and the new groin and that such use of

the Reach sand was contemplated in the permit application. *Id.* 4642. The Corps determined that the permit authorized the use of Reach A sand for sand recycling activities only, not for construction. *Id.* SIA requested a modification of the permit to allow for the use of Reach A sand for construction of the project. *Id.* The Corps determined that Reach A sand had been previously determined to meet applicable guidelines for placement onto the beach, and that use of the Reach A sand had no effect on sea turtles, Shortnose and Atlantic sturgeon, or the North Atlantic Right Whale and did not change the Corps' effects determination for the Piping Plover, Red Knot shorebirds or the West Indian Manatee, or for EFH. *Id.* 4642-43.

29. Regarding the CSC NOI allegation that SIA failed to comply with the permit by not filling the new groin cell as authorized in the approved project drawings, the Corps determined that SIA provided an interim status report on May 24, 2019 that showed the new groin cell as having been filled as approved. *Id.* 4643, 4754-5054. Further, the Corps cited the survey, monitoring, and corrective action plan provisions of the permit. *Id.*

30. The Corps evaluated deviations from the permit and SIA's subsequent request for modifications relating to the construction of the access ramp and the depths of dredging in the offshore borrow area and determined that the deviations were minor and did not change any of the effects determinations made during the evaluation of the application. *Id.* 4644.

31. The Corps also evaluated SIA's request for a modification relating to tilling requirements and the use of sand from an area known as Reach C for completion of the project. *Id.* 4644-45. Based on information provided by SIA, which included information and recommendations from the Georgia DNR, the Corps determined that the proposed modifications would not change the effects determinations made during the evaluation of the application. *Id.* 4644-46. The Corps coordinated the tilling and Reach C modification requests with the USFWS and the USFWS had no objection to the proposed modifications. *Id.* 4653-89, 4650-52.

32. The Corps determined that the proposed modifications did not change the original determinations regarding historic properties, the Public Interest Review, the 404(b)(1) analysis or cumulative impacts assessment performed during the evaluation of the original permit. *Id.* 4646.

The Corps further determined that the proposed modifications were in the public interest, in compliance with 404(b)(1) guidelines and would not have a significant effect on the human environment. *Id.*

33.     On July 5, 2019, the Corps issued a permit modification letter, incorporating modifications into the permit. *Id.* 4628-38, 4617, 4627.

*Conclusions of Law:*

1.     Federal Defendants complied with the National Environmental Policy Act.

2.     Federal Defendants complied with the Clean Water Act.

3.     Federal Defendants complied with the Endangered Species Act.

**II.     Federal Defendants' Response to Plaintiffs' Statements of Facts and Conclusions of Law:**

Where, as here, an agency action is challenged under the APA, "the court 'is not required to resolve any facts.'" *Fla. Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*, 374 Supp.2d 1116, 1126 (S.D. Fla. 2005) (quoting *Occidental Eng'g Co. v. U.S. Immigration & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985)). Rather, since the administrative record presumptively contains all the facts relevant to the challenged decision, a reviewing court need not engage in separate fact-finding. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (holding that a court must "apply the appropriate APA standard of review . . . to the agency decision based on the record the agency presents to the reviewing court"). Hence, summary judgment serves a different purpose in "reviewing a decision of an administrative agency which is itself the finder of fact." *Occidental Eng'g*, 753 F.2d at 770.[4]  To the extent that

_____

[4] Because review is limited to the record in the first instance, other courts have held that the submission of factual statements is "generally redundant because all relevant facts are contained in the agency's administrative record." *San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*, 819 F.Supp.2d 1077, 1084 (E.D. Cal. 2011). Still other courts exempt the parties in APA cases from submitting such statements. *See, e.g.*, U.S. District Court of the District of Columbia Local Rule of Civil Procedure 7(h)(2) and comment (explaining the requirement for submission of such statements "shall not apply to cases in which judicial review is based solely on the administrative record"); *Vt. Pub. Interest Research Grp. v. U.S. Fish & Wildlife Serv.*, 247 F.Supp.2d 495, 516 (D. Vt. 2002) (noting exemption for "a challenge to administrative action under the APA").

Plaintiffs' Statement of Undisputed Facts ("SoF") purports to refer to specific acts contained in the administrative records (and also supported by specific citations thereto), Federal Defendants generally do not dispute that such record facts are relevant to the challenged decision, although Federal Defendants respectfully refer this Court to the cited portions of the administrative records for additional meaning and context regarding any such facts.

With this general caveat, Federal Defendants respond to the numbered paragraphs in Plaintiffs' SoF as follows.

**A.**   **Response to Plaintiff Altamaha Riverkeeper, One Hundred Miles, and Surfrider Foundation (the Conservation Groups') Statement of Facts and Conclusions of Law:**

1.       Denied with clarification.  Sea Island is a barrier island along the Georgia Coast that is approximately five miles long.  AR 220.  Admitted that the southern portion is undeveloped.  *Id.* 244, 246.  Admitted that a portion of the south end of the island is protected by a conservation easement.  *Id.* 246-48, 1701.  Admitted that the southern portion of the island provides habitat for threatened and endangered sea turtles and shorebirds.  *Id.* 238, 1763.

2.       Admitted.

3.       Admitted with clarification that Sea Island Acquisition ("SIA") has completed infrastructure development of the upland property north of the conservation easement boundary.  *Id.* 252, 4753.  Admitted with clarification that in October, 2015, SIA filed an application for a permit to construct a T-head groin and to construct dunes.  As to the remaining allegations, the application speaks for itself.  *Id.* 3482.

4.       Denied.  Plaintiffs cite to no administrative record citation.  As such, the allegation is unsupported, in violation of Local Rule 56.1.  *See* L.R. 56.1 (stating that "each statement of material fact shall be supported by a citation to the record.").

---

5.     Denied.  Plaintiffs cite to no administrative record citation.  As such, the

allegation is unsupported, in violation of Local Rule 56.1.  *See* L.R. 56.1 (stating that "each

statement of material fact shall be supported by a citation to the record.").

6.     Denied.  Plaintiffs cite to no administrative record citation.  As such, the

allegation is unsupported, in violation of Local Rule 56.1.  *See* L.R. 56.1 (stating that "each

statement of material fact shall be supported by a citation to the record.").

7.     Denied.

8.     Admitted that a groin is a hard structure, often constructed of rock, concrete, or

steel, that is built perpendicular to the beach.[5]  The remainder of the paragraph is denied as

irrelevant and immaterial insofar as it represents one individual's definition of a groin.  AR

4259-63.

9.     Denied as irrelevant and immaterial insofar as it represents one individual's

incomplete and definition of a groin.  *Id.* 4259.

10.     Denied.  Dr. Young's opinions regarding the negative impacts of groins were

addressed by Dr. David R. Basco's Supplemental Comments, submitted as an attachment to

SIA's July 24, 2018 response to public comments.  *Id.* 4259-63.

11.     Admitted with clarification.  The Corps' Coastal Engineering Manual contains the

statement that "[c]oastal zone management policy in many countries and the United States

presently discourages the use of groins for shore protection."  However, the rest of the paragraph

in the Coastal Engineering Manual reads as follows:  "Many examples of poorly designed and

improperly sited groins caused by lack of understanding of their functional design, or failure to

implement the correct construction sequence, or failure to fill up the groin compartments with

---

[5] The Corps defines a groin as follows: "Narrow, roughly shore-normal structure built to reduce longshore currents, and/or to trap and retain littoral material.  Most groins are of timber or rock and extend from a SEA WALL, or the backshore, well onto the foreshore and rarely even further offshore."  Engineer Manual (EM) 1110-2-1100 "Coastal Engineering Manual," Appendix A, page A-34, https://www.publications.usace.army.mil/Portals/76/Publications/EngineerManuals/EM_1110-2-1100_App_A.pdf?ver=2014-03-10-140035-443.

sand during construction, or improper cross-sectional shape are responsible for these restrictions. However, when properly designed, constructed and combined with beach nourishment, groins can function effectively under certain conditions, particularly for increasing the fill life (longevity) of renourished beaches." *Id.* 4167.

12. Admitted with clarification. Admitted that the Conservation Groups provided testimony and/or reports from Dr. Webb, Dr. Young, and Dr. Jackson. SIA addressed the Conservation Groups' experts' testimony and/or reports by letter dated July 24, 2018 and provided testimony and/or reports by Dr. Timothy Kana, Dr. David Basco,[6] and Dr. George Oertel. *Id.* 4105-386.

13. Admitted.

14. Admitted.

15. Admitted with clarification. The Corps consulted with the Corps' Wilmington District coastal engineer, Kevin Conner, for an independent review of the reports of SIA's experts, Dr. Oertel and Dr. Basco, and the experts cited by the Plaintiffs, Dr. Webb and Dr. Jackson. AR000235. The Corps did not base its conclusion regarding downdrift erosion solely on the opinion of Mr. Conner. *Id.* 235-238.

16. Denied. The Conner email speaks for itself. *Id.* 1970.

17. Denied. The Conner email speaks for itself. *Id.*

18. The first sentence is admitted with clarification. The Corps provided five (5) attachments to Mr. Conner in its request for review. *Id.* 1971, 1967. Specifically the Corp attached: 1) the report by Dr. Basco and Dr. Oertel entitled "Sea Island Beaches, Shoreline Dynamics and History of Erosion Control Projects" (*id.* 1973-2037); 2) Greenlaw comment letter dated January 15, 2016 (*id.* 2038-140); 3) Southern Environmental Law Center ("SELC") comment letter dated January 15, 2016 (*id.* 2141-82); 4) SIA's January 5, 2017 response to JPN comments (*id.* 2183-371); and 5) SELC's February 28, 2017 response to SIA's January 5, 2017

---

[6] Dr. Basco is the author of the Corps' Coastal Engineering Manual, Part V, Section 3 "Shore Protection Projects," cited by the Plaintiffs and their experts. *See* AR 4257.

response to JPN comments (*id.* 2372-94).  The second sentence is denied with clarification.  The Greenlaw and SELC comment letters and the SELC response to SIA's response to JPN comments contain copies of Dr. Jackson's report (*id.* 2058-66), the letter signed by coastal scientists referred to in allegation of material fact number 14 above (*id.* 2092-95), Dr. Young's report (*id.* 2096-104), Dr. Webb's report (*id.* 2171-82), and the list of journal publications referred to in allegation of material fact number 13 above (*id.* 2146-47).  The Greenlaw and SELC letters contain numerous quotes from and cites to their experts' reports and testimony.

19.     Admitted.

20.     Denied as irrelevant and immaterial.  The letters from the Georgia Department of Natural Resources Wildlife Resources Division ("GADNR WRD") and the US Fish and Wildlife Service (USFWS) cited in this paragraph were written in 2015 regarding SIA's application for a Georgia Shore Protection Act permit for the groin.  Since these letters were written, the project has been revised to include a significant beach nourishment element.  The GADNR Coastal Resources Division ("GADNR CRD") has issued a Shore Protection Act Permit (*id.* 4483-504, 1014-1037) and the USFWS provided its concurrence that the project as revised may affect but is not likely to adversely affect the species in the vicinity of the project (*id.* 1211-14).

21.     Denied as irrelevant and immaterial for these reasons stated in paragraph 20 above.

22.     Admitted with clarification.  The April 2018 NMFS letter speaks for itself. AR004102-AR004104.

23.     Denied.  NMFS responded in a letter dated July 27, 2019 that the "Savannah District has complied with section 305(b)(4)(B) of the Magnuson-Stevens Act and 50 CFR 600.920(k)(1)."  *Id.* 837-38.

24.     Denied as irrelevant and immaterial.  Dr. Webb and Dr. Young provided testimony for purposes of a state administrative hearing relating to SIA's Shore Protection Act permit application and for the reasons stated in paragraph 20 above, the testimony is irrelevant

and immaterial to the Project.[7]  Similarly, the Webb 2017 report was written before SIA amended its application to add the beach nourishment and offshore dredging component of the Project.

25.	Denied as irrelevant and immaterial for the reasons stated in paragraphs 20 and 24 above.

26.	Denied as irrelevant and immaterial for the reasons stated in paragraphs 20 and 24 above.

27.	Admitted in part and denied in part.  Federal Defendants admit that Dr. Young testified that the Program for the Study of Developed Shorelines ("PSDS") maintains a database of every beach and dune construction project for the entire country, that he is funded by the US Geological Survey to map every beach nourishment project on the East Coast, and that PSDS has been tracking nourishment activities on Sea Island for more than twenty (20) years.  However, the testimony of Dr. Young does not reflect that PSDS is "a joint research and policy center at Duke University and Western Carolina University" or that the Beach Nourishment Database is "by far the most comprehensive catalog of beach and dune restoration projects available."  Those appear to be extraneous characterizations added by Plaintiff without evidentiary support and as such, are denied by the Corps.  *Id.* 3982-83.

28.	Admitted with clarification.  Federal Defendants admit that paragraph 28 reflects Dr. Young's testimony.  However, SIA's expert, Dr. Basco, responded to Dr. Young's testimony, which he determined to "take only a very superficial view of the design of the permitted project."  *Id.* 4259-63.  Further, the relevance and materiality of Dr. Young's testimony regarding the PSDS and nourishment database is tenuous in that each project stands on its own, with its unique circumstances and context.

---

[7] The Administrative Law Judge in the state administrative proceeding ultimately concluded that "the evidence at the hearing was insufficient to support a finding that a beach nourishment project without a groin is a reasonable or viable alternative to the permitted project."  *Id.* 4323.

29.     Admitted that Sea Island sustained damage from hurricanes Matthew and Irma, which further justifies SIA's project, the purpose of which is storm protection. *Id.* 4122. The Corps denies the second sentence of paragraph as vague in that it is unclear what area the Plaintiffs are referring to as the "developed area of the island."

30.     Admitted as to the first sentence. Denied as vague as to the second sentence. SIA addressed the impacts of hurricanes Matthew and Irma in its July 28, 2018 response to comments. *Id.* 4105-386.

31.     Admitted with clarification. SIA's addendum to its application speaks for itself. *Id.* 1669-889.

32.     Admitted with clarification. SIA's supplemental biological opinion speaks for itself. *Id.* 1730-1824.

33.     Admitted with clarification. The USFWS concurrence letter speaks for itself. *Id.* 1211-14.

34.     Admitted with clarification as to the first sentence. The Corps' determination regarding effects on species is documented in its Environmental Assessment and Statement of Findings, which speaks for itself. *Id.* 269. The Corps denies the Plaintiff's characterization in the second sentence "rather than consult with NMFS about the supplemental application and its potential effects on listed species and critical habitat, the Corps ended the consultation process . . ." The Corps contacted NMFS to inquire about packaging an expedited review process for the revised project and was instructed by NMFS to "not submit for consultation, expedited or normal track, until working it out with SAD." *Id.* 1310. Further, NMFS instructed "[t]he first step is determining coverage under SARBO and that must be done with SAD."[8] *Id.*

35.     Denied with clarification. Plaintiffs cite only a portion of the South Atlantic Regional Biological Opinion ("SARBO"). The entire SARBO is contained in separate

---

[8] "SAD" is the Corps' South Atlantic Division, the next highest level of command above the Savannah District. SAD makes the determination as to whether a project qualifies for coverage under the South Atlantic Region Biological Opinion, a programmatic Endangered Species Act Section 7 consultation with NMFS regarding dredging operations in the southeastern United States.

documents representing successive iterations and each speaks for itself. The first is the 1991 SARBO. *Id.* 308-22. The second is the 1995 SARBO. *Id.* 323-78. The third, and most current is the 1997 SARBO. *Id.* 379-96. The SARBO is supplemented by the 2017 South Atlantic Regional Biological Assessment ("SARBA"). *Id.* 397-521. The SARBA was prepared as a result of a request by the Corps' South Atlantic Division to reinitiate consultation under Section 7(a)(2) of the Endangered Species Act for dredging activities. *Id.* 406.[9] SAD determined the project qualifies under the SARBO/SARBA. *Id.* 1219. On March 27, 2020, NMFS issued the 2020 South Atlantic Regional Biological Opinion for Dredging and Material Placement Activities in the Southeast United States ("2020 SARBO"), *available at* https://www.fisheries.noaa.gov/content/endangered-species-act-section-7-biological-opinions-southeast (last visited Apr. 17, 2020). The 2020 SARBO provides ESA coverage for dredging and material placement activities under Corps jurisdiction, including sand placement for beach renourishment, as anticipated in the SARBA, AR 449. *See* 2020 SARBO at 16.

36. Admitted as to the first sentence. Admitted with clarification as to the second sentence. SIA's Supplemental Biological Assessment speaks for itself: the Biological Assessment addresses Atlantic Sturgeon (*id.* 1770-71) and Shortnose Sturgeon (*id.* 1771-73). SIA concluded that the project may affect, but is not likely to adversely affect, Atlantic and Shortnose Sturgeon (*id.* 1801). Federal Defendants clarify the assertion that SIA's January 2017 Revised Biological Assessment noted the killing of sturgeon by cutterhead dredging by noting that the Shortnose sturgeon were "taken" in the Delaware area and that there was no indication that Shortnose sturgeon frequent barrier island beaches (this Biological Assessment was for the project before the application was revised to include an offshore dredging component). *Id.* 2218-19. Admitted as to the last sentence.

---

[9] The SARBA contains a detailed description of the SARBO consultation history between NMFS and the Corps at AR 406-12.

37.     Admitted with clarification.  The SARBA speaks for itself.  *Id.* 397-521.  On March 27, 2020, NMFS issued the 2020 South Atlantic Regional Biological Opinion for Dredging and Material Placement Activities in the Southeast United States ("2020 SARBO"), *available at* https://www.fisheries.noaa.gov/content/endangered-species-act-section-7-biological-opinions-southeast (last visited Apr. 17, 2020).  The 2020 SARBO provides ESA coverage for dredging and material placement activities under Corps jurisdiction, including sand placement for beach renourishment, as anticipated in the SARBA, AR 449.  *See* 2020 SARBO at 16.

38.     Admitted with clarification.  The Corps verified SIA's use of Nationwide Permit No. 13, Bank Stabilization in anticipation of hurricane Florence and two other potential hurricanes.  The application (*id.* 183-218), Corps memorandum (*id.* 99-106), and permit verification letter (*id.* 93-98) speak for themselves.

39.     Admitted with clarification.  The permit and Corps Environmental Assessment speak for themselves.  *Id.* 1-44, 219-307.

40.     Admitted as to the first and second sentences.  Admitted with clarification to the third sentence.  With regard to the alleged deviations from the permit, the Corps addressed those deviations in its Addendum to the Environmental Assessment and Statement of Findings while evaluating SIA's request for permit modifications.  *Id.* 4639-47.

41.     Admitted with clarification.  SIA's request for permit modification speaks for itself.  *Id.* 5055-146.

42.     Admitted with clarification.  Plaintiffs cite and characterize the Corps' Memorandum for Record, which speaks for itself.  *Id.* 4639-47.

43.     Denied.

44.     Denied.

45.     Denied.

46.     Denied.

47.     Denied.

48.     Denied.

**B.     Response to Plaintiff Center for a Sustainable Coast's Statement of Facts and Conclusions of Law:**

1.     Admitted.

2.     Denied as to the first sentence.  Plaintiff's own comment letter dated January 15, 2016 speaks for itself.  AR 2039.  Admit that the southern portion of the island is bounded by the Black Banks River on the west, the Atlantic Ocean on the east, and Gould's Inlet on the south. *Id.* 654.  Admitted, with clarification, that a portion of the south end of the island it is protected by a conservation easement.  *Id.* 246-48, 1701.  The conservation easement speaks for itself.  *Id.* 4363-86.  Admitted that the southern portion of the island provides habitat for threatened and endangered sea turtles and shorebirds.  AR000238, AR001763.  Admitted that the Spit is part of the sand sharing system of the surrounding coastal barrier islands.  *Id.* 291-92.  Federal Defendants deny the remainder of the allegations.

3.     Admitted.

4.     Admitted with clarification.  Sea Island Acquisition's ("SIA's") application details the history of Sea Island's Shore Protection and speaks for itself.  *Id.* 1702-03.  Federal Defendants lack information sufficient to admit or deny that "no beach renourishment was ever conducted south of the southern groin of the spit."  Plaintiff's own comment letter dated January 15, 2016 speaks for itself.  *Id.* 2039.

5.     Denied with clarification.  Federal Defendants admit that shoreline erosion is occurring at the Spit but that multiple processes (including the construction of the existing groins) have contributed to that erosion.  *Id.* 233-35, 4137.

6.     Denied with clarification.  Federal Defendants admit that SIA has completed infrastructure development of the upland property into lots that are available for sale.  *Id.* 252, 4753.  Federal Defendants deny the remainder of the allegations.

7.     Denied with clarification.  Plaintiff's January 15, 2016 comment letter speaks for itself.

8.     Admitted.

9.      Admitted with clarification.  SIA's October 2015 and the Corps' 2018 Environmental Assessment and Statement of Findings speak for themselves.  *Id.* 3482, 232.

10.     Admitted with clarification.  Plaintiff's January 15, 2016 comment letter speaks for itself.

11.     Admitted.

12.     Denied that the Corps "received overwhelming opposition to the proposed project," which is Plaintiff's subjective characterization of the comments.  The public record of the public comments speaks for itself.  *Id.* 232-53, 548-58, 559-728, 1041-62, 1063-1116, 1159-61, 1164-76, 1179-1210, 1217-18, 1394-1400, 1890-93, 2038-140, 2141-82, 2183-2371, 2372-94, 2395, 2468-90, 2491-679, 2693-2862, 2684-92, 2863-3437, 3683-4101, 4105-386.

13.     Admitted.

14.     Admitted.  *Id.* 2680-83.

15.     Admitted that a groin is a hard structure, often constructed of rock, concrete, or steel, that is built perpendicular to the beach.[10]  The remainder of the paragraph is denied as irrelevant and immaterial insofar as it represents one individual's descriptions and characterization of groins and their effects, which have been disputed by others.  AR004259-AR004263.

16.     Denied.  Dr. Young's opinions regarding the negative impacts of groins were addressed by Dr. David R. Basco's Supplemental Comments, submitted as an attachment to SIA's July 24, 2018 response to public comments.  *Id.* 4259-63.

17.     Admitted with clarification.  The Corps' Coastal Engineering Manual speaks for itself.  *Id.* 4165.

---

[10] The Corps of Engineers defines a groin as follows: "Narrow, roughly shore-normal structure built to reduce longshore currents, and/or to trap and retain littoral material.  Most groins are of timber or rock and extend from a SEA WALL, or the backshore, well onto the foreshore and rarely even further offshore."  Engineer Manual (EM) 1110-2-1100 "Coastal Engineering Manual," Appendix A, page A-34, https://www.publications.usace.army.mil/Portals/76/Publications/EngineerManuals/EM_1110-2-1100_App_A.pdf?ver=2014-03-10-140035-443.

18.     Admitted with clarification.  The Corps' Coastal Engineering Manual contains the statement that "[c]oastal zone management policy in many countries and the United States presently discourages the use of groins for shore protection."  However, the rest of the paragraph in the Coastal Engineering Manual reads as follows:  "Many examples of poorly designed and improperly sited groins caused by lack of understanding of their functional design, or failure to implement the correct construction sequence, or failure to fill up the groin compartments with sand during construction, or improper cross-sectional shape are responsible for these restrictions.  However, when properly designed, constructed and combined with beach nourishment, groins can function effectively under certain conditions, particularly for increasing the fill life (longevity) of renourished beaches."  *Id.* 4167.

19.     Admitted with clarification.  Admitted that the Conservation Groups provided testimony and/or reports from Dr. Webb, Dr. Young, and Dr. Jackson.  SIA addressed the Conservation Groups' experts' testimony and/or reports by letter dated July 24, 2018 and provided testimony and/or reports by Dr. Timothy Kana, Dr. David Basco,[11] and Dr. George Oertel.  *Id.* 4105-386.

20.     Admitted.

21.     Admitted that the Conservation Groups submitted a letter signed by forty-three (43) coastal scientists explaining that groins can cause accelerated downdrift erosion.  Denied that the Corps shares the views expressed in the letter as suggested by the Plaintiffs.  *Id.* 2146-47.

22.     Denied with clarification.  Federal Defendants admit that Sea Island experiences erosion, but deny the characterizations of "dramatic" and "caused by the existing groins on Sea Island."  *Id.* 237.

23.     Admitted with clarification.  The Corps consulted with the Corps' Wilmington District coastal engineer, Kevin Conner, for an independent review of the reports of SIA's experts, Dr. Oertel and Dr. Basco, and the experts cited by the Plaintiffs, Dr. Webb and Dr.

---

[11] Dr. Basco is the author of the Corps' Coastal Engineering Manual, Part V, Section 3 "Shore Protection Projects," cited by the Plaintiffs and their experts.  *See* AR 4257.

Jackson. AR000235. The Corps did not base its conclusion regarding downdrift erosion solely on the opinion of Mr. Conner. *Id.* 235-238.

24. Denied. The Conner email speaks for itself. *Id.* 1970.

25. Denied. The Conner email speaks for itself. *Id.*

26. The first sentence is admitted with clarification. The Corps provided five (5) attachments to Mr. Conner in its request for review. *Id.* 1971, 1967. Specifically the Corp attached: 1) the report by Dr. Basco and Dr. Oertel entitled "Sea Island Beaches, Shoreline Dynamics and History of Erosion Control Projects" (*id.* 1973-2037); 2) Greenlaw comment letter dated January 15, 2016 (AR002038-AR002140); 3) Southern Environmental Law Center ("SELC") comment letter dated January 15, 2016 (*id.* 2141-82); 4) SIA's January 5, 2017 response to JPN comments (*id.* 2183-371); and 5) SELC's February 28, 2017 response to SIA's January 5, 2017 response to JPN comments (*id.* 2372-94). The second sentence is denied with clarification. The Greenlaw and SELC comment letters and the SELC response to SIA's response to JPN comments contain copies of Dr. Jackson's report (*id.* 2058-66), the letter signed by coastal scientists referred to in allegation of material fact number 14 above (*id.* 2092-95), Dr. Young's report (*id.* 2096-104), Dr. Webb's report (*id.* 2171-82), and the list of journal publications referred to in allegation of material fact number 13 above (*id.* 2146-47). The Greenlaw and SELC letters contain numerous quotes from and cites to their experts' reports and testimony.

27. Admitted.

28. Denied as irrelevant and immaterial. The letters from the Georgia Department of Natural Resources Wildlife Resources Division ("GADNR WRD") and the US Fish and Wildlife Service (USFWS) cited in this paragraph were written in 2015 regarding SIA's application for a Georgia Shore Protection Act permit for the groin. Since these letters were written, the project has been revised to include a significant beach nourishment element. The GADNR Coastal Resources Division ("GADNR CRD") has issued a Shore Protection Act Permit (*id.* 4483-504,

1014-1037) and the USFWS provided its concurrence that the project as revised may affect but is not likely to adversely affect the species in the vicinity of the project (*id.* 1211-14).

29.     Denied as irrelevant and immaterial for the reasons stated in paragraph 28 above.

30.     Admitted with clarification.  The April 2018 NMFS letter speaks for itself.  *Id.* 4102-04.

31.     Denied.  NMFS responded in a letter dated July 27, 2019 that the "Savannah District has complied with section 305(b)(4)(B) of the Magnuson-Stevens Act and 50 CFR 600.920(k)(1)."  *Id.* 837-38.

32.     Denied as irrelevant and immaterial.  Dr. Webb and Dr. Young provided testimony for purposes of a state administrative hearing relating to SIA's Shore Protection Act permit application and for the reasons stated in paragraph 28 above, the testimony is irrelevant and immaterial to the Project.[12]  Similarly, the Webb 2017 report was written before SIA amended its application to add the beach nourishment and offshore dredging component of the Project.

33.     Denied as irrelevant and immaterial for the reasons stated in paragraphs 32 above.

34.     Denied as irrelevant and immaterial for the reasons stated in paragraphs 32 above.

35.     Admitted in part and denied in part.  Federal Defendants admit that Dr. Young testified that the Program for the Study of Developed Shorelines ("PSDS") maintains a database of every beach and dune construction project for the entire country, that he is funded by the US Geological Survey to map every beach nourishment project on the East Coast, and that PSDS has been tracking nourishment activities on Sea Island for more than twenty (20) years.  However, the testimony of Dr. Young does not reflect that PSDS is "a joint research and policy center at Duke University and Western Carolina University" or that the Beach Nourishment Database is "by far the most comprehensive catalog of beach and dune restoration projects available."  Those

---

[12] The Administrative Law Judge in the state administrative proceeding ultimately concluded that "the evidence at the hearing was insufficient to support a finding that a beach nourishment project without a groin is a reasonable or viable alternative to the permitted project."  *Id.* 4323.

appear to be extraneous characterizations added by Plaintiff without evidentiary support and as such, are denied by the Corps. *Id.* 3982-83.

36. Admitted with clarification. Federal Defendants admit that paragraph 36 reflects Dr. Young's testimony. However, SIA's expert, Dr. Basco, responded to Dr. Young's testimony, which he determined to "take only a very superficial view of the design of the permitted project." *Id.* 4259-63. Further, the relevance and materiality of the Dr. Young's testimony regarding the PSDS and nourishment database is tenuous in that each project stands on its own, with its unique circumstances and context.

37. Admitted.

38. Admitted that Sea Island sustained damage from hurricanes Matthew and Irma, which further justifies SIA's project, the purpose of which is storm protection. *Id.* 4122. The Corps denies the second sentence of paragraph as vague in that it is unclear what area the Plaintiffs are referring to as the "developed area of the island."

39. Admitted.

40. Admitted with clarification. SIA's addendum to its application speaks for itself. *Id.* 1669-1889.

41. Denied as vague. SIA addressed the impacts of hurricanes Matthew and Irma in its July 28, 2018 response to comments. *Id.* 4105-386.

42. Admitted with clarification. SIA's addendum to its application speaks for itself. *Id.* 1669-1889.

43. Admitted with clarification. The March 20, 2018 Joint Public Notice speaks for itself. *Id.* 1619-98.

44. Denied that the Corps "received overwhelming opposition to the permit application and proposed project," which is Plaintiff's subjective characterization of the comments. The public record of the public comments speaks for itself. *Id.* 232-53, 548-58, 559-728, 1041-62, 1063-1116, 1159-61, 1164-76, 1179-1210, 1217-18, 1394-1400, 1890-93, 2038-140, 2141-82, 2183-

2371, 2372-94, 2395, 2468-90, 2491-679, 2693-2862, 2684-92, 2863-3437, 3683-4101, 4105-386.

45.     Admitted that the Conservation Groups submitted comments opposing the revised application.  Federal Defendants deny the remainder of the allegations.  *See id.* 219-307.

46.     Admitted.

47.     Admitted with clarification.  SIA's biological assessments speak for themselves. *Id.* 3543-68, 1730-1824.

48.     Admitted with clarification.  The USFWS concurrence letter speaks for itself.  *Id.* 1211-14.

49.     Admitted with clarification as to the first sentence.  The Corps' determination regarding effects on species is documented in its Environmental Assessment and Statement of Findings, which speaks for itself.  *Id.* 269.  The Corps denies the Plaintiff's characterization in the second sentence "rather than consult with NMFS about the supplemental application and its potential effects on listed species and critical habitat, the Corps ended the consultation process . . ."  The Corps contacted NMFS to inquire about packaging an expedited review process for the revised project and was instructed by NMFS to "not submit for consultation, expedited or normal track, until working it out with SAD."  *Id.* 1310.  Further, NMFS instructed "[t]he first step is determining coverage under SARBO and that must be done with SAD."[13]  *Id.*

50.     Denied with clarification.  Plaintiffs cite only a portion of the South Atlantic Regional Biological Opinion ("SARBO").  The entire SARBO is contained in separate documents representing successive iterations and each speaks for itself.  The first is the 1991 SARBO.  *Id.* 308-22.  The second is the 1995 SARBO.  *Id.* 323-78.  The third, and most current is the 1997 SARBO.  *Id.* 379-96.  The SARBO is supplemented by the 2017 South Atlantic Regional Biological Assessment ("SARBA").  *Id.* 397-521.  The SARBA was prepared as a

---

[13] "SAD" is the Corps' South Atlantic Division, the next highest level of command above the Savannah District. SAD makes the determination as to whether a project qualifies for coverage under the South Atlantic Region Biological Opinion, a programmatic Endangered Species Act Section 7 consultation with NMFS regarding dredging operations in the southeastern United States.

result of a request by the Corps' South Atlantic Division to reinitiate consultation under Section 7(a)(2) of the Endangered Species Act for dredging activities.  *Id.* 406.[14]  SAD determined the project qualifies under the SARBO/SARBA.  *Id.* 1219.  On March 27, 2020, NMFS issued the 2020 South Atlantic Regional Biological Opinion for Dredging and Material Placement Activities in the Southeast United States ("2020 SARBO"), *available at* https://www.fisheries.noaa.gov/content/endangered-species-act-section-7-biological-opinions-southeast (last visited Apr. 17, 2020).  The 2020 SARBO provides ESA coverage for dredging and material placement activities under Corps jurisdiction, including sand placement for beach renourishment, as anticipated in the SARBA, AR 449.  *See* 2020 SARBO at 16.

51.     Admitted as to the first paragraph.  Admitted with clarification as to the second sentence.  SIA's Supplemental Biological Assessment speaks for itself:  the Biological Assessment addresses Atlantic Sturgeon (*id.* 1770-71) and Shortnose Sturgeon (*id.* 1771-73).  SIA concluded that the project may affect, but is not likely to adversely affect, Atlantic and Shortnose Sturgeon (*id.* 1801).  Federal Defendants clarify the assertion that SIA's January 2017 Revised Biological Assessment noted the killing of sturgeon by cutterhead dredging by noting that the Shortnose sturgeon were "taken" in the Delaware area and that there was no indication that Shortnose sturgeon frequent barrier island beaches (this Biological Assessment was for the project before the application was revised to include an offshore dredging component).  *Id.* 2218-19.  Admitted as to the last sentence.

52.     Admitted with clarification.  The SARBA speaks for itself.  *Id.* 397-521.  On March 27, 2020, NMFS issued the 2020 South Atlantic Regional Biological Opinion for Dredging and Material Placement Activities in the Southeast United States ("2020 SARBO"), *available at* https://www.fisheries.noaa.gov/content/endangered-species-act-section-7-biological-opinions-southeast (last visited Apr. 17, 2020).  The 2020 SARBO provides ESA coverage for dredging

---

[14] The SARBA contains a detailed description of the SARBO consultation history between NMFS and the Corps at AR 406-12.

and material placement activities under Corps jurisdiction, including sand placement for beach renourishment, as anticipated in the SARBA, AR 449. *See* 2020 SARBO at 16.

53. Admitted.

54. Admitted with clarification. The Corps verified SIA's use of Nationwide Permit No. 13, Bank Stabilization in anticipation of hurricane Florence and two other potential hurricanes. The application (*id.* 183-218), Corps memorandum (*id.* 99-106), and permit verification letter (*id.* 93-98) speak for themselves.

55. Admitted with clarification as to the first sentence. The initial proffered permit speaks for itself. *Id.* 45-92. Federal Defendants deny the second sentence as it states a legal conclusion.

56. Admitted with clarification. The permit speaks for itself. *Id.* 1-44.

57. Admitted with clarification. The Corps Environmental Assessment speaks for itself. *Id.* 219-307.

58. Admitted with clarification. The Corps Environmental Assessment speaks for itself. *Id.* 232.

59. Admitted.

60. Admitted with clarification. The Center for a Sustainable Coast's 60 day Notice of Intent to Sue Letter speaks for itself. *Id.* 5174-92.

61. Admitted with clarification. Mr. Holland's e-mails speak for themselves. *Id.* 5591-5611, 5055-146.

62. Admitted with clarification. The Center for a Sustainable Coast's 60 day Notice of Intent to Sue Letter speaks for itself. *Id.* 5174-92.

63. Denied. With regard to the alleged deviations from the permit, Federal Defendants addressed those deviations in its Addendum to the Environmental Assessment and Statement of Findings, which speaks for itself. *Id.* 4639-47.

64.    Denied that "SIA asked the Corps to sanction such violations through a permit modification."  Admitted with clarification as to the remainder of the allegations.  SIA's request for permit modification speaks for itself.  *Id.* 5055-146.

65.    Denied that the Corps "lack[ed] authority to sanction all of the numerous violations, including those outside of Corps' jurisdiction."  Plaintiff cites and characterizes the Corps' Memorandum for Record, which speaks for itself.  *Id.* 4639-47.  Plaintiff describes and characterizes the July 5, 2019 amendment to SIA's permit, which speaks for itself.  *Id.* 4628-38.  Federal Defendants deny the remainder of the allegations.

66.    Denied.

67.    Admitted that Federal Defendants did not provide notice and opportunity for public comments for the permit modification.  Federal Defendants deny the remainder of the allegations.

68.    Denied with clarification.  The permit modification speaks for itself.  *Id.* 1014-37.

69.    Admitted with respect to the allegation that Plaintiff is a not-for-profit organization that seeks to ensure and improve the responsible use, protection, and conservation of Georgia's coastal resources – natural, historic, and economic – for all Georgians, including future generations.  Denied as to the remaining allegations.  In addition, Plaintiff cites to no administrative record citation.  As such, the allegation is unsupported, in violation of Local Rule 56.1.  *See* L.R. 56.1 (stating that "each statement of material fact shall be supported by a citation to the record.").

70.    Admitted with respect to the allegation that Plaintiff as an organization actively monitors and participates in decisions and activities, including policies, ordinances, legislation, permits and construction activities, impacting the Georgia coast, such as the project and permits at issue here.  Denied as to the remaining allegations.  In addition, Plaintiffs cite to no

administrative record citation. As such, the allegation is unsupported, in violation of Local Rule 56.1. *See* L.R. 56.1 (stating that "each statement of material fact shall be supported by a citation to the record.").

71. Denied. Plaintiffs cite to no administrative record citation. As such, the allegation is unsupported, in violation of Local Rule 56.1 *See* L.R. 56.1 (stating that "each statement of material fact shall be supported by a citation to the record.").

72. Denied. Plaintiffs cite to no administrative record citation. As such, the allegation is unsupported, in violation of Local Rule 56.1 *See* L.R. 56.1 (stating that "each statement of material fact shall be supported by a citation to the record.").

73. Denied. Plaintiffs cite to no administrative record citation. As such, the allegation is unsupported, in violation of Local Rule 56.1 *See* L.R. 56.1 (stating that "each statement of material fact shall be supported by a citation to the record.").

74. Denied.

75. Denied.

76. Denied.

77. Denied.

78. Denied.

79. Denied.

Respectfully submitted April 17, 2020 by

PRERAK SHAH
Deputy Assistant Attorney General

*s/ Dedra S. Curteman*
DEDRA S. CURTEMAN
HUBERT LEE
MARK ARTHUR BROWN
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 7611, Washington, D.C. 20044

(202) 305-0446 (Curteman)
(202) 514-1806 (Lee)
(202) 305-0204 (Brown)
dedra.curteman@usdoj.gov
hubert.lee@usdoj.gov
mark.brown@usdoj.gov

BOBBY L. CHRISTINE
UNITED STATES ATTORNEY

s/ *Bradford C. Patrick*
BRADFORD C. PATRICK
Assistant United States Attorney
South Carolina Bar No. 102092
U.S. Attorney's Office
Post Office Box 8970
Savannah, Georgia 31412
(912) 652-4422
bradford.patrick@usdoj.gov

*Counsel for the U.S. Army Corps of Engineers*

*Of Counsel*
JOHN E. BALLARD
Assistant District Counsel
United States Army Corps of Engineers