IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| ALTAMAHA RIVERKEEPER, *et al.*,<br><br>　Plaintiffs,<br><br>v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS, *et al.*,<br><br>　Defendants,<br><br>and<br><br>SEA ISLAND ACQUISITION, LLC,<br><br>　Defendant Intervenor. | Case No. 4:18-cv-00251-JRH-JEG |

**SEA ISLAND ACQUISITION, LLC'S STATEMENT OF MATERIAL
FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF
<u>CROSS MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Rule 56.1 of the Local Rules of the U.S. District Court for the Southern District of Georgia, Defendant Intervenor Sea Island Acquisition, LLC (Sea Island) submits this statement of material facts as to which there is no genuine dispute and conclusions of law in support of its Cross Motion for Summary Judgment.

**History of Erosion on Sea Island**

1.　Erosion has long been a source of concern at Sea Island and has been extensively studied. *See, e.g.*, Memorandum for Record (MFR), AR000219 at AR000221-31; Permit Application (October 15, 2015) (2015 Application), AR003479 at AR003518-38 (Oertel & Basco Report). Because of this erosion, the developed oceanfront property on Sea Island was protected decades ago, initially by rock revetments and sloping concrete seawalls installed in the late 1970s and early 1980s. Oertel & Basco Report at AR003530-33. By 1990, the revetments

and seawalls ran for over three miles along the beach and were sufficient to halt the retreat of the shoreline, but there was no high tide beach in many areas along the Sea Island shoreline. *Id.*

2.      In the 1990s, Sea Island obtained permits from the State and the Corps to nourish the beach with over two million cubic yards of sand from offshore sources and to construct two groins, one on the north end of the island and the other about three miles south. *Id.* The initial north and south groins were designed to hold the nourishment sand that migrates north and south from the center of the island, so that sand could be routinely recycled to rebuild and restore eroded areas using sand collected at the groins. *Id.* at AR003532. This project was successful in protecting the Sea Island developed shoreline; until recent events, there had been no need for further dredging or beach nourishment since the late 1990s. *See id.*; Amendment to Permit Application (March 6, 2018) (Application Amendment), AR001699 at AR001702-03; MFR at AR000306-07 (chart detailing Corps permits for issued to Sea Island in connection with beach nourishment).

### Permit Application for Erosion Protection at the Reserve

3.      While the system of a nourished beach buttressed by groins at each end, together with ongoing beach maintenance and recycling of sand collected from the groins, protected much of the Sea Island shoreline, erosion continued unabated at the Reserve, a newly developed and unprotected area located immediately south of the pre-existing south groin. 2015 Application at AR003481. The Reserve, a small development comprised of eight home sites, extends 1,200 feet south of the pre-existing south groin. Permit, AR000001, at AR000028 (Proposed Groin & Dune Plan). Sea Island has completed infrastructure development of the upland property at the Reserve, from county zoning and plat approval to installation of the road, bridges, and utilities. Supplemental Response to Comments (July 24, 2018) (Suppl. RTC), AR004105 at AR004112.

4. In 2015 Sea Island submitted a joint application to the Corps and the State of Georgia for a permit to extend the 1990s beach nourishment project southward by building a new, shorter groin and creating a constructed dune and nourished beach at the Reserve. 2015 Application at AR003479. No offshore dredging was initially requested, as there was at that time sufficient sand on the Sea Island beach to provide the material needed for the project at the Reserve. *Id.* at AR003483-84; MFR at 000241.

5. Sea Island owns all the land south of the Reserve. In 2015 Sea Island donated to the St. Simons Land Trust a Conservation Easement over all the land south of the Reserve, which prohibits any development except for shoreline engineering projects that extend no more than 160 feet south of the southern boundary of the Reserve. MFR at AR000246-47; 2015 Application at AR003490.

6. The area at the far south end of Sea Island that is properly denoted the "Spit" does not include the Reserve. MFR at AR000227 (map depicting shoreline segments).

7. While there is no public access from the upland to the beach on Sea Island, including the beach at the Reserve (just as there is limited access to most of Georgia's barrier islands), there is an unfettered right for any person to land a boat on the beach at Sea Island. Kayakers routinely paddle down Postell Creek or Black Bank River, land at the Spit, and walk along the shore. MFR at AR000240. The Administrative Record before the Corps reflects no effort to interfere with that use. *Id.*

**Challenge to the Georgia Shore Protection Committee Permit**

8. On December 11, 2015, the Georgia Shore Protection Committee (SPC) granted Sea Island a permit for the groin and constructed dune and beach nourishment work at the Reserve using sand from Sea Island beach north of the existing south groin. Shore Protection Committee Permit #438 (SPC Permit #438), AR004483.

3

9. Several of the plaintiffs in this case (ARK, OHM and Surfrider) challenged SPC Permit #438 by filing a petition with the Georgia Office of State Administrative Hearings (OSAH), claiming that the SPC had not adequately considered alternatives and that the project would have significant adverse environmental effects to sea turtles, shorebirds, and the sand-sharing system more generally. Suppl. RTC, Attachment F, at AR004294.

10. After four days of testimony from nearly twenty witnesses, including multiple experts, the administrative law judge (ALJ) issued a 46-page order that considered and rejected many of the same assertions Plaintiffs raise in this case. *Id.*

11. The ALJ found that the project's design would minimize adverse effects to the sand-sharing system, that any incidental effects to wildlife would not be unreasonable, and that the permit conditions would provide an additional environmental failsafe. *Id.* at AR004336-38.

12. The ALJ found that the evidence at the hearing was "insufficient to establish the existence of a reasonable or viable alternative" to the permitted groin. *Id.* at AR004335 n.52.

13. The ALJ found that the project area "does not attract significant numbers of piping plover and red knot due to human activity and the absence of dry beach above high tide," and that these birds are primarily located "on the low tide beach, sand flats, shoals, and sand bars in and around Gould's Inlet." *Id. at* AR004320.

14. The ALJ rejected Plaintiffs' contention that the project would interfere with the public's use and enjoyment of public lands. *Id.* at AR004339.

15. The ALJ affirmed SPC Permit #438, holding that "[w]eighed against Sea Island's interest in protecting its valuable upland property, the modest adverse impacts of the permitted project are not unreasonable." *Id.* at AR004336.

4

16. Plaintiffs appealed that decision to Fulton County Superior Court, which upheld the ALJ's findings in all respects. *Altamaha Riverkeeper, Inc. v. Shore Protection Comm.*, No. 2016-CV-280501 (Fulton Cty. Super. Ct. Dec. 22, 2016).

17. SPC Permit #438, along with its special conditions and other requirements, remains in full force and effect. *See* MFR at AR000241.

### Revised Application to Include Beach Nourishment and Offshore Dredging

18. While Sea Island's joint permit application was pending with the Corps, the Georgia coast was hit with two "one hundred-year" storms—Hurricane Matthew in October 2016 and Hurricane Irma in September 2017. Application Amendment at AR001700-03. The hurricanes reduced the beach profile along the entire Sea Island shoreline, leaving much of the Island without a dry sand beach. *Id.* The result was that the entire Sea Island shoreline had significantly diminished storm protection, reduced recreational beach, and little to no sea turtle nesting habitat. *Id.* The Reserve development in particular was at serious ongoing risk from storm damage and continuing erosion. *Id.* In the wake of the hurricanes, Sea Island needed not only to protect the Reserve but also to replenish the entire nourished beach. *Id.*

19. In the aftermath of Hurricane Matthew, Sea Island retained a consultant to evaluate the damage to the shoreline and to assist the company in preparing an Amended Permit Application. AR001700.

20. In March 2018, Sea Island revised the pending application with the Corps to include offshore dredging and the addition of over 1 million cubic yards of sand to the Sea Island beach to improve the storm protection functions of the beach, increase wildlife habitat (for sea turtles in particular), and enhance recreation. *Id.* The revised project extends from the existing north groin on Sea Island to the new groin located 1,200 feet south of the pre-existing south groin, a distance of more than three miles. *Id.* at AR001701, AR001877 (overall project map).

5

This nourishment plan included sufficient added volumes of sand "to restore the deficit in the area between the existing groins, including the volume necessary to accommodate the Reserve project, plus advance nourishment to account for anticipated future erosion." AR001714. The Amended Application did not alter plans for the proposed new groin at the Reserve.

21. Separately, Sea Island sought and obtained a SPC permit for the offshore dredging and beach nourishment, which Plaintiffs neither opposed nor appealed. Georgia Shore Protection Committee Permit #461 (SPC Permit #461), AR001014.

22. The entire groin construction, offshore dredging, and beach nourishment project was financed privately, with no funding support from any local, state, or federal governmental agency. Suppl. RTC at AR004106.

23. SPC Permits #438 and #461 included revocable licenses from the State that authorized use of state-owned waterbottoms. AR002290, AR001023. In addition, Sea Island secured a mineral lease from the State Properties Commission. *Id.*

**Agency Consultation**

24. The Corps compiled an administrative record documenting review of the project by the Georgia Department of Natural Resources (Georgia DNR), Georgia Department of Environmental Protection (Georgia EPD), U.S. Fish & Wildlife Service (USFWS), National Marine Fisheries Service (NMFS), and others as well as the Corps. MFR at AR000241-42, AR000267-70, AR000281, AR000288, AR000290-92, AR000294-97.

25. The Corps consulted with NMFS under Section 7 regarding the effects of groin construction, which NMFS determined was "not likely to adversely affect listed species under NMFS's purview." NMFS Oct. 19, 2017 Concurrence Letter, AR001896 at AR001900 ("all

6

potential project effects to listed species were found to be discountable, insignificant, or beneficial").

26.     The Corps consulted with NMFS regarding effects of the project on essential fish habitat in compliance with the Magnuson-Stevens Fishery Conservation and Management Act. NMFS Apr. 20, 2018 Letter, AR004102; NMFS July 27, 2018 Letter, AR000837.

27.     In its letter dated April 20, 2018, NMFS provided two conservation recommendations (CRs) pertaining to the amended project: (1) eliminating the T-head groin; and (2) limiting work to the extent practicable to the season of low biological activity. AR004102.

28.     On July 17, 2018, the Corps responded that it would follow CR 2 but not CR 1. AR000926. As for not adopting CR 1, the Corps explained that "footprint of the project . . . represents a relatively small area of habitat . . . that is utilized by the" wildlife at issue, and that "ample habitat is located both upstream and downstream of the [P]roject site that these species could relocate to." *Id.* In incorporating CR 2 as a special condition, the Corps required all work to be completed between November 1st and April 30th, outside sea turtle nesting season. *Id.*

29.     The Corps consulted with USFWS under Section 7 regarding effects of the groin and beach nourishment on numerous species under that agency's jurisdiction, including several species of sea turtles, shorebirds, and the West Indian manatee. MFR at AR000266-70. USFWS found that the project included "measures to avoid and minimize impacts" to listed species, and agreed with the Corps that the project was not likely to adversely affect these species. USFWS May 22, 2018 Concurrence Letter, AR001211 at AR001212.

30.     USFWS in its May 22, 2018 concurrence letter concluded that there would be no adverse impacts to threatened and endangered species, including piping plovers: "The project includes a supplementary biological assessment (BA) with measures to avoid and minimize

7

impacts. Because these measures are included in the project, the Service concurs with your determination for all species." AR001211 at 1212.

31. The Corps determined that the effects of dredging and beach nourishment on other listed species were covered under NMFS's 1997 SARBO and SARBA—a determination that NMFS specifically noted that the Corps should make and that NMFS did not dispute. NMFS May 1, 2018 Email, AR001310; MFR at AR00269-70.

32. The Corps received no comments during the public comment period objecting to the beach nourishment aspect of the project. Suppl. RTC at AR004106.

33. No commenters objected to the offshore dredging aspect of the revised application during the public comment period, either to the location or depths of dredging, the method of dredging, or any concerns about potential impacts to threatened or endangered species. Suppl. RTC at AR004106.

### Issuance of the Corps Permit

34. The Corps issued the Permit for the revised project on September 12, 2018. AR000001. The Permit includes seven general conditions as well as nine special conditions, many with multiple subparts. These conditions assure that the groin and nourishment project does not cause adverse effects. The Permit requires, for example, that all work take place between November 1st and April 30th to avoid turtle nesting season. *Id.* at AR000003 (Special Condition (1)(a)). The Permit also imposes extensive measures to ensure that the sand deposited on the beach is of sufficiently high quality. *Id*. at AR000004-05 (Special Condition (2)). In addition, the Permit requires extensive monitoring of the project before, during, and after construction, for the next five years. If the Corps determines the groin is causing negative impacts to the sand-sharing system, Sea Island must submit a corrective action plan to the Corps and Georgia DNR. *Id*. at AR000003-07 (Special Conditions (1)(c), (d) & (4)-(8)).

35. Properly designed groins can mitigate adverse effects, as referenced in the Corps' Coastal Engineering Manual and other scientific literature and as determined by the Corps. *See, e.g.*, MFR at AR000233-38, AR000256-62.

36. The Corps set forth its findings regarding the permitted project in its Memorandum for Record. AR000219. The MFR concluded that "[b]ased on the design of the project and proposed special condition, the Corps has determined that the project would have a minimal individual and cumulative adverse impacts on the sand sharing system." *Id.* at AR000292. The Corps further found that the overall project would provide a "minor beneficial effect on shoreline erosion and accretion." *Id.* at AR000283.

37. The Corps' decision, as explained in the MFR, relied in part of the independent review of the project by Mr. Kevin Conner, a coastal engineer in the Corps' Wilmington District.

38. The Corps provided Mr. Conner with over 400 pages of material relating to Plaintiffs' claims. The specific items are listed at AR001967 and are replicated in the administrative record at AR001973 to AR002394. These materials included:

- GreenLaw's 20-page comment letter dated January 15, 2016, with 82 additional pages of attachments, including the reports of Dr. Chester Jackson and Dr. Robert Young as well as a statement of coastal scientists opposed to groins (AR002038-140);
- SELC's 23-page comment letter dated January 15, 2016, with 18 additional pages of attachments, including the expert report of Dr. Webb (AR002141-82); and
- SELC's 22-page comment letter dated February 28, 2017 (AR002372-94).

39. Mr. Conner determined that the new groin would extend the overall length of the pre-existing groin field by only about 8%. MFR at AR000235. Mr. Conner also found that "it is

9

unlikely that the construction of a new shorter groin just south of the existing southern groin would interrupt sediment transport in any measurable way under the current system." *Id.* at AR000292.

40. Mr. Conner made his findings prior to Sea Island's submission of its Amended Permit Application in March 2018.

41. The Corps concluded that the low profile of the permitted groin would allow sand to pass over the structure, and that the use of armor stone would allow sand to pass through the structure. MFR at AR000293.

42. Addressing the beach nourishment aspect of the project as amended, the Corps found that the introduction of over 1 million cubic yards of sand "would allow the beach between the groins to eventually reach an equilibrium state and thus allow some sand to bypass the groins and travel downdrift to the spit and potentially to St. Simon's Island, including East Beach." *Id.*

43. The Corps Permit specifically authorized placement of dredged material both above and below the mean high water line along the beach. *See* Permit at AR000020-23, AR000031 (cross-sections of permitted beach nourishment and dune construction, extending well above mean high water).

44. The small segment of beach located between the new tapered groin and the existing south groin is not preferred piping plover habitat given the high level of human use and the existence of extensive preferable habitat to the south (at Gould's Inlet) and also to the north (at Little St. Simons). As the Corps found, the piping plover "prefers to utilize uninhabited areas of the shoreline (i.e. away from human interaction) and are therefore found primarily at the northern and southern ends of inhabited islands"; as a result, "piping plover usage near or within the proposed project area is expected to be low." MFR at AR000249-50.

10

45. The Permit issued by the Corps includes requirements to monitor sand movement within the area between the pre-existing southern groin and new permitted groin as well as downdrift of the groins. If the results of the monitoring indicate that the new groin is trapping sand, Sea Island would be required to submit a corrective action plan." Permit at AR000006.

46. The Corps found that the incremental contribution of the permitted project to cumulative impacts would not be significant. MFR at AR000249-50.

47. The Corps concluded that "this permit action will not have a significant impact on the quality of the human environment." MFR at AR000304. It therefore found that no Environmental Impact Statement was required. *Id.*

48. In the MFR, the Corps analyzed three alternatives that require beach nourishment without the Proposed Groin. AR000258-62. With respect to Plaintiffs' suggested "least environmentally damaging practicable alternative"—nourishment from the pre-existing south groin to the end of the Spit—the Corps found that it was outside the scope of the Project, thus not practicable, because it would not meet the overall Project purpose. *Id.* at AR000258. The Corps also concluded that if Sea Island nourished the full length of the area south of the pre-existing south groin (roughly a mile), the storm protection would be only temporary. *Id.* at AR000257-AR000258.

49. The Corps' MFR spends several pages addressing the issue of public access, ultimately rejecting the concerns raised. MFR at AR000238-42. The Corps Permit further addresses the issue, stating that it does not grant Sea Island "any property rights or exclusive privileges" and likewise "does not authorize any injury to the property or rights of others." Permit § 2.b.(2) & (3) at AR000008.

11

50. In deciding no hearing was needed, the Corps explained that those at the agency were "able to thoroughly evaluate the permit using the information . . . gathered through consultations with reviewing agencies, all of the public comments received and the applicant's responses to the public comments, as well as other sources." Corps Sept. 5, 2018 Hearing Letter, AR000522. The Corps also determined that a public hearing would not provide any "additional information necessary for evaluating the proposed permit." *Id.* In support of that determination, the Corps prepared a Decision Paper further detailing its analysis. AR000543-47. Among other things, the Corps explained that the hearing requests failed to specify why a public hearing would be necessary to present additional information and noted that it had already received extensive public comments, including several from technical experts. *Id.* at AR000545-46.

## Implementation of the Project

51. Sea Island initiated offshore dredging on January 4, 2019, which continued until March 7, 2019. Interim Status Report, AR004754. The dredged material, over 1 million cubic yards of sand, was placed in the project area, extending from the Reserve (Reach 1) to approximately 36th St. (Reach C). *Id.* at AR004755. Sand was also excavated from the area north of the south groin (Reach A) and mechanically transferred into the Reserve by truck. *Id.*

52. The Administrative Record contains no evidence that offshore dredging operations resulted in any take of threatened or endangered species.

53. Some of the material in the offshore borrow site included finer-grained sand than anticipated and, as a result, dredging operations deviated slightly from authorized depths at some locations. *Id.* at AR004755-57 ("93.0% of excavations were within design cut depths"). In addition, the finer-grained material posed issues in dewatering and in constructing the beach and dune areas. *Id*. The dredged material required extensive mechanical management after discharge from the dredge pipe into the Reserve, and the dune feature as constructed was slightly lower and

12

slightly wider than the template shown in the Permit drawings. *Id*. at AR004759-60. Sea Island explained that the constructed dune was tied in to the preconstruction escarpment to meet the project objectives and to be consistent with good engineering practices. *Id*. at AR004759.

54. After the dredged material was placed on the beach in early 2019, surf conditions caused unusual erosion. *Id.* at AR004757. The Permit authorized the recycling of dredged sand from below the mean lower low water mark to maintain the project and to correct unusual erosion rates caused by discrete events. AR000001. To address the erosion, Sea Island recycled material from both Reach A and Reach C borrow areas. Interim Status Report at AR004757.

55. Material was borrowed from Reach C at the request of the Wildlife Conservation Section of Georgia DNR to separate the beach from the offshore sandbar known as Hupp's Bar in order to protect the shorebird nesting habitat there. *Id.*; Permit Modification Request, AR005055 at AR005065 (Georgia DNR Feb. 8, 2019 Letter).

56. The groin was constructed in the location authorized by the Permit, with the seaward end located as originally designed, and the stem of the groin running 350 feet landward. Interim Status Report at AR004758 & AR004958 (survey of groin as initially constructed).

57. The seaward location of the new groin maintained the tapered groin effect that is a key aspect of the design, to be consistent with the Corps' Coastal Engineering Manual. *Id.* at AR004758.

58. After beach nourishment, a tie-in was constructed to extend the groin further landward, consistent with the project concept and design and with good engineering practices. *Id.* at AR004758 & AR004962 (survey of groin with groin tie-in). The groin tie-in was located landward of the Corps' jurisdiction limits, and it became buried under the nourished beach and constructed dune. *Id.* at AR004758-59.

59. The majority of the constructed dune portion of the project is located landward of the Corps' jurisdictional limits. *Id.*

### Permit Modification

60. The permitted project was a complex and multi-faceted undertaking that involved dredging material from a borrow site three miles offshore; pumping that material to the beach; dewatering and managing the dredged material; nourishing over three miles of beach with over one million cubic yards of dredged material plus sand transported by trucks from Reaches A and C; and construction of the groin and constructed dune at the Reserve. Interim Status Report at AR004754-60.

61. Sea Island submitted a Permit Modification Request on May 24, 2019 (Permit Mod Request). AR005055.

62. The Corps consulted with USFWS on Sea Island's Permit Modification Request. By letter dated June 21, 2019, USFWS stated it had no objection to the Permit Modification and that the modification did not change its concurrence with the Corps' ESA determination. AR004650. *See also* Permit Modification Memorandum for Record (Permit Mod MFR), AR004639 at AR004646.

63. The Corps evaluated the requested revisions in the Permit Modification Request and determined they would cause no further impacts to protected species or other resources. *Id.* at AR004642-46.

64. The Corps agreed that the groin tie-in and much of the constructed dune were above the Corps' jurisdiction line and noted that placement of material would have likely been verified under Nationwide Permit 45, which authorizes the repair of uplands damaged by discrete events. *Id.* at AR004640-41.

65. The Corps' Permit Modification did not authorize extending the groin any further into the ocean than originally permitted; rather, the seaward portion of the groin was constructed in the same location initially authorized. Interim Status Report at AR004758-59; Permit Modification (Permit Mod), AR004617 at AR004626 (overlay of as-built groin and dune onto permit groin and dune plan).

66. The landward extension of the groin tie-in was located beneath the newly added beach nourishment and constructed sand dunes that connected with the upland. AR004758-59. The Corps explained its reasoning in the Permit Mod MFR, AR004639, and issued the Permit Modification on July 5, 2019, AR004617.

67. The Corps evaluated not only the information presented by Sea Island in its Permit Modification Request, AR005055, but also the extensive allegations set forth by CSC in its April 24, 2019 letter, AR005174-92.

68. The Permit Mod MFR sets forth each alleged noncompliance event included in CSC's April 24, 2019 letter: the placement of the dredged sand outside of the permitted project footprint (AR004640); the excavation of sand from Reach A and placing it within the new groin cell (AR004642); and the alleged failure to properly fill the new groin cell (AR004643). For each alleged violation, the Corps sought a direct explanation from Sea Island, evaluated the activity and explanation in light of overall Permit requirements, and determined a proper response, as detailed in the Permit Mod MFR. *Id.*

69. Sea Island submitted a post-construction survey of sand in the cell adjacent to the Reserve and, as the Corps found in the Permit Mod MFR, the survey showed that the groin was filled as originally approved. AR004643. Sea Island has an ongoing obligation under the Permit

that ensures the sand system is "continually monitored," and the Corps has authority to require corrective action if the activity causes negative impacts to the sand-sharing system. *Id.*

70. Sea Island reported that the dredging contractor had slightly exceeded the authorized cut depths in approximately 7% of the total borrow area of 254 acres located three miles offshore. Interim Status Report at AR004755-56. The Corps concluded that these exceedances of the approved dredging depths were "minor and did not change any of the effect determinations and evaluations made in the Corps EA." Permit Mod MFR at AR004644.

71. The Corps walked through the changes in Sea Island's requested modification, the allegations from CSC, and concluded "that the proposed modifications are in the public interest, in compliance with the 404(b)(1) guidelines and would not have a significant effect on the human environment." Permit Mod MFR at AR004646.

## Groin Tie-In Removal

72. Although the Corps approved the groin tie-in, AR004628, Georgia DNR, through its own independent regulatory authority, required its removal.

73. This work has been accomplished, leaving the length of the constructed groin the same as initially permitted, prior to the Permit Modification. Notice of Groin Tie-In Removal Pursuant to Consent Order Between the Georgia Department of Natural Resources and Sea Island Acquisition, ECF No. 75. *See also* Declaration of Daniel Bucey. ECF No. 75, at Ex. 1. DNR staff inspected the groin on March 20, 2020, and confirmed that the tie-in had been satisfactorily removed. *Id.* ¶ 7. The length of the groin following removal is "the same as originally permitted" by the Corps prior to the Permit Modification. *Id.* ¶ 6.

**2020 SARBO**

74.     The Corps issued the Permit for the current project in anticipation that the Section 7 consultation process would be concluded and the 2020 SARBO would be issued, ECF No. 74 at 2, and the new biological opinion directly addresses the activities at issue here.

75.     The 2020 SARBO supersedes the 1997 SARBO/SARBA. The 2020 SARBO addresses "borrow area dredging" (also referred to as "beach sand mining") for beach nourishment projects, including those where the borrow area is located offshore in state waters under the Corps' jurisdiction. 2020 SARBO at 28-29, 522. It addresses the placement of sand "on eroding beaches to enhance beach habitat for human and animal use and/or to provide storm risk management benefits to coastal structures" for beach nourishment projects. 2020 SARBO at 29-31, 523-24. It addresses dredging and beach nourishment projects conducted by private parties under Corps permits issued pursuant to its "[r]egulatory authority to permit beach nourishments under Section 10 of the Rivers and Harbors Act and Section 404 of the Clean Water Act." 2020 SARBO at 29-30, 68. And it addresses potential effects to sturgeon, as well as critical habitat designated after the 1997 SARBO was issued, concluding that authorized activities would not appreciably reduce the survival or recovery of these species. 2020 SARBO at 391-96, 409-11, 640.

**Conclusions of Law**

76.     Plaintiffs failed to carry their mandatory burden to establish the constitutional requirements of standing as to each of their causes of action and requests for relief.

77.     Plaintiffs' claims are moot to the extent they object to the extended groin tie-in beyond that authorized under the initial Permit.

78.     Plaintiffs' claims are moot to the extent they object to the Corps' reliance on the 1997 SARBO / 1997 SARBA.

79.     Because Plaintiffs failed to first raise any environmental concerns regarding the offshore dredging component of the Permit with the Corps during the permitting process, any claims related to those purported harms are waived.

80.     Because Plaintiffs failed to first raise any environmental concerns regarding the additional beach nourishment component of the Permit with the Corps during the permitting process, any claims related to those purported harms are waived.

81.     Because Plaintiffs failed to first raise any objections to the geographic scope of the cumulative impacts analysis with the Corps during the permitting process, any claims pertaining to this aspect of the Corps' cumulative impact analysis are waived.

82.     Because Plaintiffs failed to first raise any objections regarding access to the public beach on Sea Island by foot with the Corps during the permitting process, any claims pertaining to this contention are waived.

83.     The Corps complied with all applicable requirements under NEPA in issuing the requested Permit and Permit Modification to Sea Island.

84.     The Corps adequately considered potential cumulative impacts before issuing the requested Permit and Permit Modification to Sea Island.

85.     The Corps' conclusion that the Permit and Permit Modification would not result in significant cumulative impacts was not arbitrary and capricious.

86.     The Corps' decision not to prepare an Environmental Impact Statement was not arbitrary and capricious.

87. The Corps complied with all applicable requirements under the Clean Water Act in issuing the requested Permit and Permit Modification to Sea Island.

88. The Corps complied with the Clean Water Act by adequately considering any purported less environmentally damaging practicable alternatives.

89. The Corps complied with all applicable requirements under the Endangered Species Act in issuing the requested Permit and Permit Modification to Sea Island.

90. The Corps Complied with all applicable requirements under the Administrative Procedure Act in issuing the requested Permit and Permit Modification to Sea Island.

91. The minor deviations from the work authorized by the Permit did not preclude the Corps from issuing the Permit Modification.

92. The Corps complied with all applicable requirements to consult with other federal agencies in issuing the Permit and Permit Modification.

93. The Corps' determination that the Permit and Permit Modification would not unduly interfere with public access to the Sea Island beach was not arbitrary and capricious.

94. The Corps' decision not to hold a public hearing prior to issuing the Permit and Permit Modification was not arbitrary and capricious.

95. The Corps complied with all applicable Corps regulations in issuing the Permit Modification.

Respectfully submitted this the 17th day of April, 2020.

| HALL BOOTH SMITH, P.C. | KING & SPALDING LLP |
|---|---|
| | |
| JAMES B. DURHAM | /s/ Patricia T. Barmeyer |
|    Georgia Bar No. 235526 | PATRICIA T. BARMEYER |
| 3528 Darien Highway, Suite 300 |    Georgia Bar No. 038500 |
| Brunswick, Georgia 31525 | RANDY J. BUTTERFIELD |
| Phone: (912) 554-0093 |    Georgia Bar No. 100120 |
| Fax:   (912) 554-1973 |    (admitted *pro hac vice*) |
| Email: jdurham@hallboothsmith.com | 1180 Peachtree Street NE |
| | Atlanta, Georgia 30309-3521 |
| | Phone: (404) 572-4600 |
| | Fax:   (404) 572-5137 |
| | Email: pbarmeyer@kslaw.com |
| |        rbutterfield@kslaw.com |

*Attorneys for Sea Island Acquisition, LLC*

### CERTIFICATE OF SERVICE

This is to certify that I have this day, April 17, 2020, served a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter:

                                                  /s/ Randy J. Butterfield
                                                  RANDY J. BUTTERFIELD