IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| ALTAMAHA RIVERKEEPER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES ARMY CORPS OF ENGINEERS, *et al.*, <br><br> Defendants, <br><br> and <br><br> SEA ISLAND ACQUISITION, LLC, <br><br> Defendant Intervenor. | Case No. 4:18-cv-00251-JRH-JEG |

**SEA ISLAND'S RESPONSE TO THE STATEMENT OF MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
FILED BY PLAINTIFFS ALTAMAHA RIVERKEEPER, ONE HUNDRED MILES,
AND SURFRIDER FOUNDATION**

All parties have agreed that this case is based on the Administrative Record compiled by the U.S. Army Corps of Engineers and filed with the Court. That record includes submissions by Sea Island as well as submissions by the Plaintiffs and other opponents of the Permit. As a result, the Administrative Record includes many conflicting and contradictory statements, but there are and can be no real disputed facts.

In large part, the Statement of Material Facts submitted by the Altamaha Riverkeeper, One Hundred Miles, and Surfrider Foundation (referred to together as "ARK") consists of one-sided assertions cherry-picked from the record to support the Plaintiffs' claims; of course, the Record includes documents with conflicting information and opinions. This response admits material facts that are undisputed but notes statements that are not undisputed, in whole or in part.

1

# ARK'S ASSERTED STATEMENT OF MATERIAL FACTS

1. *Sea Island is a barrier island along the Georgia coast that is approximately four- and-a-half miles long. The southern portion of the island is a fragile, undeveloped area called the Spit. The Spit, which is largely protected by a conservation easement, provides important habitat for threatened and endangered sea turtles and shorebirds. AR002159, AR002168-69.*

Denied as stated. Sea Island admits there are documents in the administrative record that include the above statements. Sea Island notes that the Spit does not include the Reserve Development; the Spit is the southernmost tip of Sea Island, south of the Reserve. *See, e.g.*, Memorandum for Record (MFR), AR000219 at AR000227 (map showing shoreline sections on Sea Island). The southernmost portion of Sea Island, south of the Reserve, is protected by a Conservation Easement, which Sea Island Acquisition, LLC donated to the St. Simons Land Trust. Supplemental Response to Comments (Suppl. Response), AR004105 at AR004363 (Deed of Conservation Easement). The southernmost portion of Sea Island, south of the Reserve development, is important habitat for sea turtles and shorebirds. *See, e.g.*, MFR at AR000266-68.

2. *Sea Island is also a popular recreation area. Both residents and tourists frequently visit the public tidelands to surf, paddle, or walk along the beach. "Kayakers routinely paddle down Postell Creek or Black Bank River, land at the Spit, and walk along the Sea Island beach." AR000240.*

Admitted.

3. *Sea Island Acquisition, a private resort and real estate development company, plans to build a new development called the Reserve on the north end of the Spit immediately north of the conservation easement boundary. In October 2015, Sea Island Acquisition filed an application seeking permission to construct a T-head groin immediately south of*

2

*the proposed Reserve development. AR003480. The application also sought authorization to construct dunes and renourish the beach between an existing groin and the groin. AR003482.*

Denied, to the extent that it implies that Sea Island has not already developed the Reserve with zoning approval, bridges, roads and utilities. *See* MFR at 000252. Also denied to the extent that it implies that the Reserve development is on the Spit. The Spit is the southernmost tip of Sea Island, south of the Reserve. *See, e.g.*, MFR at AR000227 (map showing shoreline sections on Sea Island). Otherwise admitted.

### *Standing*

4. *Plaintiff One Hundred Miles (OHM) is a not-for-profit organization that seeks to protect, preserve, and enhance Georgia's 100-mile coast, including the Sea Island Spit. OHM has members that use and enjoy the areas affected by the permit. For example, OHM members who live on and visit St. Simon's Island and Sea Island regularly walk, bird-watch, paddle, and enjoy the natural setting on the Sea Island Spit. They intend to continue doing so in the future.*

Sea Island denies that the above conclusory assertions, wholly unsupported by any declaration or other evidence, are sufficient to establish standing.

5. *Altamaha Riverkeeper is a not-for-profit organization that seeks to protect, defend, and restore the Altamaha River and its watershed. Like OHM, the Riverkeeper has members that use and enjoy the areas affected by the Permit for recreation and business and will continue doing so in the future.*

6. *Sea Island admits that there are two declarations in the record that include the above conclusory assertions. Sea Island denies that such declarations are sufficient to establish standing. Surfrider Foundation is a not-for-profit organization that seeks to protect the*

*ocean and beaches in the United States. Like OHM and the Riverkeeper, Surfrider has members and supporters who use the Sea Island Spit and the area affected by the Permit for recreation and will continue to do so in the future.*

Sea Island admits that there are two declarations in the record that include the above conclusory assertions. Sea Island denies that such declarations are sufficient to establish standing.

7. *Each of these organizations have alleged injuries to their recreational and aesthetic interests that are fairly traceable to the outcome of this litigation and that are likely to be redressed by a favorable decision from this Court.*

Sea Island admits that there are declarations in the record that include the above conclusory assertions. Sea Island denies that such declarations are sufficient to establish standing.

## Background on Groins

8. *A groin is a hard structure, often constructed of rock, concrete, or steel, that is built perpendicular to a beach. Written Direct Testimony of Dr. Bret Young, AR003998–90. Its purpose, by definition, is to trap or block sand on the "updrift" side of the groin that would otherwise naturally move with the prevailing currents along the shoreline to the "downdrift" side of the groin. Id.*

Admitted that these statements are in the record but denied as to their correctness. Properly-designed groins can mitigate adverse effects, as referenced in the Corps' Coastal Engineering Manual and other scientific literature and as determined by the Corps. *See, e.g.*, MFR at AR000233-38, 256-62.

9. *As this occurs, the beach downdrift of the groin retreats. Id.*

Admitted that this statement is in the record but denied as to its correctness. Properly-designed groins can mitigate adverse effects, as referenced in the Corps' Coastal Engineering

Manual and other scientific literature and as determined by the Corps. *See, e.g.*, MFR at AR000233-38, 256-62 .

10. ***The negative impacts of groins are widely recognized. See Rob Young, et al., Coastal Scientist Statement on Groin Impacts, AR003977-79.***

   Admitted that this statement is in the record but denied as to its correctness. Properly-designed groins can mitigate adverse effects, as referenced in the Corps' Coastal Engineering Manual and other scientific literature and as determined by the Corps. *See, e.g.*, MFR at AR000233-38, 256-62.

11. ***For example, the Corps' own Coastal Engineering Manual recognizes that "[c]oastal zone management policy in many countries and the United States presently discourages the use of groins for shore protection." See Letter from S. Envtl. Law Ctr. to U.S. Army Corps of Eng'rs (Feb. 28, 2017) (SELC 2017 Comments), AR003685 (quoting U.S. Army Corps of Eng'rs Coastal Engineering Manual at V-3-61).***

   Admitted that this statement is in the record but denied as to its correctness. Properly-designed groins can mitigate adverse effects, as referenced in the Corps' Coastal Engineering Manual and other scientific literature and as determined by the Corps. *See, e.g.*, MFR at AR000233-38, 256-62.

12. ***To support their claims of harm, the Conservation Groups provided testimony and/or reports by Dr. Bret Webb, Dr. Robert Young, and Dr. Chester Jackson stating that the proposed project would significantly accelerate downdrift erosion on the Sea Island Spit. See AR001043–62 (Webb 2018 Report); AR002171–82 (Webb 2016 Report); AR002059–66 (Jackson Report); AR003873–3975 (Jackson Testimony); AR003981–93 (Young WDT); AR003995–4036 (Webb WDT); AR004092–4101 (Webb 2017 Report).***

Admitted that these statements are in the record but denied as to their correctness. Properly-designed groins can mitigate adverse effects, as referenced in the Corps' Coastal Engineering Manual and other scientific literature and as determined by the Corps. *See, e.g.*, MFR at AR000233-38, 256-62.

13. ***In addition, the Conservation Groups provided citations to twenty-two peer- reviewed journal publications that reference the negative impacts of improperly designed groins. AR002146–47.***

    Admitted that citations to these publications are in the record but denied as to their correctness. Properly-designed groins can mitigate adverse effects, as referenced in the Corps' Coastal Engineering Manual and other scientific literature and as determined by the Corps. *See, e.g.*, MFR at AR000233-38, 256-62.

14. ***The Conservation Groups also provided a copy of a letter signed by 43 coastal scientists explaining that groins can cause accelerated downdrift erosion. AR003977.***

    Admitted that this letter is in the record but denied as to its correctness. Properly- designed groins can mitigate adverse effects, as referenced in the Corps' Coastal Engineering Manual and other scientific literature and as determined by the Corps. *See, e.g.*, MFR AR000233-38, 256-62.

15. ***In its Environmental Assessment, the Corps relied on an email from Kevin Conner, an engineer in the Wilmington Division of the U.S. Army Corps of Engineers, to conclude that the proposed groin would not cause significant downdrift erosion. See MFR, AR000235, AR000237, AR000243–44, AR000288, AR000291–92.***

    Admitted that the Corps relied, in part, on the opinions of Kevin Conner.

16. ***In his email, Mr. Conner says he "[doesn't] think construction of the new proposed groin would increase erosion downstream." AR001970.***

    Admitted.

*17. However, Mr. Conner acknowledges that "there is very limited data within the reports [he reviewed] with no information included on sediment budget and limited reference to littoral transport along the island." Id. He also complains that "it is not clear the data [in Sea Island's application] has been processed consistently" and notes that more information "is needed to fully evaluate the impact" of the project. Id.*

Admitted that the portions of Mr. Conner's statements quoted are in the record but denied as CSC has taken these statements out of context. Mr. Conner's statements as to what would have been needed to conduct an evaluation of the full impact of all structures on the Sea Island shoreline are not relevant here, given the scope of the amended project and the determination made by the Corps. *See* MFR at AR000233-251.

*18. According to the record, Mr. Conner was provided with five documents from the record. AR0001967. The Corps did not provide him all of the expert reports and expert testimony that was submitted by the Conservation Groups. Id.*

Denied as stated. Mr. Conner was provided with over 400 pages of material, AR001973-2394, including voluminous materials submitted on behalf of the Plaintiffs, including the GreenLaw Comment letter dated January 15, 2016, as well as the SELC comment letters dated January 15, 2016, and February 28, 2017. AR001971. The GreenLaw letter, written on behalf of several of the Plaintiffs, was twenty pages long and summarized their arguments in opposition to the groin. AR002038. Moreover, the GreenLaw comment letter sent to Mr. Connor included as attachments the report of Dr. Chester Jackson, AR002059-066, the statement of coastal scientists opposed to groins, AR002093-95, and the report of Dr. Robert Young, AR002097-104. AR001971. The SELC initial comment letter, as sent to Mr. Connor, included the report of Dr. Webb as an attachment. AR002171. Even if SELC's February 28, 2017 letter, as sent to Mr. Connor, did not include all the hundreds of pages of attachments, the SELC letter itself, 23 pages long, summarized

7

in great detail the testimony and opinions of Mr. Young, Dr. Jackson, and Dr. Webb. AR002374-84, AR002386-89, & AR002391-93.

19. *For example, the Corps provided the Conservation Groups' 23-page comment letter to Mr. Conner, but omitted nearly 400 pages of attachments, including analysis and testimony by three different experts. See AR001967; AR2372–2394.*

Denied as stated. See response to #18, above.

*Harm to Wildlife*

20. *In addition to causing accelerated downdrift erosion, groins also harm wildlife, especially sea turtles. For example, the T-head portion of a groin can prevent nesting females from reaching the beach or block hatchlings from migrating from the beach to the ocean. Hatchlings can also become trapped in the groin itself or be killed by predators that tend to congregate near the structure. Additionally, the accelerated erosion caused by groins can destroy important habitat for sea turtles, shorebirds, and other wildlife downdrift of the groin and harm valued recreation areas for the public. See Letter from Jon Ambrose, Ga. Dep't of Nat. Res., Wildlife Res. Div., to Sheldon Leiker, Ga. Dep't of Nat. Res., Coastal Res. Div. (Nov. 24, 2015) (WRD Comments), AR002162–66; Letter from Donald Imm, U.S. Fish and Wildlife Serv., to Sheldon Leiker, Ga. Dep't of Nat. Res., Coastal Res. Div. (Nov. 24, 2015) (USFWS 2015 Comments), AR002168–69.*

Denied as stated. Sea Island admits that the documents cited are in the record, but after the project was amended to include more than 1 million cubic yards of nourishment, Georgia DNR had no negative comments, and USFWS agreed that the project was not likely to adversely affect any protected species. AR001211-12.

21. ***Because of these impacts, the Georgia Department of Natural Resources Wildlife Resources Division and the U.S. Fish and Wildlife Service have expressed concerns over the proposed groin. Id.***

    Denied as stated. Sea Island admits that the documents cited are in the record, but after the project was amended to include more than 1 million cubic yards of nourishment, Georgia DNR had no negative comments, and USFWS agreed that the project was not likely to adversely affect any protected species. AR001211-12.

22. ***The National Marine Fisheries Service (NMFS) has also expressed concerns. In an April 2018 letter, NMFS told the Corps that its biologists had "multiple concerns with the proposed project, particularly with regard to impacts from the proposed shoreline armoring [the groin]." AR004103. Among other things, NMFS biologists worried that "the close spacing of the [new] groin with [a previously constructed] groin may create a trap for pelagic eggs and larvae of managed species and their prey." Id. As a result, NMFS recommended that the Corps deny Sea Island's request to build a T-head groin. Id.***

    Denied as stated. Sea Island admits that the documents cited are in the record, but further states that the Corps adopted one part of NMFS' recommendation, reasonably disagreed with another part of NMFS' recommendation, and that NMFS agreed that the Corps had satisfied its consultation obligation. MFR at AR000295-96; AR000926-28; AR000837-38.

23. ***Three months later, the Corps responded to NMFS's letter, AR000926–28, but, according to NMFS, largely ignored their concern that the groin could trap "pelagic eggs and larvae of managed species and their prey." In response, NMFS sent a second letter to the Corps, explaining: "Given the lack of response to this issue, the NMFS continues to recommend that the permit not allow the T-head groin." AR000837–38.***

Denied as stated. Sea Island admits that the documents cited are in the record, but further states that he Corps adopted one part of NMFS' recommendation, reasonably disagreed with another part of NMFS' recommendation, and that NMFS agreed that the Corps had satisfied its consultation obligation. MFR at AR000295-96; AR000926-28; AR000837-38.

*Practicable Alternatives*

24. **Two experts, Dr. Bret Webb and Dr. Robert Young, testified that beach nourishment without a groin is a practicable alternative to the proposed project. See, e.g., Webb WDT ¶ 95, AR004032–33; Young WDT ¶ 27, AR003988, ¶ 45, AR003993; Webb 2017 Report, AR004092–4101.**

Admitted that such documents prepared by Plaintiffs' retained experts are in the record but denied as to the correctness of the assertions. Based on many documents conflicting with these assertions, the Corps reasonably determined that beach nourishment without a groin is not a practicable alternative for this project and that beach nourishment with the proposed groin is the Least Environmentally Damaging Practicable Alternative (LEDPA). MFR at AR000245-51, AR000256-62.

25. **Dr. Webb explained that if the project had been built sans groin, the first 1,200- foot portion could have been constructed the same as Sea Island proposed, thereby serving the project purpose. The renourishment could then have continued south the full length of the Spit in order to maintain a practicable half-life. Webb WDT ¶ 95, AR004032–33.**

Admitted that such documents prepared by Plaintiffs' retained expert are in the record but denied as to the correctness of the assertions. Based on many documents conflicting with these assertions, the Corps reasonably determined that beach nourishment without a groin is not a practicable alternative for this project and that beach nourishment with the proposed groin is the

Least Environmentally Damaging Practicable Alternative (LEDPA). MFR at AR000245-51, AR000256-62.

26. *According to Dr. Young, over the past decade engineers have shown a near universal preference for beach nourishment without a groin over similar projects with a groin. See Young WDT, AR003988.*

Admitted that such document prepared by Plaintiffs' retained expert is in the record but denied as to the correctness of the assertion. Based on many documents conflicting with this assertion, the Corps reasonably determined that beach nourishment without a groin is not a practicable alternative for this project and that beach nourishment with the proposed groin is the Least Environmentally Damaging Practicable Alternative (LEDPA). MFR at AR000245-51, AR000256-62.

27. *The Program for the Study of Developed Shorelines (PSDS), a joint research and policy center at Duke University and Western Carolina University, maintains a national database called the Beach Nourishment Database that catalogs every beach and dune construction project in the country. Young WDT ¶ 7, AR003983. It is by far the most comprehensive catalog of beach and dune restoration projects available. Id. As part of this work, Dr. Robert Young, the director of the PSDS, is funded by the United States Geological Survey to map, in detail, every beach nourishment project on the United States East Coast. Id. Through Dr. Young's database, the PSDS has been tracking beach nourishment activities on Sea Island and across the country for more than twenty years. Id.*

Admitted that such documents prepared by Plaintiffs' retained expert are in the record, but denied as to relevance to this project.

28. ***Based on his experience with the Beach Nourishment Database, Dr. Young concluded that beach nourishment without a groin is, by far, the most common configuration for beach nourishment projects in the United States. In the southeast, for example, there have been 139 beach nourishment projects in the past ten years (as of 2016, when Dr. Young testified). Young WDT ¶ 27, AR003988. Of those 139 projects, only five involved a groin. Id. Of those five, three were built at the very end of the island—unlike Sea Island's proposed groin. Id. The other two projects with groins were special circumstances not related to cost. There are no such special circumstances with respect to Sea Island's proposed project. Id.***

    Admitted that such documents prepared by Plaintiffs' retained expert are in the record but denied as to the correctness of the assertions. Based on many documents conflicting with these assertions, the Corps reasonably determined that beach nourishment without a groin is not a practicable alternative for this project and that beach nourishment with the proposed groin is the Least Environmentally Damaging Practicable Alternative (LEDPA). MFR at AR000245-51, AR000256-62.

    *Sea Island Acquisition's Revised Permit Application*

29. ***Following the initial notice and comment period on Sea Island Acquisition's application, two major hurricanes, Matthew and Irma, caused substantial damage to Sea Island. Among other things, the storms severely eroded the beach and many of the dunes on the Spit. See SELC 2017 Comments, AR003703–04; Dr. Bret Webb, Supplemental Report Regarding the Practicability of Constructing a Successful Beach Nourishment Project on the Sea Island Spit (Webb Supplemental Report), AR004100–01; Letter from S. Envtl. Law Ctr. to U.S. Army Corps of Eng'rs (May 23, 2018) (SELC 2018 Comments), AR001182. The storms also damaged the parts of the beach in front of the developed area***

*of the island. SELC 2018 Comments, AR001182; Webb Supplemental Report, AR004100–01.*

Admitted as to the factual statements, and admitted that the documents cited are in the record but denied as to the characterizations in such documents.

30. *After Hurricanes Matthew and Irma, experts alerted the Corps and Sea Island that due to significant dune and beach erosion in front of the Reserve, "the proposed project needs to be redesigned and reevaluated." AR001892–93. Sea Island amended its proposal to dredge sand for placement along the length of the island, but failed to account for the changed conditions in front of the Reserve. See AR000007 (Special Condition (9)(n)); AR000028.*

Denied as stated. Sea Island was fully aware of the damage caused to the Sea Island shoreline by Hurricanes Matthew and Irma, and on its own initiative retained outside consulting engineers to evaluate the damage done and to help prepare an Amended Permit Application addressing those damages with a significant offshore dredging and beach nourishment project component. Amended Permit Application (Mar. 6, 2018), AR001699 at AR001700. This amended plan included sufficient volumes of sand "to restore the deficit in the area between the existing groins, including the volume necessary to accommodate the Reserve project, plus advance nourishment to account for anticipated future erosion." AR001714.

31. *Sea Island Acquisition submitted an addendum to its 2015 permit application, this time seeking authorization (1) to construct the new T-head groin on the Spit (as previously requested); (2) to dredge between 1,315,000 to 2,500,000 cubic yards of sand from an offshore source; and (3) to renourish over 17,000 linear feet of beach on Sea Island. AR001699.*

Admitted.

## The Supplementary Biological Assessment and Consultation

32. ***As part of its revised application, Sea Island Acquisition also submitted a supplementary biological assessment. AR001730. The company had previously submitted a biological assessment for the 1,200-foot project, but many of that assessment's determinations were based in part on the fact that "no offshore borrow areas are proposed" or on the fact that "the project is of limited size"—which were no longer the case. AR003543, AR003565–66. Like the previous assessment, Sea Island Acquisition's supplementary biological assessment concluded that the proposed project "may affect" but was "not likely to adversely affect" threatened and endangered species. AR001818.***

    Admitted.

33. ***The U.S. Fish and Wildlife Service ultimately concurred with this determination. AR001211–12. However, in its concurrence letter, the agency cautioned that "[t]he new groin is anticipated to result in decreased nesting and the loss of nests that do get laid within the project area for all subsequent nesting seasons following the completion of the proposed project." AR001212. The agency also explained that "the sand project is anticipated to result in decreased nesting and loss of nests that do get laid within the project area for two subsequent nesting seasons following the completion of the proposed sand placement." Id. Given that the supplemental application requested to remove up to 2,500,000 yd$^3$ of sand from offshore with a hydraulic cutterhead dredge, the U.S. Fish and Wildlife Service also directed the Corps to "refer to [the National Marine Fisheries Service] for impacts in the water." Id.***

    Admitted that USFWS determined there would be minor and temporary effects to sea turtle habitat and that the agency concurred with the Corps' overall determination that that the project

was not likely to adversely affect any threatened or endangered species, including sea turtles. AR001211-12.

34. ***The Corps decided that the proposed dredging and renourishment "may affect, but is not likely to adversely affect" listed species or habitat within NMFS purview. AR001219–22. However, rather than consult with NMFS about the supplemental application and its potential effects on listed species and critical habitat, the Corps ended the consultation process claiming that the "work qualifie[d] for SARBO/SARBA." AR001219; see AR000269–70.***

First sentence admitted; otherwise denied as stated. NMFS reviewed the notice of the proposed project and responded with a statement of its concerns, which did not include any comments on the proposed dredging and renourishment. AR004102. The Corps subsequently transmitted to NMFS the Biological Assessment and its minor adverse effects determination. AR004387. Admitted that the Corps concluded that the work qualified for SARBO/SARBA. NMFS directed the Corps to look to the South Atlantic Division of the Corps for a determination of the applicability of SARBO. AR001310. The South Atlantic Division advised the Savannah District that SARBO did apply. AR001219. A new 2020 SARBO covering this project has since been adopted by NOAA. Federal Defendants' Notice of Issuance of Biological Opinion, ECF No. 74.

35. ***SARBO "addresses the use of hopper dredges in [navigation] channels and borrow areas … includ[ing borrow] areas off of Dade County Florida and Myrtle Beach South Carolina." AR000383. SARBO does not discuss Clean Water Act Section 404 permits. See id. SARBO is limited to "federal project boundaries," AR001221, or the Corps' own dredging to maintain navigation in river channels and for Congressionally-mandated***

***beach nourishment. AR000323–36. The borrow area dredged by Sea Island is not within these bounds and not dredged by the Corps. See AR000072.***

Admitted. However, the SARBO/SARBA analysis is relevant to the proposed project. *See* MFR at AR00269-70. In any event, the latest SARBO is the 2020 SARBO. Federal Defendants' Notice of Issuance of Biological Opinion, ECF No. 74.

36. ***The latest SARBO dates back to September 25, 1997, or nearly fifteen years before the Atlantic sturgeon was listed as an endangered species. AR000397; 77 Fed. Reg. 5913 (Feb. 6, 2012). Sea Island's Supplemental Biological Assessment noted that sturgeon may be present in the project area and may be affected by the project. AR004429–31 and AR004459; compare AR002218 (Sea Island's January 2017 Revised Biological Assessment noted that sturgeon have been killed by cutterhead dredging). Similarly, NMFS revised the critical habitat for the North Atlantic right whale on January 27, 2016 to include the marine waters of Georgia and Sea Island's borrow site. AR000270; 81 Fed. Reg. 4838.***

Denied. The latest SARBO is the 2020 SARBO. Federal Defendants' Notice of Issuance of Biological Opinion. ECF No. 74. Otherwise admitted.

37. ***SARBA (South Atlantic Regional Biological Assessment) is an assessment, written by the Corps and the Bureau of Ocean Energy Management that has not received the concurrence of NMFS. AR000397. SARBA is a request for an update to SARBO. AR000406–10.***

Admitted that SARBA was a request for an update to SARBO. Otherwise denied, as NOAA has recently issued an updated SARBO. Federal Defendants' Notice of Issuance of Biological Opinion. ECF No. 74.

38. ***On September 10, 2018, the day before issuing the original permit at issue, the Corps permitted the placement of sand bags almost entirely above the jurisdictional line drawn on Sea Island in 2014. The sand bags were to be "buried under dunes to be created as a part of the Reserve beach renourishment project." AR000098–100; compare id. with AR004751–53 and AR004691.***

    Admitted; further stated that the sand bags were not installed.

The Permit and NEPA Documents

39. ***On September 11, 2018, the Corps issued a permit authorizing Sea Island Acquisition to (1) construct the new T-head groin on the Spit; (2) dredge between 1,315,000 to 2,500,000 cubic yards of sand from an offshore source; and (3) renourish more than 17,000 linear feet of beach on Sea Island. See generally Permit No. SAS-2015-00742, AR000045. At the same time, the Corps issued an Environmental Assessment, stating that the authorized project would have no significant impact on the environment. MFR, AR000304.***

    Admitted.

40. ***After the permit was issued, the Conservation Groups filed this lawsuit. During the course of the litigation, Sea Island Acquisition began constructing the project. During and after construction, the company deviated from multiple terms of its permit. AR005055, AR004639–47; see also AR005106 (480-foot groin); AR004637 (access ramp).***

    The first and second sentences are admitted. Sea Island further admits that the implementation of the project deviated from the permit terms in several respects, all of which were minor and none of which had any adverse impact to the resource. Interim Status Report,

17

AR004754; Permit Modification Request, AR005055; Permit Modification Memorandum for Record (Permit Mod MFR), AR005106. Otherwise denied.

41. ***After conservation groups raised concerns, Sea Island Acquisition asked the Corps to modify the permit to "authorize the project as it has been constructed to date." AR005055 (May 24, 2019).***

Denied as stated, but admitted that on May 24, 2019, Sea Island submitted a Permit Modification Request which, among other things, asked the Corps to "authorize the project as it has been constructed to date," in view of the minor deviations of the project as constructed from the permit drawings and specifications. Permit Modification Request, AR005055.

42. ***In response, the Corps' found that Sea Island Acquisition had violated the terms of its permit, but nevertheless approved the modification request. AR004639–47.***

Denied as stated. The Corps did find some minor instances in which the work was non-compliant with the Permit. Permit Modification Memorandum for the Record (Permit Mod MFR), AR004640, at AR004642. The Corps found that some of the alleged violations involved work beyond Corps jurisdiction. *Id.* The Corps further found, after consulting with USFWS and with the USFWS' concurrence, that "the proposed modifications would not change the effects determinations made during the evaluation of the application." *Id.* at AR004646. On July 5, 2019, the Corps issued a modification to the Permit that authorized the work as requested. Permit Modification, AR004617.

## CONCLUSIONS OF LAW

43. ***The Corps violated NEPA by failing to take a hard look at the impacts of the project and by failing to prepare an Environmental Impact Statement.***

Denied. *See* Sea Island's Cross-Motion for Summary Judgment and Response to Plaintiffs' Motions for Summary Judgment.

***44.  The Corps violated the Clean Water Act by issuing the permit when there is a less environmentally damaging practicable alternative.***

Denied. *See* Sea Island's Cross-Motion for Summary Judgment and Response to Plaintiffs' Motions for Summary Judgment.

***45.  The Corps violated the Endangered Species Act by failing to consult NMFS.***

Denied. *See* Sea Island's Cross-Motion for Summary Judgment and Response to Plaintiffs' Motions for Summary Judgment.

***46.  The Corps violated the Clean Water Act and the APA by sanctioning Sea Island's permit violations.***

Denied. *See* Sea Island's Cross-Motion for Summary Judgment and Response to Plaintiffs' Motions for Summary Judgment.

***47.  The Corps violated the Clean Water Act and NEPA by failing to adequately evaluate the cumulative impacts of the authorized project.***

Denied. *See* Sea Island's Cross-Motion for Summary Judgment and Response to Plaintiffs' Motions for Summary Judgment.

***48.  The Corps violated the Clean Water Act and the APA by failing to adequately consider access issues.***

Denied. *See* Sea Island's Cross-Motion for Summary Judgment and Response to Plaintiffs' Motions for Summary Judgment.

Respectfully submitted, this the 17th day of April, 2020.

| **HALL BOOTH SMITH, P.C.** | **KING & SPALDING LLP** |
|---|---|
| JAMES B. DURHAM<br>  Georgia Bar No. 235526<br>3528 Darien Highway, Suite 300<br>Brunswick, Georgia 31525<br>Phone: (912) 554-0093<br>Fax:    (912) 554-1973<br>Email: jdurham@hallboothsmith.com | /s/ Patricia T. Barmeyer<br>PATRICIA T. BARMEYER<br>  Georgia Bar No. 038500<br>RANDY J. BUTTERFIELD<br>  Georgia Bar No. 100120<br>  (admitted *pro hac vice*)<br>1180 Peachtree Street NE<br>Atlanta, Georgia 30309-3521<br>Phone: (404) 572-4600<br>Fax:    (404) 572-5137<br>Email: pbarmeyer@kslaw.com<br>           rbutterfield@kslaw.com |

*Attorneys for Sea Island Acquisition, LLC*

## CERTIFICATE OF SERVICE

This is to certify that I have this day, April 17, 2020, served a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter:

 /s/ Randy J. Butterfield
RANDY J. BUTTERFIELD