IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| ALTAMAHA RIVERKEEPER, ONE HUNDRED MILES, and SURFRIDER FOUNDATION,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES ARMY CORPS OF ENGINEERS et al.,<br><br>Defendants. | Docket No. 4:18-cv-00251-JRH-CLR |

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

The Court should grant summary judgment in favor of the Conservation Groups, vacate the permit, and require removal of any portion of the groin built during this litigation as well as mitigation of any impacts caused by the construction of the project.

## I. INTRODUCTION

The U.S. Army Corps of Engineers repeatedly cut corners during this permitting process. Among other things, the Corps:

- Did not consult with the National Marine Fisheries Service (NMFS) before dredging over a million cubic yards of sand from the ocean floor, despite the presence of threatened and endangered species within the project area;

- Misidentified critical habitat for the piping plover and, as a result, did not consider whether the proposed project would adversely modify critical habitat within the project area;

- According to NMFS, largely "did not respond," AR000837–38, to their concerns about the location of the proposed groin, even though NMFS viewed the impact as significant enough to warrant partial denial of the permit;

- Did not take a "hard look" at hundreds of pages of expert analysis about the project's impact on the sand-sharing system by three separate experts; and

- Barely considered nourishment without a groin as an alternative, even though decision-makers have chosen this option in over 96% of similar projects conducted recently in the Southeast.

Then, after Sea Island violated its permit in multiple ways, the Corps readily agreed to modify the permit to authorize the project "as constructed," without any public notice or opportunity to comment on the proposed changes.

In their briefs, the Corps and Sea Island seek to discount these concerns as minor or harmless. But at some point, enough is enough. Processes like Endangered Species Act consultation and NEPA review are in place for a reason, and the Corps and Sea Island must follow these statutorily mandated requirements. Because they failed to do so here, the Court should vacate the permit and require removal of any portion of the groin built during this litigation as well as mitigation of any impacts caused by the construction of the project.

## II. ARGUMENT AND CITATION OF AUTHORITIES

### A. The Conservation Groups have standing.

The Corps permitted a major construction project on the Georgia coast. The project involves offshore dredging, transport, and placement of over a million cubic yards of sand and the construction of a rock groin across a beach and public tidelands. The Conservation Groups have members who live, work, and recreate in the area and are negatively affected by the project. The Conservation Groups thus have standing to pursue claims challenging the Corps' issuance of the Permit.

Surfrider Foundation is a non-profit grassroots organization with over 80 volunteer-based chapters across the United States dedicated to the protection of our oceans, waves, and beaches. Dkt. 41-3 ¶ 3. Surfrider fulfills its mission through many means including public education,

advocacy, and litigation. Surfrider's Georgia Chapter is focused on supporting conservation and sustainable use of Georgia's coastal resources including the Altamaha River and other watersheds adjacent to and near the Sea Island Spit. *Id.* ¶ 5.

Altamaha Riverkeeper is a non-profit organization whose mission is to protect, defend, and restore the Altamaha River and its watershed including areas such as the Sea Island Spit, Gould's Inlet, and St. Simon's Island. Dkt. 41-1 ¶¶ 3–4. In furtherance of its mission, ARK monitors activities that impact the ecological integrity of its watershed and engages in public education, advocacy, and litigation. *Id.*

The Conservation Groups opposed the Reserve development during its initial proposal and worked to obtain Sea Island Acquisition's agreement to place the Spit into a conservation easement which will be adversely affected by the project. Among other things, these Conservation Groups submitted multiple rounds of comments on both state and federal permits for the project and were party to administrative litigation challenging the state permit in 2015. Dkt. 41-1 ¶ 6; Dkt. 41-3 ¶ 7; AR004294.

Organizations like Altamaha Riverkeeper, Surfrider, and One Hundred Miles have standing to bring suit on behalf of their members "when [1] [their] members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). The environmental, recreational, and aesthetic interests at stake are germane to the Conservation Groups' organizational purposes which include defending the ecological integrity of coastal areas, including Sea Island, as well as ensuring that the Corps complies with its statutory duties to properly evaluate the environmental impact of major

projects on the coast. Dkt. 41-1; 41-3. And neither the claim nor relief requires participation of individual members. *Id.*

Member standing requires "a plaintiff [] show: (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Laidlaw*, 528 U.S. at 180–81 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). All of these criteria are met here.

**1. The Conservation Groups' Members have shown injury in fact.**

"[E]nvironmental plaintiffs adequately allege [a substantive] injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *see also Sierra Club v. Johnson*, 436 F.3d 1269, 1279 (11th Cir. 2006) (concluding that the plaintiff's "injury in fact exists as a result of concerns about pollution, concerns that arise because the failure to use one of the mandated public participation procedures leaves him uncertain about whether pollution is being emitted in illegal quantities").

"To show a cognizable injury in fact in a procedural injury case, a plaintiff must allege that the agency violated certain procedural rules, that these rules protect a plaintiff's concrete interests and that it is reasonably probable that the challenged action will threaten these concrete interests." Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1170 (11th Cir. 2006). "[F]ailure to analyze the potential environmental impact of various projects and policy changes make it substantially more likely that the declarants' interests will be harmed." *Id.* at 1171–72.

The Conservation Groups have shown both types of injury, and have established a sufficient "direct stake in the outcome" of this litigation. *Sierra Club v. Morton*, 405 U.S. at 740. For example, the declaration of Surfrider's Georgia Chapter Chairperson Steve Combs describes his recreational and aesthetic use and enjoyment of the Spit, the area in front of the Reserve Development, and the surrounding area. Dkt. 41-3. On June 22, 2013, for instance, he and other Surfrider members celebrated International Surfing Day, paddling and surfing Gould's Inlet where they enjoyed the sights of Sea Island, and the natural sandbar surf break in the Inlet. *Id.* ¶ 14. About a year later he joined a marathon paddling event in the area to raise awareness of Georgia's remote and beautiful coastline. *Id.* ¶ 15. In September 2015, after a Surfrider-organized beach cleanup on Jekyll Island, he and another Surfrider member traveled to Gould's Inlet for more paddling and better surf conditions. *Id.* ¶ 16. In 2018, he paddled to the Sea Island Spit from St. Simons Island and walked along the public foreshore to the existing south groin, an enjoyable activity that he fears he will no longer be able to do when the proposed groin is constructed. *Id.* at ¶ 17 (including a picture of Mr. Combs on the public foreshore in the project area by the pre-existing South Groin). That is, Mr. Combs has – often with friends – surfed, paddled, walked, and viewed the beauty of the area directly affected by this project. *Id.* Mr. Combs reasonably attests that the dredging, sand-placement, and groin construction allowed by the permit adversely affects his interests by disrupting the sand-sharing system, accelerating erosion of the Spit, interfering with access to a public beach, and imperiling the wildlife and endangered species of Georgia's coast. Dkt. 41-3 ¶ 9. Jason Latham, another Surfrider member, expressed similar interests and concerns. *See* Dkt. 41-4 (Declaration of Jason Latham).

Similarly, Joni House, former-President of the Board and current member of Altamaha Riverkeeper, has by declaration established injury-in-fact. Dkt. 41-2. Ms. House owns and

regularly uses property on St. Simons Island near East Beach, immediately downdrift of the project. For decades she and her family have sailed, swum, kayaked, crabbed, fished, bird-watched, wildlife-viewed, star-gazed, and beach-walked near and on the project area and surrounding areas. *Id.* Ms. House promotes and engages in environmental education and conservation projects and a healthy coastal environment is very important to her, including the area encompassing the Spit. *Id.* ¶ 8. She too believes that the Corps' issuance of a permit to construct a groin on the Sea Island Spit and to dredge millions of cubic yards of sand from offshore will have negative impacts on the Spit, wildlife, and surrounding coastal areas that have brought her recreational and aesthetic joy throughout the years. *Id.* ¶¶ 3, 8.[1]

These impacts on Declarants are plainly cognizable injuries for purposes of standing. *Laidlaw*, 528 U.S. at 183; *Sierra Club v. Johnson*, 436 F.3d at 1279. Further, these injuries are indisputably within the zones of interests protected by environmental statutes. 42 U.S.C. § 4321 ("The purposes of [NEPA are *inter alia*] to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man…."); 16 U.S.C. § 1531 ("The purposes of [the Endangered Species Act are *inter alia*] to provide a means whereby the ecosystems upon which endangered species and threatened species may depend may be conserved…."); 33 U.S.C. § 1251(a) ("The objective of the [Clean Water Act] is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."). Importantly, any one of these declarations – or those submitted by Center for a Sustainable Coast and its members – is sufficient to establish standing for a claim for all Plaintiffs. *Georgia Latino*

[1] The Corps asserts without legal support that Ms. House must "lessen her frequency of recreational activities" as a result of this project. Dkt. 81 at 14 n.13. This is simply not the law. *Laidlaw*, 528 U.S. at 183 (affirming that lessened aesthetic and recreational *values* of the area are sufficient); *see Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 557 (5th Cir. 1996) ("[I]njuries need not be large, an identifiable trifle will suffice.").

*All. for Human Rights v. Governor of Georgia*, 691 F.3d 1250, 1258 (11th Cir. 2012); *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170 (11th Cir. 2006).

**2. The injuries are traceable to the Corps.**

The Conservation Groups have also established the traceability of these injuries to the Corps' issuance of the permit in violation of federal environmental laws. "The 'fairly traceable' requirement ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged illegal conduct." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000). Traceability does not require "scientific certainty" and is "not equivalent to a requirement of tort causation." *Id.* Instead, a plaintiff "must merely show that a defendant [undertakes activities in protected waters] that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." *Id.* (internal quotations omitted).

The Corps permitted this project authorizing the construction of the groin, dredging of sand, and nourishment of the beach in violation of environmental laws that aim to protect the public. The Conservation Groups are affected by the harms that will result from the project the Corps permitted in the area they use and enjoy. *See Sierra Club v. Franklin Cnty. Power*, 546 F.3d 918, 927 (7th Cir. 2008) ("We agree that no one knows the ultimate magnitude of [plaintiff]'s injury. . . . We do know, however, that the [project] will release some pollutants and that [plaintiff] believes these pollutants will ruin her ability to enjoy [the] Lake and taint the surrounding area. And her belief is not so irrational that it can simply be discredited."). In other words, the Corps' actions caused the injuries.

The cases cited by the Corps are distinguishable. In *Texas Independent Producers and Royalty Owners Association v. EPA*, plaintiffs had failed to identify a specific construction project or discharge authorized under the General Permit they were challenging that could cause

them harm. 410 F.3d 964, 972–74 (7th Cir. 2005); *see id.* at 976–77 (holding plaintiffs *did* have standing for procedural challenges to the same General Permit). Here the project and discharge are clearly defined.

In the other case cited by the Defendants, plaintiffs failed to present evidence that their fears of injury were "reasonable and in fact possible." *RE Sources for Sustainable Communities v. Pac. Int'l Terminals, Inc.*, No. C11-2076-JCC, 2013 WL 11233980, at *6 (W.D. Wash. July 23, 2013); *see Glynn Environmental Coalition, Inc. v. Sea Island Acquisition, LLC,* No. 2:19-cv-00050-JRH-BWC, slip op. at 11 (S.D. Ga. Mar. 9, 2020). By contrast, here the Conservation Groups' concerns of environmental, recreational, and aesthetic harm have a clear basis in the administrative record. As detailed below and in the Conservation Group's Motion, multiple experts and agencies recognized that the proposed project would increase downdrift erosion (thereby reducing available public tidelands for recreation), harm federally protected sea turtles, shorebirds, and other wildlife, and potentially cause a breach in the Spit itself. *See e.g.*, AR001043–62 (Webb 2018 Supplemental Report); AR002171–82 (Webb 2016 Report); AR002059–66 (Jackson Report); AR003873–3975 (Jackson Testimony); AR003981–93 (Young WDT); AR003995–4036 (Webb WDT); AR004092–4101 (Webb 2017 Report); AR002146–47 (citations to peer-reviewed journals); AR002162–66 (WRD Comments) ("[T]he construction of the T-head groin will result in the loss of sea turtle nesting habitat and will interfere with the conservation of sea turtle populations in Georgia."); AR002168–69 (USFWS 2015 Comments) ("We recommend denial of the permit. Construction of another groin will have negative impacts to sea turtles and have possible adverse impacts to the Sea Island spit which is utilized habitat for federally listed shorebirds and sea turtles."); AR003707–3835 (Mark Dodd, Georgia Department of Natural Resources' Sea Turtle Coordinator, testifying that proposed project would

unreasonably harm sea turtles); AR004038–65 (Rusenko WDT); AR003995–4036 (Webb WDT).

Thus, plaintiffs have sufficiently connected their concerns to the actions of the Corps. "The proper focus on causation is not harm to the environment, but harm to the plaintiffs." *Ouachita Watch League*, 463 F.3d at 1172. And to the extent the injuries are procedural, "the causation and redressability requirements are generally more relaxed." *E.g. id.*; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992).

**3. The injuries are redressable.**

Conservation Groups have also established the redressability of their harms by order of the Court. 5 U.S.C. § 706(2). To the extent Conservation Groups' injuries stem from the Corps' failure to comply with environmental laws, ordering the Corps to conduct the proper analysis plainly satisfies standing requirements. *E.g. Ouachita Watch League*, 463 F.3d at 1173. More substantively, this Court can order the permit vacated and removal of the groin, which would specifically address the Conservation Groups' concerns about erosion, breach, beach access, and harm to wildlife. Although the groin has already been constructed, it may be easily removed, as demonstrated by Sea Island's recent removal of nearly 130 feet of the groin. *See* Dkt. 78; Section G, below.

**B. The Corps violated NEPA by failing to take a hard look at the environmental consequences of the proposed action and by failing to prepare an Environmental Impact Statement.**

The Corps did not take a "hard and honest look at the environmental consequences" of its decision, nor did it make a convincing case for finding there would be no significant impact. *See Am. Rivers v. Fed. Energy Regulatory Comm'n*, 895 F.3d 32, 49 (D.C. Cir. 2018); *see also Hill v. Boy*, 144 F.3d 1446, 1450. The standard here bears repeating: an agency's Environmental

Assessment "will pass muster only if it undertook a 'well-considered' and 'fully informed' analysis of the relevant issues and opposing viewpoints." *Am. Rivers*, 895 F.3d at 49.

**1. The Corps did not take a hard look at the potential environmental consequences.**

**a. The Corps mistakenly assumed that the project area did not contain critical habitat for piping plovers.**

The Corps mistakenly assumed that the project area did not contain critical habitat for piping plovers.[2] MFR, AR000268. The Court need not take the Conservation Groups' word for it. The U.S. Fish and Wildlife Service, who drafted the critical habitat regulation, said, "[t]he construction area [surrounding the new groin] and the Sea Island Spit are designated piping plover critical habitat by the Service." USFWS 2015 Comments, AR002168.[3]

Rather than defer to USFWS's reading, the Corps and Sea Island continue to push back. First, the Corps argues that the Conservation Groups "do[] not cite a specific location designation as to where the critical habitat begins in relation to the existing southern groin." Dkt. 81 at 18. But the critical habitat regulation specifically defines where the critical habitat begins in relation to the existing south groin: "This unit extends north of Gould's Inlet (Sea Island) 2.5 km (1.54 mi) **starting just south of the [existing south] groin** and extends south of Gould's Inlet (St. Simons Island) 1.6 km (1.0 mi)." 66 Fed. Reg. 36038-01 (emphasis added).

Although the regulation does not define "just," courts typically turn to dictionary definitions for guidance when terms are undefined. *See United States v. McNab*, 331 F.3d 1228,

[2] As defined by the Endangered Species Act, critical habitat is a designated area that contains features essential to the conservation of a protected species and that may require special management and protection. 16 U.S.C. § 1532(5). Importantly, critical habitat can include areas not currently occupied by the species if they are essential to its recovery. *Id.*

[3] The Conservation Groups raised this claim in their first round of comments, despite Sea Island's suggestion otherwise. *See* SELC 2016 Comments, AR002153 ("[T]he Proposed Groin would in all likelihood cause the destruction of critical habitat of the Piping Plover in addition to the habitat of thousands of shore birds that frequent the Sea Island Spit.").

1237 (11th Cir. 2003), as amended (May 29, 2003) (citing Merriam-Webster Collegiate Dictionary). According to Merriam-Webster Dictionary, in this context, "just" means "immediately [or] directly" (for example "just west of here"). *See* Merriam Webster Online Dictionary, *Definition of Just*, https://www.merriam-webster.com/dictionary/just.

Neither Sea Island nor the Corps complains that this definition is inaccurate. More importantly, this definition is bolstered by the U.S. Fish and Wildlife Service's reading of its own regulation. In any event, the new groin is located nearly a quarter-mile south of the existing south groin. Even if the Court determines that "just south" means "a few hundred feet south," the new groin site would still be well within the critical habitat designation.

Sea Island makes a similar argument to the Corps', suggesting that the distances in the regulation are "approximated," so we can't really know whether the project area contains critical habitat. Dkt. 82 at 22. Sea Island is correct that the *distances* are approximated. 66 Fed. Reg. 36038-01. But that is precisely why the textual unit descriptions in the critical habitat regulation use landmark features—like the existing south groin—as reference points as well. *Id.* (explaining that textual unit descriptions describe the geography of the area using reference points because the dynamic nature of the coastal habitat may impact distances). Here, as described above, the textual unit description clearly states that the critical habitat starts "just south of the [existing south] groin"—a landmark that is neither changing nor "approximated."

Sea Island also argues that critical habitat excludes "buildings, marinas, paved areas, boat ramps, exposed oil and gas pipelines, and similar structures." 66 Fed. Reg. 36,038-1. That is correct, but the Reserve beachfront—where the new groin was built—contains none of those things. Instead, the residences that Sea Island refers to are located in the upland area, outside of

the critical habitat designation, and approximately a quarter-mile (or more) away from the new groin site.

All of these arguments aside, it is important to note that neither Sea Island nor the Corps argue that the project area definitely does not contain critical habitat for piping plover. At most, they argue that it isn't clear. But even if the Court accepts their position and finds that the critical habitat designation isn't clear, the fact that the Corps simply assumed the area did not contain critical habitat, without any further investigation, means that they did not take the requisite "hard look" under NEPA. *Am. Rivers*, 895 F.3d at 49 (requiring the agency to undertake a "well-considered and full-informed" analysis).

Defendants also argue that, even if the Corps wrongly assumed there was no critical habitat within the project area, it still considered potential impacts to piping plovers. According to the Corps, it relied on Sea Island's assessment that piping plovers prefer to use other areas. Dkt. 81 at 18–19. (quoting MFR, AR000267–68, which in turn cites Sea Island's Biological Assessment). Sea Island also points to other rationales contained within its own Biological Assessment. Dkt. 82 at 23. However, at most, the Corps considered only whether the proposed project would harm piping plovers themselves. The Corps did not consider whether the proposed project would "adversely modify" designated critical habitat, because it assumed there was no critical habitat within the project area. MFR, AR000268.

Under the Endangered Species Act, these are separate issues. The ESA requires agencies to separately consider (1) whether a proposed action would adversely modify critical habitat; and (2) whether a proposed action would adversely affect a threatened or endangered species. 16 U.S.C. § 1536(a)(2) (requiring federal agencies to "insure" that the actions they authorize are not likely to jeopardize the continued existence of a listed species *or* result in the adverse

modification of designated critical habitat areas); *see also* 40 C.F.R. § 230.10(b)(3) (noting that the Corps may not issue a Clean Water Act permit under Section 404 if the proposed project jeopardizes the continued existence of listed species *or* results in likelihood of the destruction or adverse modification of critical habitat).

In other words, the fact that the Corps may have considered whether the proposed project would adversely affect piping plovers does not relieve the agency of its obligation to consider whether the proposed project would adversely modify the designated critical habitat unit. Although the inquiries may involve similar questions, one is not a substitute for the other.

Here, there is no real question that the Corps did not consider potential modifications to critical habitat. Their analysis of critical habitat was limited to the following two sentences, which plainly rely on a mistaken assumption:

> **Regarding piping plover critical habitat, the listed critical habitat is located outside the project site. Therefore there would be no direct effect to critical habitat.**

MFR, AR000268.

In short, the law requires the Corps to consider potential modifications to critical habitat, and because the Corps misread the critical habitat regulation, it didn't do so. This is a textbook example of an "arbitrary and capricious" decision: the Corps plainly "failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**b. The Corps failed to adequately consider NMFS's concern regarding pelagic eggs and larvae of managed species.**

The Corps also failed to take a hard look at NFMS's concern that the close spacing of the new groin and the existing groin may create a trap for pelagic eggs and larvae of managed species. In its response brief, the Corps says it "addressed the concerns raised by NMFS" and

alleges the Conservation Groups "misconstrued" the record by saying otherwise. Dkt. 81 at 19. To be clear, NMFS itself evaluated the Corps' response and concluded that the Corps largely "did not respond to" their concerns. As set forth in the Conservation Groups' Motion, in July 2018, NMFS sent the Corps a second letter explaining:

> The Savannah District *did not respond* to the concern that the close spacing of the proposed groin with the existing groin may create a trap for pelagic eggs and larvae of managed species and their prey, beyond noting the area of direct effects from groin construction is small and that ample habitat exists upstream and downstream from the project…. *Given the lack of response to this issue, the NMFS continues to recommend that the permit not allow the T-head groin.*

AR000837–38 (emphasis added). The Corps did not respond to this second letter at all, and did not offer any additional analysis in the MFR. *See* AR000272.[4]

The Corps cannot say they took a "hard look" at the issue when NMFS raised a concern significant enough, in NMFS's opinion, to warrant partial denial of the permit, and the Corps failed to consider the issue in the MFR. Again, this falls precisely within the definition of "arbitrary and capricious." The Corps "failed to consider an important aspect of the problem" raised by a federal agency with greater expertise than the Corps on the issue at hand. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

[4] Clean Water Act regulations require the Corps to give full consideration to the views of resource agencies like NMFS. Pursuant to 33 C.F.R. § 320.4(c), "In accordance with the Fish and Wildlife Coordination Act, district engineers will consult with the Regional Director, U.S. Fish and Wildlife Service, the Regional Director, National Marine Fisheries Service, and the head of the agency responsible for fish and wildlife for the state in which work is to be performed, with a view to the conservation of wildlife resources by prevention of their direct and indirect loss and damage due to the activity proposed in a permit application. **The Army will give *full* consideration to the views of those agencies on fish and wildlife matters in deciding on the issuance, denial, or conditioning of individual or general permits."** 33 C.F.R. § 320.4(c) (emphasis added).

Defendants also argue that they complied with the Magnuson-Stevens Act. As explained in their Motion, however, the Conservation Groups do not allege that the Corps violated the Magnuson-Stevens Act. NEPA serves a different purpose and provides a different standard, and the Corps must comply with both laws. Despite NFMS's decision not to elevate the Corps' decision under the Magnuson-Stevens Act, the agency still noted unaddressed concerns that, in its view, warranted partial denial of the permit. Even if the Magnuson-Stevens Act does not require the Corps to consider and address those remaining concerns, NEPA does. *See Sierra Club v. Peterson*, 717 F.2d 1409, 1416 (D.C. Cir. 2015) ("[I]f *any* significant environmental impacts *might* result from the proposed agency action, then the agency has to prepare an Environmental Impact Statement") (second emphasis added).

**c. The Corps did not adequately consider impacts to the sand-sharing system.**

Defendants claim that the Conservation Groups' argument that Mr. Conner had incomplete information upon which to base his review is "unsupported by the record." Dkt. 81 at 19. But, as explained in the Conservation Groups' Motion, Mr. Conner himself acknowledged that "there is very limited data within the reports [he reviewed] with no information included on sediment budget and limited reference to littoral transport along the island." *See* Email from K. Conner, U.S. Army Corps of Eng'rs, to S. Wise, U.S. Army Corps of Eng'rs (May 24, 2017), AR001970. He also complained that "it is not clear the data [in Sea Island's application] has been processed consistently" and notes that more information "is needed to fully evaluate the impact of the 'as constructed' shoreline protection project." *Id.*

The Corps had additional information on hand that it could have provided in response to Mr. Conner's concerns, but it chose not to. For example, Mr. Conner noted that the analysis provided by Dr. Jackson, one of Plaintiffs' experts, was too "limited in scope" to "tell the

complete story of the system." AR001970. Mr. Conner's complaint is not surprising. The Corps provided Mr. Conner with an 8-page summary report by Dr. Jackson based on preliminary data. But the Corps had over one hundred pages of sworn testimony by Dr. Jackson which it did not provide to Mr. Conner. AR003873–3975.

As explained in their Motion, the Conservation Groups submitted hundreds of pages of thorough analysis and testimony to the contrary by three separate experts. *See* AR001967; AR002372–94. Dismissing that analysis with a two-paragraph review that is admittedly based on limited information does not meet the Corps' legal requirement to undertake "a 'well-considered' and 'fully informed' analysis of the relevant issues and opposing viewpoints." *Am. Rivers*, 895 F.3d at 49 (emphasis added).

**2. The Corps did not make a "convincing case" that there would be no significant impacts.**

Rather than argue that no significant impacts might occur, the Corps essentially argues that it "considered" the potential impacts.[5] Dkt. 81 at 23. That discussion is irrelevant: if "*any* significant impacts *might* result," it is not enough to consider them in an Environmental Assessment. *See Sierra Club*, 717 F.2d at 1415 (second emphasis added). An Environmental Impact Statement, or EIS, is required. *Id.*

Here, the Corps has not made a "convincing case" for why there are no significant impacts. *See Hill v. Boy*, 144 F.3d 1446, 1451 (11th Cir. 1998) (requiring agency to "make a convincing case in support of a finding of no significant impact"). In analyzing the Corps'

[5] The Corps also complains that "Plaintiffs choose to highlight just a few [significance] factors," rather than addressing all ten. Dkt. 81 at 23. Although it is true that the Conservation Groups limited their discussion to six factors, the regulations do not contemplate that each of the ten significance factors will be present in all, or even most, circumstances. Quite the opposite, "any one of the factors may be sufficient to require preparation of an EIS in appropriate circumstances." *See Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005); *see also Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 235 (D.D.C. 2003).

decision, it bears repeating that "[a] determination that significant effects on the human environment will in fact occur is not essential. If substantial questions are raised about whether a project may have a significant effect upon the human environment, an EIS must be prepared." *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric*., 681 F.2d 1172, 1177–78 (9th Cir.1982)

Here, as discussed above, the Corps "did not respond," AR000837–38, to NMFS's concerns about the location of the proposed groin, even though NMFS viewed these impacts as significant enough to warrant partial denial of the permit. If these largely unaddressed concerns were sufficiently significant, in NMFS's view, to warrant partial denial, they should have been significant enough to trigger the preparation of an EIS.

In addition, the Corps has not made a "convincing case" that the project would not impact the critical habitat of piping plovers. Quite the opposite, the Corps did not even acknowledge that the project area contained critical habitat. The Corps cannot build a "convincing case" on incorrect assumptions.

With respect to sea turtles, the Corps now suggests that it was not required to consider comments from the Georgia Department of Natural Resources or two experts who testified at a state court trial in 2016 because their comments pre-dated the amended permit application. *See* Dkt. 81 at 23 ("ARK overlooks that these comments pre-dated the initial permit application and the application addendum dated March 6, 2018…."). As an initial matter, the comments did not pre-date the initial permit application—to the contrary, they were submitted in direct response to the application. *See* Permit Application (dated October 15, 2015), AR003479 *et seq.*; Letter from J. Ambrose, Ga. Dep't of Nat. Res., Wildlife Res. Div., to S. Leiker, Ga. Dep't of Nat. Res., Coastal Res. Div. (dated Nov. 24, 2015), AR002162–66; *One Hundred Miles, et al. v. Shore Protection Committee*, OSAH-BNR-SP-1630908-60-Miller (May 9–12, 2016), AR003707–3835

(testimony of Mark Dodd, Georgia Department of Natural Resources' Sea Turtle Coordinator); Written Direct Testimony of Dr. Kirt Rusenko (submitted under oath at May 2016 hearing), AR004038–65.

More importantly, the comments related to the direct impacts of the groin structure itself on sea turtles and their hatchlings. For example, the comments explained that the T-head portion of a groin would likely prevent nesting females from reaching the beach and block hatchlings from migrating from the beach to the ocean. They also explained that hatchlings can become trapped in the groin structure or be killed by predators that tend to congregate near the structure. Because they addressed the direct impacts of the groin structure, and the amended application did not modify the plans for the groin structure, the comments remained directly relevant to the amended application. The fact that the Corps now suggests they were not required to consider these comments based on their date further confirms that it did not take the requisite "hard look" and cannot make a "convincing case" for its finding of no significant impact.

Finally, the Corps failed to make a "convincing case" that the groin would not cause downdrift erosion. At best, the Corps' analysis shows significant controversy among scientists on the potential impacts of the groin. Although Mr. Conner's two-paragraph analysis said he "[didn't] think construction of the new proposed groin would increase erosion downstream," AR001970, three separate experts submitted detailed analysis and testimony that it would, AR001967; AR002372–94. This type of controversy, combined with the other significance factors discussed in the Conservation Groups' Motion, is precisely the type of requirement that triggers the need to prepare an EIS. *See Wildlands v. Woodruff*, 151 F. Supp. 3d 1153, 1165 (W.D. Wash. 2015) (explaining that controversy factor weighs heavily in favor of preparing an

EIS when there is "significant disagreement among experts" about the result of a proposed action).

Finally, the Corps continues to point out that its issuance of the permit involved "a years-long process," "two public comment periods," and preparation of an in-depth Environmental Assessment. Dkt. 81 at 1. But volume cannot make up for sufficiency. To the contrary, the length and complexity of the permitting process suggest the Corps should have prepared an EIS, not the other way around. As one court put it, "To announce that these documents—despite their length and complexity—demonstrate an [Environmental Impact Statement] is unnecessary is rather like the mathematics teacher who, after filling three blackboards with equations, announces to the class, 'You see, it is obvious.'" *Sierra Club v. Marsh*, 769 F.2d 868, 874 (1st Cir. 1985) (Breyer, J.).

**C. The Corps violated the Endangered Species Act and the issuance of the 2020 SARBO does not moot Conservation Groups' Endangered Species Act claim.**

Noting that Sea Island's dredging and related beach nourishment operations "may affect" threatened and endangered marine species, on September 12, 2018, the Corps issued the Permit without consulting the experts at NMFS. AR000268–70. Four months later, Sea Island began dredging offshore. AR004754. On September 13, 2019, NMFS and the Corps "initiated consultation" on the South Atlantic Regional Biological Opinion for Dredging and Material Placement Activities in the Southeast United States (2020 SARBO) which was finalized in March of this year. 2020 SARBO at 15.[6] The Corps was and is in violation of the Endangered

[6] "Under the ESA consultation is initiated once NMFS has all information necessary to conclude the consultation." 2020 SARBO at 15 n.5, available at https://www.fisheries.noaa.gov/content/endangered-species-act-section-7-biological-opinions-southeast (last visited May 13, 2020).

Species Act because it still has not properly consulted with NMFS about this project. Contrary to Defendants' assertions, the 2020 SARBO has not automatically, retroactively resolved this issue.

To dismiss a claim on mootness grounds, Defendants must establish that the Court lacks "the ability to give meaningful relief." *Sierra Club v. U.S. E.P.A.*, 315 F.3d 1295, 1299 (11th Cir. 2002). Or, stated differently, that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Dupree v. Palmer*, 284 F.3d 1234, 1237 (11th Cir. 2002).

As an initial matter, the permit as twice-modified appears to leave open the possibility of future dredging operations. Dkt. 78-1 at 19–20; AR000001–2. It permits the dredging of up to 2,500,000 cubic yards of sand from an offshore borrow site by September 5, 2023. *Id.* As of May 2019, Sea Island had dredged and placed approximately 1,140,509 cubic yards, or less than half the permitted amount. AR004755. CRD in March 2020 noted Sea Island's activities related to this project "are ongoing and not yet complete." Dkt. 75-1 at 10. And the history of Corps authorizations for beach nourishment activities on Sea Island further undermines any implication that Sea Island's activities have ended. AR000306–07 (noting 18 authorizations in 24 years between 1986 and 2010, not including "recycling" events); *see also* AR000093 (Nationwide Permit 13 verification Sept. 11, 2018). Sea Island's April 2020 cross-motion further alludes to "any potential future dredging under the Permit." Dkt. 82 at 18 n.1. Lastly, the permit requires submittal of a certificate of compliance upon "completion of the activity authorized by this permit," which Sea Island has not submitted. *See* AR000013.

The issuance of the 2020 SARBO has not automatically brought the Corps into compliance with Section 7 of the ESA. Section 7 requires the Corps to consult with the expert agencies before undertaking projects that "may affect" endangered species. Section 7

consultation places not only procedural duties on the Corps, but substantive duties as well. Separation of the two is impossible. Strict compliance with Section 7's procedural requirements is necessary as a means of ensuring substantive compliance. *See Conner v. Burford*, 848 F.2d 1441, 1458 (9th Cir. 1988); *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985).

ESA regulations plainly require the contemporaneous written concurrence of the expert agencies after submittal of project-specific information. 50 C.F.R. § 402.13(c); § 402.14(c)(1); § 402.12(j). The Corps recognized this in its 2017 SARBA (nine months before Sea Island's amended application) which anticipated submittal to NMFS of similar project-specific information: "Information that will be sent to NMFS during the project NEPA process includes: project description, location[], construction methods, assurance of compliance with [project design criteria], [and] discussion of any specific impact pathways to [listed] species and/or critical habitat concerns." AR000451 (Beach Nourishment); AR000454 (Borrow Area Dredging) (same); *accord* 2020 SARBO at 72 ("NMFS will be notified at least 2 weeks prior to construction of any project covered under this Opinion…. The notification will include the required project information … that explains what the project is, where it will be happening, how it will be completed, and when work is expected to occur."). This approach makes sense, as NMFS can hardly concur in writing with projects about which it lacks basic information.

The Corps does not dispute that it still has not sent Sea Island-specific information to NMFS for consultation and concurrence review. Dkt. 81 at 29.

The Corps now claims that NMFS requested, in contravention of ESA regulations and prior established procedures, that the Corps never send any project-specific information or analysis. Dkt. 81 at 29 n.22. However, what NMFS said was "*The first step* is determining coverage under SARBO…we would not assign [the full project package] to staff *until that*

*question is answered*…." AR001310 (emphasis added). NMFS does not say "if the Corps determines the project is covered under SARBO, that is the end of the matter."

Just one month earlier, NMFS had told the Corps that "the status quo [for SARBO coverage] is in effect, which is basically limited to federal project boundaries." AR001221. The Corps fails to explain in the administrative record or in its briefing what changed in that intervening month. *See* AR001220–21 (Corps-internal correspondence alluding to "…developing guidance on use of SARBO/SARBA to be released soon," "…plans to expand SARBO…," and "…there might be some new flexibility on using the SARBO…"). The MFR simply states the project "is covered under the SARBA/SARBO." AR000270.

The Corps now implicitly claims that NMFS agreed to a novel, piecemeal consultation for Sea Island that relied on four separate documents pre-dating Sea Island's application and spread out over two decades. The Corps argues it relied on the 1997 SARBO as NMFS's concurrence with the effects determination for sea turtles, a North Atlantic Right Whale Conservation Plan for whales, the 2014 Section 7(d) analysis for sturgeon, and the 2017 SARBA to extend coverage of the previous documents to non-federally-operated projects. *See* Dkt. 81 at 32.[7] The Corps does not point to any written concurrence of NMFS with this approach. Nor does the Corps point to any caselaw that sanctions the piecemeal concurrence of an expert agency that has seen no project-specific information. Dkt. 81 at 31–32.

---

[7] The Corps did not mention SARBO/SARBA or Section 7(d) in its MFR discussion of sturgeon, instead copy-pasting from Sea Island's biological assessment to conclude that "activity and noise from dredging operations should deter sturgeon from swimming in the area." AR000270; Sea Island Acquisition, Supplemental Biological Assessment at 68, AR001801 (verbatim). *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) ("We do not find adequate support for the [agency]'s decision in its argument that the 3,000 page administrative record contains supporting data. The EA contains virtually no references to any material in support of or in opposition to its conclusions. That is where the [agency]'s defense of its position must be found.").

Sea Island and the Corps fall back on an argument that the issuance of the 2020 SARBO mooted Conservation Groups' ESA claim because the project here could have been covered. While the 2020 SARBO does address non-federal dredging and nourishment projects, neither the Corps nor Sea Island has shown that the Permit issued in September 2018 and first-modified in July 2019 is necessarily covered. Thus, the claim is not mooted. *Dupree v. Palmer*, 284 F.3d 1234, 1237 (11th Cir. 2002).

The Corps' failure to send project-specific information to NMFS for approval precludes coverage under the 2020 SARBO. 2020 SARBO at 71–73. Coverage also would require Corps review of all project details to ensure compliance with all applicable project design criteria (PDCs). *Id.* at 68. Project design criteria are "specific criteria, including the technical and engineering specification, indicating how an individual project must be sited, constructed, or otherwise carried out both to be covered under [2020 SARBO] and to avoid or minimize adverse effects to ESA-listed species or designated critical habitat." *Id.* at 13. The Corps has not demonstrated that it has conducted such a review or that all PDCs were required in Sea Island's permit.

For example, where a cutterhead dredge is used, the PDCs require a permit term mandating the "cutterhead will not be engaged/turned on when not embedded in the sediment, to the maximum extent possible." 2020 SARBO at 532. Sea Island's permit does not have this PDC. AR000001–44. When the Corps intends to issue a permit that does not comply with all PDCs, the 2020 SARBO now requires additional NMFS review and concurrence. 2020 SARBO at 68. The SARBO's consultation history describes ongoing revisions to PDCs up to September 13, 2019 and there could be other discrepancies between the September 2018 permit terms and

the 2020 SARBO that NMFS should review. *See id.* at 640–45.[8] In other words, the Corps and Sea Island's contentions that consultation is "complete" and additional consultation "would serve no purpose" are unsupported by the 2020 SARBO. Because Defendants have not shown that the 2020 SARBO provides coverage for this project, they fail to carry the heavy burden of demonstrating mootness. *Altamaha Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 309 F. App'x 355, 359 (11th Cir. 2009).

Whether NMFS would ultimately concur with the Corps' analysis is not for the Corps to decide. Allowing the Corps to make this determination would undermine the entire purpose of consultation. Allowing the Corps to avoid sending project-specific information to the experts turns a "may affect" species determination into a "no effect" determination. The Corps may not cut corners during the ESA consultation process and instead argue retroactively that its decision to avoid consultation was reasonable. The Corps remains in non-compliance with the Endangered Species Act and this Court should order appropriate relief.

**D. The Corps violated the Clean Water Act by failing to independently analyze practicable alternatives.**

The Corps violated the Clean Water Act by failing to adequately consider practicable alternatives—specifically, nourishment without a groin extending to the southern end of the Spit. Although the Conservation Groups thoroughly discuss this alternative in their Motion, the statistics bear repeating here: Coastal engineers have opted for nourishment *without* a groin—the Conservation Groups' proposed alternative—in over 96% of similar projects conducted in the Southeast over a recent ten-year period. Written Direct Testimony of Dr. Robert Young (Young WDT), AR003988. Indeed, even the Corps' own guidance manual counsels that "[c]oastal zone

[8] "Because the PDCs that are the core of the project description were under development through the entire process, consultation was initiated [on September 13, 2019,] very close to the issuance of this Opinion." 2020 SARBO at 15 n.5.

management policy in many countries and the United States presently discourages the use of groins for shore protection." *See* SELC 2017 Comments, AR003685 (quoting Coastal Engineering Manual at V-3-61[9]). And two experts testified under oath that this alternative would work here. *See, e.g.*, Webb WDT, AR004032–33; Young WDT, AR003993; Webb 2017 Report, AR004092–101. Despite all of this, the Corps barely even considered this alternative, despite the 404(b)(1) Guidelines' mandate to do so. 40 C.F.R. § 230.10(a).

In response to the Conservation Groups' claim, the Corps points to Sea Island's analysis as to why this alternative would not work. Dkt. 81 at 34. But the law requires the *Corps* to make this determination, not the applicant. This makes sense—to hold otherwise would allow the Corps "to abdicate its statutory duties by reflexively rubber stamping a statement prepared by others." *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974) ("The agency must independently perform its reviewing, analytical and judgmental functions and participate actively and significantly in the preparation and drafting process.").

Put differently, it does not matter whether Sea Island provided an analysis to the Corps; Eleventh Circuit case law and federal regulations say that the agency must independently verify the accuracy of the applicant's analysis. *See Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1263–67 (S.D. Fla. 2009), *aff'd*, 362 F. App'x 100 (11th Cir. 2010) ("The Corps has a duty to *independently evaluate* practicable alternatives to the proposed project …"); 33 C.F.R. Pt. 325, App. B ("The district engineer should document *in the record* the Corps' *independent evaluation* of the information and *its accuracy*…."); 40 C.F.R. § 1506.5(b) ("[T]he agency … shall make *its own* evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment."). In *Sierra Club v. Van Antwerp*, for example, the court set aside

[9] Available at https://www.publications.usace.army.mil/LinkClick.aspx?fileticket=ueOFzCUhCck%3d&tabid=16439&portalid=76&mid=43544.

a Clean Water Act permit because the Corps relied on a report from the permit applicant's expert "without critical review or verification." *Sierra Club*, 709 F. Supp. 2d at 1267. The court acknowledged that the proposed alternatives might fail, but explained that the law still required the Corps to independently evaluate them. *Id.*; *see also Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1165, 1187 (10th Cir. 2002) (holding that when a public commenter and an applicant disagree over the practicability of an alternative, the Corps may not rely upon the applicant's position without independently verifying its accuracy).

This is precisely what the Corps seeks to do here—rely on the analysis of Sea Island's hired experts without any critical review. Tellingly, the Corps does not point to any place in the record where the agency independently evaluated or verified Sea Island's consideration of alternatives.[10] In fact, in the "Response to Comments" section of the MFR, the Corps indicates that it "is satisfied with the applicant's response" on nearly every other issue. *See, e.g.*, MFR, AR000237, AR000238, AR000241, AR000242, AR000244, and AR000251. With respect to Sea Island's analysis of alternatives, however, the Corps did not say that it was "satisfied with the applicant's response," like it did on so many other of Sea Island's responses. Indeed, the Corps did not indicate that it accepted, incorporated, or even considered Sea Island's alternatives analysis in any way. Instead, the MFR directs readers to Section 5 of the document, where the Corps explicitly incorporates one paragraph of Sea Island's alternatives analysis, but leaves out the bulk of Sea Island's analysis—including parts that the Corps cites in its Response Brief. *Cf.*

[10] For example, the Corps points to Sea Island's statement that Dr. Webb's report confirms that the half-life of a nourishment project from the existing south groin to the end of the spit would be only 1.25 years. *See* Dkt. 81 at 36. Had the Corps independently verified this statement (or even performed a simple check of Sea Island's citations), it would have learned that this statement was taken out of context and omitted Dr. Webb's caveat that "adequate bypassing from the existing south groin would substantially increase the longevity of this fill material." Adequate bypass is a condition of the existing groin's permit, and Sea Island has repeatedly insisted that the south groin has adequate bypassing of sand.

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (explaining the common-sense *expressio unius* canon which allows the inference that things in an associated group that are not mentioned "were excluded by deliberate choice").

Despite the Corps' attempt to adopt Sea Island's analysis now that litigation has begun, the law is clear that the agency may not identify outside bases for rejecting alternatives after the fact. *See Nat'l Wildlife Fed'n v. Marsh*, 568 F. Supp. 985, 996-97 (D.D.C. 1983) ("Of great importance to a reviewing court is the distinction to be made between the [NEPA document] and the remainder of the administrative record.… Any substantial information pertinent to … the analysis of alternatives found in the administrative record, but not in the environmental impact statement, would render the impact statement inadequate under NEPA."); *see also Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) ("We do not find adequate support for the [agency]'s decision in its argument that the 3,000 page administrative record contains supporting data. The EA contains virtually no references to any material in support of or in opposition to its conclusions. That is where the [agency]'s defense of its position must be found."); *League of Wilderness Defs. v. Forsgren*, 184 F. Supp. 2d 1058, 1069 (D. Or. 2002) (criticizing the agency for "again go[ing] outside of the EA to a [report] in the Administrative Record in attempting to assure the court that 'cumulative impacts' were considered").

The only independent, contemporaneous rationale the Corps offered for rejecting the Conservation Groups' proposed alternative was that the proposed alternative was "outside the scope" of the project. But that is not a valid objection. The Corps may reject an alternative as impractical or incapable of being done or, in some cases, as too costly, but it may not reject an alternative simply because it is outside the geographical footprint of a project. Quite the opposite,

the law *requires* the Corps to consider available off-site alternatives where practicable, even if those alternatives are on land not owned by the applicant. 40 C.F.R. § 230.10 ("If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.").

The Corps' after-the-fact attempt to connect the MFR's "outside the scope" language with the conservation easement does not hold water. The Corps referenced the easement only in passing to indicate that "currently there is no development or potential for development in the upland property that is bounded by the existing conservation easement." AR000258. The Corps did *not* say that the conservation easement was a basis for finding this alternative to be "outside the scope" of the project, did *not* analyze the language of the conservation easement in any way, and did *not* attempt to determine whether the easement even applied.[11]

[11] Even if the Corps had properly relied on the conservation easement—which it did not—its analysis would be arbitrary and capricious. First, the conservation easement states that if an activity does not impair conservation values and the holder of the conservation easement approves, the activity may proceed. Under the terms of the easement, "Shoreline Engineering Activities" [including 'beach restoration or re-nourishment'] more than 160 feet south of the northern boundary are not specifically listed under the "Prohibited Uses" provision. Easement at p. 7, ¶ 8. Instead, these activities would fall under ¶ 8(k), which prohibits "any [other] unanticipated use or activity on or at the Property which would impair conservation values . . . ." Id. at p. 8, ¶ 8(k). That section, however, is modified as follows: "unless such use or activity is necessary for the protection of the Conservation Values that are the subject of this Easement, in which case such use or activity shall be subject to the approval of Grantee [St. Simons Land Trust], which approval shall not be unreasonably withheld." Id. at p. 8, ¶ 8(k). Under these limited circumstances, it is possible that the grantee would find that nourishment from the existing south groin to Gould's Inlet—for the limited purpose of avoiding the detrimental impacts of an updrift groin—would further the Conservation Values referenced in the easement and thus permit such nourishment. In any event, the record shows that the Spit could be nourished from the southern groin to its tip without affecting the portion of the beach protected by the conservation easement. *See* SELC 2017 Comments, AR003702-03; Webb Supplemental Report, AR004092-4101; SELC 2018 Comments, AR001202.

In the MFR (but not its Motion), the Corps also suggests that the Conservation Groups' proposed alternative—which involved nourishment on the length of the Spit—would not serve the project's overall purpose. As explained in the Conservation Groups' Motion, this rationale is based on a misunderstanding of the purpose of the extended nourishment. The purpose of the extension would be to support the nourishment project in front of the Reserve (and thereby support the overall project purpose) by extending its half-life. The purpose of the extension would not be to protect upland areas on the Spit, as the Corps incorrectly assumed. *See* Dkt. 68 at 15.

**E. The Corps did not adequately consider cumulative impacts.**

As described in the Conservation Groups' Motion, the Corps' consideration of cumulative impacts was inadequate. The Corps' description of how it satisfied the five-factor test is conclusory at best. For example, with respect to the first factor (geographic scope), the Corps says that "the scope of the Corps' cumulative impacts assessment was appropriately defined," Dkt. 81 at 26, but does not offer any analysis or explanation as to why its chosen scope was appropriate. Rather than address the specific CEQ guidance cited by the Conservation Groups, the Corps argues only that it is not practical to analyze the cumulative effects "on the universe." Dkt. 81 at 28 (citing CEQ, *Considering Cumulative Effects Under the National Environmental Policy Act* (Jan. 1997), Table 1-2, p. 8). However, they ignore that CEQ recommends analysis of the entire coastal region or watershed when conducting a cumulative effects analysis for coastal zone resources. *Id.* at 15. Or that CEQ recommends consideration of the entire species habitat or ecosystem when evaluating impacts to wildlife resources. *Id.*

**F. The Conservation Groups properly exhausted their claims at the administrative level.**

Under the "issue exhaustion" rule, courts typically will not consider issues that were not raised before the administrative agency. However, a plaintiff "need not raise an issue using precise legal formulations, as long as enough clarity is provided that the decision maker understands the issue raised." *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010). In addition, the exhaustion requirement is satisfied if other parties besides the plaintiff raised an issue before the administrative agency, or "if the agency's decision, or a dissenting opinion, indicates that the agency had 'the opportunity to consider 'the very argument pressed'" by the plaintiffs on judicial review. *See Am. Forest & Paper Ass'n v. U.S. Envt'l Prot. Agency*, 137 F.3d 291, 296 (5th Cir. 1998); *Nat. Res. Def. Council, Inc. v. U.S. Envt'l Prot. Agency*, 824 F.2d 1146, 1151 (D.C. Cir. 1987). As shown below, the Conservation Groups properly exhausted all of their claims.

**1. The Conservation Groups raised the issue of access, as did other commenters and the Corps.**

Sea Island argues that "no commenter expressed concern to the Corps during the permitting period about reaching [the tidelands fronting the new development] by foot." Dkt. 82 at 21. In their May 23, 2018 comments, however, the Conservation Groups complained that the proposed project would violate the Corps' public interest guidelines because, among other things, the groin would "disrupt the public's right to use public tidelands on the Spit…for their recreation and enjoyment…." SELC 2018 Comments, AR001209. Not only did the Conservation Groups raise the argument, they cited the specific regulation relied upon in their Complaint, 33 C.F.R. § 320.4. *Id.*; *see also* Second Amended Complaint, Dkt. 59 at 24.

In addition, multiple other commenters expressed concern that the proposed project would effectively privatize the beach in front of the new development. *See* Comments of Leslie Graitcer, AR003417 ("[T]he beach in front of these homes will not be open to use of any other Georgia residents."); Comments of Monica Smith, AR003423 ("[I]t would be nice to have the USACE affirm that the beach is public and properly accessible to the public at all times.").

Finally, the Corps itself raised and addressed the access requirement in the Memorandum for Record and Environmental Assessment (MFR), despite reaching a different conclusion. MFR, AR000329 ("In the case of proposals which create undue interference with access to, or use of, navigable waters, the authorization will generally be denied."). Despite claiming in its brief that the Corps did not have an opportunity to consider this argument, Sea Island recognizes just the opposite in its Statement of Facts, explaining, "The Corps' MFR spends several pages addressing the issue of public access, ultimately rejecting the concerns raised." Dkt. 82-1 at ¶ 49.

**2. The Conservation Groups raised the issue of cumulative impacts multiple times, as did other commenters and the Corps.**

Sea Island also complains that the Conservation Groups did not raise the issue of cumulative impacts. To the contrary, the Conservation Groups repeatedly noted that the Corps must analyze, to the extent 'reasonable and practicable,' the cumulative impacts of the proposed project." SELC 2016 Comments, AR002153; SELC 2018 Comments, AR001203-04. Again, they even cited the specific regulation relied upon in their Complaint. *Id.* ("The Guidelines require the Corps to predict, to the extent 'reasonable and practicable,' the cumulative effects of the project. 40 C.F.R. § 230.11(g)(2)."); *see also* Dkt. 59 at 22. Regarding the geographic scope of cumulative impacts, Surfrider and other commenters specifically addressed the need to examine the "potential impacts the project may have on East Beach, St. Simons Island as cumulative sand losses reduce the amount of sand making it into inlet shoals, and thus reduce the

amount of sand bypassing the inlet onto St. Simons" – an area that was excluded from the geographic scope ultimately considered. AR002102-03 (expert report of Dr. Robert Young). Like with public access, other commenters raised the issue of cumulative impacts as well. *See* Greenlaw Comments, AR002053 ("Finally, with respect to adverse impacts, the Corps must predict and consider the cumulative impacts of the project to the extent "reasonable and practical."). So did the Corps. MFR § 9.2, AR000289.

**3. The Conservation Groups properly raised the Corps' obligation to consult with NFMS about any activities that may affect threatened or endangered marine life.**

Sea Island also complains that the Conservation Groups did not object to the proposed offshore dredging of sand. But the Conservation Groups' claim regarding offshore dredging is based on the Corps' failure to consult with NMFS before authorizing dredging. In their January 2016 Comments, the Conservation Groups broadly explained the Corps' obligation to consult with USFWS or NMFS for any future activities that may affect threatened or endangered species. SELC 2016 Comments, AR002155-56 ("[T]he Corps may not issue a Section 404 permit until it completes a consultation with FWS or NMFS."). With respect to offshore dredging specifically, the U.S. Fish and Wildlife Service raised the Corps' obligation to consult with NMFS regarding marine life in their comments to the Corps, further satisfying the issue exhaustion requirement. AR001212 (directing the Corps to "refer to NMFS for impacts in the water").

**G. The Corps unlawfully modified Sea Island's Permit and the removal of the groin tie-in extension does not moot Conservation Groups' modification claim.**

Sea Island, but not the Corps, argues that aspects of the Conservation Groups' permit modification claim were mooted by the removal of the 130-foot groin extension as required by Sea Island's Consent Order with the Georgia Department of Natural Resources, Coastal

Resources Division (CRD). But the groin extension was not the only violation of the Permit that the Corps sanctioned. Further, CRD's enforcement of its permit certainly has not mooted the Conservation Groups' argument relating to the Corps' failure to provide public notice or consult with NMFS pursuant to the Clean Water Act before rubberstamping Sea Island's permit violations.

On March 4, 2020, Sea Island and CRD entered into a Consent Order to resolve several of Sea Island's state permit violations during construction of this project. Specifically, CRD found that Sea Island failed to seek or obtain approval from CRD "before making modifications to the plans for the T-head groin by constructing the rock groin tie-in … [or] making modifications to the plans for the access ramp." Dkt. 75-1 at 8. During a site visit CRD also "discovered that the access ramp had been constructed, in part, with inappropriate and unauthorized materials such as brick and other construction related debris." *Id.* at 9. CRD determined these violations "were not minor deviations of the permit." *Id.* CRD ordered Sea Island to remove the groin tie-in and access ramp and pay a $40,000 fine. *Id.* at 10–11.

The groin tie-in extension and access ramp construction had violated the federal permit too. As described in the Conservation Groups' Motion, Sea Island also violated other terms of its federal permit, including deviations from the dune design, renourishment with sand from an unauthorized area, and dredging in unauthorized locations and depths. Dkt. 68 at 20–21. Nevertheless, the Corps modified Sea Island's permit, compounding errors made to support the original permit issuance.[12] Although the status of all the federal violations of the original permit

[12] For example, Hurricanes Matthew and Irma significantly changed the shoreline, as pointed out to the Corps in several comments. AR003704; AR004100–01; AR001182. Sea Island failed to take this into account during permitting and then during construction determined so-called "good engineering practices" necessitated the construction of an extension of the groin to reach back to the eroded upland. *See* AR004759. The Corps did not consider this when

is unclear in the wake of CRD's enforcement, *see* Dkt. 78-2, the Conservation Groups maintain that the Corps' failure to seek public input and acceptance of Sea Island's excuses for the violations was arbitrary.

The Corps' failure to consult NMFS about Sea Island's proposed dredging in the first instance led to the violation of Corps regulations when the Corps modified the permit in 2019. The Corps "shall consult with resource agencies before modifying any permit terms or conditions, that would result in greater impacts, for a project about which that agency expressed a significant interest in the term, condition, or feature being modified prior to permit issuance." 33 C.F.R. § 325.7(b).[13]

In the original MFR for the Permit as issued in September 2018, the Corps concluded that dredging "may affect" endangered and threatened marine species. AR000268–70. Sea Island then violated the terms of its permit and told the Corps that "dredging locations and depths deviated." AR004755. It is unclear what is meant by "dredging locations … deviated," and it seems the Corps never asked. *See* AR005146 (bathymetry survey dated March 10, 2019).

The MFR for the permit modification discusses the violations where Sea Island dredged deeper than permitted, but not where Sea Island dredged shallower than anticipated (with the cutterhead closer to the surface of the seafloor). AR004644. The Corps then concludes that the "deviation from the approved cut depths is minor and did not change any of the effect

---

rubberstamping the modification. The Conservation Groups also note there is no guarantee Sea Island will not seek a third modification to rebuild the groin extension.

[13] The Corps, but not Sea Island, argues that Conservation Groups did not properly plead this claim. Dkt. 81 at 41. Conservation Groups' Second Amended Complaint alleges that the Corps' decision to modify the Permit without adequately notifying the public or considering and explaining the impacts of the modification violated the APA and the CWA. Dkt. 59 ¶ 168–70. Conservation Groups' further specifically quoted the Corps' MFR acknowledgement of the dredging violations. *Id.*¶ 91(d). The Corps was thus on notice that its consideration of the dredging violations under its CWA modification regulation was a basis of the claim asserted. Fed. R. Civ. P. 8(a)(2).

determinations and evaluations made in the [original MFR]."*Id.* Yet a permit violation can be considered "minor" by the Corps and still result in greater impacts than authorized.

As explained in Section C above, NMFS never had a chance to weigh in on, or "express[] a significant interest in," this aspect of the project before the permit was issued.[14] The Corps violated the CWA and APA by again cutting corners during its review of Sea Island's modification request.

## III. CONCLUSION

For the reasons described above and in the Conservation Groups' Motion for Summary Judgment, the Court should grant summary judgment in favor of the Conservation Groups, vacate the permit, and require removal of any portion of the groin built during this litigation as well as mitigation of any impacts caused by the construction of the project.

Respectfully submitted this 15th day of May, 2020.

**SOUTHERN ENVIRONMENTAL LAW CENTER**

/s/ *Megan Hinkle Huynh*
William W. Sapp
Georgia Bar No. 626435
Megan Hinkle Huynh
Georgia Bar No. 877345
Ten 10th Street NW, Suite 1050
Atlanta, Georgia 30309
Phone: (404) 521-9900
bsapp@selcga.org
mhuynh@selcga.org

*Counsel for Plaintiffs*

[14] When NMFS did have a chance to review the pre-dredging proposal, it advised the Corps to not permit construction of the groin. AR004103.

**CERTIFICATE OF SERVICE**

I certify that on May 15, 2020, I electronically filed the foregoing *Reply in Support of Motion for Summary Judgment and Response in Opposition to Defendants' Cross-Motions for Summary Judgment* with the Clerk of Court using the CM/ECF system.

/s/ *Megan Hinkle Huynh*