IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2020 SEP 30 P 2: 35

CLERK J. Hodge
SO. DIST. OF GA.

ALTAMAHA RIVERKEEPER; ONE HUNDRED        *
MILES; CENTER FOR A SUSTAINABLE          *
COAST, INC.; and SURFRIDER               *
FOUNDATION,                              *
                                         *
        Plaintiffs,                      *
                                         *
    v.                                   *        CV 418-251
                                         *
THE UNITED STATES ARMY CORPS OF          *
ENGINEERS; LT. GENERAL TODD T.           *
SEMONITE, in his official capacity       *
as Commanding General of the U.S.        *
Army Corps of Engineers; COL.            *
DANIEL HIBNER, in his official           *
capacity as District Commander of        *
the Savannah District; TUNIS             *
MCELWAIN, in his official capacity       *
as Chief of the Regulatory Branch        *
of the U.S. Army Corps of                *
Engineers,                               *
                                         *
        Defendants,                      *
                                         *
SEA ISLAND ACQUISITION, LLC,             *
                                         *
        Defendant-Intervenor.            *


─────────

**O R D E R**

─────────


    This is an action under the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 701 *et seq.*, challenging Permit Number SAS-

2015-00742 (the "Permit") issued by the United States Army Corps

of Engineers (the "Corps") to Sea Island Acquisition, LLC, and the

subsequent modification of the Permit.   The Permit allows Sea Island Acquisition to construct a new T-head groin on the Sea Island Spit and to dredge and pump sand from an offshore source for construction of the T-head groin, new dunes and beach renourishment.   All parties in the case have filed their respective motions for summary judgment, which are ripe for adjudication.[1] The Federal Defendants and the Defendant-Intervenor Sea Island Acquisition call upon the Court to find that the Corps did not act arbitrarily and capriciously by issuing the Permit and modification and that the Corps acted within its discretion and authority in issuing the Permit and modification; thus, they seek judgment as a matter of law on all of Plaintiffs' claims. Plaintiffs, four separate and distinct conservation groups, ask the Court to vacate the Permit and require removal of any portion

---

[1]   Specifically, Plaintiffs Altamaha Riverkeeper, One Hundred Miles, and Surfrider Foundation filed a motion for summary judgment and Plaintiff Center for a Sustainable Coast, Inc., filed a motion for summary judgment on February 28, 2020.   (Docs. 68 & 70, respectively.)   Defendants United States Army Corps of Engineers, Lt. Col. Todd T. Semonite, Col. Daniel Hibner, and Tunis McElwain (the "Federal Defendants") filed their motion for summary judgment on April 17, 2020.   (Doc. 81.)   Defendant Sea Island Acquisition also filed a cross-motion for summary judgment that same day. (Doc. 82.)   The Clerk gave the non-moving parties notice of the summary judgment motions and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default.   (Docs. 69, 71, 83 & 84.)   Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.

of the groin that has been built as well as mitigation of any impact caused by the construction of the project.

## I.   STATUTORY FRAMEWORK

Plaintiffs seek review of the Corps' actions under the APA for alleged violations of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1388, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370m, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.

The CWA was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."   33 U.S.C. § 1251(a).   Section 301(a) of the CWA prohibits discharges of pollutants, such as dredged or fill material, into "navigable waters" except in compliance with the statute.   33 U.S.C. § 1311(a).   Section 404(a) authorizes the Secretary of the Army, acting through the Corps, to issue permits for the discharge of dredged or fill material at specified disposal sites.   33 U.S.C. § 1344(a).   Because the Project at issue in this case involved the placement of dredged or fill material in the navigable waters of the United States, a Section 404 permit was required.

The Corps issues CWA Section 404 permits under the guidance and requirements imposed by its regulations, see 33 C.F.R. Pt. 320, as well as the CWA Section 404(b)(1) Guidelines developed by the Environmental Protection Agency and the Corps, see 40 C.F.R.

3

Pt. 230.  The Section 404(b)(1) Guidelines specify that the Corps must ensure that the proposed fill material will not cause any significantly adverse effects on human health or welfare, aquatic life, aquatic ecosystems, or recreational, aesthetic, or economic values.  40 C.F.R. § 230.10(c)(1)-(4).  In addition, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternate does not have other significant adverse environmental consequences."  40 C.F.R. § 230.10(a).

NEPA requires federal agencies to consider and disclose potential environmental effects of a proposed "major federal action," which includes CWA Section 404 permits.  Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 371 (1989).  NEPA is a purely procedural statute; it does not mandate substantive results.[2]  Id. It "requires only that the agency take a 'hard look' at the environmental consequences before undertaking a major action."  N. Buckhead Civil Ass'n v. Skinner, 903 F.2d 1533, 1540-41 (11th Cir. 1990) (quoted source omitted).  An agency's evaluation of environmental consequences must be based on scientific information

---

[2]  The federal regulations implementing NEPA were comprehensively updated recently with an effective date of September 14, 2020. See Fed. Reg. 43,304 (July 16, 2020).  The Court cites, however, to the federal regulations as they existed at the time of the agency action in this case.

that is both "accurate" and of "high quality."   40 C.F.R. §
1500.1(b).   If an agency relies on the permit applicant to submit
environmental information, the agency "shall independently
evaluate the information submitted . . . and shall be responsible
for its accuracy, scope, and content . . . ." 40 C.F.R. § 1506.5(a).

NEPA requires agencies to prepare an Environmental Impact
Statement ("EIS") for "major Federal actions significantly
affecting the quality of the human environment . . . ."   42 U.S.C.
§ 4332(C).   To determine if an action requires an EIS, the agency
will prepare an Environmental Assessment ("EA"), a document that
briefly describes the proposal, examines alternatives, and
considers environmental aspects.   40 C.F.R. §§ 1501.4(b), 1508.9;
Fund for Animals v. Rice, 85 F.3d 535, 546 (11th Cir. 1996).   If
the agency concludes the action will not have significant impact,
it may issue a Finding of No Significant Impact ("FONSI") in lieu
of an EIS.   40 C.F.R. § 1508.9(a)(1).

The ESA requires federal agencies to carry out the
Congressional policy of conserving "endangered" or "threatened"
plant and animal species.   16 U.S.C. § 1531(b).   The ESA provides
for the listing of species as threatened or endangered, if
warranted, and for the designation of "critical habitat."   16
U.S.C. § 1533(a).   Section 7 of the ESA requires that federal
agencies ensure that any action authorized, funded, or carried out
by such agency is not likely to "jeopardize the continued existence

5

of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical . . . ." 16 U.S.C. § 1536(a)(2). The Secretary refers to either the Secretary of the Interior and the Secretary of Commerce, who in turn have delegated their responsibilities to the United States Fish and Wildlife Service ("USFWS") and the National Marine Fisheries Service ("NMFS"), respectively.[3]

If the action agency determines its action "may affect" a listed species or critical habitat, it is required to consult with the USFWS or NMFS depending on the species at issue. 50 C.F.R. § 402.14(a). If the action agency determines, with written concurrence of USFWS or NMFS, that the action "is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." 50 C.F.R. § 402.13(a). A formal consultation is required if the agency action is likely to adversely affect listed species or critical habitat. Formal consultation culminates in the issuance of a "biological opinion" by USFWS or NMFS. See 50 C.F.R. § 402.14(g).

---

[3] In general, the USFWS has authority over terrestrial species and the NMFS has authority over marine species. See, e.g., Nw. Res. Info. Ctr. v. NMFS, 56 F.3d 1060, 1065 (9th Cir. 1995). Plaintiffs challenge the Corps' Section 7 compliance only as to consultation with NMFS.

## II.   FACTUAL BACKGROUND

Under the APA, judicial review generally involves only the agency's administrative record, which documents the agency's decision-making process and justifies its decision.   Thus, the facts set forth herein are either undisputed or drawn from the Administrative Record[4] in this case as asserted by a party in its Statement of Material Facts.   The Court has independently verified the facts against the asserting party's citation to the Administrative Record.   The Court will only cite to the Administrative Record (or "AR" with the Bates page numbers) to the extent it believes helpful to do so.

Sea Island is a barrier island along the Georgia coast that is approximately five miles long.   The southern portion of the island is an undeveloped area known as the Spit, which is largely protected by a conservation easement.   In fact, the southern portion of the island provides habitat for threatened and endangered sea turtles and shorebirds.   The Spit is part of the sand-sharing system of surrounding coastal barrier islands.   Sea Island is also a popular recreation area for surfing, paddling, kayaking and walking along the beach.

In October 2015, Sea Island Acquisition, a private resort and real estate development company, filed an application with the

---

[4]   The Federal Defendants filed the Administrative Record in three parts.   (See Docs. 46, 48 & 67.)

Corps seeking a CWA Section 404 permit to construct a T-head groin south of property it sought to develop on Sea Island known as the "Reserve," which is located immediately north of the conservation easement boundary. (Application, AR at 3479-3682.) The application also sought authorization to construct dunes and renourish the beach between an existing groin and the proposed groin.[5,6]

A groin is a hard structure, often constructed of rock, concrete or steel, that is built perpendicular to the beach and extends into the water. Plaintiffs presented evidence by way of expert opinion and publications that groins may trap or block sand on the "updrift" side of the groin that would otherwise naturally move with the prevailing currents along the shoreline to the "downdrift" side of the groin. This may cause an acceleration of downdrift erosion. Plaintiffs also presented evidence that the proposed groin would have negative impacts on wildlife, especially sea turtles.

On December 18, 2015, the Corps published notice of the Project. The overwhelming majority of comments received by the

---

[5]  The proposed construction of the groin, renourishment of the beach, and activities in furtherance thereof are collectively referred to as the "Project."

[6]  The proposed groin is south of two existing groins, the closest one referred to as the Southern Groin and the other referred to as the Northern Groin.

Corps from individuals, federal and state agencies, and conservation organizations opposed the Project, and many requested a public hearing. (See generally Table of Requests for Public Hearing, AR at 548-558; Table of Issues and Concerns, AR at 559-728.) The Corps did not hold a public hearing.

Following the initial notice and comment period on Sea Island Acquisition's application, two major hurricanes, Matthew and Irma, caused substantial damage to Sea Island. The storms severely eroded the beach and many of the dunes on the Spit. Sea Island Acquisition was alerted that the Project needed to be "redesigned and reevaluated." Sea Island Acquisition therefore submitted an addendum to its 2015 permit application, seeking authorization (1) to construct the new T-head groin on the Spit (as previously requested); (2) to dredge between 1,315,000 to 2,500,000 cubic yards of sand from an offshore source; and (3) to renourish over 17,000 linear feet[7] of beach on Sea Island from the existing Northern Groin to the proposed T-head groin. (Amended Application, AR at 1699-1889.) In support of its supplemental application, Sea Island Acquisition submitted an amended biological assessment which concluded that the proposed Project "may affect" but was "not likely to adversely affect" threatened and endangered species. (Id. at 1729-1824.)

---

[7] The 2015 permit application involved only 1,200 linear feet of beach.

Because of the substantial changes proposed in the March 2018 addendum, the Corps published notice of the revised Project on March 20, 2018.  The Corps again received numerous comments to the proposed revised Project.  Despite pending requests, the Corps did not hold a public hearing.

Following receipt of public comments, the Corps prepared a Memorandum for Record ("MFR") documenting its Environmental Assessment and Statement of Findings for the permit application. (MFR, AR at 219-307.)  The Corps stated therein that the Project's purpose was "storm protection" and "to protect upland lots and development located along the shoreline of Sea Island from storm damages."  On September 12, 2018, the Corps issued the Permit authorizing the construction requested by Sea Island Acquisition in its 2018 addendum.  (Permit, AR 1-44.)  Concurrently, the Corps issued an Environmental Assessment ("EA") with a finding of no significant impact ("FONSI").  (Id.)

After the permit was issued, Plaintiffs filed this lawsuit.[8] The Court denied their motion for preliminary injunction, however,

---

[8]  The instant case was filed by Plaintiffs Altamaha Riverkeeper and One Hundred Miles on October 31, 2018.  Two days later, Plaintiff Center for a Sustainable Coast, Inc. filed suit regarding the same Permit, see Ctr. for a Sustainable Coast, Inc. v. U.S. Army Corps of Eng'rs, Case No. 4:18-CV-254 (S.D. Ga. Nov. 2, 2018), which was then consolidated into this action (see id., doc. 13). On December 19, 2019, the Court granted Sea Island Acquisition's motion to intervene. (Doc. 24.)  On February 13, 2019, Plaintiffs filed an Amended Complaint to add Plaintiff Surfrider Foundation and a claim under the Endangered Species Act. (Doc. 41.)  On

10

and Sea Island Acquisition began constructing the Project.[9]
Plaintiff Center for a Sustainable Coast, Inc. ("CSC") discovered
that Sea Island Acquisition had dredged sand from unauthorized
locations and depths as well as placed sand in unauthorized
locations among other violations of the Permit.  Plaintiff CSC
notified the Corps and Sea Island Acquisition of its intent to
sue. (NOI Letter dated Apr. 24, 2019, AR at 5174-5192.)
Thereafter, Sea Island Acquisition asked the Corps to modify the
permit to "authorize the project as it has been constructed to
date." (Modification Request, AR at 5055-5146.)  In response, the
Corps found that Sea Island Acquisition had violated the terms of
its permit, but it approved the modification request on July 5,
2019. (Modification MFR, AR at 4639-4647; Permit Modification
Authorization, AR at 4628-4638.)  The Corps had determined that
the proposed modifications did not change the original
determinations regarding historic properties, the Public Interest

---

September 13, 2019, Plaintiffs filed Amended Complaints in light
of the Corps' 2019 modification to the original Permit.  These
Amended Complaints (docs. 59 & 60) are the operative complaints in
the case.

[9]  For purposes of the preliminary injunction motion, the Court
considered whether or not Plaintiffs had a likelihood of success
on the merits of several of their claims, and the Court concluded
that Plaintiffs were unlikely to be able to establish successfully
that the Federal Defendants had violated their obligations under
NEPA, the CWA, or the APA.  The Court did not address any claim
under the ESA or pertaining to the Permit modification. (See Order
of Dec. 10, 2018, Doc. 23.)

Review, the Section 404(b)(1) analysis, or cumulative impacts assessment performed during the evaluation of the original permit, and that the proposed modifications were in the public interest, were in compliance with the Section 404(b)(1) Guidelines, and would not have a significant effect on the human environment. (See generally Modification MFR.)

### III.   STANDING

At the outset, the Court must address Defendants' challenge to Plaintiffs' standing.   Article III of the United States Constitution requires a plaintiff to show:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)).   All four Plaintiffs are organizations, meaning they have standing to sue on behalf of their members when one of their members (1) would otherwise have standing to sue individually; (2) the member's interests at stake in the suit are germane to the organization's purpose; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id. (citing

12

Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)).   Finally, because Plaintiffs are challenging agency action under the APA, they must identify some action taken by the agency that affects them in the required manner; and they must show that they have suffered a "legal wrong" or a wrong within the zone of interests of the underlying statute.   See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 882-83.[10]

As the parties invoking federal jurisdiction, Plaintiffs bear the burden of demonstrating their standing.   See Lujan, 504 U.S. at 561.   So long as one of the Plaintiffs has standing, the Court need not decide whether each Plaintiff has standing, especially where they seek a particular form of global relief.   See Comfort v. Lynn School Comm., 418 F.3d 1, 11 (1st Cir. 2005)[11] (citing Watt v. Energy Action Educ. Found., 454 U.S. 151, 160 (1981) ("Because we find California has standing, we do not consider the standing of the other plaintiffs." (cited sources omitted))); Rumsfeld v. F. for Acad. & Institutional Rights, Inc., 547 U.S. 47, 52 n.2 (2006) (agreeing with Court of Appeals that "the presence of one party with standing is sufficient to satisfy Article III's case-

---

[10]   Plaintiffs satisfy both of these requirements.   The Permit is a final agency action, and the injuries Plaintiffs assert are of the sort intended to be prevented by NEPA and the CWA.

[11]   Comfort was abrogated on other grounds by Parents Involved in Comm. Schools v. Seattle School Dist. No. 1, 551 U.S. 701 (2007).

or-controversy requirement"); Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1170 (11th Cir. 2006) ("So long as one party has standing, other parties may remain in the suit without a standing injury.") (citing Clinton v. City of New York, 524 U.S. 417, 434-36 (1998)).[12]  For the following reasons, the Court finds that Plaintiff Altamaha Riverkeeper ("ARK") has satisfied Article III's standing requirements.

ARK supports its standing with declarations from its Executive Director, Jenifer Hilburn, and one of its members, Joni House.  (See Hilburn Decl., Doc. 41-1; House Decl., Doc. 41-2.) Defendants argue that these declarations fail to demonstrate that at least one of ARK's members would have standing to sue in her own right.  See Summers v. Earth Island Inst., 555 U.S. 488, 498 (2009) (requiring that at least one identified member of a plaintiff-organization suffer harm).

Ms. House's declaration states that she engages in recreational activities[13] near the Spit and derives aesthetic enjoyment from the Spit's natural state.  (See House Decl. ¶¶ 5-8.)  She states that the proposed project would have a negative

---

[12]  For further discussion – and criticism – of the "one good plaintiff" rule, see Aaron-Andrew P. Bruhl, One Good Plaintiff Is Not Enough, 67 DUKE L. J. 481 (2017).

[13]  Ms. House sails, swims, kayaks, crabs, fishes, bird-watches, views wildlife, star-gazes, beach walks, and more on the Spit and surrounding areas.  (See House Decl. ¶ 6.)

impact on her enjoyment of the Spit and its wildlife and that those harms "would be redressed by an appropriate order of this court." (Id. ¶¶ 3, 8.)   This satisfies the "identifiable member" requirement from Summers.

The Court finds that Ms. House's declaration also satisfies the other requirements of organizational standing for ARK: Ms. House would have standing to sue individually, her interests are germane to those of ARK,[14] and neither the claim asserted nor the relief requested requires individual participation of ARK's members.

Defendants next argue that Ms. House's recreational and aesthetic interests are "too vague and conclusory to establish injury-in-fact" for Article III standing.   However, the United States Supreme Court has held that "plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Laidlaw, 528 U.S. at 183 (quoting Sierra Club v. Morton, 405 U.S. 727, 735

---

[14]   ARK's purpose is to "protect, defend, and restore" areas of the Georgia coast including the Spit.   (See Hilburn Decl. ¶ 4.)   It does so through public education, advocacy, litigation, and monitoring of the area.   (See id.)

15

(1972)).  Ms. House's declaration satisfies that standard, at least with respect to ARK's claims premised on NEPA and the CWA.[15]

ARK also meets Article III's requirements of traceability and redressability.  As discussed above, Ms. House documents an injury in fact.  As for traceability, ARK must show that its members' injury is "fairly traceable to Defendants' – rather than a third party's – actions."  See Lujan, 504 U.S. at 560.  In other words, it must be "reasonably probable that the challenged actions will threaten" a plaintiff's interests.  Ouachita Watch, 463 F.3d at 1172.  Ms. House's declaration satisfies that requirement by explaining how the proposed project would negatively affect her recreational and aesthetic interests by harming the wildlife and habitat as well as increasing erosion of the Spit.

Finally, Article III requires that the injury be redressable by a favorable decision.  ARK ultimately seeks removal of the Project, which would remediate the injuries discussed above.  Accordingly, ARK has Article III standing.  As such, the Court need not address the standing of the remaining Plaintiffs.

## IV.   STANDARD OF REVIEW

Summary judgment in an APA case "serves as the mechanism for deciding, as a matter of law, whether an agency action is supported

---

[15]  Because Plaintiffs' ESA claim is moot, their standing with respect to that claim is not considered.  See Section V.E., *infra*.

16

by the administrative record and is otherwise consistent with the APA standard of review." Resolute Forest Prod., Inc. v. U.S. Dep't of Agric., 187 F. Supp. 3d 100, 106 (D.D.C. 2016). Because of the limited role a district court plays in reviewing the administrative record, the typical summary judgment standards are not applicable. Rather, the APA provides the following standard of judicial review of agency actions on summary judgment:   A court must set aside agency action it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).   The "arbitrary and capricious" standard of review is "exceedingly deferential." Fund for Animals, 85 F.3d at 541; see also N. Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1538 (11th Cir. 1990) ("Along the standard of review continuum, the arbitrary and capricious standard gives an appellate court the least latitude in finding grounds for reversal.").   "The reviewing court may not substitute its judgment for that of the agency but must, instead, defer to the agency's technical expertise." City of Oxford, Ga. v. FAA, 428 F.3d 1346, 1352 (11th Cir. 2005).

The court is required to determine whether the Corps' decision "was reasonably supported by the information before it.   This does not require that all the data support the agency's decision." Envtl. Coal. Of Broward Cnty. v. Myers, 831 F.2d 984, 986 (11th Cir. 1987).   "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action

including 'a rational connection between the facts found and the choice made.'" <u>Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) (quoted source omitted).

With respect to NEPA, an agency's decision is arbitrary and capricious under the required "hard look" review if it suffers from one of the following: "(1) the decision does not rely on the factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise." <u>Sierra Club v. U.S. Army Corps of Eng'rs</u>, 295 F.3d 1209, 1216 (11th Cir. 2002).

Finally, at all times the burden is on Plaintiffs to demonstrate that the Corps acted arbitrarily and capriciously. <u>See</u> <u>Black Warrior Riverkeeper, Inc. v. Ala. Dep't of Transp.</u>, 2016 WL 223672 (M.D. Ala. Jan. 19, 2016); <u>see also</u> <u>Legal Envtl. Assistance Found. Inc. v. U.S.E.P.A.</u>, 276 F.3d 1253, 1265 (11th Cir. 2001) ("[A] party seeking to have a court declare an agency action to be arbitrary and capricious carries a heavy burden indeed."). "Absent evidence to the contrary, [the court will] presume that an agency has acted in accordance with its regulations." <u>Sierra Club</u>, 295 F.3d at 1223.

## V.   LEGAL ANALYSIS

Plaintiffs contend they are entitled to summary judgment on their claims that the Corps violated the CWA, NEPA and the ESA in the following ways:

- The Corps violated NEPA by failing to take a "hard look" at the impacts of the Project and failing to prepare an EIS.

- The Corps violated the CWA and NEPA by failing to adequately evaluate the cumulative impacts of the Project.

- The Corps violated the CWA by issuing the Permit when there is a less environmentally damaging practicable alternative.

- The Corps violated the CWA and the APA by failing to adequately consider access issues.

- The Corps violated the ESA by failing to consult NMFS.

- The Corps violated the CWA and the APA by sanctioning Sea Island Acquisition's permit violations.

- The Corps violated NEPA and the EPA for failing to conduct a public hearing.

For their part, Defendants seek summary judgment on all of these claims.

The first four claims were considered by the Court in denying Plaintiffs' request for a preliminary injunction. While the Court borrows in large part from its prior analysis, it has carefully reconsidered and reevaluated each argument anew. That said, Plaintiffs have not set forth any new legal argument nor have they pointed to any other part of the Administrative Record that would

compel a different result here; thus, Defendants are entitled to summary judgment on those claims. The Court finds Defendants are entitled to summary judgment on the remaining claims as well.

### A.   The Corps' "Hard Look" and Failure to Issue an EIS

NEPA has "twin aims." Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 97 (1983). First, it requires an agency "to consider every significant aspect of the environmental impact of a proposed action." Id. (quotation omitted). Second, it requires the agency to "inform the public that it has indeed considered environmental concerns in its decisionmaking process." Id. (citation omitted). As previously explained, a federal agency prepares an EA (Environmental Assessment) to determine whether the environmental impact of the proposed action is significant enough to warrant an EIS. If the EA shows the proposed project will not have any significant environmental impact, as is the case here, the agency issues a FONSI. The agency is required to make a convincing case in support of its FONSI determination.

In evaluating the Corps' decision in this regard, the APA requires courts to give substantial deference to the Corps, "not only when reviewing decisions like what evidence to find credible and whether to issue a FONSI or EIS, but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue." Ga. River Network v. U.S. Army Corps of Eng'rs, 2012 WL 930325, at

*11 (S.D. Ga. Mar. 19, 2012) (quoting Sierra Club v. Van Antwerp, 526 F.3d 1353, 1361 (11th Cir. 2008)); Marsh, 490 U.S. at 376 (stating that a FONSI is a factual determination which "implicates substantial agency expertise" and is entitled to deference).   As stated by the Eleventh Circuit, the court's ultimate task is to "'ensure that the agency took a "hard look" at the environmental consequences of the proposed action.'"   Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1288 (11th Cir. 2015) (quoting Sierra Club, 295 F.3d at 1216).   In doing so, "the court cannot interfere with the agency decision made within its statutory discretion."   See S. La. Envtl. Council, Inc. v. Sand, 629 F.2d 1005, 1011 (5th Cir. 1980).   Also, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."   Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).   In this way, "NEPA merely prohibits uninformed-rather than unwise-agency action."   Id. at 351.   Importantly, the court can only find a federal agency's attempted NEPA compliance inadequate where it is arbitrary, capricious, or an abuse of discretion.   Van Antwerp, 526 F.3d at 1361.

The Eleventh Circuit has set forth four criteria to be considered in determining whether the Corps' decision not to prepare an EIS was arbitrary and capricious:

21

(1)  The Corps "must have accurately identified the relevant environmental concern";

(2)  The Corps "must have taken a "'hard look' at the problem in preparing the EA";

(3)  If a FONSI is made, the Corps "must be able to make a convincing case for its finding"; and

(4)  If the Corps finds "an impact of true significance, preparation of an EIS can be avoided only if the [Corps] finds that changes or safeguards in the project sufficiently reduce the impact to a minimum."

Hill v. Boy, 144 F.3d 1446, 1450 (11th Cir. 1998) (quoted sources omitted).[16]

In this case, Plaintiffs have focused on two principal environmental concerns or impacts at which they contend the Corps

---

[16]  Additionally, the applicable federal regulations provide ten factors to consider whether an environmental impact is significant, including the following factors brought into play by Plaintiffs' claims:

- Unique characteristics of the geographical area;
- The degree to which the possible effects on the human environment are likely to be highly controversial;
- Whether the action is related to other actions with individually insignificant but cumulatively significant impacts; and
- The degree to which the action may adversely affect an endangered or threatened species or its habitat.

40 C.F.R. § 1508.27(b).

failed to take the requisite hard look.[17]   These concerns involve downdrift erosion and harm to wildlife.

1.   Downdrift Erosion

Plaintiffs complain that the Corps did not take the requisite "hard look" at the effect of the new groin on downdrift erosion, particularly erosion of the Spit, south of the proposed new groin.

To address the erosion issue from the outset, Sea Island Acquisition attached an expert report to its Permit Application titled "Sea Island Beaches: Shoreline Dynamics and History of Erosion-control Projects," written by Dr. George F. Oertel and Dr. David Basco in 2015.  (Oertel/Basco Report, AR at 1973-2037.)  This report explained that prior to the construction of the Northern and Southern Groins, Sea Island was hard armored with revetments by private landowners, but while the revetments halted the shoreline retreat, the beach continued to erode.  By the late 1980's there was no high tide beach for many areas of Sea Island. Oertel and Basco further explained that the existing beach was the result of the construction of the groins and a beach nourishment project where sand was pumped from an offshore source onto the area between the two groins.  Thus, the sand present between the

---

[17]   It bears reiterating that Plaintiffs have the "heavy burden" of showing that an agency action is arbitrary and capricious.  See St. Johns Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, --- F.3d ---, 2020 WL 2735208 (M.D. Fla. May 26, 2020) (quoted and cited sources omitted).

existing groins was not captured and prevented from drifting down the beach. Further, recession of the shoreline area south of the existing groins is due to the lack of shoreline protection, not from the existing groins. In fact, Oertel and Basco suggested that the tapered effect of the shorter proposed groin should aid in the transition of sand back to the natural beach.

In their comment letters, however, Plaintiffs pointed out several sources of expert information explaining that groins cause downdrift erosion by trapping material such as sand and silt. Plaintiffs presented the expert testimony of Dr. Robert S. Young and Chester W. Jackson, Jr., who opined that the existing groins caused dramatic rates of erosion and similar erosion could be expected from the proposed groin. (Greenlaw's Comment Ltr. of Jan. 15, 2016, AR at 2038-2140.) They also present the expert report of Dr. Bret M. Webb who offers similar conclusions. (SELC Comment Ltr. of Jan. 15, 2016, AR at 2141-2182.)

In response, the Corps turned to Mr. Kevin Conner, a coastal engineer, to independently review "reports document[ing] the history of shoreline change on Sea Island and the potential for the Project to result in erosion of downdrift shorelines." (MFR, AR at 288.) Mr. Conner reviewed (1) the Oertel/Basco Report; (2) Greenlaw's Comment Letter of Jan. 15, 2016, which included the expert reports of Drs. Young and Jackson, a Coastal Scientist Statement on Groin Impacts, and Georgia Department of Natural

24

Resources and USFWS comments regarding the Project; (3) the SELC

("Southern Environmental Law Center") Comment Letter of Jan. 15,

2016, which included the expert report of Dr. Webb; (4) the

comprehensive response to Public Comments from Resource and Land

Consultants (on behalf of Sea Island Acquisition), which includes

various reports and studies; and (5) the SELC's Comment Letter of

February 28, 2017.[18]   (See AR at 1971-72 with attachments AR at

1973-2037; AR at 2038-2140; AR at 2141-2182; AR at 2183-2371; and

AR at 2372-2394, respectively.)  After review, Mr. Conner conceded

the Sea Island Spit is "sand starved and eroding as a result of

the hardening of the northern portion of the island and the

construction of the two T-head groins."  (AR at 1970.)  However,

in consideration of the proposed new groin, Mr. Conner opined that

it would not increase erosion downstream.  He stated: "It is

unlikely that the construction of a new shorter groin just south

of the existing southern groin will interrupt sediment transport

---

[18]   Plaintiffs complain at great length that the Corps did not
provide to Mr. Conner for review the attachments to this SELC
letter, and thus, his review was incomplete.  To the extent this
is accurate, the omission is not clear error.  First, the 23-page
SELC Letter that he did review thoroughly summarizes and analyzes
the expert testimony and reports in the missing attachments.
Second, this expert information pre-dates Sea Island Acquisition's
amended plan to dredge offshore and fill 17,000 linear feet of
beach.  Third, the Corps analyzed the letter as well as the
attachments.  Finally, Plaintiffs fail to point to any specific
information not considered by Mr. Conner that would have altered
his analysis.

in any measurable way under the current system."[19] (Id.)  Mr. Conner
then recommends that the construction of the groin be accompanied
by "planned fill placement" and a monitoring program.  (Id.)

As the Court has noted previously, when experts have
conflicting views, "an agency must have discretion to rely on the
reasonable opinions of its own qualified experts even if, as an
original matter, a court might find contrary views more
persuasive."  (See Order of Dec. 10, 2018, at 25 (quoting Marsh,
490 U.S. at 378).)

Moreover, many of the expert reports or testimony did not
take into account Sea Island Acquisition's expansion of the Project
to nourish more than three miles of Sea Island shoreline, which
was not proposed until March 2018.  With respect to the Project as
amended, Sea Island Acquisition presented supplemental reports
from Dr. Timothy W. Kana and Dr. David R. Basco.  (See generally
Sea Island Acquisition Resp. to SELC's Comment Ltr. of Jun. 18,
2018, AR at 4105-4386.)  Dr. Kana opined that the volume of sand
infused into the Project area will be in excess of the trapping
capacity of the existing groin and the proposed new groin.  Thus,
the "resulting bypassing sand will reduce the underlying (i.e.
historical) erosion rate for the area" south of the proposed groin.

---

[19]  The Corps points out in the MFR that the area between the
Southern Groin and the new proposed groin represents only an 8%
increase.  (MFR, AR at 235.)

Dr. Basco provided similar opinions.  Also, Dr. Kana noted that the Spit area "has experienced highly variable rates of change since the mid-1980s. . . . These variable changes do not correlate with the timing of nourishment and construction of the south groin in 1991." (See id. at 4115-4120.)

Ultimately, the Corps determined that the introduction of 1.3 to 2.5 million cubic yards of sand from an offshore source is likely to "allow the beach between the groins to eventually reach an equilibrium state and thus allow some sand to bypass the groins and travel downdrift to the [S]pit." (MFR, AR at 235.)  The Corps also noted that the low profile of the proposed groin "would allow sand to pass over and around the structure," and the granite armor stone will allow "sand to pass through the structure." (Id. at 262.)  Importantly, the Corps imposed a requirement that Sea Island Acquisition monitor sand movement within the Southern Groin and proposed new groin and downdrift from the new groin. (Id. at 235.) If the results of the monitoring indicate that the proposed groin is trapping sand, Sea Island Acquisition would be required to submit a correction action plan. (Id.)

In consideration of the MFR as outlined here, the Court concludes that the Corps accurately identified the relevant environmental concern of downdrift erosion, took a "hard look" at the problem in preparing the EA, and made a convincing case through its expert and the utilization and reliance upon the beach

27

nourishment and monitoring plans to determine that the adverse impact on the sand-sharing system was not significant.   The Corps' decision in this regard was not arbitrary and capricious.

2.   Harming Wildlife

In processing Sea Island Acquisition's permit application, the Corps requested the analysis of the USFWS and NMFS because of the Project's possible impact on wildlife.  (AR at 1141-42; AR at 1904-1966.)   Specifically, the Corps called upon these agencies to evaluate the effects upon sea turtles and the piping plover as required under the ESA and the Magnuson-Stevens Fishery Conservation and Management Act,[20] 16 U.S.C. §§ 1801 *et seq.*

On April 20, 2018, the NMFS responded, voicing the following concerns "particularly with regard to impacts from the proposed shoreline armoring":

> Hard stabilization structures lead to a wide range of adverse environmental impacts resulting from permanent alteration in natural shoreline processes including larval transport and sediment transport.  The placement of the proposed hardened structure will result in the permanent loss of unconsolidated bottom habitat directly underneath the proposed structure and accelerated erosion of downdrift habitat.  The close spacing of the proposed groin with the existing groin may create a trap for pelagic eggs and larvae of managed species and their prey.

---

[20] Congress enacted the Magnuson-Stevens Act to respond to overfishing and "inadequate conservation measures which were threatening future commercial and recreational fishing, as well as the very survival of species." Ace Lobster Co. v. Evans, 165 F. Supp. 2d 148, 154 (D.R.I. 2001) (quoted source omitted).

Accordingly, the NMFS provided the following conservation recommendations ("CR"): "(1) The T-head groin portion of the proposed action should not be permitted[; and] (2) To the extent practicable, work should be limited to seasonal periods of low biological activity." (NMFS Ltr. of Apr. 20, 2018, AR at 4102-4104.)

On July 17th, the Corps responded, stating that it would not follow CR1 but would follow CR2. (Corps Ltr. of Jul. 17, 2018, AR at 926-928.) The Corps justified the reasons for not following CR1 as follows: "[T]he footprint of the project (i.e. the groin and beach nourishment activities) represents a relatively small area of habitat . . . that is utilized" by the species at issue, and "ample habitat is located both upstream and downstream of the project site that these species could relocate to." (Id. at 926.) Moreover, the Corps explained and iterated the reasoning of Mr. Conner and Sea Island Acquisition's experts that the "small proposed increase in the groin field is not expected to more than minimally exacerbate ongoing erosion of the [S]pit." (Id. at 927.) The Corps also explained about the "tapering effect" of the smaller proposed groin and about the anticipated equilibrium state caused by the added sand that will allow some sand to bypass the groins and travel downstream to the Spit. (Id.)

Although not satisfied with the analysis of the Corps in its July 17th letter, and persisting with its recommendation not to

29

permit the new proposed groin, the NMFS nevertheless decided not to "further elevate the decision" and noted that the Corps had complied with the Magnuson-Stevens Act. (NMFS Ltr. of Jul. 27, 2018, AR at 837-838.)

The USFWS responded to the Corps' request for evaluation on May 22, 2018. (USFWS Ltr. of May 22, 2018, AR at 1211-1214.) Therein, the USFWS notes that the Project includes a supplemental Biological Assessment (provided by Sea Island Acquisition) with "measures to avoid and minimize impacts." The USFWS concluded that because these proposed measures are included in the Project, it concurred with the Corps' determination that the Project "may affect, but is not likely to adversely affect" the relevant species. (Id.)

At summary judgment, Plaintiffs take issue with the Corps' determination that the Project will not likely adversely affect the piping plover or the sea turtle because it did not take the requisite "hard look" at the impact the Project would have on these species.

    a.  Piping Plover Habitat

With respect to the piping plover, the Corps made the following determinations in the MFR. The piping plover prefers uninhabited areas of the shoreline (i.e., away from human interaction) and are therefore found primarily at the northern and

southern ends of inhabited islands. (MFR, AR at 267-268.)

Continuing, the Corps stated:

> According to the [Biological Assessment], "due to the Sea Island development, high usage, and high traffic, piping plover usage near and within the proposed project area is expected to be low." Regarding piping plover critical habitat, **the listed critical habitat is located outside the project site.** Therefore there would be no direct effect to critical habitat. Indirectly, continued erosion of the [S]pit could result in adverse effects to listed critical habitat. However, . . . the proposed project would not increase erosion of the [S]pit in any measurable amount. Therefore, the Corps has determined that the project would have no effect on piping plover critical habitat.

(Id. at 268 (emphasis added).)

Plaintiffs complain that the Corps incorrectly concluded that the Project area did not include the critical habitat of the piping plover, and therefore, it failed to make a convincing case that no significant impact might result requiring an EIS. The critical habitat of the piping plover is textually described in the Federal Register as "starting just south of the [Southern Groin] and extends south of Gould's Inlet." Endangered & Threatened Wildlife and Plants; Final Determination of Critical Habitat for Wintering Piping Plovers, 66 Fed. Reg. 36,038-01, 36,099 (Jul. 1, 2001). Noting that distances and areas listed in the Federal Register are approximated, see id. at 36,086, Defendants counter that the designation of "just south" of the Southern Groin is too unspecific to place the piping plover's critical habitat within the Project area. Moreover, Defendants

31

point out that the Project Area is not suitable for the piping plover because it is close to a beach access point with high levels of disturbance; it has little to no beach above the high tide mark; and the narrow beach is backed by high vegetation-covered dune, which is less favorable to the piping plover who prefer more open beaches. (AR at 3492-3493.)  In recognition of this, the Corps found that the piping plover prefers the northern and southern ends of inhabited islands, and thus, their use of the Project area is low.  Moreover, the Corps analyzed the potential impact of the Project upon the critical habitat of the piping plover north and south of the Project area and determined in sum that the impact would not be significant because the Project would not increase the erosion of the Spit in a measurable amount.

Thus, in consideration of the Corps' findings in the MFR as outlined here, the Court concludes that the Corps accurately identified the relevant environmental concern of the piping plover's habitat, took a "hard look" at the problem in preparing the EA, and made a convincing case that the adverse impact upon their critical habitat on Sea Island was not significant.  The Corps' decision in this regard was not arbitrary and capricious.

b. Pelagic Eggs and Larvae of Managed Species

With regard to sea turtles and their eggs and hatchlings, the Corps made the following determinations in the MFR.  The Corps observed that the current area between the proposed groin and the

32

Southern Groin experiences erosion that limits the available beach for turtle nesting.  Thus, the creation of a dune field in this area through the proposed Project, as well as repair to the dune field between the existing groins, would add dry sand beach for turtle nesting.  (MFR, AR at 266-267.)  It also pointed out that the Sea Island Sea Turtle Program, operated through the Georgia Department of Natural Resources, Wildlife Resources Division, has an established protocol to patrol the island during nesting season and hatchling season and to relocate sea turtle nests that are subject to inundation by the tide to dry sand beach.  Thus, the chance of a sea turtle hatchling becoming trapped or preyed upon at the groin would be minimal.  (Id.)  Finally, the Corps required work on the Project to be performed outside of sea turtle nesting season.  (Id.)

Plaintiffs contend that the Corps ignored NMFS's stated concern that "the close spacing of the proposed groin with the existing groin may create a trap for pelagic eggs and larvae of managed species and their prey."  (NMFS Ltr. of Apr. 20, 2018.)  This assertion, however, is belied by the record.  The Corps addressed the concern but concluded it was not significant because the footprint of the project was small and there was ample habitat located both upstream and downstream for relocation.  (Corps Ltr. of Jul. 17, 2018.)  Here, Plaintiffs focus on the fact that NMFS did not think the Corps' response was adequate or complete.  (See

33

NMFS Ltr. of Jul. 27, 2018.)  In Plaintiffs' estimation, the fact that NMFS had unaddressed concerns requires a finding that the Corps did not make a convincing case of no significant impact. The Corps, however, is not bound to follow the recommendations of NMFS.  It is only required to show that it fully considered and addressed NMFS's concerns.

Upon consideration of the Corps' findings in the MFR as outlined here, the Court concludes that the Corps accurately identified the relevant environmental concern of the effect on sea turtles, took a "hard look" at the problem in preparing the EA, and made a convincing case that the adverse impact upon the sea turtles was not significant.  The Corps' decision in this regard was not arbitrary and capricious.

In their NEPA claim, Plaintiffs contend that the Corps failed to make a convincing case that no significant environmental impacts might result.  Thus, an EIS was required.  Here, Plaintiffs return to their arguments that their experts provided convincing and conclusive analysis that demonstrated the Project would significantly increase erosion on the Spit and would harm federally protected wildlife.  Plaintiffs also point to the uniqueness of Sea Island as a habitat for over ten threatened and endangered species.  Plaintiffs complain that the Corps simply rubber-stamped Sea Island Acquisition's experts' opinions to the contrary.  Or, at the very least, Plaintiffs' experts created enough debate or

conflict that the Corps should have found significant impact might result.

In considering whether an EIS is warranted, the Court must assess the Corps' FONSI determination. A FONSI determination must be supported by a statement of reasons and evidence, not merely conclusions. As discussed above, the Court has found that the Corps took a "hard look" at the environmental impacts of the Project and supported their finding of no significant impact by expert testimony and evidence as well as their own analysis of the same. It must be noted that much of Plaintiffs' evidence and expert opinions upon which they rely to create the debate or conflict over the environmental impacts pre-dates the amended application which called for the nourishment of 17,000 linear feet of beach. The Corps' assessment of environmental impacts takes this into account. In reviewing its assessment, the Court is reminded that a FONSI determination "implicates substantial agency expertise" and is entitled to deference. See Marsh, 490 U.S. at 376; see also Fund for Animals, Inc., 85 F.3d at 547 ("'[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive.'" (quoting Stryker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227 (1979))). Giving appropriate deference to the Corps'

expertise and in light of the Corps' reasoned analysis of the environmental impacts, the Court cannot conclude that the Corps' determination that there are no significant environmental impacts is arbitrary and capricious. In sum, the Corps took the requisite hard look at the Project and its Environmental Assessment supported the Corps' issuance of a FONSI.   Accordingly, an EIS was not necessary.

### B.   Cumulative Impacts

Both the CWA and NEPA require the Corps to evaluate the cumulative effects of a project before granting a permit.   See C.A.R.E. Now, Inc. v. FAA, 844 F.2d 1569, 1574 (11th Cir. 1988) ("NEPA requires that a federal agency examine not only the impact directly attributable to one project, but also the cumulative effects of that project."); 40 C.F.R. § 230.11(g) (listing "cumulative effects on the aquatic ecosystem" as a factual determination that must be made regarding any proposed discharge under the Clean Water Act).   "Cumulative effects are defined to be the impact on the environment which results 'from the incremental impact of the action when added to other past, present, and reasonably foreseeable further actions regardless of what agency (federal or non-federal) or person undertakes such other actions.'"   C.A.R.E. Now, 844 F.2d at 1574 (quoting 40 C.F.R. § 1508.7).

Plaintiffs contend that the Corps failed to consider the impacts of other existing and reasonably anticipated shoreline stabilization or nourishment projects in the coastal region. In this regard, Plaintiffs argue that the Corps should have expanded its geographic scope in its analysis of the Project's effect on the environment.

In the MFR, the Corps explained that the geographic scope of its assessment included the entire shoreline of Sea Island, portions of Gould's Inlet and the Hampton River, and portions of the adjacent island of St. Simon's Island (including East Beach), as well as the ocean waters and seafloor offshore of the borrow site. (MFR, AR at 289.) The Corps identified three major areas of concern including water quality, aquatic organisms and wildlife, and the sand-sharing system. (Id. at 290-292.) Finally, the Corps examined changes to the area from 1980 through 2023 and the impacts from past beach nourishment projects and the existing groins. (Id. at 289.) In doing so, the Corps determined that the "incremental contribution" from the Project "in relation to the overall impacts from past, present, and reasonably foreseeable future activities" is not significant. (Id. at 293.) More specifically, the Corps found that any potential impact, both individually and cumulatively, would be minimal with respect to water quality, aquatic organisms and wildlife, and the sand-sharing system because of the short-term and localized nature of sediment

suspension effects attributable to sand dredging and placement, the shorter new groin and design, and the imposition of monitoring requirements. (Id. at 290-294; see also Order of Dec. 10, 2018, at 21-26.)

Agencies must be given deference in how they define the appropriate geographic scope of a cumulative impact analysis. See Ga. River Network v. U.S. Army Corps of Eng'rs, 334 F. Supp. 2d 1329, 1343 (N.D. Ga. 2003) ("Identification of the geographic area for an environmental assessment 'is a task assigned to the special competency of the appropriate agencies.'" (quoting Kleppe v. Sierra Club, 427 U.S. 390, 414 (1976))). In this case, the Court has already determined that the Corps examined, considered, and supported its findings respecting the environmental impacts of the Project. These findings reveal that the Corps went outside the Project area to consider the environmental impacts to Sea Island as a whole. It is also apparent that the Corps considered how the Project fit into the past, present and future beach nourishment and erosion-control efforts. While Plaintiffs attack the scope of these findings, they do not identify any particular other project, impact or geographical area that the Corps should have considered. In short, Plaintiffs have failed to carry their burden to demonstrate that the Corps' cumulative impacts analysis was arbitrary or capricious.

## C.  Practicable Alternatives

The CWA mandates that a discharge permit may not be issued if there is a less environmentally damaging practicable alternative. See 40 C.F.R. § 230.10(a).  A "practicable alternative" is one that "is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of the overall project purposes." 40 C.F.R. § 230.10(a)(2).

At the preliminary injunction phase and at summary judgment, Plaintiffs focus on the testimony of Dr. Webb and Dr. Young, who testified that beach nourishment without a groin is a less damaging practicable alternative to beach nourishment with a groin. Plaintiffs complain that the Corps "summarily dismissed this alternative *without any analysis*." (Pls.' Mot. for Summ. J., Doc. 68, at 16 (emphasis in original).)  As previously explained by the Court, this alternative was thoroughly analyzed in Sections 4.0 and 5.0 of the MFR.  (See Order of Dec. 10, 2018, at 8-11.)  In fact, the Corps analyzed three alternatives that involved beach nourishment without the proposed groin.

As to On-Site Alternative 6 - beach nourishment from the existing Southern Groin to the proximal end of the Spit - the Corps found it to be outside the scope of the Project because it would not meet the overall Project purpose to protect upland lots and development located along the shoreline of Sea Island from storm damage.  (MFR, AR at 258.)  Moreover, there is no development nor

potential for development in the upland property that is bounded by the conversation easement of the Spit; thus, the purpose of the Project is not served in this area. (Id.) Finally, Dr. Basco testified that the storm protection provided by this alternative would only be temporary. (See Order of Dec. 10, 2018, at 8-10.) The Corps therefore concluded this alternative is not practicable. (MFR, AR at 258.)

The Corps also analyzed On-Site Alternatives 4 & 5, which both involved beach nourishment without adding the proposed groin. On-Site Alternative 4 consisted of relocating the existing Southern Groin to the site of the proposed groin and renourishing the beach. (Id. at 257.) The Corps found this to be a practicable alternative, but not the least damaging one, because by removing the Southern Groin, "it is likely that it would result in the sand bypassing the southern end of Sea Island and potentially jetting the sand offshore and completely out of the sand[-]sharing system." (Id. at 261.) Thus, this alternative was not environmentally preferable. (Id.) On-Site Alternative 5 consisted of removing the Southern Groin altogether and renourishing the beach. The Corps found this not to be a practicable alternative because "without the [S]outhern [G]roin[,] any sand placed along the shoreline . . . would disseminate downdrift quickly" and result in only temporary storm protection. (Id. at 257.) Long term, the result is "erosion of a portion of the existing storm protection"

and "adverse effects to sea turtles through erosion of nesting habitat." (Id. at 258.)

In short, the Corps did analyze Plaintiffs' preferred alternative of beach nourishment without constructing the proposed groin, but it did not find a less environmentally damaging practicable alternative that served the Project's purpose of protecting upland lots from storm damage.

In reply, Plaintiffs complain that the Corps failed to conduct an independent analysis of practicable alternatives and instead simply agreed with the analyses of the applicant, Sea Island Acquisition. The record shows, however, that the Corps' practicable alternative analysis was broader than the analysis submitted by Sea Island Acquisition in that it evaluated more alternative possibilities. For instance, the Corps evaluated a "No Action" alternative where a bulkhead in the landward/upland portion of the Corps' jurisdiction would be placed and an On-Site Alternative where a nearshore berm would be placed in shallow water just off the beach. (Compare MFR, AR at 255-258 with Sea Island Acquisition's Permit Application, AR at 3487-3488, and Amended Permit Application, AR at 1705-1710.)

Based upon the foregoing, Plaintiffs' contentions that the Corps did not adequately or independently analyze practicable alternatives are belied by the record. Thus, Plaintiffs have failed to establish that the Corps acted arbitrarily or

capriciously in analyzing "practicable alternatives" to Sea Island Acquisition's proposed plan.

D. **Public Access**

Plaintiffs contend that the Corps violated the CWA by failing to consider that the proposed groin would reduce beach access in violation of 33 C.F.R. § 320.4(g)(3). In particular, Plaintiffs claim that the Corps failed to consider the groin's interference with access by foot to the beach in front of the Reserve, i.e., the beach between the proposed groin and the Southern Groin, especially because beach walkers cannot cross the groin at high tide without trespassing on the groin.

Section 320.4(g)(3) states that projects should "generally be denied" if they create "undue interference with access to, or use of, navigable waters" for "riparian landowners." Section 320.4(g)(3) focuses on the need for the agency to consider a riparian landowner's, not the general public's, ability to access the navigable waters. Stated another way, Section 320.4(g)(3) does not convey unfettered beach access to the general public; instead, it only ensures that a permit application decision will secure the "general public's right of navigation on the water surface."

In this case, the Corps recognized the general public's interest protected by Section 320.4(g)(3) in finding that the Project does not interfere with the unfettered right for any person

to land a boat on the beach at Sea Island.[21]   (MFR, AR at 240.)
Accordingly, the Corps considered access, and its analysis of the
same was not arbitrary or capricious.

### E.   Failure to Consult NMFS

Plaintiffs[22] claim the Corps violated the Endangered Species
Act ("ESA") because it failed to consult NMFS as required by
Section 7 of the ESA after Sea Island Acquisition expanded the
Project to include offshore dredging and beach nourishment.
Defendants contend that Plaintiffs' ESA claim is moot, and if it
is not moot, the Corps fully complied with the ESA before issuing
the Permit.   Because the Court concludes that the ESA claim is
moot, it need not reach its merits.

A claim is moot when "events subsequent to the commencement
of a lawsuit create a situation in which the court can no longer
give the plaintiff meaningful relief . . . ."   Fla. Ass'n of Rehab.

---

[21]   Responding to the public's concern about access, Sea Island
Acquisition noted that there is no public access to the beach on
Sea Island by land.   (MFR, AR at 240.)   Rather, the public gains
access to the beach by approaching by kayak, for example, from a
nearby creek or river and landing to walk along the beach.   In
recognizing that the State of Georgia owns the beach below the
mean high water mark, Sea Island Acquisition stated that there
would be "no effort to interfere with that use" before or after
construction.   (Id.)

[22]   Plaintiff CSC did not include an ESA claim in its operative
complaint.   (See Doc. 60.)   Rather, this claim appears in the
operative complaint of Plaintiffs ARK, One Hundred Miles and
Surfrider Foundation.   (See Doc. 59, ¶¶ 152-62.)

Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs., 225 F.3d 1208, 1217 (11th Cir. 2000).  In other words, when the issues in a case are no longer "live," the case is moot.  See Powell v. McCormack, 395 U.S. 486, 496 (1969).  Ultimately, the mootness doctrine is grounded in the question of whether the court can effectively provide the relief a plaintiff seeks based on the issues before it.  See 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3533.1 (3d ed. 2008).

A detour here is necessary to reexamine Plaintiffs' ESA claim against the Corps.  Plaintiffs' fifth claim alleges that the Corps violated the ESA and APA by failing to consult with NMFS on the Project. (See Pls.' Sec. Am. Compl., Claim Five.)  While Plaintiffs base their claim on both the ESA and the APA, the APA is inapplicable here.  See W. Watersheds Project v. Kraayenbrink, 632 F.3d 472, 497 (9th Cir. 2011) ("[T]he APA applies only where there is 'no other adequate remedy in a court,' 5 U.S.C. § 704, and – because the ESA provides a citizen suit remedy – the APA does not apply in such actions."); see also Bennett v. Spear, 520 U.S. 154, 161-62 (1997) ("[T]he APA by its terms independently authorizes review only when 'there is no other adequate remedy in a court.'" (quoting 5 U.S.C. § 704)).  The remedy available under the ESA's citizen suit provision is injunctive relief.  See 16 U.S.C. § 1540(g)(1)(A).

Returning to mootness, Defendants' argument frames Plaintiffs' ESA claim as an "assertion that the Corps incorrectly determined that the offshore dredging and nourishment was adequately covered by the 1997 SARBO . . . ."[23] (Doc. 82, at 17-18.) The South Atlantic Regional Biological Opinion, or SARBO, is a document issued by NMFS in response to the Corps' request for consultation pursuant to Section 7 of the ESA. (See South Atlantic Regional Biological Opinion for Dredging and Material Placement Activities in the Southeast United States (2020 SARBO), PDF available at https://www.fisheries.noaa.gov/content/endangered-species-act-section-7-biological-opinions-southeast (last visited Sept. 25, 2020) (hereinafter, "2020 SARBO").) The 2020 SARBO, issued in March of 2020, operates as a "Programmatic Consultation," or a sort of continuing and preemptive ESA consultation between NMFS and the Corps. See 50 C.F.R. § 402.02 (defining "Programmatic Consultation").[24] The 2020 SARBO explains the particular risks

---

[23] Defendants also argue that dredging has been completed, making Plaintiffs' claim moot. While substantial dredging has taken place, Plaintiffs note that the Permit approves additional dredging beyond that already completed. Therefore, the claim is not moot on this basis.

[24] The relevant portion of Section 402.02 reads:

Programmatic consultation is a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the Services to consult on the effects of programmatic actions such as:

endangered species and their habitats face from the Corps' (and its permittees') activities along the coast of the southeastern United States.   It also provides for certain project design criteria, which "are the specific criteria, including the technical and engineering specifications, indicating how an individual project must be sited, constructed, or otherwise carried out . . . to be . . . covered under [the 2020 SARBO]." (2020 SARBO, at 13.)   The 2020 SARBO concludes with findings that the actions covered by the 2020 SARBO are "not likely to jeopardize the continued existence" of the endangered species in the project area.   (2020 SARBO, at 427.)

Apparently, the 1997 SARBO in effect at the time the Corps issued the Permit neither addressed the sort of activities contemplated in the Permit or in the expanded scope of the Project, nor applied to a geographic area encompassing Sea Island.  However, the 2020 SARBO considers precisely the sort of activities at issue in this case: dredging, sand mining in borrow sites, and beach

-----

(1) Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and

(2) A proposed program, plan, policy, or regulation providing a framework for future proposed actions.

This definition is a new addition to 50 C.F.R. § 402.02; it was added in August of 2019.  See Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation, 84 Fed. Reg. 44,976-01, 45,016 (Aug. 27, 2019).

nourishment along Georgia's coast.  (See id. at 1, 63.)  Defendants argue that Plaintiffs' ESA claims are therefore moot, as an order from this Court requiring further consultation with NMFS or declaring the Corps' reliance on the old SARBO insufficient would not amount to "real relief" as required by Article III.  Defendants rely on a number of cases where courts found later consultation with NMFS to have mooted challenges based on failure to comply with ESA Section 7.

In the cited cases,[25] the plaintiffs sought declaratory relief that the action agency violated the ESA, or injunctive relief requiring the action agency to reinitiate consultation with NMFS. The reasoning of these cases is that a court can only order a new consultation.  So, when an action agency consults with NMFS – even if during the pendency of the lawsuit – an order requiring consultation would be meaningless relief.  See, e.g., Rio Grande Silvery Minnow, 601 F.3d at 1112 ("[E]ven as to the [new biological opinion], a consultation injunction would be meaningless because the federal agencies already have consulted.")

---

[25]   The cases include: Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1111-12 (10th Cir. 2010); All. for the Wild Rockies v. U.S. Dep't of Agric., 772 F.3d 592, 600-01 (9th Cir. 2014); Voyageurs Nat'l Park Ass'n v. Norton, 381 F.3d 759, 765 (8th Cir. 2004); Sierra Club v. Van Antwerp, 526 F.3d 1353, 1359 (11th Cir. 2008); Defs. of Wildlife v. U.S. Dep't of Navy, 895 F. Supp. 2d 1285, 1311 & n.24 (S.D. Ga. 2012); Defs. of Wildlife v. Bureau of Ocean Energy Mgmt., Regul. & Enf't, 791 F. Supp. 2d 1158, 1170 (S.D. Ala. 2011).

None of the cases the parties cite dealt with Programmatic Consultations, and the Court was unable to locate any case considering mootness with respect to Programmatic Consultations. That said, there is no reason the rationale of the cited cases should not apply here. Any order requiring the Corps to consult NMFS again would be pointless because the 2020 SARBO exists as an ongoing consultation between the Corps and NMFS about the activities in the Permit. To the extent Plaintiffs are dissatisfied with the 2020 SARBO's substantive conclusions, such a challenge would have to be made against NMFS and not the Corps.

Because the Corps consulted with NMFS via the 2020 SARBO and even a late consultation satisfies ESA Section 7's mandate, Plaintiffs' ESA claim is moot, and summary judgment in Defendants' favor on this claim is appropriate.

**F.   2019 Permit Violations**

Plaintiffs claim that the Corps violated the CWA and the APA in essentially sanctioning Sea Island Acquisition's violations of the Permit as discovered by Plaintiff CSC in 2019. Specifically, Sea Island Acquisition violated the Section 404 Permit by: (1) building the groin longer than authorized; (2) building the dune larger than authorized; (3) placing dredged sand outside of the permitted project area, landward of the new groin cell[26]; (4)

---

[26]   The new groin cell refers to the area between the existing Southern Groin and the proposed new groin, i.e., the area known as the Reserve.

48

dredging in unauthorized locations and depths; and (5) failing to fill the new groin cell area to capacity.   On April 24, 2019, Plaintiff CSC sent a Notice of Intent to Sue letter to Sea Island Acquisition.  (NOI Ltr., AR at 5174-5192.)  In response, Sea Island Acquisition requested a permit modification pursuant to 33 C.F.R. § 325.7(b).[27]

The federal regulations provide for the modification, suspension or revocation of Corps permits.   33 C.F.R. § 325.7. Under this regulation, the Corps, through its district engineer, "may reevaluate the circumstances and conditions of any permit . . . on [its] own motion [or] at the request of the permittee . . . and initiate action to modify . . . a permit as may be made necessary by considerations of the public interest." 33 C.F.R. § 325.7(a).   However, if the modification would significantly increase the scope of the permitted activity, it will be processed as a new application under 33 C.F.R. § 325.2.  Id.  Factors to be considered by the [Corps] in reevaluation of a permit include "the extent of the permittee's compliance with the terms and conditions of the permit; whether or not circumstances relating to the authorized activity have changed since the permit was issued or extended . . .; . . . and the extent to which modification, suspension, or other action would adversely affect plans,

---

[27] The request for permit modification appears in the Administrative Record, AR at 5055-5146.

49

investments and actions the permittee has reasonably made or taken in reliance on the permit."[28]   Id.

In considering a modification request, the Corps shall hold informal consultations with the permittee "to ascertain whether the terms and conditions can be modified by mutual agreement." Id. § 325.7(b).   If mutual agreement is reached, the modification will become effective on a date set by the Corps.   Id.   Furthermore, the Corps "shall consult with resource agencies before modifying any permit terms or conditions[] that would result in greater impacts[] for a project about which that agency expressed a significant interest in the term, condition, or feature being modified prior to permit issuance."   Id.

---

[28] Defendants argue that the Corps was not required to consider these public interest factors because Sea Island Acquisition requested a modification under § 325.7(b), which does not contain these factors. (Fed. Defs.' Opp'n to Mot. for Summ. J., Doc. 81, at 42-43 (citing La. Crawfish Producers Ass'n W. v. Mallard Basin Inc., 2019 WL 171693 (W.D. La. Jan. 10, 2019)).   The Court, however, views subsection (b) as an offshoot of subsection (a), the procedural mechanism by which modifications (whether by request or Corps reevaluation) are to be processed.   Indeed, subsection (a) refers to modification requests of permittees and then requires that "[s]ignificant increases in scope of a permitted activity" will be treated as new applications and "not as modifications under this section."   33 C.F.R. § 325.7(a).   That said, the procedural mechanism for modifications does not require any rigid or express "check-the-box" consideration of these factors.   Rather, Section 325.7 requires the Corps' consideration of the public interest taking into account the listed factors.

In this case, Sea Island Acquisition requested modifications of the Permit. The Corps evaluated Sea Island Acquisition's responses to the alleged violations and found that in some respects Sea Island Acquisition had violated the Permit, but the Corps also found Sea Island Acquisition's responses reasonable. Through mutual agreement, the Corps granted the requested modifications to accommodate the violations. In essence, the Corps determined that Sea Island Acquisition's requested modifications were not significant enough to warrant a new application procedure. (See generally MFR for Permit Modification, AR at 4639-4647.)

Plaintiffs first take issue with the Corps' failure to consult with NMFS, an agency that had expressed a significant interest in the scope of the Project, particularly recommending that the proposed new groin not be built because of its impact on sea turtles. However, the MFR for the Permit modification demonstrates that the Corps considered the impact of the modifications on sea turtles and found no greater impact. (See id. at 4642.) Thus, the Corps' obligation to consult with NMFS on the modification request was not triggered. Moreover, further consultation with NMFS was unnecessary given the Project is subject to the mitigation requirements set forth in the 2020 SARBO, discussed *supra*. In

short, the decision not to consult NMFS about the modification requests was not arbitrary or capricious.[29]

Second, in referring to the Corps' handling of the modification requests as "rubber-stamping" Sea Island Acquisition's violations, Plaintiffs challenge the Corps' determination that the modifications are not significant enough to warrant a new application procedure. Section 325.7 gives the Corps great discretion. In fact, it allows the Corps to modify a permit in an abbreviated, informal manner. Mo. Coal. for the Env't v. Corps of Eng'rs of the U.S. Army, 678 F. Supp. 790, 799 (E.D. Miss. 1988) (holding that "the Corps' reevaluation regulation has no procedural mandates[] and vests broad discretion in [the Corps] to handle each proceeding as [it] sees fit"), aff'd, 866 F.2d 1025 (8th Cir. 1989), abrogated on other grounds by Goos v. Interstate Com. Comm'n, 911 F.2d 1283 (8th Cir. 1990); see also City of

---

[29] It is noteworthy that the Corps did consult with USFWS because the revised tilling and planting requirements for the nourished dunes and the request to use Reach C as an additional borrow area could potentially affect sea turtle nesting and shorebird habitat. (AR at 4653-54.) On June 21, 2019, USFWS stated that it had no objection to the Permit modification and the it would not change its concurrence with the Corps' ESA determination. (AR at 4650.)

Moreover, NMFS's primary area of concern was the proposed groin. It is undisputed that Sea Island Acquisition extended the length of the proposed groin but it is also undisputed that the extension was landward and buried under the nourished beach and constructed dune system, so that it would "tie-in" with the shoreline. Thus, it would have no impact on NMFS's stated concerns with the proposed new groin. Besides, the Corps removed the "tie-in" extension, mooting any potential impact resulting therefrom.

Olmstead Falls v. U.S. EPA, 233 F. Supp. 2d 890, 905 (N.D. Ohio 2002) (describing language of § 325.7 as "obvious[ly] discretionary"). Given this obvious discretion and the Court's deferential standard of review, Plaintiffs' obligation to show that the Corps' inferred finding that the modification was not significant enough to warrant a new application procedure is a heavy one. Here, despite Sea Island Acquisition's non-compliance, the Corps determined "that the proposed modifications [did] not change the determinations made in the Public Interest Review, 404(b)(1) analysis or cumulative impacts assessment performed during the evaluation of the original permit." (MFR, AR at 4646.) Based on the record with particular attention paid to the MFR for the Permit modifications, the Court does not find the Corps' decision to grant the requested modifications to be arbitrary and capricious.

G.   **Public Hearings**

Plaintiffs argue that the Corps violated the procedural requirements of the CWA by failing to provide any public hearings on the Project prior to issuance of the Permit. While the CWA provides that a permit may be issued "after notice and opportunity for public hearings," 33 U.S.C. § 1344(a), the statute does not mandate that the Corps itself hold its own public hearings, Fund for Animals, Inc., 85 F.3d at 545. Instead, "[t]he applicable regulations provide the Corps discretion to hold hearings on permit

53

applications on an 'as needed' basis." Id. (citing 33 C.F.R. §
327.4). Thus, the Corps has discretion not to hold a public
hearing if it is unnecessary to make a decision on a permit
application and "there is 'no valid interest to be served by
[holding] a hearing.'" Id. (citing 33 C.F.R. § 327.4(b)).

In this case, the Project was subject to an administrative
hearing under state regulatory proceedings. The testimony from
Plaintiffs' experts was submitted to the Corps and included in the
Administrative Record. (See AR at 3706-4065.) Further, the Corps
received 233 comments by 202 different individuals or entities in
response to the Permit application (see AR at 543-547), including
several technical experts who provided scientific analysis of Sea
Island Acquisition's technical reports (see, e.g., cite SELC and
Greenleaf). The comments made the Corps aware of the public's
issues and concerns. The Corps evaluated the comments and
requested additional information from Sea Island Acquisition based
on the concerns raised.

Of the 202 commenters, only 9 requested the Corps hold a
public hearing. (AR at 2684-2692.) However, the Corps determined
that no commenter provided specific information as to why a public
hearing would be necessary or would provide an opportunity to
present information the Corps did not already have or had not
already requested from Sea Island Acquisition. (AR at 543-547.)
Thus, a public hearing was unlikely to generate new information.

Accordingly, the Corps determined that no valid interest would be served by holding a public hearing on the proposed Project.  (Id.) Given the amount of information the Corps received from the comments, Sea Island Acquisition's responses thereto, and the administrative hearing, the Court finds the Corps did not act arbitrarily or capriciously in exercising its discretion to forego holding a public hearing prior to the issuance of the Permit.

Plaintiffs also contend that the Corps should have issued public notice for the opportunity to comment and held a hearing prior to authorizing the modification of the Permit in 2019.  As discussed above, Sea Island Acquisition requested a permit modification pursuant to 33 C.F.R. § 325.7(b).  This regulation does not provide for public notice, comment, or a hearing.

In this case, the Corps determined Sea Island Acquisition's request for modification was in the public interest, the Corps and Sea Island Acquisition were able to reach a mutual agreement on the terms of the modification, and the Corps authorized various modifications to the Permit.  The Court has concluded that the Corps' determination that the modifications did not significantly increase the scope of the permitted activity (so as to require a new application procedure) was not arbitrary nor capricious.  Thus, the Corps was not subject to the public notice requirements of 33 C.F.R. § 325.2 for the Permit modifications.

## VI.   CONCLUSION

Upon the foregoing, and having afforded the Federal Defendants the substantial deference that is required under the APA, the Court **GRANTS** their cross motion for summary judgment (doc. 81) on all of Plaintiffs' claims. Concomitantly, the Court **GRANTS** the cross motion for summary judgment filed by Sea Island Acquisition (doc. 82). Finally, the motions for summary judgment filed by Plaintiffs (docs. 68 & 70) are **DENIED**. The Clerk is directed to **ENTER JUDGMENT** against Plaintiffs and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 30ᵗʰ day of September, 2020.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA